DAVID J. MERRILL
David J. Merrill, P.C.
Nevada Bar No. 6060
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 566-1935
Facsimile: (702) 924-0787
Email: david@djmerrillpc.com

*Attorneys for Defendants AMG Services, Inc.; Red Cedar Services, Inc. dba 500FastCash; SFS, Inc. dba OneClickCash; Tribal Financial Services, dba Ameriloan, UnitedCashLoans, USFastCash, Miami Nation Enterprises*

*Additional Counsel Listed on Following Page*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                    Plaintiff,<br><br>        v.<br><br>AMG Services, Inc., et al.,<br><br>                    Defendants, and<br><br>Park 269 LLC, et al.,<br><br>                    Relief Defendants. | Case No.:  2:12-cv-536<br><br>**JOINT OPPOSITION AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF** |

1

*Additional Counsel*

2

3  ADAM S. HOFFINGER*
   BRADLEY S. LUI*
4  NICHOLAS G. MIRANDA*
   Morrison & Foerster, LLP
   2000 Pennsylvania Ave
5  Suite 6000
   Washington, DC  20006
6  Telephone: (202) 887-6924
   Facsimile:  (202) 887-0763
7  Email: AHoffinger@mofo.com
   (*Motion to permit appearance pending)
8

9  CONLY SCHULTE*
10 Fredericks Peebles & Morgan LLP
   3610 North 153rd Plaza
11 Omaha, Nebraska 68116
   Telephone: (303) 673-9600
12 Fascimile: (402) 333-4761
   Email: cschulte@ndnlaw.com
13 (*Motion to permit appearance pending)

14
   *Attorneys for Defendants AMG Services, Inc.; Red Cedar*
15 *Services, Inc. dba 500FastCash; SFS, Inc. dba*
   *OneClickCash; Tribal Financial Services, dba*
16 *Ameriloan, UnitedCashLoans, USFastCash, Miami*
   *Nation Enterprises*

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

I.     STATEMENT OF FACTS ....................................................................................... 3

       A.     Overview ...................................................................................................... 3

              1.     The Miami Tribe of Oklahoma and Its Entities............................... 4
              2.     The Santee Sioux Nation and Its Entity SFS, Inc............................ 7
              3.     The Modoc Tribe of Oklahoma and Its Entity Red Cedar Services,
                     Inc. .................................................................................................... 8

       B.     The Tribes' Online Loan Application, Funding, Payments and Collection
              Processes..................................................................................................... 10

              1.     Online Loan Application and The Loan Documents........................ 11
              2.     Loan Approval and Customizable Payment Schedules.................... 14
              3.     Collections....................................................................................... 18

II.    ARGUMENT ......................................................................................................... 20

       A.     Plaintiff is Not Entitled To A Preliminary Injunction ............................... 20

              1.     Legal Standard................................................................................. 20
              2.     The Plaintiff Has Not Demonstrated A Likelihood of Success on the
                     Merits............................................................................................... 21
              3.     The Equities Do Not Favor a Grant of a Preliminary Injunction ............. 38

       B.     Even If Preliminary Injunctive Relief Were Appropriate,
              Plaintiff's Proposed Preliminary Injunction Must Be
              Rejected Because It is Vague and Overly Broad........................................ 47

III.   CONCLUSION ...................................................................................................... 49

i

1

**TABLE OF AUTHORITIES**

2

CASES                                                                PAGE

3
4
*Am. Passage Media Corp. v. Cass Commc'ns Inc.,*
    750 F.2d 1470 (9th Cir. 1985) ................................................. 32, 39

5
*Anderson Bros. Ford v. Valencia,*
    452 U.S. 205 (1981) .................................................................. 36

6
7
*Archive Corp. v. Cipher Data Prods., Inc.,*
    No. SACV88296, 1988 WL 168533 (C.D. Cal. Dec. 21, 1988) ............ 44

8
*Atari Corp. v. Sega of Am. Inc.,*
    869 F.Supp. 783 (N.D. Cal. 1994) ............................................. 44

9
10
*Cal. v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987) .................................................................. 46

11
*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................. 47

12
13
*Cash Advance & Preferred Cash Loans v. State of Col.,*
    242 P.3d 1099 (Colo. 2010) ......................................................... 7

14
*Cmty. Blood Bank of the Kansas City Area, Inc. v. F.T.C.,*
    405 F.2d 1011 (8th Cir. 1969) .............................................. 21, 23

15
16
*Earth Island Inst. v. Carlton,*
    626 F.3d 462 (9th Cir. 2010) .................................................... 39

17
18
*F.T.C. v. Cyberspace.Com LLC,*
    453 F.3d 1196 (9th Cir. 2006) .................................................. 30

19
20
*F.T.C. v. Inc21.com Corp.,*
    745 F. Supp. 2d 975 (N.D. Cal. 2010) *aff'd*, No. 11-15330, __ Fed. App'x __, 2012 WL
    1065543 (9th Cir. Mar. 30, 2012) ............................................. 29

21
22
*F.T.C. v. Loanpointe,*
    No. 10-225, (C.D. Utah Feb. 16, 2011) ...................................... 40

23
24
*F.T.C. v. Payday Financial LLC,*
    No. 11-3017, (C.D. S.D. Sep. 6, 2011) ...................................... 40

25
26
*F.T.C. v. Stefanchik,*
    559 F.3d 924 (9th Cir. 2009) .............................................. 24, 25, 29

27
*Ford Motor Credit Co. v. Milhollin,*
    444 U.S. 555 (1980) .................................................................. 36

28

*FTC v. Landmark Clearing Inc.*,
   No. 11-00826 (E.D. Tex. Dec. 15, 2011) ..................................................................29

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
   739 F.2d 466 (9th Cir. 1984) ...................................................................................43

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
   531 F.3d 767 (9th Cir. 2008) ...................................................................................46

*Hauk v. JP Morgan Chase Bank USA*,
   552 F.3d 1114 (9th Cir. 2009) .................................................................................36

*Inyo Cnty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*,
   538 U.S. 701 (2003) ................................................................................................22

*Lamb–Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991) ...................................................................................49

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ...................................................................................20

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ................................................................................................20

*McClanahan v. State Tax Comm'n of Ariz.*,
   411 U.S. 164 (1973) ................................................................................................22

*Mont. v. Blackfeet Tribe of Indians*,
   471 U.S. 759 (1985) ................................................................................................46

*N.M. v. Mescalero Apache Tribe*,
   462 U.S. 324 (1983) ................................................................................................46

*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*,
   762 F.2d 1374 (9th Cir. 1985) .................................................................................40

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,
   636 F.3d 1150 (9th Cir. 2011) ............................................................................passim

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ...........................................................................47, 49

*S.E.C. v. Bankers Alliance Corp.*,
   881 F. Supp. 673 (D.D.C. 1995) ..............................................................................48

*S.E.C. v. Parkersburg Wireless LLC*,
   156 F.R.D. 529 (D.D.C. 1994) .................................................................................48

*Sac & Fox Nation of Mo. v. LaFaver*,
   905 F. Supp. 904 (D. Kan 1995) ........................................................................43, 47

*Segundo v. City of Rancho Mirage,*
    813 F.2d 1387 (9th Cir. 1987) ............................................................... 46

*Seneca–Cayuga Tribe v. Okla.,*
    874 F.2d 709 (10th Cir. 1989) ............................................................... 43

*Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200,*
    611 F.3d 483 (9th Cir. 2010) ............................................................... 39

*Stanley v. Univ. of S. Cal.*
    13 F.3d 1313 (9th Cir. 1994) ............................................................... 20

*Sw. Sunsites, Inc. v. F.T.C.,*
    785 F.2d 1431 (9th Cir. 1986) ............................................................... 24, 29

*Williams V. Lee,*
    358 U.S. 217 (1959) ............................................................... 22

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................... 20, 39, 42


STATUTES

15 U.S.C.
    § 44 ............................................................... 23
    § 45(a) ............................................................... 21, 24
    § 53(b) ............................................................... 20
    § 1631(a) ............................................................... 35
    § 1638(b) ............................................................... 35
    § 1640 ............................................................... 36

25 U.S.C.
    § 501 ............................................................... 5
    § 4301 ............................................................... 2, 23, 45
    § 4301(a) ............................................................... 45, 46


OTHER AUTHORITIES

12 C.F.R. § 1005.3(c) ............................................................... 38

12 C.F.R. § 1005.10, Suppl. I ............................................................... 38

12 C.F.R. § 1005.10(e) ............................................................... 38

12 C.F.R. § 1005.10(e) ............................................................... 38

12 C.F.R. § 1026, Suppl. I ............................................................... 36, 37

12 C.F.R. § 1026.17(a) ............................................................................................ 35

12 C.F.R. § 1026.17(b) ............................................................................................ 35

12 C.F.R. § 1026.17(c) ............................................................................................ 35

12 C.F.R. § 1026.18 ................................................................................................. 35

75 Fed. Reg. 60,810 (Oct. 1, 2010) ...................................................................... 3, 5

Glenda K. Harnad, *Power of Federal and State Governments in Matters Involving Indians*,
    41 Am. Jur. 2d Indians; Native Americans § 37 (2012) ...................................... 45

Jack E. Karns, *The Federal Trade Commission's Evolving Deception Policy*, 22 U. Rich. L.
    Rev. 399 (1988) .............................................................................................. 29, 31

Kelly D. Edmiston, *Could Restrictions on Payday Lending Hurt Consumers?*, Fed. Reserve
    Bank of Kan. City Econ. Review, First Quarter 2011, 63 ...................................... 10

Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for
    Reservation Tax Revenue*, 80 N.D. L. Rev. 759 (2004) ...................................... 4, 43

Michael L. Lawson, *Dammed Indians: The Pick-Sloan Plan and the Missouri River Sioux,
    1944-1980* (Univ. of Okla. Press, 2d ed. 1994) ................................................... 7

## INTRODUCTION

The Defendants[1] respectfully submit, by and through undersigned counsel, their Joint Opposition and Memorandum of Points and Authorities in Opposition to the Motion for Preliminary Injunction and Other Equitable Relief and Memorandum of Points and Authorities in Support ("Plaintiff's Motion"). The Federal Trade Commission ("FTC") fails to show under each of the relevant factors that it is entitled to the extraordinary remedy of a mandatory preliminary injunction.

The FTC fails to demonstrate a likelihood of success on the merits for each of the following reasons, among others:

1.      The FTC is not authorized to bring this action against the Tribal Lending Defendants who are arms of their respective federally-recognized Indian tribes.

2.      For over seven years, the Tribal Lending Defendants have provided millions of customers short-term loan solutions through their online lending operations. Although the FTC has been investigating Defendants' lending operations since 2008, the FTC has never questioned the practices of the Tribal Lending Defendants and has not sought a preliminary injunction against other online lenders it has targeted that have used virtually identical loan notes and payment terms.

3.      The loan terms and payment options offered by the Tribal Lending Defendants are not confusing, and the FTC's inability to convince any affiants to say otherwise is dispositive. In cases where the FTC has obtained preliminary injunctions, it has done so with overwhelming and consistent evidence of customer confusion, which makes the ruling on whether a practice is deceptive an easy decision. Here, the FTC offers no such evidence; less than 0.2% of the

---

[1]  Defendants Red Cedar Services, Inc. dba 500 FastCash ("Red Cedar"), SFS, Inc. dba OneClickCash ("SFS"), and Miami Nations Enterprises, dba Tribal Financial Services, dba Ameriloan, UnitedCashLoans, USFastCash ("MNE") are online short-term lending businesses wholly owned and operated by federally recognized Indian tribes (together, Red Cedar, SFS, and MNE are sometimes collectively referred to herein as the "Tribal Lending Defendants"). AMG Services, Inc. ("AMG") is a shared services provider that provides employee staffing and related services to the Tribal Lending Defendants and is also wholly-owned and operated by a federally-recognized Indian tribe (AMG and the Tribal Lending Defendants are sometimes herein collectively referred to as the "Defendants").

Defendants' ▌▌▌▌▌ of customers have filed complaints for any reason, and the FTC's own affidavits actually *prove* that the loan terms and payment options are not misleading.

4.      The Defendants do not engage in deceptive or improper collection tactics.  To the contrary, the Defendants employ and enforce strict debt collection protocols to ensure compliance with the law.

The FTC also fails to demonstrate any urgency requiring the extraordinary relief of a preliminary injunction.  Indeed, the Tribal Lending Defendants' businesses have been scrutinized by the FTC for the past four years.  During that entire period of review, the FTC never issued a direct request for information or documents, never contacted the Defendants, and never requested a Preliminary Injunction until now.  This significant delay in moving for injunctive relief vitiates any claim that relief is now urgent.

Finally, the equities weigh heavily against a preliminary injunction.  (And because the FTC has offered such a dearth of evidence to show that it is likely to succeed on the merits, the Court should give added weight to these equities as well.)  On one hand, the FTC fails to articulate any defined public interest.  On the other hand, enforcing the preliminary injunction would impose irreparable harm on the Defendants' businesses, deprive millions of customers of the financial products they use to meet their immediate needs, and deny three federally recognized Indian tribes the revenue they depend upon to fund basic necessities such as education, housing, early childhood development, and eldercare.  As recognized by the Ninth Circuit and codified by Congress in the Native American Business Development Act of 2000, 25 U.S.C. § 4301, these are "important" and "critical" federal interests.

For all of the reasons set forth below, Defendants respectfully request Plaintiff's motion be denied.[2]

---

[2] Undersigned counsel understands that additional defendants join in the arguments demonstrating Plaintiff's failure to justify injunctive relief.  These joinders will be memorialized in separate joinder motions that voice supplemental opposition points relative to the individual and remaining defendants.

## I.   STATEMENT OF FACTS

### A.   Overview

Each of the undersigned Defendants are arms of federally recognized Indian tribes.  *See Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 75 Fed. Reg. 60,810, 60,811-60,812 (Oct. 1, 2010).  AMG and MNE are arms of the Miami Tribe of Oklahoma (also known as the "Miami Nation").  SFS is an arm of the Santee Sioux Nation (formerly known as the "Santee Sioux Tribe of Nebraska").  And, Red Cedar is an arm of the Modoc Tribe of Oklahoma.

As arms of federally recognized Indian tribes, these Defendants provide necessary loans and associated services to over one million customers annually, a significant number of whom are repeat customers.[3]  MNE, SFS, and Red Cedar own several lending websites, and each fund, originate and own their respective loans.  AMG provides employee staffing and related services to the Lending Defendants.

The online short-term lending businesses are vital for these tribes.  AMG employs over 850 people who service the dynamic lending businesses owned by the Tribal Lending Defendants.[4]  All three tribes benefit immensely from revenue distributions that constitute important components of their respective tribal economies, and the growing capital within the lending businesses constitutes a significant long-term economic asset of the tribes.

Like any government, the Miami, Modoc, and Santee Sioux tribes each strive to develop their reservation economies in order to provide for the welfare of their people.  Unlike federal or state governments, however, and as a result of decades of failed paternalistic federal policies, the tribes lack a tax base to provide a revenue source to operate their government or fund essential governmental services for their people.  *See* Matthew L.M. Fletcher, *In Pursuit of Tribal Economic*

---

[3] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████   *See* Declaration of Natalie Dempsey
("Dempsey Decl.") ¶¶ 11, 12, TLDX 4 at 748.

[4] *Id.* ¶ 8, TLDX 4 at 748.

3

*Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 771-72 (2004). In order to achieve the objectives of developing their economies and providing for the critical needs of their members, the Miami, Modoc, and Santee Sioux tribes have been left to develop viable economic ventures to fund their governmental and social programs. *Id.* at 775.

Due to the forcible removal of the tribes from their ancestral homelands by the United States government, they have been unable to take advantage of economic opportunities available to other federally recognized tribes, such as tourism, energy, mining, agriculture, forestry, manufacturing, and gaming resorts. The advent of e-commerce and technologies related thereto, however, provided them with economic opportunities from which they can generate revenues despite their geographical isolation and remote locations. The Defendants capitalized on such opportunities and now fund many of the tribes' basic needs such as housing, education, early childhood development and elder care, and other essential governmental functions like tribal law enforcement using the revenue from these lending businesses.

### 1.    The Miami Tribe of Oklahoma and Its Entities

AMG and MNE are arms of the Miami Tribe of Oklahoma.[5] The Miami Tribe has a rich history, modern records of which date prior to the 1600s. Its ancestral homelands were located in Indiana, Illinois, Ohio, lower Michigan, and lower Wisconsin, but it was forcibly removed from its homelands, and forced westward many times.[6] In the process, the Miami Tribe ceded its land and lost countless members to disease, starvation and the abuse of forced migration.[7] Ultimately, the Miami Tribe was forced onto a small tract of land in remote Northeastern Oklahoma.[8] In 1936, the Miami Nation organized its government pursuant to the Oklahoma Indian Welfare Act of 1936, 25

---

[5]  Named Defendant Tribal Financial Services is a not a legal entity but instead is a division of MNE Services, Inc., a wholly owned arm of the Miami Tribe.

[6]  Declaration of Chief Thomas Gamble ("Gamble Decl.") ¶ 3, TLDX 1 at 3.

[7] *Id.*

[8] *Id.*

4

U.S.C. § 501.[9]  Since that time, the Miami Tribe has been governed by a Constitution and By-Laws that have been approved by the Secretary of the Interior.[10]  *See, e.g.,* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 75 Fed. Reg. 60,810, 60,811 (Oct. 1, 2010).

The Miami Tribe's current location  is near a forty square mile environmental superfund site,[11] and has been designated by the United States Small Business Administration as a "Historically Underutilized Business Zone" or "HUBZone."[12]  Due to geographic isolation and lack of economic opportunities, coupled with dramatic decreases in federal funds over the past decade, the Miami Tribe has been compelled to develop tribally-owned economic ventures in order to build a tribal economy and sustain itself.[13]

In 2005, the Miami Tribe, recognizing "a critical need for the development of economic activities . . . to provide for the well being of the citizens of the Miami Tribe," organized "Miami Nation Enterprises" or "MNE," as a wholly-owned and controlled tribal entity.[14]  MNE "serves an essential governmental function of the Miami Tribe of Oklahoma by allowing the Miami Tribe to provide directly for the development of tribal revenue generating activities and to acquire property."[15]  MNE, as a tribal entity, maintains sovereign immunity.[16] MNE has engaged in economic development activities, including government contracting, a movie theater, an information technology company, an office supply company, and, relevant to this matter, an online

---

[9] *Id.* ¶ 4, TLDX 1 at 3.

[10] *Id.* and Ex. A, TLDX 1 at 3, 11, Miami Tribe Constitution.

[11] Gamble Decl. ¶ 5, TLDX 1 at 3; Agency for Toxic Substances and Disease Registry, *available at* http://www.atsdr.cdc.gov/sites/tarcreek/ (last visited May 3, 2012).

[12] Gamble Decl. ¶ 5, TLDX 1 at 3; United States Small Business Administration, *available at* http://map.sba.gov/hubzone/maps/ (last visited May 3, 2012).

[13] Gamble Decl. ¶ 5, TLDX 1 at 3.

[14] *Id.* ¶ 7 and Ex. C, TLDX 1 at 4, 45, Fourth Amended MNE Act.

[15] *Id.* Ex. C at 45.

[16] *Id.* at 53.

short-term lending business–a business well suited for a geographically isolated Indian tribe that has been foreclosed from participating in the broader national economy.

In 2008, MNE, acting pursuant to Section 305(n) of the MNE Act, created a wholly owned subsidiary company named "MNE Services, Inc."[17]  MNE Services is a governmental instrumentality, established to carry out economic advancement functions of the Tribe and its members.[18]  MNE Services presently focuses on online short-term lending.  MNE Services does business under trade names including "Tribal Financial Services" (aka "TFS"), "Ameriloan," "US Fast Cash," and "United Cash Loans."[19]

MNE and MNE Services are governed by Miami Tribal law, including statutes governing Interest Rates and Loans and Cash Advance Services[20] and the Miami Business Regulatory Act.[21]  All loans are approved by an officer or employee of MNE Services on federal trust land under the sovereign jurisdiction of the Tribe.[22]  MNE Services' revenue is utilized by the Miami Tribe to fund critical governmental services to its members, such as poverty assistance, disability assistance, housing, nutrition, child care, preschool, elder care, substance abuse counseling, job training, school supplies and scholarships.[23]

In 2008, the Miami Tribe also formed AMG.  AMG is a shared services provider that provides employee staffing and related services to the Tribal Lending Defendants.  AMG acquired all of the units of CLK Management, LLC, the company that had previously been providing employee staffing services to the Tribal Lending Defendants, and merged CLK into AMG

---

[17] Gamble Decl. ¶ 10 and Ex. D, TLDX 1 at 5, 62.

[18] *Id.* Ex. D, TLDX 1 at 63.

[19] Gamble Decl. ¶ 12, TLDX 1 at 5.

[20] *Id.* ¶ 18 and Exs. Q, R, S, TLDX 1 at 6-7, 288, 301, 321.

[21] *Id.* ¶ 17 and Exs. O, P, TLDX 1 at 6, 229, 235.

[22] Gamble Decl. ¶ 13, TLDX 1 at 5.

[23] *Id.* ¶¶ 6, 19, TLDX 1 at 4, 7.

Services.[24]  The merger was effectuated under the laws of the Miami Tribe and recognized by the State of Kansas.[25]  Accordingly, since 2008 the Miami Tribe has both integrated and expanded its online short-term lending related operations.

### 2.     The Santee Sioux Nation and Its Entity SFS, Inc.

SFS is an arm of the Santee Sioux Nation.[26] The ancestral homeland of the Santee Sioux Nation (formerly the Santee Sioux Tribe of Nebraska) is present-day Minnesota, but following an 1862 conflict between starving Santee Sioux and the U.S military, the Santee Sioux were forcibly relocated to present-day South Dakota and later to present-day northeastern Nebraska. *See Cash Advance & Preferred Cash Loans  v. State of Col.*, 242 P.3d 1099, 1104 (Colo. 2010). The land in Nebraska is ill-suited for farming, and what little arable land existed on the reservation was flooded by the federal government in order to provide hydroelectric power to surrounding non-Indian communities. *See* Michael L. Lawson, *Dammed Indians: The Pick-Sloan Plan and the Missouri River Sioux, 1944-1980* (Univ. of Okla. Press, 2d ed. 1994).  The Santee Sioux Reservation is severely economically depressed, and the isolated rural region of Nebraska is a "HUBZone."[27]

The Santee Nation is governed by a Constitution that has been approved by the Secretary of the Interior.[28]  The Santee Nation's governing body is the "Tribal Council," which consists of eight elected members,[29] and is vested with the authority to "charter subordinate organizations for

---

[24] *Id.* ¶¶ 14-16, TLDX 1 at 5-6.

[25] *Id.* ¶ 16, TLDX 1 at 6.

[26] Declaration of Chairman Roger Trudell, Santee Sioux Nation ("Trudell Decl.") ¶ 7, TLDX 2 at 388-89.

[27] Trudell Decl. ¶ 4, TLDX 2 at 388.

[28] Trudell Decl. ¶ 2 and Ex. A, TLDX 2 at 387, 395, Santee Sioux Nation Constitution and Bylaws.

[29] *Id.* at 397, Santee Sioux Nation Constitution, Art. III, §§ 1-2.

7

economic purposes,"[30] and to "safeguard, regulate and promote the peace, safety, morals and general welfare of the nation by regulating the conduct of trade . . . ."[31]

In 2005, the Santee Nation, acting through its governing Tribal Council, created SFS.[32] SFS's sole purpose is to generate revenue for governmental operations and social welfare programs through an online lending business.[33]  SFS is licensed pursuant to the laws of the Santee Sioux to operate an online lending business utilizing the trade name "One Click Cash."[34]  This business is the sole source of revenue for SFS.[35]  SFS pays funds into the Santee Sioux tribal government and supports essential tribal programs and services, including education, housing, and poverty assistance.[36]

All loans are approved by an SFS officer or employee on reservation land under the sovereign jurisdiction of the Tribe.[37]  The transactions the FTC complains of are consummated on tribal lands, and are subject to, and fully compliant with, the laws and regulations of the Tribe.[38]  Since 2008 SFS has retained AMG to provide services in connection with SFS' lending activities.[39]

### 3.    The Modoc Tribe of Oklahoma and Its Entity Red Cedar Services, Inc.

The ancestral home of the Modoc Tribe of Oklahoma consisted of some 5,000 square miles along the California-Oregon border.[40]  Following a war with the United States Military, in 1873, the

---

[30] *Id.* at 397-99, Santee Sioux Nation Constitution, Art. III, §§ 1-2, IV, § 1(k). The Board of Directors of SFS consists of the duly elected Tribal Council of the Santee Sioux Nation.

[31] *Id.* at 399, Santee Sioux Nation Constitution, Art. IV, § 1(i).

[32] Trudell Decl. ¶ 7, Exs. B, C, TLDX 2 at 386-89, 406, 414.

[33] Trudell Decl. at ¶ 14, TLDX 2 at 390-91.

[34] *Id.* ¶ 11, TLDX 2 at 390.

[35] *Id.* ¶ 14, TLDX 2 at 390-91.

[36] *Id.* ¶ 11, TLDX 2 at 390.

[37] *Id.*

[38] *Id.*

[39] *Id.* ¶ 10, TLDX 2 at 390.

[40] Declaration of Second Chief Judy Cobb ("Cobb Decl.") ¶ 3, TLDX 3 at 630.

remaining 155 Modoc tribal members were loaded on 27 wagons and transported east to the Quapaw Agency in Indian Territory (now Oklahoma). Federal Indian agents drove the Modoc Tribe to the brink of genocide through embezzlement and abuse.[41] By 1891, only 68 tribal members remained.[42]

The Modoc Tribe was ostensibly terminated from federal supervision in 1956, but was subsequently acknowledged by the United States as an Indian tribe in 1978 through the efforts of Chief Bill Follis, who remains the Tribe's Chief to this day.[43] Like the Miami Tribe, the Modoc's land base is located in remote northeastern Oklahoma, next to an environmental superfund site that also is a "HUBZone."[44]

The Modoc Tribe has strived to fulfill the federal policies of tribal economic development and self-sufficiency through economic development activities, including a casino, a recycling business, a tobacco shop, an Information Technology company, and, relevant to this matter, an online short-term lending business.[45]

Red Cedar is a governmental instrumentality of the Modoc Tribe, established to stimulate the Tribe's economy, create employment, generate profits for the tribal government, and to increase the economic well-being of tribal members.[46] The economic development activities currently operated by Red Cedar consist of offering online short-term loans. Red Cedar does business under the trade name "500FastCash."[47] Red Cedar is governed and regulated by Modoc Tribal law, including the Modoc Tribe's laws governing Interest Rates and Loans and Cash Advance

---

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶ 4, TLDX 3 at 630.

[44] *Id.* ¶ 5, TLDX 3 at 630-31.

[45] *Id.* ¶ 6, TLDX 3 at 631.

[46] *Id.* ¶¶ 7-12, TLDX 3 at 631-32.

[47] *Id.* ¶ 9, TLDX 3 at 632.

Services.[48]  All loans are approved by Red Cedar on federal trust land.[49]  Red Cedar helps fund critical governmental services to its members, including healthcare, assistance for victims of domestic violence, tribal child support enforcement, clothing and school supplies for tribal members, funding for tribal roads, tribal housing and home improvement, tribal land purchase and development, and college and technical school financial assistance for tribal members.[50]

**B.    The Tribes' Online Loan Application, Funding, Payments and Collection Processes**

Each of the Tribal Lending Defendants performs lending operations solely through online websites.[51]  The online process generally begins when a prospective borrower searches online for a short-term loan.  All borrowers must have a regular source of income, an established banking relationship, and be able to navigate the Internet and complete the various online application forms that are required.  Many customers seeking online short-term loans are repeat customers familiar with the product, procedures and lending guidelines.[52]  Online short-term loans, which are unsecured and vulnerable to significant default risks, are generally required to be repaid within 14 to 30 days to coincide with borrowers' paydays.  *See* Kelly D. Edmiston, *Could Restrictions on Payday Lending Hurt Consumers?*, Fed. Reserve Bank of Kan. City Econ. Review, First Quarter 2011, p. 63, available at http://www.kansascityfed.org/publicat/econrev/pdf/11q1Edmiston.pdf.

---

[48] *Id.* ¶ 11 and Ex. E, TLDX 3 at 632, 690.

[49] *Id.* ¶ 10, TLDX 3 at 632.

[50] *Id.*

[51]   The Tribal Lending Defendants each contract with AMG for the provision of employee staffing and related services for each of their respective loan portfolios.  The lending web sites have different color formats and stylistic themes, but utilize similar language, application forms and consumer disclosures.  Dempsey Decl. ¶ 13, TLDX 4 at 749.

[52]   Indeed, 14 out of the 19 affiants selected by the FTC were customers who had online loans prior to the loan referenced in their affidavit.  One of the affiants actually obtained a new loan <u>after</u> submitting an affidavit to the FTC.  Dempsey Decl. ¶ 15 and Att. B, TLDX 4 at 749-50, 790.

### 1.     Online Loan Application and The Loan Documents

The Tribal Lending Defendants provide comprehensive and clear information and instructions to consumers.

### a.     The Online Loan Application

[redacted][53] Most prospective borrowers are referred through "lead generation sites." Lead generation websites—operated independent from any ultimate lender involved—collect information about an applicant, and, in real time, transfer the applicant to an online lender, which might include one of the Tribal Lending Defendants.[54] The discussion below describes the process of making an initial application at a proprietary website,[55] and the application, underwriting and approval process once an applicant has completed the initial application on a proprietary website or been referred by a lead generator.

### (i)     Application for the Online Loan  on a Proprietary Website[56]

If a customer begins on a Tribal Lending Defendant's web site, a customer first views the homepage. Once the customer clicks "APPLY NOW" to begin the loan application process,[57] the customer proceeds through sequential pages of questions regarding Personal Information,

---

[53] Dempsey Decl. ¶ 18, TLDX 4 at 750.

[54] Examples of lead generation screenshots are included at *id*. ¶ 20 and Att. D, TLDX 4 at 751, 804.

[55] Each of the FTC's affiants were referred to the Tribal Lending Defendants in this manner through a "lead generation site."

[56] A comparison of the Tribal Lending Defendants' initial loan application templates with lead generation site screen shots demonstrates that the Tribal Lending Defendants accumulate the same type of information and provide the same directions to individuals seeking online short-term loans. Dempsey Decl. ¶ 22 and Atts. D & E, TLDX 4 at 751, 804, 809.

[57] Dempsey Decl. ¶ 23 and Att. A, TLDX 4 at 751, 769-88 (collection of tribal screen shots).

Employment Information,[58] Banking Information,[59] and Personal References.[60] The customer then reaches a page entitled "Final Step."[61]  On this page, the customer must acknowledge by checking a box that she has read and agrees to all of the notices and disclosures.  To submit the application for processing, the customer also enters a verification code and clicks "Continue."  The information is then processed and, if the information provided is accurate and verifiable, a pre-approval may issue that allows the loan process to continue.

**(ii)    Confirmation and E-Signature Page**

A customer who has successfully completed the initial steps on either a Tribal Lending Defendant's website or a third-party lead generation site is next directed to a Confirmation and E-Signature page to complete the loan application:

- The customer is shown the maximum amount she is pre-approved for and then is allowed to choose a lesser amount from a drop-down box.

- A hyperlink to the loan documents—including the Application, Loan Note and Disclosure, Privacy Policy, Authorization to Affect ACH Credit and Debit Entries, and Electronic Disclosure and Consent Agreement—is provided so that the customer can view the documents.

- To finalize the loan, the customer must check and click on required boxes to acknowledge that she has read and agrees to the terms and provisions of these documents

- The customer provides an eSignature and clicks the "I Agree" button to confirm the loan.[62]

- If a customer does not properly check all the required boxes concerning review of loan documents, the lending system will not accept the submission.[63]

---

[58]  A representative screenshot of the website that would appear to a customer applying for a loan is attached. Dempsey Decl. ¶ 24 and Att. E, TLDX 4 at 751-52, 809-10.

[59]  *Id.* at 751-52, 811.

[60]  *Id.* at 751-52, 812.

[61]  *Id.* at 751-52, 813.

[62]  A screenshot of this website page is attached.  Dempsey Decl. ¶ 25 and Att. E, TLDX 4 at 752, 815.

[63]  Dempsey Decl. ¶ 26, TLDX 4 at 752.

12

- The application is then submitted for formal underwriting and approval.

### (iii)   Thank You and Print Documents Page

On the final page, the "Thank You and Print Documents" Page, the following language is displayed in conspicuous letters:

(1): THE FOLLOWING IS EXTREMELY IMPORTANT!

You will receive an e-mail from us momentarily containing your user ID and password which will allow you to check the status of your loan.

(2): PRINT YOUR DOCUMENTS

To print your documents for your reference, please <u>CLICK HERE</u>.[64]

From this screen, the customer can print the Application[65], Loan Note and Disclosure[66], Privacy Policy[67], Authorization to Affect ACH Credit and Debit Entries[68], and Electronic Disclosure and Consent Agreement.[69]

### (iv)   Language of the Loan Documents

#### (1)   The Loan Note and Disclosure (the "Loan Note")

The Loan Note clearly states how a customer's payment schedule is structured.[70]  For example, the plain language of the Payment Schedule appears on the first page of a Loan Note as shown in this Loan Note generated for a $400 loan:

---

[64]  A screenshot of the Thank You and Print Documents Page is attached. Dempsey Decl. ¶ 27 and Att. G, TLDX 4 at 752-53, 817.

[65]  A copy of the Application is attached. Dempsey Decl. ¶ 29 and Att. H, TLDX 4 at 753, 819.

[66]  A copy of the Loan Note and Disclosure is attached. Dempsey Decl. ¶ 29 and Att. J, TLDX 4 at 753, 827.

[67]  A copy of the Privacy Policy is attached. Dempsey Decl. ¶ 29 and Att. I, TLDX 4 at 753, 823.

[68]  A copy of the Authorization to Affect ACH Credit and Debit Entries is attached. Dempsey Decl. ¶ 29 and Att. K, TLDX 4 at 753, 831.

[69]  A copy of the Electronic Disclosure and Consent Agreement is attached. Dempsey Decl. ¶ 29 and Att. L, TLDX 4 at 753, 833.

[70]  Plaintiff makes reference to the "TILA Box" incorporated within the loan document, and this box does exactly what it is statutorily required to do—apprise the borrower of the fundamental term for

13

**Payment Schedule**: 1 payment of $520.00 due on 2012-04-23, if You decline the option of renewing Your Loan.  If renewal is accepted, **You will pay the Finance Charge of $120.00 only, on 2012-04-23. You will accrue a new Finance Charge at each renewal of Your Loan.  On the due date resulting from a fourth renewal, and every due date thereafter, the outstanding principal of Your Loan must be paid down by $50.00.  This means Your Account will be debited for the Finance Charge plus a $50.00 principal payment on the due date.**  This will continue until Your Loan is paid in full.  If Your pay date falls on a weekend or holiday and You have direct deposit, Your Account will be debited on the business day prior to Your normal pay date.   To decline the option of renewal Your signed Account Summary document must be received in Our office at least three business days before Your Loan is due.  This Loan may be renewed on the payment of the Finance Charge only.

*(Emphasis added).*[71]

### (2)   The Authorization to Affect ACH Credit and Debit Entries

This document states plainly that "one or more ACH debit entries" to the customer's account <u>may</u> occur and are authorized, and gives customers the opportunity to revoke their authorization for electronic funds transfers and pay via remote created check.[72]  Customers also may repay by means of a debit card.[73]  This form also notifies customers that they may adjust the payment schedule by calling a toll-free number, by faxing, or by logging into the customer's account online through the Online Portal.[74]

### 2.   Loan Approval and Customizable Payment Schedules

#### a.   Confirmation Email

Immediately after a customer's loan application is approved by the underwriting department, the customer receives the Initial Confirmation Email that provides an username and password, and

---

the loan.  If their "TILA Box" was in any way different, the Tribal Lending Defendants would be faulted for failing that standard.  Indeed, the FTC fails to demonstrate any requirement that the "TILA Box" incorporate all the different extensions, renewals and other modifications that can be incorporated into a short term loan at the direction and control of the borrower.

[71]   A copy of the Loan Note and Disclosure is attached. Dempsey Att. J, TLDX 4 at 827.

[72]   *Id.* Att. K, TLDX 4 at 831.

[73]   Dempsey Decl. ¶ 32, TLDX 4 at 754.

[74]   *Id.*

14

notifies the customer of the online portal to "access loan status at any time" and the toll-free customer service number for any questions.[75]

### b.      Approval Terms Letter

After a loan is funded, the customer receives via email the Approval Terms Letter,[76] which informs the customer of the loan amount and provides the Tribal Lending Defendant's email, phone number, and online portal address if the customer has any questions.

The letter walks the customer through how to modify the payment schedule to pay only finance charges, finance charges with principal reductions or pay off the loan in its entirety.  On its first page, the letter states in all capital letters and bold language: **"PLEASE REVIEW THE FOLLOWING REMINDERS REGARDING YOUR LOAN."**

It then states how the loan payments are scheduled and can be modified:

**Loan Receipt**:

By receiving a loan through 500FastCash you agree that your loan will be renewed on every due date unless you request to pay in full or to pay down your principal amount borrowed, at least 3 full business days prior to your next due date.  If you do not notify 500FastCash, 3 full business days prior to your due date, you will only pay the interest fee plus any scheduled pay downs on your due date.  If your loan is renewed, you will acquire a new interest fee.  If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited the business day prior to your normal pay date.

**Renewal**:

Your loan is always due on your paydays.  By receiving a loan through 500FastCash you agree that your loan will be renewed unless you request to pay down an additional amount against your principal, or pay out the balance in full.  Renewing your loan means that you will pay the renewal fee (only) on this due date.  Every time your loan is renewed, you will accrue a new renewal fee.  You can renew your loan four times.  On the FIFTH and subsequent due dates, you must pay the renewal fee plus pay down your balance by $50.00.  This is called an automatic pay down.  When in automatic pay down, your principal loan amount and renewal fee will decrease.  (EXAMPLE: For a $300.00 dollar loan the fee is $90.00.  On the 5th due date, you

---

[75] A copy of the Confirmation Email is attached.  Dempsey Decl. ¶¶ 35-36 and Att. M, TLDX 4 at 755, 835.

[76] A copy of the Approval Terms Letter is attached. Dempsey Decl. ¶ 37 and Att. N, TLDX 4 at 755, 837.

pay $140.00 which equals the $90.00 renewal fee plus the $50.00 pay down.  Consequently, your principal balance will be $250.00 with a new renewal fee of $75.00.)  Once the automatic pay down has begun, your loan must be paid down every due date until it is paid in full.

### c.    Approval Fund Letter

The customer also receives the Approval Fund letter once the funds are deposited via ACH in the customer's bank account.[77]  In that letter, the customer is provided the Online Portal link to access her account, the toll-free customer service phone number, and the customer service email address.[78]

### d.    Account Summary Link Emails

Each customer also receives an Account Summary Link Email prior to any scheduled payment.[79]  These emails are automatically sent three days after a loan is funded and three business days after any subsequent payment amount is debited from a customer's account.[80]

A customer may, at any time, "Log In To View [Her] Account"[81] within the Account Summary Link Email to access, view, and customize her payment schedule:

- After logging in to her account from the homepage, the customer enters the Customer Service Portal and views the "Loan Status Page."[82]

- The "Loan Status Page" provides an overview of the customer's account status, including the "Next Due Date," "New Amount Due," and a "Breakdown of the

---

[77]  A copy of the Approval Fund Letter is attached. Dempsey Decl. ¶ 42 and Att. O, TLDX 4 at 756, 840.

[78]  *Id.*

[79]  A copy of the Account Summary Link Email is attached. Dempsey Decl. ¶ 43 and Att. P, TLDX 4 at 757, 842.

[80]  *Id.*

[81]  A screenshot of the Customer Service Login Page is attached. Dempsey Decl. ¶ 44 and Att. Q, TLDX 4 at 757, 844.

[82]  A screenshot of the Loan Status Page is attached.  Dempsey Decl. ¶ 45 and Att. R, TLDX 4 at 757, 846.

remaining 155 Modoc tribal members were loaded on 27 wagons and transported east to the Quapaw Agency in Indian Territory (now Oklahoma).  Federal Indian agents drove the Modoc Tribe to the brink of genocide through embezzlement and abuse.[41]  By 1891, only 68 tribal members remained.[42]

The Modoc Tribe was ostensibly terminated from federal supervision in 1956, but was subsequently acknowledged by the United States as an Indian tribe in 1978 through the efforts of Chief Bill Follis, who remains the Tribe's Chief to this day.[43]  Like the Miami Tribe, the Modoc's land base is located in remote northeastern Oklahoma, next to an environmental superfund site that also is a "HUBZone."[44]

The Modoc Tribe has strived to fulfill the federal policies of tribal economic development and self-sufficiency through economic development activities, including a casino, a recycling business, a tobacco shop, an Information Technology company, and, relevant to this matter, an online short-term lending business.[45]

Red Cedar is a governmental instrumentality of the Modoc Tribe, established to stimulate the Tribe's economy, create employment, generate profits for the tribal government, and to increase the economic well-being of tribal members.[46]  The economic development activities currently operated by Red Cedar consist of offering online short-term loans.  Red Cedar does business under the trade name "500FastCash."[47]  Red Cedar is governed and regulated by Modoc Tribal law, including the Modoc Tribe's laws governing Interest Rates and Loans and Cash Advance

---

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶ 4, TLDX 3 at 630.

[44] *Id.* ¶ 5, TLDX 3 at 630-31.

[45] *Id.* ¶ 6, TLDX 3 at 631.

[46] *Id.* ¶¶ 7-12, TLDX 3 at 631-32.

[47] *Id.* ¶ 9, TLDX 3 at 632.

Services.[48]  All loans are approved by Red Cedar on federal trust land.[49]  Red Cedar helps fund critical governmental services to its members, including healthcare, assistance for victims of domestic violence, tribal child support enforcement, clothing and school supplies for tribal members, funding for tribal roads, tribal housing and home improvement, tribal land purchase and development, and college and technical school financial assistance for tribal members.[50]

**B.    The Tribes' Online Loan Application, Funding, Payments and Collection Processes**

Each of the Tribal Lending Defendants performs lending operations solely through online websites.[51]  The online process generally begins when a prospective borrower searches online for a short-term loan.  All borrowers must have a regular source of income, an established banking relationship, and be able to navigate the Internet and complete the various online application forms that are required.  Many customers seeking online short-term loans are repeat customers familiar with the product, procedures and lending guidelines.[52]  Online short-term loans, which are unsecured and vulnerable to significant default risks, are generally required to be repaid within 14 to 30 days to coincide with borrowers' paydays.  *See* Kelly D. Edmiston, *Could Restrictions on Payday Lending Hurt Consumers?*, Fed. Reserve Bank of Kan. City Econ. Review, First Quarter 2011, p. 63, available at http://www.kansascityfed.org/publicat/econrev/pdf/11q1Edmiston.pdf.

---

[48] *Id.* ¶ 11 and Ex. E, TLDX 3 at 632, 690.

[49] *Id.* ¶ 10, TLDX 3 at 632.

[50] *Id.*

[51] The Tribal Lending Defendants each contract with AMG for the provision of employee staffing and related services for each of their respective loan portfolios.  The lending web sites have different color formats and stylistic themes, but utilize similar language, application forms and consumer disclosures.  Dempsey Decl. ¶ 13, TLDX 4 at 749.

[52] Indeed, 14 out of the 19 affiants selected by the FTC were customers who had online loans prior to the loan referenced in their affidavit.  One of the affiants actually obtained a new loan <u>after</u> submitting an affidavit to the FTC.  Dempsey Decl. ¶ 15 and Att. B, TLDX 4 at 749-50, 790.

### 1. Online Loan Application and The Loan Documents

The Tribal Lending Defendants provide comprehensive and clear information and instructions to consumers.

### a. The Online Loan Application

█████████████████████████████████████████████████████████

████████████████████████████████████████[53] Most prospective borrowers are referred through "lead generation sites." Lead generation websites—operated independent from any ultimate lender involved—collect information about an applicant, and, in real time, transfer the applicant to an online lender, which might include one of the Tribal Lending Defendants.[54] The discussion below describes the process of making an initial application at a proprietary website,[55] and the application, underwriting and approval process once an applicant has completed the initial application on a proprietary website or been referred by a lead generator.

### (i) Application for the Online Loan on a Proprietary Website[56]

If a customer begins on a Tribal Lending Defendant's web site, a customer first views the homepage. Once the customer clicks "APPLY NOW" to begin the loan application process,[57] the customer proceeds through sequential pages of questions regarding Personal Information,

---

[53] Dempsey Decl. ¶ 18, TLDX 4 at 750.

[54] Examples of lead generation screenshots are included at id. ¶ 20 and Att. D, TLDX 4 at 751, 804.

[55] Each of the FTC's affiants were referred to the Tribal Lending Defendants in this manner through a "lead generation site."

[56] A comparison of the Tribal Lending Defendants' initial loan application templates with lead generation site screen shots demonstrates that the Tribal Lending Defendants accumulate the same type of information and provide the same directions to individuals seeking online short-term loans. Dempsey Decl. ¶ 22 and Atts. D & E, TLDX 4 at 751, 804, 809.

[57] Dempsey Decl. ¶ 23 and Att. A, TLDX 4 at 751, 769-88 (collection of tribal screen shots).

11

Employment Information,[58] Banking Information,[59] and Personal References.[60] The customer then reaches a page entitled "Final Step."[61]  On this page, the customer must acknowledge by checking a box that she has read and agrees to all of the notices and disclosures.  To submit the application for processing, the customer also enters a verification code and clicks "Continue."  The information is then processed and, if the information provided is accurate and verifiable, a pre-approval may issue that allows the loan process to continue.

### (ii)   Confirmation and E-Signature Page

A customer who has successfully completed the initial steps on either a Tribal Lending Defendant's website or a third-party lead generation site is next directed to a Confirmation and E-Signature page to complete the loan application:

- The customer is shown the maximum amount she is pre-approved for and then is allowed to choose a lesser amount from a drop-down box.

- A hyperlink to the loan documents—including the Application, Loan Note and Disclosure, Privacy Policy, Authorization to Affect ACH Credit and Debit Entries, and Electronic Disclosure and Consent Agreement—is provided so that the customer can view the documents.

- To finalize the loan, the customer must check and click on required boxes to acknowledge that she has read and agrees to the terms and provisions of these documents

- The customer provides an eSignature and clicks the "I Agree" button to confirm the loan.[62]

- If a customer does not properly check all the required boxes concerning review of loan documents, the lending system will not accept the submission.[63]

---

[58]  A representative screenshot of the website that would appear to a customer applying for a loan is attached. Dempsey Decl. ¶ 24 and Att. E, TLDX 4 at 751-52, 809-10.

[59]  *Id.* at 751-52, 811.

[60]  *Id.* at 751-52, 812.

[61]  *Id.* at 751-52, 813.

[62]  A screenshot of this website page is attached.  Dempsey Decl. ¶ 25 and Att. E, TLDX 4 at 752, 815.

[63]  Dempsey Decl. ¶ 26, TLDX 4 at 752.

12

- The application is then submitted for formal underwriting and approval.

### (iii)    Thank You and Print Documents Page

On the final page, the "Thank You and Print Documents" Page, the following language is displayed in conspicuous letters:

(1): THE FOLLOWING IS EXTREMELY IMPORTANT!

You will receive an e-mail from us momentarily containing your user ID and password which will allow you to check the status of your loan.

(2): PRINT YOUR DOCUMENTS

To print your documents for your reference, please <u>CLICK HERE</u>.[64]

From this screen, the customer can print the Application[65], Loan Note and Disclosure[66], Privacy Policy[67], Authorization to Affect ACH Credit and Debit Entries[68], and Electronic Disclosure and Consent Agreement.[69]

### (iv)    Language of the Loan Documents

### (1)    The Loan Note and Disclosure (the "Loan Note")

The Loan Note clearly states how a customer's payment schedule is structured.[70]  For example, the plain language of the Payment Schedule appears on the first page of a Loan Note as shown in this Loan Note generated for a $400 loan:

---

[64] A screenshot of the Thank You and Print Documents Page is attached. Dempsey Decl. ¶ 27 and Att. G, TLDX 4 at 752-53, 817.

[65] A copy of the Application is attached. Dempsey Decl. ¶ 29 and Att. H, TLDX 4 at 753, 819.

[66] A copy of the Loan Note and Disclosure is attached. Dempsey Decl. ¶ 29 and Att. J, TLDX 4 at 753, 827.

[67] A copy of the Privacy Policy is attached. Dempsey Decl. ¶ 29 and Att. I, TLDX 4 at 753, 823.

[68] A copy of the Authorization to Affect ACH Credit and Debit Entries is attached. Dempsey Decl. ¶ 29 and Att. K, TLDX 4 at 753, 831.

[69] A copy of the Electronic Disclosure and Consent Agreement is attached. Dempsey Decl. ¶ 29 and Att. L, TLDX 4 at 753, 833.

[70] Plaintiff makes reference to the "TILA Box" incorporated within the loan document, and this box does exactly what it is statutorily required to do—apprise the borrower of the fundamental term for

13

1

2

3        <u>Payment Schedule</u>: 1 payment of $520.00 due on 2012-04-23, if You
4        decline the option of renewing Your Loan.  If renewal is accepted,
         **You will pay the Finance Charge of $120.00 only, on 2012-04-23.**
         **You will accrue a new Finance Charge at each renewal of Your**
         **Loan.  On the due date resulting from a fourth renewal, and**
5        **every due date thereafter, the outstanding principal of Your Loan**
         **must be paid down by $50.00.  This means Your Account will be**
6        **debited for the Finance Charge plus a $50.00 principal payment**
         **on the due date.**  This will continue until Your Loan is paid in full.
7        If Your pay date falls on a weekend or holiday and You have direct
         deposit, Your Account will be debited on the business day prior to
8        Your normal pay date.  To decline the option of renewal Your signed
         Account Summary document must be received in Our office at least
9        three business days before Your Loan is due.  This Loan may be
         renewed on the payment of the Finance Charge only.

10   (*Emphasis added*).[71]

11
                        **(2)        The Authorization to Affect ACH Credit and Debit**
12                                  **Entries**

13        This document states plainly that "one or more ACH debit entries" to the customer's

14   account <u>may</u> occur and are authorized, and gives customers the opportunity to revoke their

15   authorization for electronic funds transfers and pay via remote created check.[72]  Customers also

16   may repay by means of a debit card.[73]  This form also notifies customers that they may adjust the

17   payment schedule by calling a toll-free number, by faxing, or by logging into the customer's

18   account online through the Online Portal.[74]

19           **2.        Loan Approval and Customizable Payment Schedules**

20                   **a.        Confirmation Email**

21        Immediately after a customer's loan application is approved by the underwriting department,

22   the customer receives the Initial Confirmation Email that provides an username and password, and

23   ─────────────────────────────────────────
      the loan.  If their "TILA Box" was in any way different, the Tribal Lending Defendants would be
24   faulted for failing that standard.  Indeed, the FTC fails to demonstrate any requirement that the
     "TILA Box" incorporate all the different extensions, renewals and other modifications that can be
25   incorporated into a short term loan at the direction and control of the borrower.

26   [71]  A copy of the Loan Note and Disclosure is attached. Dempsey Att. J, TLDX 4 at 827.

27   [72]  *Id.* Att. K, TLDX 4 at 831.

28   [73]  Dempsey Decl. ¶ 32, TLDX 4 at 754.
     [74]  *Id.*

                                            14

notifies the customer of the online portal to "access loan status at any time" and the toll-free customer service number for any questions.[75]

### b.    Approval Terms Letter

After a loan is funded, the customer receives via email the Approval Terms Letter,[76] which informs the customer of the loan amount and provides the Tribal Lending Defendant's email, phone number, and online portal address if the customer has any questions.

The letter walks the customer through how to modify the payment schedule to pay only finance charges, finance charges with principal reductions or pay off the loan in its entirety. On its first page, the letter states in all capital letters and bold language: "**PLEASE REVIEW THE FOLLOWING REMINDERS REGARDING YOUR LOAN.**"

It then states how the loan payments are scheduled and can be modified:

**Loan Receipt:**

By receiving a loan through 500FastCash you agree that your loan will be renewed on every due date unless you request to pay in full or to pay down your principal amount borrowed, at least 3 full business days prior to your next due date. If you do not notify 500FastCash, 3 full business days prior to your due date, you will only pay the interest fee plus any scheduled pay downs on your due date. If your loan is renewed, you will acquire a new interest fee. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited the business day prior to your normal pay date.

**Renewal:**

Your loan is always due on your paydays. By receiving a loan through 500FastCash you agree that your loan will be renewed unless you request to pay down an additional amount against your principal, or pay out the balance in full. Renewing your loan means that you will pay the renewal fee (only) on this due date. Every time your loan is renewed, you will accrue a new renewal fee. You can renew your loan four times. On the FIFTH and subsequent due dates, you must pay the renewal fee plus pay down your balance by $50.00. This is called an automatic pay down. When in automatic pay down, your principal loan amount and renewal fee will decrease. (EXAMPLE: For a $300.00 dollar loan the fee is $90.00. On the 5th due date, you

---

[75] A copy of the Confirmation Email is attached. Dempsey Decl. ¶¶ 35-36 and Att. M, TLDX 4 at 755, 835.

[76] A copy of the Approval Terms Letter is attached. Dempsey Decl. ¶ 37 and Att. N, TLDX 4 at 755, 837.

pay $140.00 which equals the $90.00 renewal fee plus the $50.00 pay down.  Consequently, your principal balance will be $250.00 with a new renewal fee of $75.00.)  Once the automatic pay down has begun, your loan must be paid down every due date until it is paid in full.

### c.    Approval Fund Letter

The customer also receives the Approval Fund letter once the funds are deposited via ACH in the customer's bank account.[77]  In that letter, the customer is provided the Online Portal link to access her account, the toll-free customer service phone number, and the customer service email address.[78]

### d.    Account Summary Link Emails

Each customer also receives an Account Summary Link Email prior to any scheduled payment.[79]  These emails are automatically sent three days after a loan is funded and three business days after any subsequent payment amount is debited from a customer's account.[80]

A customer may, at any time, "Log In To View [Her] Account"[81] within the Account Summary Link Email to access, view, and customize her payment schedule:

- After logging in to her account from the homepage, the customer enters the Customer Service Portal and views the "Loan Status Page."[82]

- The "Loan Status Page" provides an overview of the customer's account status, including the "Next Due Date," "New Amount Due," and a "Breakdown of the

---

[77]  A copy of the Approval Fund Letter is attached. Dempsey Decl. ¶ 42 and Att. O, TLDX 4 at 756, 840.

[78]  *Id.*

[79]  A copy of the Account Summary Link Email is attached. Dempsey Decl. ¶ 43 and Att. P, TLDX 4 at 757, 842.

[80]  *Id.*

[81]  A screenshot of the Customer Service Login Page is attached. Dempsey Decl. ¶ 44 and Att. Q, TLDX 4 at 757, 844.

[82]  A screenshot of the Loan Status Page is attached.  Dempsey Decl. ¶ 45 and Att. R, TLDX 4 at 757, 846.

Charges" section.[83]  The "Breakdown of the Charges" section includes both the "Next Principle Amount Due" and "Next Service Charge Due."[84]

- The customer then may select "Next Payment Due" from the options on the left side of the page.[85]

- The "Next Payment Due" displays the "Total Amount Due," "Due Date," and "Pay Off Amount."  It also has a tab to "CLICK HERE TO VIEW PAYMENT OPTIONS."[86]

- The "Payment Options" page lists the customer's currently scheduled amount.  It also contains a simple selection menu that easily allows the customer to:

   (1)   "Make the minimum Scheduled Payment;"
   (2)   "Pay Down your principal amount in increments of $50.00;" or
   (3)   "Pay Total Balance"[87]

   **e.     Customer Service Online Portal ("Online Portal")**

At all times, a customer is able to log in to the Online Portal for her lender.[88]  From the Online Portal, the customer can navigate everything she needs to view, understand, and customize her loan and payment schedules.  The following tabs are found on the left side of the page:

- My Profile
- Current Balance
- Loan Status
- Payment History
- Next Payment Due
- Account Documents
- Contact Us[89]

---

83 Dempsey Decl. ¶ 46 and Att. R, TLDX 4 at 757, 846.

84 *Id.*

85 Dempsey Decl. ¶ 47 and Att. R, TLDX 4 at 757, 846.

86 A screenshot of this webpage is attached. Dempsey Decl. ¶ 47 and Att. S, TLDX 4 at 757, 848.

87 A screenshot of this webpage is attached. Dempsey Decl. ¶ 48 and Att. T, TLDX 4 at 757-58, 850.

88 Dempsey Decl. ¶ 54, TLDX 4 at 760.

89 A screenshot of this webpage is attached. Dempsey Decl. ¶ 54 and Att. R, TLDX 4 at 760, 846.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### f.  Toll-free Customer Service Number

As described above, all customers have access to a toll-free number to call with any questions, make payments, or customize the payment schedule.[90]  The toll-free number is prominently displayed throughout numerous sections of the enterprise sites and is contained in the numerous emails sent to customers.[91]

### 3.  Collections

[Text redacted]

90 [Text redacted]

94 [Text redacted]





[97] *Id.*

[98] Ms. Bongiovi obtained a $300.00 loan from OneClickCash on July 8, 2011.  She paid back only $90.00 of the loan.  Ms. Bongiovi obtained a $300.00 loan from USFastCash on June 23, 2011.  She paid back only $230.00 of the loan.  Dempsey Decl. ¶¶ 66, 67, TLDX 4 at 763-64.

[99] *Id.* ¶ 67, TLDX 4 at 763-64 (transcript of recorded call; audio made available in chamber's copy and counsel courtesy copy).

[100] Dempsey Decl. ¶ 68, TLDX 4 at 764.

[101] Dempsey Decl. ¶ 69, TLDX 4 at 764-65.

[102]

## II.    ARGUMENT

### A.    Plaintiff is Not Entitled To A Preliminary Injunction

#### 1.    Legal Standard

To obtain a preliminary injunction, the FTC must show that "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).  The burden is on the FTC to make such a showing, and "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation omitted) (*emphasis in original*); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

In cases such as this, where the plaintiff seeks mandatory relief rather than prohibitory relief to preserve the status quo, the granting of a preliminary injunction "is particularly disfavored."[103] *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).  In fact, a mandatory preliminary injunction cannot be granted unless "extreme or very serious damage will result," and is not to be "issued in doubtful cases."  *Id.* (citation omitted); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011) (same).  Therefore, Plaintiff's motion can be granted only if "the facts and [the] law clearly favor the mov[ant]." *Stanley v. Univ. of S. Cal.* 13 F.3d 1313, 1320 (9th Cir. 1994) (citations and internal quotation omitted).

---

[102] *Id.* Dempsey ¶ 69 and Att. Z, TLDX 4 at 764-65, 875.

[103] "A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.' . . . A mandatory injunction 'orders a responsible party to "take action."'" *Marlyn Nutraceuticals*, 571 F.3d at 878-79 (internal citations omitted).

Under the applicable standards, Plaintiff falls short on each of the essential requirements for a Preliminary Injunction.

### 2. The Plaintiff Has Not Demonstrated A Likelihood of Success on the Merits

The Defendants accurately and reasonably disclose the terms of their loans under the FTC Act Section 5(a) and even the affidavits accompanying Plaintiff's motion demonstrate that no reasonable person could find these basic terms confusing. The Defendants also do not engage in deceptive or improper collection tactics: zero tolerance debt collection protocols are employed and enforced, and again, even the affidavits accompanying the Plaintiff's motion show the debt collection practices employed by the Defendants are *lawful*. Moreover, the Tribal Lending Defendants' TILA disclosures are based, as required by law, on the legal obligations of the parties at the outset of the transaction. Finally, the Tribal Lending Defendants do not condition the extension of credit on preauthorized electronic fund transfers in violation of the law because they expressly allow payment by a remote created check.

### a. The Plaintiff Does Not Have Authority to Prosecute Claims Against These Defendants

The scope of the FTC's authority to prosecute claims is set forth in, and limited by, the Federal Trade Commission Act (the "FTC Act"). *See Cmty. Blood Bank of the Kansas City Area, Inc. v. F.T.C.,* 405 F.2d 1011, 1015 (8th Cir. 1969). Although the FTC is "empowered . . . to prevent *persons, partnerships, or corporations* . . . from using . . . unfair or deceptive acts or practices in or affecting commerce," the FTC does not have authority to prosecute its claims against these tribal entities because they are not "persons, partnerships, or corporations" under the FTC Act.[104] 15 U.S.C. § 45(a)(2) (*emphasis added*).

---

[104] As discussed *supra* and in the accompanying declarations, AMG, MNE, and MNE Services are governmental subdivisions of the Miami Tribe of Oklahoma. *Supra*, Section I.A.1. SFS is "an economic and political subdivision" of the Santee Sioux Nation. *Supra*, Section I.A.2. Red Cedar is a "governmental instrumentality" of the Modoc Tribe of Oklahoma. *Supra*, Section I.A.3.

First, none of these Defendants is a "person" for purposes of the FTC Act.  Sovereign Indian tribes (and, by extension, subdivisions and instrumentalities thereof) are presumed not to be "persons" under any federal statutes absent an "affirmative showing of statutory intent to the contrary."  *Inyo Cnty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 709 (2003) (holding that there is "'long-standing interpretive presumption that "person" does not include the sovereign,' a presumption that 'may be disregarded only upon some affirmative showing of statutory intent to the contrary'") (citation omitted).  The FTC Act does not designate Indian tribes as "persons" within the meaning of the Act and there is nothing in the FTC Act that even remotely suggests that there is any intent to include Indian Tribes within the definition of "persons" for purposes of the FTC Act.  Indeed, Indian tribes are not even referenced within the Act.  Consequently, Indian tribes cannot be considered persons for the purposes of the FTC Act.  This is particularly the case since this Court must construe any ambiguity in favor of the Indian tribes.  *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 174 (1973).

Second, none of the Defendants is a "partnership" under the FTC Act.  The FTC Act does not define the term "partnership," and there is no federal common law definition of "partnership." Consequently, the term "partnership" must be defined using the laws governing the Defendants. *See Williams V. Lee*, 358 U.S. 217, 220 (1959) (Indian tribes have inherent right to "make their own laws and be ruled by them").  In this case, the Miami, Modoc, and Santee Sioux Tribes have each enacted Business Partnership Ordinances, each of which define a "partnership" as "an association of two or more persons to carry on as co-owners of a business for profit formed and existing in compliance with and subject to the limitations and requirements of the Ordinance."[105]  Under each tribe's Business Partnership Ordinance, a partnership cannot be formed with an entity wholly

---

[105]  Gamble Ex. T, TLDX 1 at 349, Miami Tribe of Oklahoma Business Partnership Ordinance, § 1.2.5.; Trudell Ex. I, TLDX 2 at 590, Santee Sioux Nation Business Partnership Ordinance, Ch. 1, § 2(D); Cobb Ex G, TLDX 3 at 710, Modoc Tribe of Oklahoma Business Partnership Ordinance, § 1.2.5.

owned by the tribe absent a written partnership agreement.[106]   No such written agreement exists for any of these tribal entities. Thus, as a matter of law, none of the Defendants is a "partnership" over which the FTC could have authority.

Third, none of the Defendants is a "corporation" as defined in the FTC Act.  The FTC Act defines "corporation" in pertinent part as "any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business *for its own profit or that of its members*."[107]  15 U.S.C. § 44 (*emphasis added*).  Here, there is nothing in the language or legislative history of the FTC Act that indicates that Congress intended the term "corporation" to apply to governmental subdivisions of federally recognized Indian tribes. Moreover, the Defendants are not "organized to carry on business for [their] *own profit* or that of [their] *members*."  15 U.S.C. § 44 (*emphasis added*).  Rather, any income is used exclusively for essential tribal governmental programs and services such as housing, education, early childhood development, and elder care, and to further the congressional policies of promoting tribal economic development and self-sufficiency.  *See, e.g.*, 25 U.S.C. §§ 4301.

In *Community Blood Bank*, the court held that nonprofit corporations were not "corporations" within the FTC's jurisdiction because the profits realized by such entities were "devoted exclusively to the charitable purposes of the corporation."  405 F.2d at 1019.  Since these tribal entities are operated for the public benefit and profits are devoted solely to the *governmental* purposes of their respective Indian tribal governments, they cannot be considered corporations under the FTC Act.

---

[106]  Gamble Ex. T, TLDX 1 at 383-384, Miami Tribe of Oklahoma Business Partnership Ordinance, § 11.3.; Trudell Ex. I, TLDX 2 at 625-626, Santee Sioux Nation Business Partnership Ordinance, § 11.3; Cobb Ex. G, TLDX 3 at 744-745, Modoc Tribe of Oklahoma Business Partnership Ordinance, § 11.3

[107]  "Congress intended to exclude some corporations from the [FTC's] jurisdiction. . . . Congress did not intend to bring within the reach of the [FTC] any and all nonprofit corporations regardless of their purposes and activities." *Cmty. Blood Bank*, 405 F.2d at 1017-18.  In determining whether an entity is a corporation under FTC's jurisdiction, "the charter of a corporation . . . alone [is] not controlling" and the court should look to "the reality of [the entity's] being in law and in fact." *Id.* at 1018-19.

Because the FTC is not authorized to prosecute claims against any of these Defendants, the FTC lacks any chance of succeeding in its claims, and the FTC's request for a preliminary injunction should be denied on this basis alone.

      **b.**    **Plaintiff's FTC Act Section 5(a) Claims Are Meritless**

Even if the FTC did have the authority to prosecute this action, this Court should deny Plaintiff's proposed injunction because Plaintiff has failed to demonstrate a likelihood of success on the merits of its claims under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) ("Section 5(a)"). To establish a violation of Section 5(a), Plaintiff must show that the alleged act or practice by the defendant is "deceptive." 15 U.S.C. § 45(a).[108] "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (citation omitted).[109] As will be discussed below, the FTC has not pointed to any statement or practice of any of the Tribal Lending Defendants that is in fact deceptive. To the contrary, the information that the Tribal Lending Defendants provide to customers fully informs them of the costs of their loans and the repayment options. Here, the FTC fails to make a showing under any of its asserted claims.

      **(i)**    **Alleged Lending Violations**

At the heart of the FTC's claims against the Tribal Lending Defendants is the allegation that they misrepresent to customers that they will repay their loans with a single payment, on a single date, with a single finance charge. Pl.'s Mem. in Supp. of PI, ECF No. 5 at 22-24. Plaintiff's argument, however, is unsupported and contrary to the overwhelming weight of the evidence.

As a threshold matter, the FTC's core allegation in this case makes no real-world business sense. One of the benefits to customers of the Tribal Lending Defendants is that they are afforded

---

[108] A Plaintiff may also show that an alleged act or practice is "unfair," but this is not raised by the FTC here in an apparent concession that such conduct was indeed fair.

[109] Deceptions are material if "they are likely to cause injury to a reasonable relying consumer" rather than just "deceptions that a consumer might have considered important, whether or not there was reliance." *Sw. Sunsites, Inc. v. F.T.C.*, 785 F.2d 1431, 1436 (9th Cir. 1986).

the flexibility to choose different repayment terms depending upon their particular financial circumstances.  As will be discussed below, throughout the loan process, the Tribal Lending Defendants provide communications and materials to customers that clearly and accurately state that the consumer has *two basic options*: she can *either* repay her loan in full in one scheduled payment consisting of the loan principal plus a single finance charge, *or* she can repay it in multiple installments, the amounts of which are at her discretion.  A reasonable consumer would not be misled by the communications and materials of the Tribal Lending Defendants, and would correctly understand the payment options and the number of finance charges associated with each.  It would be contrary to the Tribal Lending Defendants' business interests to "hide" the flexibility their loan repayment terms provide customers.  Instead, the Tribal Lending Defendants make it abundantly clear to customers that they have flexibility to select a multiple installment payment plan if that plan better suits their needs.

> **(1)   The Materials and Communications Provided To Consumers Accurately Reflect the Payment Options and Would Not Misled A Reasonable Consumer**

The Tribal Lending Defendants make the basic loan payment options and associated number of finance charges clear to consumers throughout the loan process, and no reasonable consumer would be confused by the sum total of the communications and materials provided.  *See Stefanchik*, 559 F.3d at 928 (stating that deception must be assessed by looking at the "'net impression' created by a representation") (internal citation omitted).

Most consumers' initial interaction with the Tribal Lending Defendants' websites provide the consumers with the opportunity to select their desired loan amount (up to a preset amount).  They are then provided hyperlinks to a series of documents, including the Loan Note and Disclosure ("Loan Note"), the Privacy Policy, and the Electronic Disclosure and Consent Agreement.

Consumers must then check a box to confirm that they have read each of these documents, and agree to the terms in the documents, before proceeding.[110]

Each of the linked documents on this page makes the basic loan payment options and associated number of finance charges clear to the consumers up front, long before they agree to the loan. These terms are stated clearly and accurately on the top of the first page of the Loan Note, set off from the rest of the text. *See, e.g.,* Pl.'s Mem. in Supp. of PI, Sliger Att. B, PX 10 at 343. As this disclosure explicitly states, borrowers have two options: (1) paying in full in one scheduled payment; or (2) "renewing [their] loan." *Id.* This disclosure clearly explains how they may select their customizable payment option. *See id.* (stating that they may choose a single payment by "select[ing] [their] payment options using the Account Summary link sent to [their] email at least three business days before [their] loan is due"). Additionally, this disclosure makes clear that if they select one payment, the total amount will equal the amount borrowed plus a one-time finance charge, whereas if they select the multiple payment option the defendants will assess multiple finance charges. Furthermore, this disclosure explicitly states that under the single payment option "1 payment of $390.00 [will be] due" on the listed date, whereas "if renewal is accepted you will pay the finance charge of $90.00 only, on [listed date.] You will accrue new finance charges with every renewal of your loan. On the due date resulting from a four[t]h renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date." *Id.*

Moreover, these terms are stated clearly and accurately in a set off box of bolded text in the Privacy Policy that accompanied the application of affiants such as Ms. Sliger. The Privacy Policy states:

**YOU WILL BE CHARGED ADDITIONAL FEES IF YOU RENEW THIS LOAN. As an example, suppose you borrow $200 for 14 days at an APR of 782.14%. The Finance Charge would be $60.00. If you did not repay the loan at maturity but chose instead to renew the balance . . . you would incur an additional**

---

[110] A screenshot of this website page is attached. Dempsey Decl. ¶ 26 and Att. A, TLDX 4 at 752, 771.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> **Finance Charge of $60.00. So, if you renew the $200 loan 4 times, the total finance charge you would be required to pay would be $300.00.**

*Id. (emphasis in original).*

If the loan application is approved, the consumers are provided a letter notifying them of approval and again clearly and accurately stating the payment options and finance charges of the loan.[111] On the first page of the letter, it states in all capital letters and bold language: "**PLEASE REVIEW THE FOLLOWING REMINDERS REGARDING YOUR LOAN**," and the letter states:

> **Renewal**:
>
> Your loan is always due on your paydays. By receiving a loan through Ameriloan you agree that your loan will be renewed unless you request to pay down an additional amount against your principal, or pay out the balance in full. Renewing your loan means that you will pay the renewal fee (only) on this due date. Every time your loan is renewed, you will accrue a new renewal fee. You can renew your loan four times. On the FIFTH renewal, you must pay the renewal fee plus pay down your balance by $50.00. This is called an automatic pay down. (EXAMPLE: for a $300.00 dollar loan the fee is $90.00. On the 5th renewal, you pay $140.00 which equals the $90.00 renewal fee plus the $50.00 pay down. If you renew your loan again on the next due date, your principal balance will be $250.00 with a new renewal fee of $75.00. When the automatic pay down process is in effect his will decrease your principal loan amount and your renewal fee.) After your fifth renewal, your loan must be paid down every due date until it is paid in full.[112]

Dempsey Decl. ¶ 41 and Atts. N, CC, TLDX 4 at 755-56, 837, 893-94 (*emphasis in original*).

At the time of approval, and again days prior to each loan payment due date, consumers are also provided an email reminder that they can log into their account to review their loan status. When consumers do log in, they can see their current selected payment plan and can quickly navigate this page to easily access their loan payment options via easy and clear drop-down schedules. Of particular note is the "Payment Options" tab, which lists the customer's currently scheduled amount. It also contains a simple selection menu that easily allows the customer to:

---

[111]   An example is provided at Dempsey Decl. ¶ 58, TLDX 4 at 761; Dempsey Att. CC, TLDX 4 at 886 (citing September 7, 2010 Approval letter.)

[112]   *Id. (emphasis in original).*

(1) "Make the minimum Scheduled Payment";

(2) "Pay Down your principal amount in increments of $50.00"; or

(3) "Pay Total Balance"[113]

When these communications are read together, it is clear the Tribal Lending Defendants offered multiple payment options, and a reasonable consumer would understand that she had the option of *either* repaying in multiple payments with multiple finance charges, *or* instead choosing to repay in a single payment with a single finance charge.[114]

**(2)   Plaintiff Provides No Evidence That a Reasonable Consumer Would Rely On One Alleged Isolated Misstatement.**

Plaintiff does not and cannot address the overwhelming evidence that the Tribal Lending Defendants clearly and repeatedly inform consumers of the basic payment options and the number of finance charges associated with each. Instead, Plaintiff myopically focuses on *one* isolated statement contained within a sub-page entitled "How it Works" of the Tribal Lending Defendants' websites to allege that the Tribal Lending Defendants "[m]isrepresent the Terms of the Loans." Pl.'s Mem. in Supp. of PI, ECF No. 5 at 14. This argument must be rejected.

As an initial matter, the isolated statement cited is not deceptive on its face. The so-called misrepresentation emphasized by Plaintiff states, "[w]hen your loan is due, we automatically deduct your scheduled payment from your bank account along with any applicable fees." *Id.* This is a true statement. The "scheduled payment" is whatever payment that the borrower has requested, and that amount—plus fees—will be debited from the borrower's bank account.

Second, even if this statement were deceptive, Plaintiff fails to meet its burden to show that a reasonable person would rely on this statement alone in light of the number of undisputedly correct statements. *See Sw. Sunsites, Inc. v. F.T.C.*, 785 F.2d 1431, 1436 (9th Cir. 1986) (stating

---

[113]   A screenshot of this webpage is attached. Dempsey Decl. ¶¶ 49-51 and Atts. U, V, & W, TLDX 4 at 758-59, 852, 854, 861.

[114]   In addition, further disclosures are made repeatedly throughout the loan term that reinforce this point.

28

that the plaintiff must show materiality—*i.e.*, that the deceptions "are likely to cause injury to a reasonable relying consumer" rather than just "deceptions that a consumer might have considered important, whether or not there was reliance.").[115]  Moreover, not a single FTC affiant testifies that he or she read, or relied upon, the allegedly deceptive statement contained within the "How it Works" sub-page.  To make the required showing under Ninth Circuit law, the FTC needs more than its own conjecture.  In cases where the court has found this element to be met, the FTC has produced significant evidence, such as a customer survey showing an extremely high rate of customer dissatisfaction and a report from an investigator indicating that "an overwhelming number of consumers" were misled.  *See Stefanchik*, 559 F.3d at 929; *see also F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010) *aff'd*, No. 11-15330, __ Fed. App'x __, 2012 WL 1065543 (9th Cir. Mar. 30, 2012) (providing evidence that $37 million in largely unauthorized charges flowed to Defendants).

In other recent investigations of deceptive online statements, the FTC has relied upon "charge-back" rates, or the rates that consumers dispute charges made to their accounts as unauthorized.  In these other cases, charge-back rates have run as high as 80 percent—that is, 80 percent of consumers have disputed account charges as unauthorized.  *See FTC v. Landmark Clearing Inc.*, No. 11-00826, ECF No. 1 at 9 (E.D. Tex. Dec. 15, 2011); *available at* http://www.ftc.gov/opa/2012/01/landmark.shtm.  With respect to the Tribal Lending Defendants, rates of returned transactions for unauthorized debit entries are less than one-half of one percent,[116] which is well within industry standards and also indicates that borrowers understand the charges and accept them.  *See* 2012 NACHA Operating Rules, Article Two, Subsection 2.17.2 (establishing

---

[115]  That a "reasonable" customer would be misled is critical to defining what is deceptive; it is well settled that "the deception standard has not been applied to protect those few people whose misunderstanding of a sales practice is unreasonable. These unfortunate few represent 'an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.'" Jack E. Karns, *The Federal Trade Commission's Evolving Deception Policy*, 22 U. Rich. L. Rev. 399, 410-11 (1988) (footnote omitted).

[116]  Dempsey Decl. ¶ 76, TLDX 4 at 766.

a 1.0% return rate threshold for unauthorized debit entries, and requiring financial institutions to remedy any return rate over 1.0%).

As the Ninth Circuit held in *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006), although "[p]roof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." (internal citation omitted). Here, the FTC offers no such evidence. Indeed, read carefully, none of the affidavits Plaintiff relies upon even state that a single affiant believed that the loan was required to be repaid in a single payment or that they were misled by the Loan Documents. ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████ [117] Most importantly, the FTC cannot credibly contend that the *one* statement in the "How it Works" sub-page would cause reasonable consumers to be misled given the many prominent notices discussed above that explain in detail the customers' repayment options and the costs of those options.

The FTC's failure to provide any evidence speaks volumes here. In light of the other extensive disclosures made to consumers, there is no reasonable probability that a reasonable consumer would be misled by this isolated statement, and, thus, Plaintiff has failed to meet its burden to show otherwise.

(3)      **The Evidence Shows that Consumers Are Not Confused And Understand The Basic Payment Options**

Not only has the FTC failed to meet its burden to provide evidence that a reasonable consumer would be misled, but the evidence affirmatively shows that consumers actually do understand their payment options for their loans. In particular, in the first quarter of 2012, over ██% of the Tribal Lending Defendants' customers paid off their loan in full or paid down the

---

[117] *Id.* ¶ 18, TLDX 4 at 750.

principal of their loan prior to the first date that a principal payment would be due by logging on to their account through the Online Portal, affirmatively selecting a new payment option, and completing the payment; statistics which in and of themselves contradict the FTC's allegations.[118]

Moreover, the FTC's allegation that the loan documents are misleading is also contradicted by the success of the Tribal Lending Defendants in a highly competitive market. ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ This repeat business further demonstrates that the payment options offered by the Tribal Lending Defendants are not misleading. *See* Karns, *supra,* at 411 ("Sellers want repeat purchases and to the extent that they make false claims about the product they will lose repeat purchases.").

In sum, the Tribal Lending Defendants clearly and accurately state the basic loan pricing options and associated number of finance charges in numerous materials and communications with consumers. The FTC has failed to make any substantial showing that a reasonable consumer would be confused, and indeed, the evidence actually shows that consumers are not confused. Therefore, Plaintiff has not shown likelihood of success on the merits of its Section 5(a) claims.

### (4)   Alleged Debt Collection Claims

The FTC's debt collection claims also must be rejected.  The FTC claims that Defendants violate Section 5(a) by falsely representing to consumers in the course of debt collection that "consumers who do not pay will be arrested, prosecuted, or imprisoned" or will be sued by the Tribal Lending Defendants.  Pl.'s Mem. in Supp of PI, ECF No. 5 at 24-26.  However, the few affidavits the FTC relies upon for these claims are insufficient to support a preliminary injunction, and, moreover, the affiants actually undermine Plaintiff's allegations.  Defendants in fact do not engage in such practices and have a comprehensive, well articulated, measured, and responsive compliance program in place to prevent these practices from happening.

---

[118]  Dempsey Decl. ¶ 52, TLDX 4 at 759.

The FTC bases its entire debt collection claims on no more than a handful of affidavits. Pl.'s Mem. in Supp. of PI, ECF No. 5 at 19. These few affidavits fail to contain even the most basic information about the calls, such as the date and times of the alleged calls, the names of the employees who made the alleged threats, or in some cases, even which Tribal Lending Defendant allegedly made the threat. The FTC cannot rely on affidavits with such a paucity of relevant facts to support the extraordinary relief that a preliminary injunction embodies. Moreover, some of these affidavits do not even on their face support their claim that *the Defendants* made the alleged threats.[119] This is simply not enough to support a preliminary injunction against all of the defendants in this matter. The Ninth Circuit has overturned preliminary injunctions in cases like this where the Motion for a Preliminary Injunction was purportedly supported by affidavits, but those affidavits were "conclusory and without sufficient support in facts." *See, e.g., Am. Passage Media Corp. v. Cass Commc'ns Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985).

In addition, while the lack of specificity in the information provided in the FTC's affidavits makes it difficult to respond in detail to the allegations in them, additional facts uncovered by the Defendants suggests that none of the Defendants were responsible for the calls in question. Instead, as explained more fully herein—and as the FTC is aware—the calls that affiants received were likely the handiwork of fake debt collectors from overseas against whom the FTC recently sought injunctions. *See* http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt076.shtm (Feb. 2012) (FTC "Consumer Alert" that is "warning consumers to be on the alert for scam artists posing as debt collectors"); http://www.ftc.gov/opa/2012/04/broadway.shtm (Apr. 11, 2012) (FTC enforcement action against "an operation that the agency alleges collected phantom payday loan debts that consumers either didn't owe to the defendants or didn't owe at all" by alleging they were "representatives of fake government agencies")[120]; http://www.ftc.gov/opa/2012/02/acc.shtm (Feb.

---

[119] *See, e.g.*, Turner Decl. ¶ 20, PX 14 at 448 (conceding that when she called UnitedCashLoans after receiving a call purportedly from them, the UnitedCashLoans representatives specifically denied any connection to the call).

[120] The "Federal Business Bureau" is admittedly a "fake government agency," as Eric Barboza, one of the FTC's affiants, was undoubtedly aware. Pl.'s Mem. in Supp. of PI, Barboza Decl., PX 20 at 573, ¶ 12 ("I received several collection calls from a man with a foreign accent claiming to be

21, 2012) (FTC enforcement action against "an operation that the FTC alleges collected phantom payday loan 'debts' that consumers did not owe" ).

For example, in the case of affiant Ms. Betty Turner, the records of UnitedCashLoans reveal that it received an email from her on June 24, 2011 at 9:38 am.  In her email, Ms. Turner stated that she keeps getting calls from (845) 765-9442 and the caller states that they are from a "collection agency" and that Ms. Turner needed to call them about payment arrangements on a past due bill. UnitedCashLoans responded promptly to Ms. Turner's email and explained that the call Ms. Turner was complaining about did not originate from its office.  UnitedCashLoans is sure that it is not the source of these calls because phone records do not indicate any communications with Ms. Turner from this number and the calls Ms. Turner was complaining about originated from area code (845).[121]  Additionally, none of the Defendants has a phone number that originates from within the (845) area code, which encompasses parts of New York state.[122]

Approximately two months after her complaint to AMG, Ms. Turner filed a complaint with the Better Business Bureau ("BBB") complaining about the calls that she was receiving.  Ms. Turner's written complaint to the BBB stated that on August 5, 2011, someone called from 315-604-3601 claiming to be from the "US Crime Investigation Bureau."  The caller reported that Ms. Turner needed to call him or someone was going to come and arrest her.[123]  Ms. Turner stated that she believed the "scammers" were saying this to get her to call them.  Ms. Turner also reported that

---

calling from the 'Federal Business Bureau.'  I do not believe this caller represented US Fast Cash. This person claimed that there was a pending lawsuit against me and he threatened to have me arrested if I did not pay the money he requested.  He added that 'the sheriff will be coming tomorrow.'  I replied by calling the man a fraud, and he proceed to hang up on me.")  Perhaps then, the FTC was merely mistaken when it alleged in its press release touting the initiation of this action that Mr. Barboza was a victim of these Defendants' abusive collection practices. http://www.ftc.gov/opa/2012/04/amg.shtm (April 2, 2012) ("In one typical example, the defendants allegedly told consumer Eric Barboza that a $500 loan would cost him $650 to repay.  But the defendants attempted to charge him $1,925 to pay off the $500 loan, and threatened him with arrest when he balked at paying that amount.")

[121]  Dempsey Att. AA, TLDX 4 at 878.

[122]  Dempsey Decl. ¶ 71, TLDX 4 at 765.

[123]  Ms. Turner's affidavit is another example of an FTC affiant referring to a "fake government agency" threatening arrest and stating it is not these Defendants.

she has received these calls from the following telephone numbers:  685-497-3580, 818-579-7689, 616-980-1306, 904-222-8312, 818-457-5528 and 845-765-9442.  Yet again, none of the Defendants have a phone number that originates from any of these area codes.  Moreover, records confirm that no call was made to Ms. Turner on August 5, 2011—the only date Ms. Turner provided for one of the harassing calls.[124]

In sum, not only has Plaintiff failed to provide evidence that the Defendants committed debt collection violations sufficient to support a Preliminary Injunction, what little evidence is available actually undermines their claim and shows that the Defendants did not make the allegedly offending calls.

Indeed, considering the manner in which the Defendants operate their collection practices, the absence of evidence to support Plaintiff's claims is not surprising.  They have a comprehensive, well articulated, measured, and responsive compliance program in place to prevent these threats from happening.  First, there are clear policies in place that prohibit employees from making any of the threats the FTC alleges were made.[125]  Second, employees are given a written employee handbook that clearly prohibits such threats.[126]  Third, the employees are instructed as part of

---

[124]  Ms. Turner's experience is not unlike other declarations the FTC included in its moving papers. For example, the FTC attached a declaration from Ms. Wendy Belles, but it did not cite to the declaration in its Memorandum in Support of a Preliminary Injunction.  Ms. Belles' description of calls she received is similar to the descriptions Ms. Turner provided.  On Wednesday, October 5, 2011 at 9:27 a.m., Ms. Belles stated that "a man with a very heavy foreign accent called [her] from (704) 990-6618 claiming that [she] was in default on a loan with 'Payday Advance America' and requested [her] credit card information."  Ms. Belles explained to the caller that she never took a loan from that company.  The caller proceeded to name a number of companies until he got to OneClickCash, a company through which she recently had a loan, but which had been paid off by the time of the call.  After confirming for herself that she had paid off her loan with OneClickCash, the heavily accented caller called her back at 9:39 a.m. from (865) 365-5093.  Ms. Belles explained that she did not owe anything, and the caller proceeded to put his "supervisor" on the line.  Ms. Belles stated that the "supervisor" was equally unintelligible in stating his name and sounded very similar in speech to the first man.  OneClickCash has been able to determine that Ms. Belles emailed OneClickCash to report these calls.  In her email, Ms. Belles stated that the calls came from three numbers:  (865) 365-5093, (775) 410-1816, and (704) 990-6618.  None of the Defendants have a phone number that originates from within these area codes.  Pl.'s Mem. in Supp. of PI, Belles Decl. ¶¶ 8-11, PX 09 at 303; Dempsey Att. BB, TLDX 4 at 882.

[125]  Dempsey Decl. ¶ 60, TLDX 4 at 761.

[126]  *Id.* ¶ 64, TLDX 4 at 762.

34

training that such threats are prohibited.[127]   Fourth, there is supervision in place to make sure that those threats do not occur as well as random call monitoring and recording to check to make sure that no such threats are being made.[128]   Finally, there is a zero tolerance discipline program in place to punish any employees who engage in such threats, that has been and is used to terminate offending employees.[129]

### c.   TILA & Regulation Z claims

The FTC's claimed violations of TILA and its implementing Regulation Z are likewise baseless.

The FTC states correctly that creditors of closed-end credit must disclose, "before the credit is extended, the following terms of the loan: the finance charge; the annual percentage rate; the payment schedule; and the total of payments." Pl.'s Mem. in Supp. of PI, ECF No. 5 at 26; *see* TILA Sections 121(a) and 128(b)(1), 15 U.S.C. §§ 1631(a) and 1638(b)(1); Regulation Z sections 1026.17(a), 1026.17(b) and 1026.18, 12 C.F.R. §§ 1026.17(a), 1026.17(b), and 1026.18.

The FTC, however, neglects to mention that Regulation Z specifically requires that these "disclosures shall reflect *the terms of the legal obligation* between the parties." 12 C.F.R. § 1026.17(c) *(emphasis added)*.  The Official Commentary to Regulation Z of the Consumer Financial Protection Bureau ("CFPB") staff amplifies this fundamental principle: "The disclosures shall reflect the credit terms to which the parties are *legally bound as of the outset of the transaction. . . . The legal obligation is determined by applicable state law or other law.*"[130]  *See* 12

---

[127] *Id.* ¶¶ 60-65, TLDX 4 at 761-762.

[128] *Id.* ¶ 68, TLDX 4 at 764.

[129] *Id.* ¶ 69, TLDX 4 at 764-765.

[130] CFPB interpretations of Regulation Z have the force of law.  See 12 C.F.R. pt. 1026, Supp. I, Comment 1 (stating that Section 130(f) of the Truth in Lending Act (15 U.S.C. 1640) "protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the [CFPB]"); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) (CFPB staff opinions construing TILA or Regulation Z are dispositive unless "demonstrably irrational"); *accord Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981) ("[A]bsent some obvious repugnance to the statute, the [CFPB's] regulation implementing this legislation should be accepted by the courts, as should the [CFPB's] interpretation of its own regulation.").  (Although these cases originally considered interpretations

C.F.R. pt. 1026, Supp. I, Comment 17(c)(1)-1 (*emphasis added*).  These legal obligations are to be determined by reference to the loan agreement.  *See* 12 C.F.R. pt. 1026, Supp. I, Comment 17(c)(1)-2 ("The legal obligation normally is presumed to be contained in the note or contract that evidences the agreement."); *see also Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (same; addressing open-end credit disclosures).

The Tribal Lending Defendants' loan disclosures are based, as required by law, on the legal obligations of the parties at the outset of the transaction.  For example, in the case of a $300 loan, the one certain contractual obligation for all borrowers is to repay the loan in one payment of $390, and a Tribal Lending Defendant's TILA box would clearly reflect that outcome.  Although the Tribal Lending Defendants permit borrowers, solely at their option, to renew a loan for an additional term or, if a borrower so elects, for multiple additional terms, any borrower who does not choose to renew must repay his or loan by a single payment of $390.

The FTC claims, however, that the Tribal Lending Defendants' disclosures are somehow deficient because the borrowers are provided with the option of renewing their loan.  *See* Pl.'s Mem. in Supp. of PI, ECF No. 5 at 27.  Whether the borrower may have an option to modify the terms of the loan agreement at some later, post-consummation date, however, is not relevant to the TILA disclosures required at the outset of the transaction.  TILA and Regulation Z effectively require that a lender base its disclosures on a "snapshot" of the contractual obligations as they existed at the time that the disclosures were given, and to ignore any options of the borrower or lender.  Indeed, in other situations where the parties to a loan may have options under a loan contract, Regulation Z requires that the loan disclosures be calculated and provided as though no option exists, without regard to the likelihood that the lender or the borrower might actually exercise the option.  *See* 12 C.F.R. pt. 1026, Supp. I, Comment 17(c)(5)-3 (where a lender has an option to call a loan after a fixed period, disclosures should ignore the options and reflect the full loan term); 12 C.F.R. pt.

_____

of the Federal Reserve Board ("FRB") staff under Regulation Z, responsibility for interpreting Regulation Z has subsequently transferred to the CFPB.)

1026, Supp. I, Comment 18(g)-5 (although a borrower has an option to terminate mortgage insurance after a particular scheduled payment, loan disclosures should ignore the option and disclose the payment schedule as though the option is not exercised).

In fact, the Regulation Z requirement to disclose loan terms as determined by the loan agreement at the outset of the transaction is the only feasible method of disclosure for lenders. If lenders were required to take renewal options or other options into account when providing disclosures, it would put the lenders in the impossible position of having to anticipate all of the possible outcomes for each loan transaction. For example, because of the flexibility that the Tribal Lending Defendants provide to borrowers, there are over 450 repayment options for a simple $300 loan. The single repayment option is the only payment schedule for which the Tribal Lending Defendants can estimate with any degree of certainty. It simply would not be feasible for Tribal Lending Defendants to disclose all possible permutations of amounts financed, finance charges and APRs to every individual borrower.

Furthermore, the Tribal Lending Defendants not only clearly comply with TILA's and Regulation Z's requirements, but they actually go beyond the requirements in two ways: (1) by providing clear and accurate information regarding basic terms of the option of loan renewal on the top of the first page of the loan notes right below the TILA box, set off from the rest of the text; and (2) by providing new loan terms with a new TILA box to a borrower (specifying the current pricing terms of their loan) every time the borrower selects a new payment schedule.[131]

The FTC's TILA and Regulation Z claims ignore both the purpose and the letter of the regulatory requirements, and are unavailing. The FTC has shown no likelihood of success on the merits with respect to these claims.

### d.   EFTA Claims

Under the rules implementing the Electronic Funds Transfer Act, 12 C.F.R. § 1005.10(e) ("Regulation E"), "[n]o . . . person may condition an extension of credit to a consumer on the

---

[131]   Dempsey Decl. ¶¶ 50, 51, TLDX 4 at 758-59.

consumer's repayment by preauthorized electronic funds transfers." *See* 12 C.F.R. § 1005.10(e) & Suppl. I to Part 1005-Official Interpretations. That is, lenders are prohibited from requiring borrowers to preauthorize multiple electronic fund transfers from their accounts to obtain a loan. The Tribal Lending Defendants are in compliance with Regulation E; they do not require borrowers to consent to multiple electronic fund transfers to obtain a loan.

Customers are not required to make all of their payments by preauthorized electronic funds transfers. Borrowers can revoke their authorization for electronic funds transfers and instead have the transactions processed as a remotely created check, which is not an electronic funds transfer under Regulation E. *See* 12 C.F.R. § 1005.3(c) (providing that the term "electronic fund transfer does not include . . . any transfer of funds originated by check, draft or similar paper instrument"); Pl's. Mem. in Support of PI, Burton Privacy Policy and Authorization Agreement, PX 01 at 9 (expressly stating that the customer may revoke an electronic funds transfer authorization and in so doing instead "authorize us to prepare and submit one or more checks drawn on your Account(s) on or after the due date of your loan.").

The documentation the Tribal Lending Defendants provide to consumers clearly inform them of their option to remit payments by remotely created checks instead of electronic funds transfers. The FTC's Regulation E claim is not well founded, not supported by the evidence, and the FTC is not likely to succeed on its merits.

### 3. The Equities Do Not Favor a Grant of a Preliminary Injunction

In reviewing an injunction, the court must always carefully "balance the competing claims of injury," and although a preliminary injunction is "a matter of equitable discretion," at all times it remains "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469, 475 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 24, 32, 22 (internal citations omitted)).

1
2
3
          **a.**     **Plaintiff Has Shown No Evidence of Harm to the Public if an Injunction Is Denied**

4        In this case, the FTC's entire argument as to the equities of an injunction – which is less than

5 a single page long – rests on vague and conclusory allegations that the public will be harmed if the

6 preliminary injunction is not granted. *See* Pl.'s Mem. in Supp. of PI at 29-30.  Of course, the FTC's

7 showing is far less than what is required, and the FTC's allegations are contradicted by the actual

8 evidence in this case and the FTC's own actions in this case and others.  The FTC provides no

9 evidence regarding the *scope of the future injury feared*, the potential *likelihood of future injury* to

10 the public in this case, or why the drastic remedy of a preliminary injunction *is immediately*

11 *necessary to prevent this future injury*, even though these requirements are the sine-qua-non of a

12 preliminary injunction.  As a result, the FTC's showing falls far short of what is necessary.  *See,*

13 *e.g., Am. Passage Media*, 750 F.2d at 1470, 1473 (finding that mere conclusory allegations of harm,

14 without more, are insufficient to support a preliminary injunction).[132]

15        Moreover, the evidence is directly contrary to the FTC's bald allegations. The fact that the

16 Tribal Lending Defendants provide loan services to over ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮  and the fact that the FTC (by its own admission) reviewed "thousands" of

18 complaints but could find only 19 affiants, fatally undermines the contention that injunctive relief is

19 necessary.  *See* Pl.'s Mem. in Supp. of PI at 29.

20        Similarly, any argument that such an injunction is needed to prevent future harm is further

21 contradicted by the fact that, as discussed *supra*, these Defendants have policies and procedures in

22 place that protect consumers and will prevent the occurrence of the alleged violations.  *See supra*

23 Sections 1.B.1 (detailing repeated disclosure of loan terms to consumers prior to loan approval);

24 1.B.2 (detailing post-approval confirmation email with loan terms, repeated reminder emails, and

25 opportunity for consumers to alter payment options at any time online or via a toll-free customer

---

26  [132]  To the extent that the FTC is implicitly relying on the statutory authorization of injunctive relief

27 to create a presumption of harm to the public, the Ninth Circuit has rejected this approach in light of the *Winter* decision issued by the Supreme Court. *See Park Vill. Apartment*, 636 F.3d at 1162 (9th

28 Cir. 2011) (explaining that "we do not presume irreparable harm simply because a defendant violates a statute that authorizes injunctive relief."); *Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 494 (9th Cir. 2010) (same).

service number); 1.B.3 (detailing debt collection written procedures prohibiting alleged conduct at issue, training regarding such conduct, and an enforced zero-tolerance policy against any employee who performs such conduct). These procedures mitigate any potential harm and make it overwhelmingly likely that any alleged violation will not reoccur, thus further disposing of the FTC's claimed need for a sweeping injunction.

Finally, any argument as to the immediate need for a preliminary injunction is belied by the FTC's own actions in this and similar cases. In this case, the FTC has been investigating the Tribal Lending Defendants for over four years, yet failed to seek an injunction at any point, and is only bringing this motion for a preliminary injunction now. Delay by itself is not a determinative factor, but the fact that the FTC waited so long weighs strongly against the need for immediate preliminary relief. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir. 1985). Moreover, in recently litigated cases, the FTC has encountered virtually *identical* loan disclosures—with a single payment disclosure and a renewal option—and has never questioned them despite the fact that at least one of these cases remains in litigation. *See F.T.C. v. Loanpointe,* No. 10-225, ECF No. 44-5 (C.D. Utah Feb. 16, 2011), TLDX 5 at 915; *F.T.C. v. Payday Financial LLC,* No. 11-3017, ECF No. 10 (C.D. S.D. Sep. 6, 2011). In these cases, the FTC has filed such loan disclosures as a part of its evidence and has amended its complaint to add new charges, but it has *never* challenged the loan disclosures as deceptive. The FTC's failure to seek a preliminary, or even a final injunction, in those cases involving almost identical disclosures undercuts the Plaintiff's sense of urgency in this case and weighs against the Plaintiff's unsubstantiated claim that an injunction is needed to protect the public here. It also disproves the assertion that the requested disclosures are necessary at all.

### b. Granting the Preliminary Injunction Will Cause Devastating Harm to the Tribal Entities

If an injunction is granted, the harm to the Defendants and to the public will be real, acute, and irreparable. Although the Defendants are not engaged in any conduct that violates the law, the

broad and amorphous nature of the terms of the proposed preliminary injunction could effectively prohibit the Tribal Lending Defendants from conducting their lending operations at all.

The clearest example of this is Section V of the proposed Order. Proposed Order § 5, ECF No. 4-1 at 6. Plaintiffs do not even allege a violation related to the Tribal Lending Defendants' disclosures of information to third parties, yet this Section would prohibit the Defendants from "disclosing to any third party the name, address, telephone number, Social Security number, credit card number, bank account number, email address, or other identifying information of any person who applied for and/or obtained a loan."[133] Not only are disclosures such as these specifically permitted by the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the USA PATRIOT Act, and other federal lending and privacy laws, but they are absolutely critical to the ongoing business of loan underwriting, funding, servicing, and collection.

For example, to underwrite a loan, the Tribal Lending Defendants must disclose borrower data to credit bureaus, identity verification databases and fraud prevention services, to ensure that borrowers are creditworthy, credit applications are legitimate, and loans applicants are who they say they are. To fund a loan, the Tribal Lending Defendants must disclose borrower information to payment processors and banks so that these third parties can deposit the funds in borrowers' accounts. To service a loan, the Defendants must disclose borrower data to payment processors and banks so that these third parties can debit borrowers' accounts for the amount due. Moreover, in the ordinary course of their businesses, the Defendants must disclose borrower data to bankruptcy trustees, executors, personal representatives, Better Business Bureaus, consumer debt settlement firms, attorneys, accountants, and outside auditors for a variety of purposes, including to process borrower requests, handle borrower disputes, service or collect borrower accounts, and perform internal audits and analytics.[134]

---

[133] The only exception provided is for disclosures "to a law enforcement agency or *as required by any law, regulation, or other court order.*" Proposed Order §5, ECF No. 4-1 at 6 (emphasis added).

[134] Dempsey Decl. ¶¶ 77-79, TLDX 4 at 766-67.

Under the terms of the proposed Preliminary Injunction, the Defendants could do none of these things, and thus could not reasonably continue their online short-term lending operations, a factor that weighs strongly against the grant of an injunction. *See Winter*, 555 U.S. at 27 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome"). Even assuming that the implementation of the requested relief were viable through a restructuring of loan operations, doing so would be devastating to the Tribal Lending Defendants' businesses; not only would the cost of implementation be high, but they would also: a) be required to suspend their ongoing operations as they implemented the changes; b) be prohibited from engaging in conduct that it is otherwise legal, and would thereby be forced to incur additional cost for their unique new requirements, putting them at a competitive disadvantage; and c) suffer substantial reputational damage that would further harm their ability to attract future customers.

More importantly, forcibly shuttering or interrupting the Tribal Lending Defendants ongoing lending operations will have immediate and irreparable impacts on their respective tribes. The lending operations provide crucial income to tribal governments and life-sustaining benefits to their members. As discussed in the accompanying declarations from leaders of the Santee Sioux Nation, the Miami Tribe of Oklahoma and the Modoc Tribe of Oklahoma, as a result of decades of failed paternalistic federal policies, these Indian tribes lack a tax base to provide a revenue source to operate their government or fund essential governmental services for their people. *See, e.g.,* Gamble Decl. ¶¶ 19–21, TLDX 1 at 7; Trudell Decl. ¶ 14, TLDX 2 at 390-91; Cobb Decl. ¶¶ 12-14, TLDX 3 at 632-33; *see also* Fletcher, *supra*, 771-72. These online short-term lending businesses provide a successful response to this unique and trenchant problem for the geographically isolated tribes, and the tribes rely on the income from the Tribal Lending Defendants to provide tribal members' basic necessities such as poverty assistance, health care, housing, education, disability, and domestic violence victims programs. *See* Gamble Decl. ¶¶ 19–21, TLDX 1 at 7; Trudell Decl. ¶ 14, TLDX 2 at 390-91; Cobb Decl. ¶¶ 12-14, TLDX 3 at 632-633.

In addition, the tribes rely on the income from the Tribal Lending Defendants to fund basic governmental and associated functions such as tribal government payroll and maintenance of tribal government buildings. *See* Gamble Decl. ¶ 19, TLDX 1 at 7; Trudell Decl. ¶ 14, TLDX 2 at 390-91. If this Court grants the requested Preliminary Injunction, this crucial source of tribal government income will vanish and these basic necessities will be unmet, causing an "immediate, devastating and irreversible impact" on the tribes and their members. Gamble Decl. ¶ 21. *See also Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan 1995) (holding that loss of revenues that are used to fund tribal government services and programs to tribal members would be "extremely serious and potentially devastating to the Tribes"). This loss of income will threaten the ability of the tribes to govern themselves. *See Seneca–Cayuga Tribe v. Okla.*, 874 F.2d 709, 716 (10th Cir. 1989). Ultimately, the tribal governments stand to lose the ability to provide life-sustaining services to their members, and the thousands of members of these tribes will suffer immediate and devastating consequences. *See Sac & Fox Nation*, 905 F. Supp. at 907-08.

The court must take into consideration all of these harms to the Defendants, and cannot merely presume *ipso facto* that the harms to the public necessarily outweigh those to the Defendants as the Plaintiff so cavalierly suggests it should. *See Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

### c. The Public Interest Will Be Served By Denying An Injunction In This Case

The harm to the public if an injunction is granted will also be severe. First, while the FTC offers a mere 19 affiants (and only relies upon eight of them in support of its Motion), the Defendants currently employee almost 900 people, many or all of whom may be out of work if the injunction is granted.[135] This itself weighs against an injunction. *See Archive Corp. v. Cipher Data Prods., Inc.*, No. SACV88296, 1988 WL 168533, at *7 (C.D. Cal. Dec. 21, 1988) (holding equitable interests weighed against granting injunction where injunction would force defendant to lay off employees and would leave third party manufacturers without a supply); *see Atari Corp. v. Sega of*

---

[135] *See* Dempsey Decl. ¶ 8, TLDX 4 at 748.

*Am. Inc.*, 869 F.Supp. 783, 792 (N.D. Cal. 1994) (considering harm to defendant of laying off employees as factor in assessing equitable interests).

Next, the Tribal Lending Defendants originated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[136] The financial product that they provide is critical to this legion of customers, who rely on loans to pay for necessities such as rent, groceries, and utilities. The proposed preliminary injunction will deprive borrowers of this source of funds at a time when the economy is especially fragile, and may leave Defendants' customers without any options or with less desirable options, such as exorbitant bank overdraft fees (repeated use of which eventually may lead to closure of a bank account); foregoing necessary medical, auto repair or other expenses and jeopardizing consumers' health or safety; or allowing utility bills to remain unpaid, with the attendant inconvenience, health and safety concerns, and high reconnection fees.

The harm to the public interest that would result from the requested injunction is also reflected by the fact that the grant of such extraordinary relief would contravene congressional policies designed to promote the very type of tribal economic development activity at issue here. In 2000, Congress passed the Native American Business Development, Trade Promotion, and Tourism Act (the "NABDA"). 25 U.S.C. § 4301. Congress passed this Act "to revitalize Native American economies, to promote private investment, and to promote long-range sustained economic growth." Glenda K. Harnad, *Power of Federal and State Governments in Matters Involving Indians*, 41 Am. Jur. 2d Indians; Native Americans § 37 (2012). The NABDA imposes several affirmative obligations on the U.S. Government that the Plaintiff contravenes by pursuing this action against the tribal enterprises and declaring them a "common enterprise" simply because they take advantage of non-Indian capital and expertise. Not only are the tribes' business pursuits legal, they were expressly encouraged by federal statute by Congress back in 2000.

---

[136] *See* Dempsey Decl. ¶¶ 11-12, TLDX 4 at 748. It is important to note that repeat customers are not renewals or "rollovers," but "reacts," or borrowers who paid in full, took a time out, and then came back to Defendants for another loan.

44

In passing the NABDA, Congress decreed that the "United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes." 25 U.S.C. § 4301(a)(6). Congress explicitly recognized that "Native Americans suffer higher rates of unemployment, poverty, poor health, substandard housing and associated social ills that those of any other group in the United States," and that "the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands." *Id.* at § 4301(a)(7) and (8).  The United States expressly announced its assumption of an "obligation to assist Indian tribes with the creation of appropriate economic and political conditions" to "(A) encourage investment from outside sources that do not originate with the tribes; and (B) facilitate economic ventures with outside entities that are not tribal entities." *Id.* at § 4301(a)(9).

Congress further stated that "the economic success and material well-being of Native American communities depends on the combined efforts of the Federal Government, tribal governments, the private sector, and individuals." *Id.* at § 4301(a)(10).  Congress unequivocally explained that "the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available to address the challenges faced by those groups – (A) the resources of the private market; (B) adequate capital; and (C) technical expertise." *Id.* § 4301(a)(12).

Beyond the NABDA, federal law consistently has recognized that "tribal self-sufficiency and economic development" are "important" and "compelling" interests.  *Cal. v. Cabazon Band of Mission Indians*, 480 U.S. 202, 219, 222 (1987).  Congress is "firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes." *N.M. v. Mescalero Apache Tribe*, 462 U.S. 324, 334-35 (1983).  To this end, "federal statutes relating to Indian tribes 'are to be construed liberally in favor of the Indians, *with ambiguous provisions interpreted to their benefit.*'" *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767,

779-80 (9th Cir. 2008) (*emphasis in original*) (quoting *Mont. v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766 (1985)).

Against this backdrop, the FTC—while seeking significant preliminary relief adverse to the Tribal Lending Defendants—seems to disregard entirely these important national interests. The FTC attempts to condemn and penalize the tribes for carrying out Congress' express directive to achieve economic self-development and self-sufficiency. In the process, the FTC looks to permanently impair the tribes' businesses and their access to the funds that are used to combat the ills that Congress, back in 2000, recognized the United States has an obligation to help end.

This approach is misdirected. The Ninth Circuit has consistently rejected proposals that "would frustrate Indian tribes' efforts to promote economic development and fiscal autonomy" and in doing so has observed that "[p]ut simply, the tables have turned since 1872 . . . . Congress now considers self-determination—not paternalism—to be in the Indians' best interest." *Guidiville Band of Pomo Indians*, 531 F.3d at 780-81 (internal quotations and citation omitted). It follows that this Court should avoid imposing a form of relief that "'not only would threaten to disrupt the federal and tribal regulatory scheme, but would also threaten Congress' overriding objective of encouraging tribal self-government and economic development.'" *Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1393 (9th Cir. 1987) (quoting *Mescalaro*, 462 U.S. at 341).

Finally, as noted above, if the requested injunction is issued, the Tribal governments stand to lose the ability to provide life-sustaining services to their members, and the thousands of members of these Indian Tribes will suffer immediate and devastating consequences, which undeniably contravenes the public interest:

> The public interest in assuring the continued presence of social service, public safety and education programs and benefits to the Tribes on Indian lands is significant. The public also has a genuine interest in helping to assure Tribal self-government, self-sufficiency and self-determination. Should . . . the previously stated negative impact on the Tribes occur, the public interest will be ill-served by the potential influx of Tribal members into the state's social service and welfare programs.

*Sac & Fox Nation*, 905 F. Supp. at 907-08.

In sum, in light of the harm to the public and the Tribal Lending Defendants if the injunction is granted, and the lack of harm if an injunction is denied, the equities overwhelmingly favor an order denying an injunction, and no preliminary injunction should issue.

**B.      Even If Preliminary Injunctive Relief Were Appropriate, Plaintiff's Proposed Preliminary Injunction Must Be Rejected Because It is Vague and Overly Broad**

Preliminary injunctions "must be narrowly tailored . . . to remedy only the specific harms shown by the Plaintiffs, rather than 'to enjoin all possible breaches of the law.'"  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (citation omitted)*; see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").  In *Park Village Apartment Tenants Association*, for example, the Ninth Circuit reversed the district court's entry of a preliminary injunction as "overbroad because it [was] not tailored to remedy the Plaintiffs' actual harms . . . ."  636 F.3d at 1150, 1161.  The district court erred in that case because it did not limit the language of the order to the specific statute at issue; instead, it sought to protect "uncabined, implied rights" that the plaintiff insisted were cognizable. *Id.*

The preliminary injunction proposed here does not meet the Ninth Circuit's mandate.  It is entirely unclear what conduct the proposed preliminary injunction actually prohibits and in turn what conduct it would require Defendants to undertake in order to comply with its vaguely worded commands. *See, e.g.*, Proposed PI, ECF No. 4-1 at 4 (enjoining "misrepresent[ation] . . . expressly or by implication").  On top of that, the scope of the proposed preliminary injunction is far broader than necessary to remedy the specific violations alleged by the Plaintiff.  For example, the Plaintiff alleges a narrow violation of Section 5(a) of the FTC Act stemming from Defendants purported misrepresentation that consumers could be arrested or would be sued, but the proposed preliminary injunction not only prohibits such misrepresentations related to arrest or lawsuit, but also enjoins Defendants from "misrepresenting . . . [a]ny other material fact." *Id.* at 5.  And, finally, Section V does not have anything to do with any of the allegations asserted by the FTC. *Id.* at 6.  It simply puts forth an entirely *ad hominem* prohibition on certain consumer information disclosures. *Id.* at 6.

47

Plaintiff also seeks to force almost twenty corporate, individual and relief defendants to assemble financial information and complete onerous and intrusive financial statements that amount to full accountings.  The proper time to seek financial information is in connection with routine discovery once discovery commences in this case consistent with the Federal Rules of Civil Procedure, the Local Rules of this District and the Tribal Entities' due process rights.  The FTC offers no justification for its extraordinary remedy of "expedited discovery," aside from asserting that this relief was provided in two prior Securities Exchange Commission cases.  These earlier cases are easily distinguished, however.  In both cases an order for an accounting was entered by the court with an asset freeze, because of clear evidence that there was a risk of dissipation of assets.  *See S.E.C. v. Bankers Alliance Corp.*, 881 F. Supp. 673, 676 (D.D.C. 1995) (order entered requiring repatriation to the United States of "all funds and assets of [allegedly defrauded] investors"); *S.E.C. v. Parkersburg Wireless LLC*, 156 F.R.D. 529, 533-34 (D.D.C. 1994) ("[W]e were concerned about the possibility the $260,000, not then subject to the asset freeze, would be further dissipated to the detriment of … investors.").  The FTC has presented no such evidence here, and indeed, after four years of investigation cannot credibly assert that there is a risk of flight or dissipation of assets.

The FTC's invasive request for mandatory injunctive relief is simply unsupported by the facts, the law, or after four years of investigation with no action taken, an urgent need.   In sum, the injunction proposed by the Plaintiff is nowhere near "narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs," *Price*, 390 F.3d at 1117, and must be denied for this additional reason.  The extremely overbroad language of the FTC's proposed order flies squarely in the face of the Ninth Circuit's admonishment that "'[i]njunctive relief . . . must be tailored to remedy the *specific harm alleged*.  An overb[roa]d injunction is an abuse of discretion.'"  *Park Vill.*, 636 F.3d at 1160 (*emphasis and brackets in original*) (quoting *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).

1
2
3          **III.    CONCLUSION**
4          For all of the reasons set forth above, Plaintiff's motion for a preliminary injunction should
5   be denied.
6   Dated: May 4, 2012
7
8                                            Respectfully Submitted,
9                                            DAVID J. MERRILL, P.C.
10
11
12                                    By:    _David J. Merrill_
                                            DAVID J. MERRILL
13                                          10161 Park Run Drive, Suite 150
                                            Las Vegas, Nevada  89145
14                                          (702) 566-1935
15                                          *Attorneys for Defendants AMG Services,*
                                            *Inc.; Red Cedar Services, Inc. dba*
16                                          *500FastCash; SFS, Inc. dba OneClickCash;*
                                            *Tribal Financial Services, dba Ameriloan,*
17                                          *UnitedCashLoans, USFastCash, Miami*
                                            *Nation Enterprises*
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that on the 4th day of May, 2012, service of the foregoing **JOINT OPPOSITION AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF** was submitted electronically for filing and/or service with the United States District Court of Nevada.  Electronic service of the foregoing document shall be made in accordance with the E-Service List as follows:

Blaine T. Welsh                          blaine.welsh@usdoj.gov
Julie G. Bush                                 jbush@ftc.gov
Jason Schall                                  jschall@ftc.gov
Nikhil Singhvi                             nsinghvi@ftc.gov
                    Attorneys for Plaintiff

David J. Merrill                          david@djmerrillpc.com
Attorney for Defendants AMG Services, Inc.; Red Cedar Services, Inc. dba 500FastCash; SFS, Inc. dba OneClickCash; Tribal Financial Services, dba Ameriloan, UnitedCashLoans, USFastCash, Miami Nation Enterprises

Von S. Heinz                             vheinz@lrlaw.com
Darren J. Lemieux                      dlemieux@lrlaw.com
E. Leif Reid                              lreid@lrlaw.com
Attorneys for Defendants AMG Capital Management, LLC; Level 5 Motorsports, LLC; LeadFlash Consulting, LLC; Black Creek Capital Corporation; Groadmoor Capital Partners, LLC; Scott A. Tucker; Blaine A. Tucker

Andrew P. Gordon                      agordon@mcdonaldcarano.com
            Attorney for Defendant Partner Weekly, LLC

L. Christopher Rose                    lcr@juww.com
Attorney for Defendants The Muir Law Firm, LLC and Timothy J. Muir

Whitney P. Strack                       pstrack@gbmglaw.com
Brian R. Reeve                           breeve@swlaw.com
Nathan F. Garrett                       ngarrett@gbmglaw.com
            Attorneys for Defendant Don E. Brady

Jay Young                                jay@maclaw.com
            Attorney Defendant for Robert D. Campbell

Paul C. Ray                             PaulCRayLaw@gmail.com

Attorney for Defendant Troy L. Littleaxe

Patrick J. Reilly                                   preilly@hollandhart.com
Attorney for Defendants Kim C. Tucker and Park 269 LLC

An Employee of David J. Merrill P.C.

51