ANDREW A. KASSOF, P.C.
BRADLEY H. WEIDENHAMMER
RICHARD U.S. HOWELL
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email: andrew.kassof@kirkland.com
            bradley.weidenhammer@kirkland.com
            rhowell@kirkland.com

*Attorneys for Defendants AMG Services, Inc. and*
*MNE Services, Inc. (dba Tribal Financial Services,*
*Ameriloan, UnitedCashLoans, USFastCash)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>AMG SERVICES, INC., *ET AL.*,<br><br>                    Defendants, and<br><br>PARK 269 LLC, *ET AL.*,<br><br>                    Relief Defendants. | Case No. 2:12-CV-536-GMN-(VCF)<br><br><br>**DEFENDANTS' MOTION FOR**<br>**SUMMARY JUDGMENT**<br>**ON COUNT III** |

        In accordance with Federal Rule of Civil Procedure 56(a), defendants AMG Services, Inc.,

SFS, Inc., Red Cedar Services, Inc., and MNE Services, Inc. (the "Movants") move this Court to

enter summary judgment in favor of the defendants on Count III of the First Amended Complaint,

which contains the plaintiff's claims that the defendants violated sections 121 and 128 of the Truth

in Lending Act, 15 U.S.C. §§ 1631, 1638, and sections 1026.17 and 1026.18 of Regulation Z,

1
2
3
4
5
6
7
8

12 C.F.R. §§ 1026.17, 1026.18.  The Movants base this motion on the pleadings and papers on file, the following memorandum of points and authorities, the accompanying declarations and the exhibits referenced therein, and any argument of counsel that may be heard by the Court pursuant to LR 78-2 and respectfully ask the Court to enter the proposed order filed concurrently with this motion.


**Dated**:  September 30, 2013

9
10
11
12
13

/s/ David J. Merrill
DAVID J. MERRILL
DAVID J. MERRILL, P.C.
Nevada Bar No. 6060
10161 Park Run Drive, Suite 150
Las Vegas, NV  89145
Telephone:     (702) 566-1935
Facsimile:      (702) 924-0787
Email:  david@djmerrillpc.com

14
15
16

*Attorney for Defendants AMG Services, Inc. and MNE Services, Inc. (dba Tribal Financial Services, Ameriloan, UnitedCashLoans, USFastCash)*

/s/ Bradley Weidenhammer
BRADLEY WEIDENHAMMER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago IL  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:  bradley.weidenhammer@kirkland.com

*Attorney for Defendants AMG Services, Inc. and MNE Services, Inc. (dba Tribal Financial Services, Ameriloan, UnitedCashLoans, USFastCash)*

17
18
19
20
21

/s/ Conly Shulte
CONLY SCHULTE
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
Omaha, NE  68116
Telephone:     (303) 673-9600
Facsimile:      (303) 673-9155
Email:  cschulte@ndnlaw.com

22
23
24

*Attorney for Defendants AMG Services, Inc.; Red Cedar Services, Inc. dba 500FastCash; SFS, Inc. dba OneClickCash;MNE Services, Inc., dba Tribal Financial Services, Ameriloan, UnitedCashLoans, USFastCash*

25
26
27
28

ANDREW A. KASSOF, P.C.
BRADLEY H. WEIDENHAMMER
RICHARD U.S. HOWELL
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email: andrew.kassof@kirkland.com
           bradley.weidenhammer@kirkland.com
           rhowell@kirkland.com

*Attorneys for Defendants AMG Services, Inc. and
MNE Services, Inc. (dba Tribal Financial Services,
Ameriloan, UnitedCashLoans, USFastCash)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 2:12-CV-536-GMN-(VCF) |
| v. | |
| AMG SERVICES, INC., *ET AL.*, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT III** |
| Defendants, and | |
| PARK 269 LLC, *ET AL.*, | |
| Relief Defendants. | |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ............................................................ 2

     A.    The Lending Defendants and AMG ........................................................... 2

     B.    The Loan Agreements ................................................................................. 3

           1.    Initial Loan Obligations .................................................................. 5

           2.    Renewal of Loan Obligations .......................................................... 5

     C.    The FTC's TILA Claim .............................................................................. 7

III.  SUMMARY JUDGMENT STANDARD ................................................................ 8

IV.   ARGUMENT .......................................................................................................... 9

     A.    Lending Defendants' TILA Disclosures Are Based on the Legal Obligation at the Outset of a Loan Transaction. ..................................................................... 10

     B.    The Loan Agreements Create a Single Payment Obligation. ..................................... 12

     C.    The Loan Agreements Do Not Oblige Borrowers To Renew Loans. .......................... 13

           1.    The Loan Agreements Unambiguously Contradict the FTC's Contention That Consumers Were Obliged To Renew Their Loans. .............. 13

           2.    The FTC Cannot Rely on Extrinsic Evidence To Contradict Unambiguous Loan Terms. ..................................................................... 16

     D.    The Lending Defendants' TILA Disclosures Properly Reflect A Single Payment Obligation. ................................................................................................ 19

CONCLUSION ........................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1414 P'ship v. Taveau,*
    815 P.2d 1228 (Okla. Civ. App. 1991) ............................................................... 15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................................... 8, 9

*Anthony* v. *Cmty. Loan & Investment Corp.,*
    559 F.2d 1363 (5th Cir. 1977) ............................................................................ 17

*Aydin Corp. v. Loral Corp.,*
    718 F.2d 897 (9th Cir. 1983) ................................................................................ 9

*Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,*
    293 F.3d 1139 (9th Cir. 2002) ............................................................................ 14

*Bhan v. NME Hosps., Inc.,*
    929 F.2d 1404 (9th Cir. 1991) .............................................................................. 9

*Bone v. Hibernia Bank,*
    493 F.2d 135 (9th Cir. 1974) .............................................................................. 11

*Cades v. H&R Block, Inc.,*
    43 F.3d 869 (4th Cir. 1994) ................................................................................ 18

*Circuit City Stores, Inc. v. Najd,*
    294 F.3d 1104 (9th Cir. 2002) ............................................................................ 15

*Connick v. Teachers Ins. & Annuity Ass'n of Am.,*
    784 F.2d 1018 (9th Cir. 1986) .............................................................................. 8

*Dixon v. S&S Loan Serv. of Waycross, Inc.,*
    754 F. Supp. 1567 (S.D. Ga. 1990)..................................................................... 19

*Eureka Water Co. v. Nestle Waters N. Am., Inc.,*
    690 F.3d 1139 (10th Cir. 2012) .......................................................................... 18

*First Nat'l Bank v. Cities Serv. Co.,*
    391 U.S. 253 (1968)............................................................................................. 9

*Gray v. First Century Bank,*
    547 F. Supp. 2d 815 (E.D. Tenn. 2008)............................................................. 17

*Hansen v. Liberty Mut. Fire Ins. Co.,*

2012 WL 4611013 (D. Nev. Sept. 30, 2012) ....................................................... 8, 9

*Hicks v. Star Imports, Inc.*,
    5 Fed. Appx. 222 (4th Cir. 2001) ............................................................... 17, 18

*In re Vylene Enters., Inc.*,
    90 F.3d 1472 (9th Cir. 1996) ...................................................................... 14, 15

*Medina v. Hous. Auth. of San Miguel Cnty.*,
    974 F.2d 1345 (10th Cir. 1992) ......................................................................... 17

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ............................................................................. 9

*Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.*,
    746 F.2d 557 (9th Cir. 1984) ............................................................................ 18

*Pierce Cnty. Hotel Emps. & Rest. Emps. Health Trust v.*
    *Elks Lodge, B.P.O.E. No. 1450*,
    827 F.2d 1324 (9th Cir. 1987) .......................................................................... 17

*Porter v. Nationacredit Consumer Disc. Co.*,
    285 F. App'x 871 (3d Cir. 2008) ...................................................................... 17

*Porter v. NationsCredit Consumer Disc. Co.*,
    2006 WL 3333837 (E.D. Pa. Nov. 14, 2006), *aff'd sub nom.*
    *Porter v. Nationacredit Consumer Disc. Co.*,
    285 F. App'x 871 (3d Cir. 2008) ...................................................................... 17

*Zoslaw v. MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982) .............................................................................. 9

**Statutes**

15 U.S.C. § 1601(a) ............................................................................................... 10

15 U.S.C. § 1604(a) ............................................................................................... 10

15 U.S.C. § 1631 ...................................................................................................... 7

15 U.S.C. § 1634 ............................................................................................... 12, 19

15 U.S.C. § 1638 ...................................................................................................... 7

15 U.S.C. § 1638(a)(10) ........................................................................................ 11

15 U.S.C. § 1693k(1) ............................................................................................... 7

**Other Authorities**

*17A Am. Jur. 2d Contracts* § 509 .......................................................................... 15

*A Dictionary of Modern Legal Usage* (2d ed. 1995) ........................................... 13

*Black's Law Dictionary* (9th ed. 2009) ........................................................... 13, 14

Lamont, Dennis D.
    *Negative Option Offers in Consumer Service Contracts*,
    42 UCLA L. Rev. 1315 (1995) ................................................................... 15

*Restatement (Second) of Contracts* (1981) ................................................. 14, 15

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 8

**Treatises**

*Williston on Contracts* (4th ed.) ............................................................ 14, 15

**Regulations**

12 C.F.R. § 1005.10(e)(1) ............................................................................ 7

12 C.F.R. § 1026.1(a) ................................................................................. 10

12 C.F.R. § 1026.17 ..................................................................................... 7

12 C.F.R. § 1026.17(a) ............................................................................... 11

12 C.F.R. § 1026.17(b). .............................................................................. 11

12 C.F.R. § 1026.17(c) ............................................................................... 1, 9

12 C.F.R. § 1026.18 ..................................................................................... 7

12 C.F.R. § 1026.18(b) ............................................................................... 10

12 C.F.R. § 1026.18(d) ............................................................................... 11

12 C.F.R. § 1026.18(e) ............................................................................... 11

12 C.F.R. § 1026.18(g) ............................................................................... 11

12 C.F.R. § 1026.18(h) ............................................................................... 11

12 C.F.R. § 1026.2(a)(10) ............................................................................. 2

12 C.F.R. § 1026.2(a)(17) ........................................................................... 10

12 C.F.R. § 1026.2(a)(20) ........................................................................................ 2

12 C.F.R. § 1026.2(a)(22) ...................................................................................... 10

12 C.F.R. § 1026.20(a)(1) ...................................................................................... 11

12 C.F.R. Pt. 1026, Supp I, Pt. 2, § 1026.17(c)(1)-1 ................................... 1, 11, 20

12 C.F.R. Pt. 1026, Supp. I, Pt. 1, § 1026.2(a)(14)-2 ............................................. 2

12 C.F.R. Pt. 1026, Supp. I, Pt. 1, § 1026.20(a)-1 ................................................ 12

12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.17(c)(1)-1 ................................... 9, 17, 19

12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.17(c)(1)-2 .......................................... 17

## I.    INTRODUCTION

The question before this Court on this motion is a simple one: Were the borrowers who took loans from the Lending Defendants obligated to renew their loans?  If not, then the Lending Defendants complied with the Truth in Lending Act and are entitled to summary judgment on Count III.  If so, then the FTC is correct and the Lending Defendants failed to disclose the borrowers' legal obligations at the outset of the loans.

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, requires lenders to provide written disclosures to consumers that "reflect the terms of the legal obligation between the parties," 12 C.F.R. § 1026.17(c), meaning "the credit terms to which the parties are legally bound *as of the outset of the transaction*," 12 C.F.R. Part 1026, Supp. I, Pt. 2 § 1026.17(c)(1)-1 (emphasis added). The Lending Defendants' (*i.e.*, MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc.) Loan Agreements, particularly the Loan Note and Disclosure, clearly and unambiguously oblige borrowers to pay in full the amount financed plus the stated finance charge at the end of a single pay period.  The TILA disclosures in the Loan Note and Disclosure properly reflect the borrowers' obligation to repay in full at the end of a single pay period.

The Loan Agreements also establish a process by which borrowers *may*, three days before their due date (and well after the outset of the transaction), choose to renew their loans for an additional pay period.  But borrowers have no right, let alone an obligation, to renew at the outset: renewal is contingent on both borrower and lender accepting the renewal three days in advance of the due date.  (*See* Ex. A-1, 10/12/11 Barboza US Fast Cash Loan Agreements at AMG_00423422 (attached to Ex. A, 9/30/13 Dempsey Decl.) ("This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed.").)  Disclosures under TILA and Regulation Z need not—and, in fact, cannot—reflect contingent obligations the borrower *may or may not* incur in the future.

The FTC alleges in Count III that TILA required the Lending Defendants to provide disclosures reflecting *not* the obligation that existed at the outset of the transaction but the amount a

borrower would pay if she and the lender repeatedly accepted renewal, up to the maximum number of renewals allowed under the Loan Agreements.

This is not the law.  The Truth in Lending Act does not require loan disclosures to reflect contingent obligations that might be incurred *after* the outset of the transaction.  The Lending Defendants' Loan Agreements unambiguously create a single period/single payment obligation between lender and borrower at the outset of the loan transaction, while also setting forth the process by which the parties *may in the future* agree to renew the loan for an additional pay period (or periods).  Renewal is expressly and unambiguously contingent on future events (both lender's and borrower's acceptance).  And although the FTC tries to step outside the terms of the Loan Agreements by contending that "in practice" borrowers are obliged to renew the maximum number of times, (Ex. C, FTC Consol. Interrog. Resp. 11), that argument likewise fails: the FTC may not rely on parol evidence (such as the parties' conduct "in practice") to contradict the unambiguous terms of the Loan Agreements.

In short, the FTC has developed no material facts from which a fact finder could conclude that borrowers were obliged at the outset to renew their loans.  Contrary to the FTC's allegations in Count III, the Lending Defendants fully complied with the requirements of TILA by providing disclosures reflecting the borrower's single-payment obligation at the outset of the loan transaction. Pursuant to Federal Rule of Civil Procedure 56, the Lending Defendants are entitled to summary judgment on Count III of the FTC's First Amended Complaint.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Lending Defendants and AMG

The Lending Defendants extend closed-end credit to borrowers.[1]  (*E.g.*, Ex. A-1, 10/12/11 Barboza US Fast Cash Loan Agreements at AMG_00423420–24.)  These short-term consumer loans are most commonly for $300.  (Ex. B,[2] 8/7/13 Dempsey Dep. Tr., at 135:13–14.)[3]  This type of loan

---

[1]   *See* Ex. D, First Am. Compl., ECF No. 386, ¶ 55 ("Defendants extend closed-end credit (as opposed to open-end credit) to consumers under TILA and Regulation Z.").)

[2]   Exhibits A through N are attached to the declaration of Bradley Weidenhammer.

[3]   The maximum loan amount has changed over the years.  (*See* Ex. B at 135:13–14.)

is often called a "payday loan" because the money is lent until the borrower's next payday— typically two weeks.  (*See* Ex. D, First Am. Compl., ECF No. 386, ¶ 27.)

MNE Services, Inc. ("MNES") was incorporated under the laws of the Miami Tribe of Oklahoma in 2008 (Ex. E, Resolution 8-1, ECF No. 102-5, at Ex. L) and does business as UnitedCashLoans, USFastCash, Ameriloan, Star Cash Processing, and Advantage Cash Services (Ex. F, MNES Ans., ECF No. 404, ¶ 9; Ex. G, 5/4/12 Dempsey Decl., ECF No. 70-4, ¶¶ 7–9).  SFS, Inc. was created under the laws of the Santee Sioux Nation in 2005 (Ex. H, Resolution 2005-27, ECF No. 102-6, at Ex. P) and does business as OneClickCash (Ex. I, SFS Ans., ECF No. 409, ¶ 8). Red Cedar Services, Inc. was created under the laws of the Modoc Tribe of Oklahoma in 2009 (Ex. J, Resolution 9-11, ECF No. 102-9, at Ex. R) and does business as 500FastCash (Ex. K, Red Cedar Ans., ECF No. 408, ¶ 7).  Defendant AMG Services, Inc. is not a lender; it is a shared services provider that supplies staffing, human resources, customer service, information technology, and other services to the Lending Defendants.  (Ex. G ¶¶ 7–10.)

The Lending Defendants operate exclusively online through proprietary websites.  (*Id.* ¶ 13.) Although these websites differ somewhat in appearance, they all provide the same information to borrowers in the same language.  (*Id.*; *see also* Ex. L, ECF No. 5-2, at 17–45 (500FastCash screenshots); *id.* at 47–74 (Ameriloan screenshots); *id.* at 76–106 (OneClickCash screenshots); *id.* at 108–35 (UnitedCashLoans screenshots); *id.* at 137–64 (USFastCash screenshots).)  Each portfolio's loan documents and terms are identical (aside from the lender's name).  (Ex. B at 78:9–13.)

B.    **The Loan Agreements**

To apply for a loan, a potential borrower must complete a short application online.  (Ex. G ¶¶ 20–24.)  Applicants must provide their name, date of birth, contact information, employer's name and contact information, information about when and how much they are paid, and bank account and routing numbers.  (Ex. B at 82:5–83:4, 86:17–24.)[4]

---

[4]  Many consumers are directed to the Lending Defendants via "lead generation sites" rather than directly through a Lending Defendant's website.  If the borrower first lands on a lead generation site, she may provide some of this basic application information to the lead generator, who then will send the information to the lender.  (Ex. G ¶ 18.) The borrower must provide substantially the same information whether she begins the process on a lead generation site or one of the lender's websites.  (Ex. B at 86:17–24)

If an applicant submits this information and a Lending Defendant pre-approves the loan application, the applicant is directed to the electronic signature page where she is given the opportunity to review her Loan Agreements.  (Ex. G ¶¶ 25–26.)  If the applicant agrees with the terms of the Loan Agreements and wishes to borrow money subject to those terms, the applicant must confirm that she has read and accepts those terms:



(Ex. A-2, Training Manual, at AMG_00003651 (attached to Ex. A, 9/30/13 Dempsey Decl.).)

An applicant who wishes to borrow subject to the terms of the Loan Agreements must also type his name into the form and click a button that reads "I Agree."  The electronic signature form clearly states, "By typing your full name below to provide your Electronic Signature and clicking the "I Agree" button, you agree to accept this loan pursuant to the terms and provisions of all the loan documents above."  (Ex. B at 131:7–13.)  The Lending Defendants extend loans only to consumers who (1) indicate that they have "read and accept[ed]" the terms of each of the Loan Agreements by checking the appropriate boxes; and (2) further indicate their agreement by typing their name and clicking "I Agree."  (Ex. G ¶ 26.)

### 1.    Initial Loan Obligations

The Promise to Pay provision of the Loan Note and Disclosure states, "You promise to pay to us or to our order . . . on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed."  (Ex. A-1. at AMG_00423422.)  The Total of Payments for each loan is the amount financed plus a single finance charge: in the example below, the amount financed is $500.00, and the finance charge is $150.00.  (*Id.*)  The Payment Schedule provision in the Loan Note and Disclosure likewise states that the Total of Payments is due on the borrower's next pay date, unless the borrower chooses to renew his loan: "1 payment of $650.00 due on 2011-10-25, if You decline* the option of renewing your loan" (*id.*):

**DISCLOSURE OF CREDIT TERMS**: The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate (e) **912.50%** | FINANCE CHARGE The dollar amount the credit will cost you. **$150.00** | Amount Financed The amount of credit provided to you or on your behalf. **$500.00** | Total of Payments The amount you will have paid after you have made the scheduled payment. **$650.00** |
|---|---|---|---|

Your **Payment Schedule** will be: 1 payment of **$650.00** due on **2011-10-25**, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $150.00 only, on 2011-10-25 You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline the option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security**: The loan is unsecured.
**Prepayment:** You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge.(e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is 10-13-2011.
**Itemization Of Amount Financed of $500.00**; Given to you directly: **$500.00**; Paid on your account **$0**
See below and your other contract documents for any additional information about prepayment, nonpayment and default.
**Promise To Pay:** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in the Note, the term "Business Day" means a day other than Saturday, Sunday or legal holiday, that USFastCash is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or for the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal checks. We do not accept personal checks, however, if You send Us a check, You authorize Us to perform an ACH debit on that Account in the amount specified.

### 2.    Renewal of Loan Obligations

In addition to disclosing the borrower's initial obligation, the Loan Agreements set forth the process by which the consumer and lender may in the future agree to renew the loan for an additional pay period.

The Promise to Pay provision of the Loan Note and Disclosure states that each party may indicate its acceptance by inaction: "This Note will be renewed on the Due Date unless at least three

Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed."  (Ex. A-1 at AMG_00423422.)  The Payment Schedule provision likewise provides, "*To decline the option of renewal you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due."  (*Id.*)  The Payment Options provision likewise provides: "Renewal.  Your loan will be renewed on every* due date unless you notify us of your desire to pay in full or to pay down your principal amount borrowed." (*Id.* at AMG_00423424.)

The Loan Note and Disclosure and the other Loan Agreements also provide that if the borrower chooses renewal, and the lender accepts, then on the original due date the consumer will pay only the Finance Charge without paying the Amount Financed and will incur an additional Finance Charge for renewing the loan through an additional pay period:

- **Payment Schedule Provision:** "If renewal is accepted you will pay the finance charge of $90.00 only, on 2011-9-14.  You will accrue new finance charges with every renewal of your loan."  (*Id.* at AMG_00423422.)

- **Promise to Pay Provision:** "If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above."  (*Id.*)

- **Payment Options Provision:** "You will accrue a new fee every time your loan is renewed.  Any fees accrued will not go toward the principal amount owed."  (*Id.* at AMG_00423424.)

- **Application Supplement:** "YOU WILL BE CHARGED ADDITIONAL FEES IF YOU RENEW THIS LOAN. . . .  If you did not repay the loan at maturity but chose instead to renew the balance by obtaining a new loan in the same amount and for an additional 14-day period, you would incur an additional Finance Charge . . . ."  (*Id.* at AMG_00423422.)

The Loan Agreements further state that borrowers may renew their loan four times without making any principal payments.  On their fifth and every subsequent renewal, borrowers must pay at least $50 on their principal:

- **Promise to Pay Provision:** "This Note may be renewed four times without having to make any principal payments on the Note.  If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00."  (*Id.*)

- **Payment Schedule Provision:** "On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00.  This means your

Account will be debited the finance charge plus $50.00 on the due date.  This will continue until your loan is paid in full."  (*Id.*)

- **Payment Options Provision:** "On your fifth renewal and every renewal thereafter, your loan will be paid down by $50.00.  This means your account will be debited for the finance charge plus $50.00, this will continue until your loan is paid in full."  (*Id.* at AMG_00423424.)

### C.    The FTC's TILA Claim

The FTC filed this lawsuit on April 2, 2012.  (Ex. M, Compl., ECF No. 1.)  The FTC's First Amended Complaint alleges in Count III that Defendants violated sections 121 and 128 of TILA, 15 U.S.C. §§ 1631, 1638, and sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18, by "failing to disclose in writing before extending credit the following information in a manner reflecting the terms of the legal obligation between the parties: a. the finance charge; b. the annual percentage rate; c. the payment schedule; and d. the total of payments."  (Ex. D ¶¶ 58–59.)[5]

AMG served interrogatories on the FTC asking it to identify the material facts supporting its contention that the Lenders violated the requirements of TILA and Regulation Z.  In response, the FTC stated:

> For a borrower receiving a $300 loan from Defendants, the legal obligation under the agreement described in paragraph 35 of the FTC's Complaint is to repay the loan by making ten separate payments over the course of ten pay periods for a total cost of $975. During the first four pay periods, borrowers are charged only a finance fee of 30% of the principal balance (for a $300 loan, a $90 finance fee). No portion of those payments is counted towards the principal.  After the fourth payment, borrowers pay $50 towards their principal each pay period, plus a finance charge equal to 30% of the principal balance, until the entire principal is paid off.  The only way a borrower can opt out of this default loan structure is by contacting the lender three business days before the due date and expressly ask to pay off the loan through another repayment schedule.  If the borrower does nothing and simply continues making payments under the loan, however, s/he will fully repay the loan in 10 payments, having paid back the $300 principal plus $675 in finance charges.

---

[5]   The First Amended Complaint also alleges that the defendants violated the FTC Act by using "deceptive collections practices" (Ex. D ¶¶ 50–52) and the Electronic Funds Transfer Act Section 913(1), 15 U.S.C. § 1693k(1), and Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1) (*id.* ¶¶ 66–67.)  The parties agreed to settle these claims and await the Court's entry of the stipulated settlement agreement.  (ECF No. 446.)

As a result, for a $300 loan, the Defendants should have, but failed to, make the following disclosures regarding the consumers' legal obligations vis-à-vis the loan:

APR:  727.3669%
Finance Charge:  $675
Total of Payments:  $975
Payment schedule:

- Payment 1:   $90
- Payment 2:   $90
- Payment 3:   $90
- Payment 4:   $90
- Payment 5:   $90 + $50 = $140
- Payment 6:   $75 + $50 = $125
- Payment 7:   $60 + $50 = $110
- Payment 8:   $45 + $50 = $95
- Payment 9:   $30 + $50 = $80
- Payment 10: $15 + $50 = $45

(Ex. C, FTC Consol. Resp. Interrog. at Interrog.  Resp. 11; *see also id.* at Interrog. Resps. 5 and 8.) The FTC failed to quote or identify any specific contractual language that obliges consumers at the outset of the transaction to renew their loans.  (*Id.* at Interrog. Resps. 5, 8, and 11.)  The FTC says the ten-payment obligation arises "in practice" and "in the manner processed by Defendants."  (*Id.* at Interrog. Resp. 5 ("[I]n practice, the consumer is obligated to repay the loan in ten installments.").)

## III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) requires summary judgment in favor of a moving party when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Summary judgment is uniquely appropriate when the contract is before the court and the issue is contractual interpretation."  *Connick v. Teachers Ins. & Annuity Ass'n of Am.*, 784 F.2d 1018, 1020 (9th Cir. 1986).  A "genuine" issue exists when "there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party."  *Hansen v. Liberty Mut. Fire Ins. Co.*, No. 2:11-CV-01519, 2012 WL 4611013, at *3 (D. Nev. Sept. 30, 2012) (Navarro, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986)).  A dispute is "material" when it can "affect the outcome of the suit under the governing law."  *Id.* (citing *Anderson,* 477 U.S. at 248–49).

The moving party bears the burden of showing the absence of genuine issues of material fact. *Hansen*, 2012 WL 4611013, at *2 (Navarro, J.) (citing *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982)). To carry its burden of production, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once this requirement is satisfied, the party resisting the motion must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 256, by "produc[ing] specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

## IV.    ARGUMENT

Under TILA, lenders must provide consumers written disclosures that "reflect the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(c). The legal obligation is determined "***as of the outset of the transaction***." *Id.* Supp. I, Pt. 2 § 1026.17(c)(1)-1 (emphasis added). The Lending Defendants' TILA disclosures in the Loan Note and Disclosure properly reflect the borrower's obligation to repay in full at the end of a single pay period, which is the only repayment obligation that exists as of the outset of the transaction.

It is irrelevant for TILA purposes that the Loan Agreements also establish a process by which consumers may choose to renew their loans, because nothing in the Loan Agreements ***obliges*** borrowers to renew. The Loan Note and Disclosure describes renewal in explicitly conditional terms that are plainly inconsistent with an extant obligation at the time the loan is consummated. Rather than oblige either party to renew, the Loan Note and Disclosure merely sets forth the process by which both parties ***may*** agree in the future to renew the loan, with the explicit understanding that both parties may manifest their assent by inaction. Hence borrowers do not have a right to renew, let

9

alone an obligation: renewal cannot occur unless both the borrower and lender accept renewal three days in advance of the due date. (*See* Ex. A-1 at AMG_00423422 ("This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed.").) Disclosures under TILA and Regulation Z need not reflect contingent obligations such as those incurred if renewal is accepted days or weeks after the loan is consummated.

The FTC's claim in Count III is contrary to the plain language of the Loan Agreements, Regulation Z, and hornbook contract law. As noted above and explained further below, the Loan Agreements unambiguously describe renewal as an event contingent on future acceptance by both the borrower and the lender. The fact that such acceptance is manifested by inaction does not make a contingent obligation extant at the outset of the transaction. Moreover, the FTC's reliance on the parties' "practice" and the "manner [in which loans are] processed by Defendants" is misplaced because such extrinsic evidence is inadmissible to contradict the unambiguous terms of the Loan Agreements. In short, the record evidence contains no material facts that could support a judgment in the FTC's favor on Count III.

### A. Lending Defendants' TILA Disclosures Are Based on the Legal Obligation at the Outset of a Loan Transaction.

The Lending Defendants are creditors as defined under the Truth In Lending Act[6] and consequently are required under that statute to provide consumers certain disclosures before extending them credit.[7] Under TILA and Regulation Z, creditors who provide closed-end credit must disclose to the borrower the following terms:

- "The *amount financed*, using that term, and a brief description such as the amount of credit provided to you or on your behalf." 12 C.F.R. § 1026.18(b).

---

[6] A "creditor" is a "person who regularly extends consumer credit." 12 C.F.R. § 1026.2(a)(17). "Person" includes "a natural person or an organization, including a corporation, partnership, proprietorship, association, cooperative, estate, trust, or governmental unit." *Id.* § 1026.2(a)(22). "Consumer credit" refers to "credit offered or extended to a consumer primarily for personal, family, or household purposes." *Id.* § 1026.2(a)(12).

[7] Congress passed the Truth in Lending Act to promote consumers' "informed use of credit" by requiring the "meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). Congress charged the Bureau of Consumer Financial Protection with promulgating regulations to implement TILA. *Id.* § 1604(a). The Bureau has issued Regulation Z for this purpose. 12 C.F.R. § 1026.1(a).

- "The *finance charge*, using that term, and a brief description such as 'the dollar amount the credit will cost you.'" *Id.* § 1026.18(d).

- "The *annual percentage rate*, using that term, and a brief description such as 'the cost of your credit as a yearly rate.'" *Id.* § 1026.18(e).

- "*Payment Schedule*. . . . the number, amounts, and timing of payments scheduled to repay the obligation." *Id.* § 1026.18(g).

- "The *total of payments*, using that term, and a descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments.'" *Id.* § 1026.18(h).

The TILA disclosures must "reflect the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(c).   The Federal Reserve Board's official staff interpretation of Regulation Z states:

> 1.    Legal obligation. ***The disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction.*** . . .  The legal obligation is determined by applicable state law or other law. . . .
>
> 2.    Modification of obligation. ***The legal obligation normally is presumed to be contained in the note or contract that evidences the agreement.***   But this presumption is rebutted if another agreement between the parties legally modifies that note or contract.   If the parties informally agree to a modification of the legal obligation, the modification should not be reflected in the disclosures unless it rises to the level of a change in the terms of the legal obligation.

*Id.* Pt. 1026, Supp I, Pt. 2, § 1026.17(c)(1)-1 (emphases added).[8]  Disclosures must be made "clearly and conspicuously in writing" and "shall be grouped together [and] segregated from everything else."  *Id.* § 1026.17(a)(1).   Creditors must make these disclosures "before consummation of the transaction." *Id.* § 1026.17(b).

A creditor need not disclose any "deferral or extension charge[s]," 15 U.S.C. § 1638(a)(10), and a deferral of repayment that occurs after consummation is a "subsequent modification" of the initial contract that need not be disclosed at the outset and does not require new TILA disclosures. 12 C.F.R. § 1026.20(a)(1).  Likewise, "[a] renewal of a single payment obligation with no change in the original terms" is not a "refinancing" that requires "new disclosures to the consumer." *Id.*; *see*

---

[8]   "Great deference is especially due the Federal Reserve Board's construction of its own Regulation Z because of the important interpretive and enforcement powers granted this agency by Congress under the Truth in Lending Act." *Bone v. Hibernia Bank*, 493 F.2d 135, 139 (9th Cir. 1974).

*also* 12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.20(a)-1 ("Changes in the terms of an existing obligation, such as the deferral of individual installments, will not constitute a refinancing unless accomplished by the cancellation of that obligation and the substitution of a new obligation."). If the borrower defers repayment after consummating the loan, the original TILA disclosures do not become invalid or inaccurate. *See* 15 U.S.C. § 1634.

### B.     The Loan Agreements Create a Single Payment Obligation.

At the outset of a loan transaction with the Lending Defendants, the borrower is obliged to repay the loan in a single payment equal to the full amount financed plus a single finance charge. Several provisions in the Loan Note and Disclosure clearly state this obligation. The Promise to Pay provision of the Loan Note and Disclosure states, "You promise to pay to us . . . on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed." (Ex. A-1 at AMG_00423422.) The Payment Schedule provision within the Loan Note and Disclosure reiterates that the Total of Payments is due on the borrower's next pay date, unless the borrower chooses to renew his loan: "1 payment of $650.00 due on 2011-10-12, if You decline* the option of renewing your loan." (*Id.*) The Total of Payments is disclosed in the Loan Note and Disclosure as the Amount Financed plus a single Finance Charge: for a $500 loan, the finance charge is $150, for a $650 Total of Payments. (*Id.*)

Other terms of the Loan Agreements further reiterate that borrowers incur a single payment obligation at the outset of the transaction. The Prepayment provision plainly refers to a single Finance Charge that the consumer is obliged to pay: "***The Finance Charge consists solely of a loan fee*** that is earned in full at the time the loan is funded. Although you may pay all or part of your loan in advance without penalty, you will not receive a refund or credit of any part or all of ***the Finance Charge***." (*Id.* (emphases added).)

The Application Supplement likewise explains that the consumer is obliged to pay a single finance charge when the loan matures at the end of a single period: "As an example, suppose you borrow $200 for 14 days at an APR of 782.14%. The Finance Charge would be $60.00. ***If you did not repay the loan at maturity but chose instead to renew*** the balance by obtaining a new loan in

the same amount and for an additional 14-day period, you would incur an additional Finance Charge of $60.00." (*Id.* at AMG_00423421 (emphasis added).)

### C.      The Loan Agreements Do Not Oblige Borrowers To Renew Loans.

The heart of the FTC's claim in Count III is its allegation that "the consumer is *obligated* to repay the loan in ten installments, resulting in a $675 finance charge and a $975 total of payments." (Ex. C at Interrog. Resp. 5 (emphasis added); *see also id.* at Interrog. Resp. 11; Ex. D ¶¶ 35–41, 53–60.)   The FTC's claim is directly contrary to the unambiguous terms of the Loan Agreements, hornbook contract law, and Regulation Z.   It is impossible to read the Loan Agreements as creating at the outset an obligation to renew, as opposed to an offer to renew in the future.   Acceptance of renewal (by both borrower and lender) occurs only after the loan is consummated, and the Lending Defendants need not provide TILA disclosures reflecting any obligation a borrower might later incur by choosing to renew.   Moreover, the FTC's attempt to create a fact issue by relying on extrinsic evidence is misplaced because such evidence is inadmissible to contradict the plain terms of the Loan Agreements.

### 1.      The Loan Agreements Unambiguously Contradict the FTC's Contention That Consumers Were Obliged To Renew Their Loans.

The FTC's theory that borrowers were obliged at the outset to renew their loans cannot be reconciled with the unambiguous terms of the Loan Agreements.   *First*, the term "renewal" itself refutes the FTC's claim: renewal is "[t]he act of restoring or reestablishing."   *Black's Law Dictionary* (9th ed. 2009).   In the context of a contract, renewal is "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract."   *Id.*   Renewal necessarily involves a two-step process: the existence of an initial obligation, and subsequent re-creation or replacement of it.   *See A Dictionary of Modern Legal Usage* 343 (2d ed. 1995) ("[A] renewal institutes a new contract that replaces the old one.").   The FTC tries to sidestep this fundamental contradiction by ignoring the word "renewal" and instead alleging that the "consumer is obligated to repay the loan in ten *installments*."   (Ex. C at Interrog. Resp. 5 (emphasis added)).   But the word "installment" appears nowhere in the Loan Agreements, whereas the word "renewal" appears twenty-seven times.   (*See e.g.*, Ex. A-1.)

*Second*, the Loan Agreements make clear that neither party is obligated to renew.  Under the plain terms of the agreements, there can be no renewal unless and until both the borrower and the lender agree to renew.  (*Id.* at AMG_00423422 ("This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed.").)  A contractual obligation can be enforced by legal action and is actionable upon breach.[9]  Performance that either party can unilaterally reject is not an obligation.  An "obligation" is a "legal or moral duty to do or not do something." *Black's Law Dictionary* (9th ed. 2009).  At the outset of the loan transaction, neither the borrower nor the lender has a legal duty to renew: each has until three days before the due date (*i.e.*, a week or more *after* the borrower receives the loan) to decide whether to renew and both must accept renewal before an obligation arises.[10]  *See In re Vylene Enters., Inc.*, 90 F.3d 1472, 1476 (9th Cir. 1996) (finding that when "either party by the terms of [a] promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise").

The FTC attempts to turn this basic principle on its head by arguing that the Lending Defendants' offer to let their customers defer their contract performance is legally binding on both parties—even though the Lending Defendants remain free to revoke the offer and the customers remain free to decline.  As a matter of basic contract law, a possible future agreement creates no present obligation.  *See* 1 *Williston on Contracts* § 1:2 (4th ed.) ("[A]n understanding that leaves an

---

[9]  *Restatement (Second) of Contracts* § 1 (1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."); *see Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1144 (9th Cir. 2002) ("For the Company to have been contractually obligated, it must have had a legal duty to contribute and someone must be entitled to a remedy if it does not.").

[10]  Under the terms of the Loan Agreements, at the outset of the transaction, borrowers do not have even a right, let alone an obligation, to renew. Although the Loan Note and Disclosure refers to the borrower's "option to renew," the fact that either the lender or borrower can decline renewal demonstrates that the word "option" there is meant in the general sense of "something that may be chosen" as opposed to an irrevocable offer by the lender.  *See Black's Law Dictionary* (9th ed. 2009) (defining "option" as "1. The right or power to choose; something that may be chosen <the lawyer was running out of options for settlement>. 2. An offer that is included in a formal or informal contract; esp., a contractual obligation to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period."). But even if the Loan Note and Disclosure vested in borrowers the irrevocable option to renew, such option still would not give rise to an obligation until the borrower accepted the option three days before the Due Date (and several days or weeks after the loan is extended).

14

essential element of a promise open for future negotiation and agreement, constitutes no promise, and creates no legal obligation until the future agreement is actually made."); *In re Vylene*, 90 F.3d at 1476.

The fact that the parties expressly agree in the Loan Note and Disclosure that they will manifest their acceptance of renewal by inaction does not create an obligation to renew, contrary to the FTC's contention.[11]   It is well established that silence can constitute acceptance if the "offeree . . . authorize[s] the offeror to regard the former's silence as an acceptance of the proposal." *2 Williston on Contracts* § 6:54 (4th ed.); *see also Restatement (Second) of Contracts* § 69 (1981).[12] The key question is not whether the parties agreed to accept renewal actively or passively, but rather **when** the borrower gains the right to extend the loan for an additional period and an attendant duty to pay an additional fee.  The Loan Agreements unambiguously provide that renewal cannot occur until **after** the outset of the transaction, three days before the Due Date.  (*See* Ex. A-1 at AMG_00423422.)

**Third**, the FTC's contention that borrowers were obliged to renew contradicts numerous unambiguous terms of the Loan Agreements.  For example, the FTC asserts that a borrower taking a $300 loan is obliged at the outset of the transaction to pay $675 in finance charges.  (Ex. C at Interrog. Resp. 5.)  But the Loan Agreements repeatedly use the terms "new" and "additional" to describe any finance charges the borrower will incur if she chooses to renew:

---

[11]   The FTC contends that "the consumer is obligated to repay the loan in ten installments . . . because, absent further modification by the parties . . . the loan contract states in vague, confusing, and ambiguous language that the loan is repaid first with four $90 finance charges, and then with additional payments combining finance charges and $50 principal payments."  (Ex. C at Interrog. Resp. 5; *see also id.* at Interrog. Resp. 11 ("If the borrower does nothing and simply continues making payments under the loan, however, s/he will fully repay the $300 principal plus $675 in finance charges.").)

[12]   "[I]f the offeror agrees with the offeree in advance that silence will be treated as acceptance, then the two have contracted to replace the default rules of common law formation."  Dennis D. Lamont, *Negative Option Offers in Consumer Service Contracts*, 42 UCLA L. Rev. 1315, 1351 (1995); *17A Am. Jur. 2d Contracts* § 509 ("Where a change is made pursuant to a contractual provision therefor, the contract as so changed is as completely voluntary and consensual as was the original contract."); *1414 P'ship v. Taveau*, 815 P.2d 1228, 1229 (Okla. Civ. App. 1991) (finding that when "[t]he method of acceptance was actually contained in . . . the contract . . . [e]xecution by the buyer and seller rendered the contract valid and enforceable."); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1109 (9th Cir. 2002) (finding that silence equaled acceptance when contract "set out in writing the significance of [an employee's] failure to opt out and described in detail the mechanism by which he could" do so).

1  • "YOU WILL BE CHARGED *ADDITIONAL FEES* IF YOU RENEW THIS LOAN."

2  • "You will accrue *new finance charges* with every renewal of your loan."

3  • "If you did not repay the loan at maturity but chose instead to renew the balance by obtaining
4  *a new loan* in the same amount and for *an additional 14-day period*, you would incur *an
    additional Finance Charge* of $60.00."

5  • "You will accrue *a new fee* every time your loan is renewed."

6  (*E.g.*, Ex. A-1 at AMG_00423421–24 (emphases added).)  This language unambiguously contradicts

7  the FTC's assertion that, at the outset of the loan transaction, borrowers incur an obligation to renew

8  and pay renewal fees.  It would be nonsensical to say the borrower "will accrue new finance charges

9  with every renewal" if the borrower were already obliged to pay such fees at the outset of the

10 transaction.

11         The contradiction between the FTC's position and the terms of the Loan Agreements is

12 sharpened when one considers the Prepayment provision in the Loan Note and Disclosure, which

13 provides, "The Finance Charge consists solely of a loan fee that is earned in full at the time the loan

14 is funded.  Although you may pay all or part of your loan in advance without penalty, you will not

15 receive a refund or credit of any part or all of the Finance Charge." (*Id.* at AMG_00423422.)  That

16 provision clearly states that the Finance Charge is a single loan fee that is earned in full at the time

17 the loan is funded.  If, as the FTC contends, consumers had an obligation at the outset of their loan

18 transaction to pay $675 in finance charges on a $300 loan, then the Prepayment provision would

19 oblige them to pay that $675 regardless of whether they renewed their loan zero, one, or nine times.

20 Nothing in the Loan Agreements supports such a construction.

21             **2.    The FTC Cannot Rely on Extrinsic Evidence To Contradict
                       Unambiguous Loan Terms.**

22         The FTC has no plausible argument that the terms of the Loan Agreements oblige consumers

23 to renew their loans, as the agreements themselves amply demonstrate.  Instead, the FTC alleges that

24 an obligation to renew is apparent from how borrowers use the loan "in practice." (Ex. C at Interrog.

25 Resp. 5; *see also* Ex. N, Mot. Prelim. Inj., ECF No. 5, at 27–28 ("In fact, the loan is repaid over

26 multiple installments and Defendants thereby assess multiple finance charges. This practice results

27 in Defendants assessing an actual finance charge, payment schedule, and total of payments that

28

16

differ from those stated in Defendants' TILA disclosures.").)  But parol evidence is inadmissible to contradict the terms of the Loan Agreements, which clearly and unambiguously state that the borrower and the lender both must accept renewal before it becomes an obligation (and even then, the obligation is for one pay period at a time, not ten or more pay periods as the FTC alleges).

It is widely accepted in the common law of contracts that "[e]xtrinsic evidence is inadmissible to contradict a clear contract term."  *Pierce Cnty. Hotel Emps. & Rest. Emps. Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324 (9th Cir. 1987); *Medina v. Hous. Auth. of San Miguel Cnty.*, 974 F.2d 1345 (10th Cir. 1992) ("The parol evidence rule bars the admission of oral and extrinsic evidence to contradict an unambiguous written contract.").  TILA does not alter the common law of contracts.  *See* 12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.17(c)(1)-1 ("The legal obligation is determined by applicable state law or other law.").  The parol evidence rule's bar on extrinsic evidence is thus fully applicable in the TILA context.  *See Porter v. NationsCredit Consumer Disc. Co.*, No. CIV A 03-03768, 2006 WL 3333837, at \*6 (E.D. Pa. Nov. 14, 2006) (excluding extrinsic evidence to contradict a plaintiff's signed agreement, because to admit such evidence would go "against basic contract law principles and case law on Regulation Z"), *aff'd sub nom. Porter v. Nationacredit Consumer Disc. Co.*, 285 F. App'x 871 (3d Cir. 2008); *Hicks v. Star Imports, Inc.*, 5 Fed. App'x 222, 225 (4th Cir. 2001) (holding that the "parol evidence rule bars the introduction of evidence contradicting written disclosure requirements"); *Anthony* v. *Cmty. Loan & Investment Corp.*, 559 F.2d 1363 (5th Cir. 1977) (holding that parol evidence could not be used to contradict a signed disclosure statement); *Gray v. First Century Bank*, 547 F. Supp. 2d 815, 821 (E.D. Tenn. 2008) (holding that parol evidence rule barred plaintiffs' claim that written TILA disclosures were "negated" by matters extrinsic to the contract).

The rationale for barring extrinsic evidence to show TILA noncompliance is consistent with Regulation Z, which explicitly provides that the terms of the legal obligation are "presumed to be contained in the note or contract that evidences the agreement," 12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.17(c)(1)-2—not in parties' behavior, oral communications, or subjective understanding of the contract terms.

*Hicks v. Star Imports, Inc.* is instructive on this point.  In that case, a buyer signed a retail installment contract that included in the "amount financed" column a charge for insurance accompanied by a clause stating that, while borrowers were required to purchase insurance, they did not have to buy it from the seller.  5 Fed. App'x at 224.  The buyer later filed suit alleging this disclosure violated TILA because, contrary to the contract's plain terms, in practice purchasing insurance from the seller was mandatory, not optional.  The buyer attempted to offer extrinsic evidence to show that "her signature on the contract [wa]s not dispositive on the issue of whether she could purchase VSI insurance from an insurer of her choosing."  *Id.* at 225.  In affirming the district court's grant of summary judgment to the seller, the Fourth Circuit rejected the buyer's "substance over form approach looking beyond the express terms of the contract to determine compliance with the TILA."  *Id.*  This approach did not square with TILA, which "is concerned primarily with providing borrowers with *information* that they have the right to buy VSI from insurers of their choice, and not assuring that borrowers actually exercise the right."  *Id.*; *see also Cades v. H&R Block, Inc.*, 43 F.3d 869, 875 (4th Cir. 1994) ("[S]ection 226.17(c)(1) emphasizes that the disclosures required depend only on the terms of the parties' legal obligations, not on the prevailing practice of a creditor.  It provides: 'The disclosures shall reflect the terms of the legal obligation between the parties.'").  Nor may the FTC introduce extrinsic evidence to "create an ambiguity in a contract that is unambiguous on its face."  *Eureka Water Co. v. Nestle Waters N. Am., Inc.*, 690 F.3d 1139, 1149 (10th Cir. 2012); *see Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 566 (9th Cir. 1984) ("[T]here is no ambiguity or uncertainty in the letter requiring the receipt of extrinsic evidence, and we will not consider extrinsic evidence, here the subsequent monthly reports, simply to create an ambiguity.").

As explained in the previous two sections, the Loan Agreements describe renewal as an option—an obligation borrowers may assume ***after*** the outset of the transaction.  The Loan Agreements unambiguously contradict the allegation that borrowers are obliged at the outset of the transaction to renew their loans even once, let alone ten or more times as the FTC alleges.  The express terms of the Loan Agreements permit no question of material fact on this point, and the FTC

cannot use extrinsic evidence to create one, for "[i]n essence, the parol evidence rule renders that evidence immaterial, and, as such, it creates no genuine issue of *material* fact to defeat summary judgment on this count."   *Dixon v. S&S Loan Serv. of Waycross, Inc.*, 754 F. Supp. 1567, 1571 (S.D. Ga. 1990) (citation omitted, emphasis in original).

### D.    The Lending Defendants' TILA Disclosures Properly Reflect A Single Payment Obligation.

The Lending Defendants complied with the Truth In Lending Act by disclosing to consumers before the loan was consummated the annual percentage rate, amount financed, finance charge, total of payments, and payment schedule reflecting borrowers' single payment obligation at the outset of the transaction.   *See* 12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.17(c)(1)-1.   The Loan Agreements unambiguously differentiate between the obligation extant at the time of the disclosure—a single payment, single pay period loan—and contingent obligations borrowers may incur later if and when renewal is accepted by both parties.   Renewal, under the terms of the Loan Agreements, is a "subsequent occurrence" that need not be included in TILA disclosures and does not retroactively invalidate such disclosures.   *See* 15 U.S.C. § 1634.   Because the Loan Agreements cannot reasonably be read as creating an obligation to renew and because parol evidence is inadmissible to contradict the Loan Agreements' unambiguous terms, the FTC cannot point to any admissible evidence sufficient to show that the Lending Defendants violated the Truth In Lending Act.   Absent any genuine dispute of material fact as to Count III, the Lending Defendants are entitled to summary judgment in their favor.

### CONCLUSION

The Lending Defendants' TILA disclosures properly reflected the borrowers' obligation under the Loan Agreements' unambiguous terms to repay the loan in full at the end of a single pay period.   The FTC is wrong as a matter of law and undisputed fact that the Lending Defendants were obliged by TILA to disclose the amount a consumer would pay if she were to renew her loan the maximum number of times allowed under the Loan Agreements: at the outset of the loan transaction, renewal remains contingent on events that may occur in the future (*i.e.*, the borrower and lender accept renewal by inaction three days before the due date).   The Truth in Lending Act requires

1

2   lenders to provide to consumers written disclosures of "the credit terms to which the parties are

3   legally bound *as of the outset of the transaction*," *id.* Supp. I, Pt. 2 § 1026.17(c)(1)-1 (emphasis

4   added), not contingent obligations to which the parties *may* later become bound.    Contrary to the

5   FTC's allegations in Count III, the Lending Defendants fully complied with the requirements of

6   TILA by providing disclosures reflecting the borrowers' single payment obligation at the outset of

7   the loan transaction.   Pursuant to Federal Rule of Civil Procedure 56, the Movants are entitled to

8   summary judgment on Count III of the FTC's First Amended Complaint.

9

10  **Dated**:  September 30, 2013

11  /s/ David J. Merrill                              /s/ Bradley Weidenhammer
    DAVID J. MERRILL                                   BRADLEY WEIDENHAMMER
12  DAVID J. MERRILL, P.C.                             KIRKLAND & ELLIS LLP
    Nevada Bar No. 6060                                300 North LaSalle
13  10161 Park Run Drive, Suite 150                    Chicago IL  60654
    Las Vegas, NV  89145                               Telephone:     (312) 862-2000
14  Telephone:     (702) 566-1935                      Facsimile:     (312) 862-2200
    Facsimile:     (702) 924-0787                      Email:  bradley.weidenhammer@kirkland.com
15  Email:  david@djmerrillpc.com

16  *Attorney for Defendants AMG Services, Inc.*        *Attorney for Defendants AMG Services, Inc.*
    *and MNE Services, Inc. (dba Tribal Financial*      *and MNE Services, Inc. (dba Tribal Financial*
17  *Services, Ameriloan, UnitedCashLoans,*             *Services, Ameriloan, UnitedCashLoans,*
    *USFastCash)*                                       *USFastCash)*
18

19  /s/ Conly Shulte
    CONLY SCHULTE
20  FREDERICKS PEEBLES & MORGAN LLP
    1900 Plaza Drive
21  Louisville, CO 80027
    Omaha, NE  68116
22  Telephone:     (303) 673-9600
    Facsimile:     (303) 673-9155
23  Email:  cschulte@ndnlaw.com

24  *Attorney for Defendants AMG Services, Inc.;*
    *Red Cedar Services, Inc. dba 500FastCash; SFS,*
25  *Inc. dba OneClickCash;MNE Services, Inc., dba*
    *Tribal Financial Services, Ameriloan,*
26  *UnitedCashLoans, USFastCash*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on the 30th day of September, 2013, the foregoing *Defendants' Motion for Summary Judgment on Count III* was submitted electronically for filing and/or service with the United States District Court of Nevada. Electronic service of the foregoing document shall be made to all counsel of record.

/s/ *Bradley Weidenhammer*
Bradley Weidenhammer