ANDREW A. KASSOF, P.C.
BRADLEY H. WEIDENHAMMER
RICHARD U.S. HOWELL
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email: andrew.kassof@kirkland.com
          bradley.weidenhammer@kirkland.com
          rhowell@kirkland.com

*Attorneys for Defendants AMG Services, Inc. and
MNE Services, Inc. (dba Tribal Financial Services,
Ameriloan, UnitedCashLoans, USFastCash)*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 2:12-CV-536-GMN-(VCF) |
| v. | |
| AMG SERVICES, INC., *ET AL.*, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNT III** |
| Defendants, and | |
| PARK 269 LLC, *ET AL.*, | |
| Relief Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

REPLY TO FTC'S RESPONSIVE "FACTS" ........................................................................... 2

ARGUMENT ............................................................................................................................... 6

I.      The Loan Note Unambiguously Creates A Single Payment Obligation And The FTC's Argument That Consumers Were Obligated To Renew Lacks Legal And Factual Support. ....................................................................................................... 6

        A.     The Loan Note Unambiguously Creates A Single Payment Obligation ........................ 7

        B.     The FTC's Obligation-To-Renew Theory Is Unsupported By Facts Or Law. ............ 11

II.     The FTC Cannot Use Extrinsic Evidence To Prove An Initial Renewal Obligation That Would Conflict With The Plain Terms Of The Loan Note. ............................................. 14

III.    The FTC Improperly Seeks To Expand TILA And Regulation Z. ......................................... 18

CONCLUSION .......................................................................................................................... 20

i

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Amerada Hess Pipeline Corp., v. Fed. Energy Reg. Comm'n,*
    117 F.3d 596 (D.C. Cir. 1997) ........................................................................ 20

5

6

*Begala v. PNC Bank, Ohio, Nat. Ass'n,*
    163 F.3d 948 (6th Cir. 1998) ......................................................................... 18

7

*Bone v. Hibernia Bank,*
    493 F.2d 135 (9th Cir. 1974) ......................................................................... 18

8

9

*Brooks v. Community Lending, Inc.,*
    2010 WL 2680265 (N.D. Cal. 2010) ............................................................... 6

10

11

*Burton v. Pub. Fin. Corp. of Akron No. 3,*
    657 F.2d 842 (6th Cir. 1981) ....................................................................... 8, 9

12

*Castaneda v. Dura-Vent Corp.,*
    648 F.2d 612 (9th Cir. 1981) ......................................................................... 16

13

14

*Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,*
    440 F. Supp. 2d 1184 (D. Nev. 2006),
    *aff'd*, 583 F.3d 1232 (9th Cir. 2009) ........................................................ 14, 15

15

16

*Dixon v. S&S Loan Servs.,*
    754 F. Supp. 1567 (S.D. Ga. 1990) ............................................................... 16

17

18

*Duensing v. Gilbert,*
    2013 WL 2476810 (D. Nev. June 7, 2013) ...................................................... 6

19

*Eureka Water Co. v. Nestle Waters N. Am., Inc.,*
    690 F.3d 1139 (10th Cir. 2012) ..................................................................... 15

20

21

*Ford Motor Credit Co.,*
    444 U.S. 555 (1980) ....................................................................................... 19

22

23

*Fox v. The Montell Corp.,*
    2001 WL 293632 (N.D. Ill. Mar. 19, 2001) ................................................. 15

24

*Franklin v. Smalls,*
    2012 WL 5077630 (S.D. Cal. Oct. 18, 2012) .................................................. 6

25

26

*Gennuso v. Commercial Bank & Trust Co.,*
    566 F.2d 437 (3d Cir. 1977) .......................................................................... 19

27

*Hauk v. JP Morgan Chase Bank USA,*

28

ii

552 F.3d 1114 (9th Cir. 2009) ......................................................... 9, 18, 19

*Heckler v. Cmty. Health Servs. of Crawford County, Inc.,*
    467 U.S. 51, 60 n12 (1984)............................................................. 20

*Hicks v. Star Imports,*
    5 Fed. Appx. 222 (4th Cir. 2001) ................................................... 16

*Household Credit Servs., Inc. v. Pfennig,*
    541 U.S. 232 (2004)........................................................................ 19

*In re IndyMac Bancorp, Inc.,*
    2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012) ................. 15, 16

*In re Streeter,*
    2002 WL 32114477 (Bankr. E.D. Ark. Oct. 28, 2002)...................... 15

*In re Villa W. Associates,*
    146 F.3d 798 (10th Cir. 1998) ....................................................... 12

*In Re Vylene Enters., Inc.,*
    90 F.3d 1474(9th Cir. 1996) ..................................................... 11, 18

*Jackson v. Am. Loan Co., Inc.,*
    202 F.3d 911 (7th Cir. 2000) ......................................................... 18

*Local Motion, Inc. v. Niescher,*
    105 F.3d 1278 (9th Cir. 1997) ................................................ 8, 14, 16

*McAdams v. Citifinancial Mortgage Co.,*
    2007 WL 141128 (M.D. La. Jan. 16, 2007).................................... 15

*Miller v. United States,*
    363 F.3d 999 (9th Cir. 2004) ............................................ 8, 14, 15, 16

*Monaco v. Bear Stearns Residential Mortgage Corp.,*
    554 F. Supp. 2d 1034 (C.D. Cal. 2008) .......................................... 15

*Murphy v. DirecTV, Inc.,*
    724 F.3d 1218 (9th Cir. 2013) ....................................................... 12

*Onyx Pharm., Inc. v. Bayer Corp.,*
    2011 WL 7905185 (N.D. Cal. May 10, 2011)................................. 16

*Operating Engineers Pension Trust v. Beck Eng'g & Surveying Co.,*
    746 F.2d 557 (9th Cir. 1984) ......................................................... 15

*Romero v. Countrywide Bank, N.A.,*
    740 F. Supp. 2d 1129 (N.D. Cal. 2010) ............................................ 6

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................ 20

*Sec'y of Labor v. Excel Mining, LLC*,
    334 F.3d 1 (D.C. Cir. 2003) ................................................................... 20

*Smith v. FJM Corp.*,
    2009 WL 703482 (D. Nev. Mar. 16, 2009) ........................................... 16

*Spriggs v. Ray Orr Auto Sales, Inc.*,
    508 F. Supp. 116 (E.D. Mo. 1980),
    *aff'd,* 676 F.2d 704 (8th Cir. 1981) ....................................................... 15

*Texas Instruments, Inc. v. Hyundai Electronics Indus. Co., Ltd.*,
    42 F. Supp. 2d 660 (E.D. Tex. 1999) ..................................................... 12

**Statutes**

12 C.F.R. § 1026.17 ...................................................................................... 18

12 C.F.R. § 1026.17(a) ................................................................................. 10

12 C.F.R. § 1026.17(c) ................................................................................... 6

12 C.F.R. § 1026.17(c), Part 1026, Supp. I, Pt. 2 § 1026.17(c)(1)-1 ....... 6, 8, 11

12 C.F.R. § 1026.18(d) ................................................................................... 7

12 C.F.R. § 1026.18(h) ................................................................................... 8

12 C.F.R. § 1026.20(a) ................................................................................. 18

12 C.F.R. § 1026.40 ........................................................................................ 6

12 C.F.R. § 1026.6 .......................................................................................... 6

12 C.F.R. § 226.17 ........................................................................................ 18

12 C.F.R. Pt. 226, Supp. I, ¶ 17(c)(1)–8 ....................................................... 6

12 C.F.R. Pt. 226, Supp. I. ¶ 19(b)(2)(vii)–2 ............................................... 6

12 U.S.C. § 5514 ........................................................................................... 19

15 U.S.C. § 1604(a) ...................................................................................... 19

15 U.S.C. § 1634 ................................................................................. 9, 16, 18

**Other Authorities**

Williston on Contracts (4th ed.) ........................................................... 4, 11, 12

## INTRODUCTION

The Loan Note unambiguously obliges borrowers at the outset of their loan transaction to repay in full in a single payment, and also allows the borrower and lender later to change that obligation by renewing the loan for an additional finance charge.  Either party may decline renewal until three days before the due date; neither party is obliged at the outset to accept renewal.  The Truth in Lending Act (TILA) requires loan disclosures to reflect the legal obligation that exists between the parties at the outset of the transaction.  The Loan Note complied with TILA by including disclosures that reflect the single payment obligation that exists between the parties at the time the loan was funded.

In Count III of its amended complaint, as well as in its preliminary injunction briefing and interrogatory responses, the FTC contends that the Loan Note actually obliges borrowers to renew their loans according to a maximum renewal schedule, and that the TILA disclosures improperly failed to reflect this obligation.  More recently, though, in its opposition memorandum (and its Motion for Summary Judgment), and in apparent recognition that its obligation-to-renew theory cannot be squared with the Loan Note's plain terms, the FTC shifts its focus to two main arguments: (1) renewal is "automatic" and thus TILA required the disclosures to reflect the assumption that borrowers would renew the maximum number of times permitted by the Loan Note and (2) the Loan Note is ambiguous as to the single payment obligation (on its face, and in light of extrinsic evidence), and such ambiguity violates TILA.  Both arguments fail because the FTC identifies no Loan Note provisions that oblige the parties to renew the loan, does not explain how such an obligation could be reconciled with numerous Loan Note provisions contradicting it, and cites no legal authority for the proposition that a renewal offer that may be passively accepted *at the end* of the loan term creates a legal obligation to renew *at the outset* of the loan term.  At their core, the FTC's arguments in opposition ask this Court to read into TILA and Regulation Z a new requirement that disclosures reflect obligations that may be passively accepted weeks or months after the outset of the transaction.  Such a requirement is nowhere in the regulations and would constitute a radical

departure from current law.  The Court should reject the FTC's novel interpretation of TILA and Regulation Z and enter summary judgment in Defendants' favor.

### REPLY TO FTC'S RESPONSIVE "FACTS"

The FTC cut-and-pasted a number of factual allegations from its Motion for Summary Judgment into its opposition brief, and also offers four responses to Defendants' Statement of Undisputed Facts.  (FTC Opp'n at 1–14, ECF No. 491.)  Defendants already have responded to the FTC's allegations.  (*See* Defs.' Stmt. of Disputed Facts, ECF No. 494.)  Defendants respond to the FTC's Response to Defendants' Undisputed Facts as follows:

**Reply to Response No. 1.**  The FTC argues that "[c]onsumers did not choose to 'renew' their loans."  (FTC Opp'n at 11.)  But consumers (and lenders) undoubtedly make a choice about whether to renew or pay in full: the plain terms of the Loan Note state, "This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed."[1]  The agreement to accept renewal by inaction does not in any way diminish the fact that both the borrower and the lender must choose to act (to reject renewal) or not to act (to accept renewal) three days before the due date.[2]  And although the FTC asserts that "[c]onsumers uniformly complained" about renewal (FTC Opp'n at 11), such extrinsic evidence is inadmissible to contradict the plain terms of the Loan Agreements, and in any event, consumers did not uniformly complain:[3]

- Of the more than 5 million loans issued by the Lending Defendants since 2008, the FTC identified about 750 consumers who allegedly complained about the loan terms, which equals 0.015% of loans issued since 2008 (*i.e.*, less than two hundredths of one percent).[4]

---

[1]   Ex. I to Defs.' Opp'n (ECF No. 493)(Archer August 3, 2011 loan documents); *see also* Defs.' Stmt. of Disputed Facts ¶ 42.  Merriam-Webster defines "choice" as "the act of choosing: the act of picking or deciding between two or more possibilities; the opportunity or power to choose between two or more possibilities."

[2]   The Consumer Financial Protection Bureau ("CFPB") uses the term "renewal" the same way the Lending Defendants do: "If you renew or roll over your loan, you will be charged another fee and still owe the entire original balance. For example, if you pay a fee renewal or rollover fee of $45 you would still owe the original $300 loan and another $45 fee when the extension is over."  Ex. O (www.consumerfinance.gov/askcfpb/1589/what-costs-and-fees-could-i-expect-payday-loan.html).

[3]   *See* Defs.' Stmt. of Disputed Facts ¶¶ 87–88, 90.

[4]   *See* Defs.' Opp'n (ECF No. 493) at 55–57.

2

- All four of the FTC's consumer witnesses understood their Loan Notes to mean they could choose whether to renew, subject to the lender's acceptance.[5]

- Even among the relatively few consumers the FTC identified as complaining, many say they understood the passive renewal term, like Lakeshia Boyer: "If the loan is not PIF [paid in full], each pay period I acquire a new renewal/interest fee of $90 (I may pay additional money in increments of $50 if I choose- which would go toward the principal and lower my renewal fee on my next pay perion [sic]."[6]

**Reply to Response No. 2.** This one is a head-scratcher. The FTC insists that the "lender possessed no contractual right to effect a full repayment at the first due date" but the Promise to Pay provision in the Loan Note unambiguously contradicts the FTC's assertion: "This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note *or we tell you that the Note will not be renewed*."[7] Moreover, the FTC's observation that "Defendants *never* declined renewal," except when they did "in very isolated circumstances involving borrower misstatement, borrower default, or change in underwriting" is self-defeating: the FTC is admitting that Lending Defendants sometimes exercised their right to decline renewal,[8] as its own evidence also shows.[9] Also contrary to the FTC's assertion, the Lending Defendants did not require consumers paying in full to sign a new contract:

---

[5] *See* Defs.' Opp'n Stmt. of Facts ECF No. 493, ¶ 40 . For example, Ms. Vanderhoof testified she had no trouble understanding from the Payment Schedule in her Loan Note that she had "two options: You can either pay down your loan in full on the first due date or you can renew it." *Id.*

[6] *See* Defs.' Stmt. of Disputed Facts ¶ 90.

[7] *See* Ex. I to Defs.' Opp'n (emphasis added). The FTC mischaracterizes this language as "merely provid[ing] that the lender could give notice that the loan would not be renewed; it did not state that the lender reserved the right to disallow renewal, or under what circumstances it might have done so." (FTC Opp'n at 12 n.38.) This argument is nonsensical: renewal would not be conditioned on neither party declining if the lender had no right to decline.

[8] The Loan Note is unambiguous on this point, so the frequency with which the Lending Defendants exercise their right to decline renewal is inadmissible extrinsic evidence. *See* Part II, *infra*. But in any event the FTC has its facts wrong: it cites the testimony of Ms. Dempsey (Defendants' 30(b)(6) witness) enumerating specific examples of when Lending Defendants have declined renewal, but fails to acknowledge that she went on to explain, "I want to be clear that those are reasons that have been utilized. That would not encompass every possible reason that the lender would delcline the option to renew the loan with the consumer. There could be any number of changes in business policies that would create a situation where the lender would decide not to renew the loan. I just cited one." (FTC Ex. 2 at 296:1-8.) The FTC also ignores the testimony of its own consumer witnesses, who understood the Loan Note to mean they were obligated to repay in full if the lender declined renewal. Defs.' Opp'n Stmt. of Facts ¶ 40 (quoting the FTC's consumer witness testimony).

[9] *See, e.g.*, FTC Ex. 167, Compl. of Brandi Coen at 298 (complaining that OneClickCash declined renewal and withdrew full amount due on the due date despite the consumer's acceptance of renewal); Defs.' Stmt. of Disputed Facts ¶ 90.

they required some (but not all) consumers to memorialize their choice to pay in full by signing their Account Summary (Document Request to Pay Out).  (*See* Defs.' Stmt. of Disputed Facts ¶ 50.)

**Reply to Response No. 3.**  The Application Supplement and Payment Options provisions—which every borrower between 2003 and late 2011 had to read, accept, and sign along with their Loan Note—track the plain language of the Loan Note and provide that consumers are obliged to repay in full on their first pay date unless the loan is renewed.[10]  The FTC's arguments to the contrary are unavailing:

- Courts look at the plain language of a contract, not the conspicuousness of the language.[11] But even if this were relevant to construing the legal obligation that exists at the outset of the loan transaction, it would cut in Defendants' favor because the Application Supplement and Payment Options provision *are* conspicuous: the Application Supplement provision in question had a bold, all caps heading "YOU WILL BE CHARGED ADDITIONAL FEES IF YOU RENEW THIS LOAN" and is set off in a prominent, attention-grabbing box, as is the Payment Options provision.[12]

- The Payment Options provision is clear and consistent with the Loan Note.  It informs consumers of *their* payment options: it does not purport to summarize the lenders' rights or any other loan terms.[13]  And its reference to borrowers' "desire to pay in full" reiterates the borrower-choice portion of the Promise to Pay provision—it does not remotely suggest a borrower is obliged at the outset to renew.

- The Application Supplement provision likewise is clear and consistent with the Loan Note. Contrary to the FTC's argument, it simply cannot be read to suggest borrowers were obliged at the outset to renew.  It explicitly refers to "additional fees if you renew this loan," a loan that reaches "maturity" at the end of a single two-week period, and "repay[ing] the loan at maturity" or "cho[osing] instead to renew the balance by obtaining a new loan in the same amount and for an additional 14-day period," all of which would be nonsensical if the borrower were obliged at the outset to renew the loan and pay additional fees for multiple pay periods.[14]

---

[10]  *See* Defs.' Mem. ISO SJ, ECF No. 461, at 6; Defs.' Opp'n at 12–13,  ¶¶ 8-9; Defs.' Stmt. of Disputed Facts ¶¶ 13, 33-34, 49.

[11]  *See* 11 Williston on Contracts § 32:3 (4th ed.).

[12]  *See* Defs.' Mem. ISO SJ at 6; Defs.' Opp'n Stmt. of Facts at 12–13, ¶¶ 8-9; Defs.' Stmt. of Disputed Facts ¶¶ 13, 33-34, 49.

[13]  *Id.*

[14]  *See* Defs.' Mem. ISO SJ at 6; Defs.' Opp'n at 12, ¶ 8; Defs.' Stmt. of Disputed Facts ¶¶ 13, 18, 25, 33-34, 49, 88.

Finally, the FTC urges the Court to brush aside these provisions as irrelevant because they "appear to have been discontinued in 2011."[15]  This is another instance of the FTC shifting its theory to suit argumentative exigencies rather than to reflect reality.  The FTC's original and amended complaint are based on (and extensively quote from) 2010 Loan Agreements that contained the Application Supplement and Payment Options provision,[16] all of its consumer witnesses' Loan Agreements contained those provisions,[17] and its interrogatory responses are based on a Loan Note from 2010 that contained those provisions.[18]

**Reply to Response No. 4.**  The FTC stated unequivocally in its interrogatory responses, "The Finance Charge that should be disclosed [is] $675 . . . .  The Total of Payments that should be disclosed [is] $975 which reflect the sum of finance charges and principal payments."[19]  The FTC identified its obligation-to-renew theory as *the* material "fact" on which Count III is based and called this the "true schedule and cost of the loan" that "reflects the consumer's obligation"[20]—yet the alleged obligation to renew is irreconcilable with the unambiguous provisions of the Loan Note and other Loan Agreements.  (*See* Defs.' Mem. ISO SJ at 13-16.)  Now, faced with insurmountable arguments against this theory (which it should have considered before filing Count III), the FTC throws up its hands and untimely objects that it is not required to "decrypt [Defendants'] loan

---

[15]  FTC Opp'n at 14; *see also* FTC Stmt. of Material Facts ¶ 36; FTC Mem. ISO SJ at 49 ("Defendants also cannot find safe harbor in the additional, vague repayment terms disclosures in the "Privacy Policy" and "Privacy Policy and Authorization" agreement.  First, these terms were found only in older versions of their contracts.").

[16]  FAC, ECF No. 386, ¶¶ 35–36 (citing as an example "a consumer who borrowed $300 from Defendants on or about September 7, 2010," and quoting a Loan Note with a due date of "2010-09-24"); *see also* Defs.' Stmt. of Disputed Facts ¶¶ 33–36 (regarding changes to order of sentence in Payment Schedule provision).

[17]  Ex. NN to Defs.' Opp'n (Sliger September 7, 2010 loan documents); Ex. MM to Defs.' Opp'n (Barboza October 12, 2011 loan documents; Ex. CC to Defs.' Opp'n (Vanderhoof October 7, 2010 loan documents); Ex. LL to Defs.' Opp'n (Archer August 3, 2011 loan documents).

[18]  Ex. GG to Defs.' Opp'n, FTC Consolid. Rog Responses, at 9.

[19]  *Id.* at 25.

[20]  *Id.* at 21.  ("The true schedule and cost of the loan in the manner processed by Defendants is described in the answer to Interrogatory No. 8.  That schedule reflects the consumer's obligation to repay with respect to the finance charge, payment schedule, and total of payments."); *id* at 31 ("Defendants should have, but failed to, make the following disclosures regarding the consumers' legal obligations vis-à-vis the loan:  . . . Finance Charge:  $675[;] Total of Payments: $975. . . .").

agreement and state definitively the obligation created."[21]  The FTC bears the burden of proof on Count III, and its failure to articulate any reasonable basis to interpret the Loan Note as creating an obligation to renew means it failed to show the Loan Note is ambiguous, and more fundamentally, failed to show the Loan Note violated TILA by reflecting a single (as opposed to multiple) payment obligation.

## ARGUMENT

### I.  The Loan Note Unambiguously Creates A Single Payment Obligation And The FTC's Argument That Consumers Were Obligated To Renew Lacks Legal And Factual Support.

TILA and Regulation Z require written disclosures to consumers that reflect "the legal obligation between the parties" at "the outset of the transaction," as "determined by applicable state law or other law."[22]  The FTC's TILA claim is based on the contention that borrowers were obliged at the outset to renew their loans and pay over the maximum number of renewal periods.[23]  The only reasonable reading of the Loan Note is that it creates a single-payment obligation (which the TILA disclosures properly and accurately reflect) and also establishes the process by which both parties may later passively agree to accept renewal and extend the loan for another pay period.[24]  But the FTC's obligation-to-renew theory cannot be reconciled with the text of the Loan Note, the other Loan Agreements, TILA, Regulation Z, the official commentary to Regulation Z, or basic principles of contract law.[25]

---

[21] *Id.* at 23-25.  In responding to Interrogatory No. 8, the FTC did <u>not</u> object (as it does now) that it cannot be expected to "decrypt their loan agreement and state definitively the obligation" (FTC Opp'n at 14); it simply stated its definitive position that, for a $300 loan, the obligation that should have been disclosed was a $675 Finance Charge and a $975 Total of Payments.  Ex. GG to Defs.' Opp'n at 31.  *See Franklin v. Smalls*, No. 09CV1067, 2012 WL 5077630, at *9 (S.D. Cal. Oct. 18, 2012) ("The Federal Rules of Civil Procedure provide that any ground for objection to an interrogatory that is not stated in a timely manner is waived."); *Duensing v. Gilbert*, No. 2:11-CV-01747, 2013 WL 2476810, at *4 (D. Nev. June 7, 2013).

[22] 12 C.F.R. § 1026.17(c); *id.* Part 1026, Supp. I, Pt. 2 § 1026.17(c)(1)-1.  The FTC agrees this is the standard.  *See* FTC Opp'n at 15.

[23] FAC ¶¶ 40–41, 58; Ex. GG to Defs.' Opp'n at 23-25.

[24] *See* Defs.' Mem ISO SJ at 10–19.

[25] *See id.* at 13–16.  The FTC's reliance on mortgage cases is unavailing.  (FTC Opp'n at 17 n.44.)  Mortgages and home equity plans are subject to different regulations than the closed-end credit regulations at issue here, *see*

**A.      The Loan Note Unambiguously Creates A Single Payment Obligation.**

The plain terms of the Loan Note establish an obligation to repay the loan in a single payment, and set forth the process whereby the parties' subsequent mutual inaction would constitute mutual agreement to renew the loan (at which point the borrower would become obliged to pay an additional Finance Charge and the lender would become obliged to extend the loan for another pay period):

> You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed.  If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above.  This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed.

The FTC calls this "convoluted," "ambiguous," and "highly imaginative" (FTC Opp'n at 18, 28), but the Loan Note's Promise to Pay provision unambiguously states—in three clear sentences that require zero imagination—that the borrower promises to pay in full on the due date, unless the Note is renewed.  It also allows the borrower or lender to decline renewal until near the end of the loan term, meaning that renewal can occur only post-consummation.[26]  The Lending Defendants' TILA disclosures clearly and unambiguously reflect this:

- The Finance Charge disclosure reflects a single fee.  12 C.F.R. § 1026.18(d).

- The Total of Payments disclosure provision reflects the single-payment obligation (*i.e.*,

---

12 C.F.R. § 1026.6; *id.* § 1026.40, and the cases on which the FTC relies are inapposite.  In *Romero v. Countrywide Bank, N.A.*, 740 F. Supp. 2d 1129, 1137-39 (N.D. Cal. 2010), the plaintiff survived dismissal by alleging that negative amortization was *certain to occur* under the terms of the mortgage note, the disclosure of which is required by the regulations and Staff Commentary, *id.* (citing 12 C.F.R. Pt. 226, Supp. I, ¶ 19(b)(2)(vii)–2), and by alleging that the lender based disclosure of payments for "the first four to five years of the loan" on an introductory interest rate that would apply for only thirty days, despite the fact that the Staff Commentary clearly states that "in a variable rate transaction with . . . a discounted or premium rate, disclosure *should not be based solely on the initial terms*," *id.* (citing 12 C.F.R. Pt. 226, Supp. I, ¶ 17(c)(1)–8 (emphasis added)).  The other negative amortization case on which the FTC relies—an unpublished district court case, *Brooks v. Community Lending, Inc.*, No. C 07-4501, 2010 WL 2680265, at *8 (N.D. Cal. 2010)—is the same.  Thus *Romero* and *Brooks* dealt with clear violations of specific regulations (and interpretive commentary) that inapplicable to the closed-end consumer credit at issue here.  The FTC cites <u>no</u> applicable regulation or interpretive commentary supporting its novel proposition that TILA required Lending Defendants' disclosures to reflect a renewal term that the borrower and lender are free to decline well after the outset of the transaction.  *See* Part III, *infra*.

[26]  *See* Defs.' Mem. ISO SJ at 1.  As the Court may recall, in their Joint Opposition to the FTC's Motion for Preliminary Injunction, the Lending Defendants highlighted two recent FTC cases where the lenders' notes contained nearly identical Promise to Pay provisions.  ECF No. 70 at 40 (citing *FTC v. Loanpointe*, No. 10-225, ECF No. 44-5 (C.D. Utah Feb. 16, 2011); *FTC v. Payday Financial, LLC*, No. 11-3017, ECF No. 10 (C.D. S.D. Sept. 6, 2011)).  This discredits the FTC's claim that this straightforward provision is "highly imaginative."

Amount Financed plus a single Finance Charge), and explicitly states it is "The amount you will have paid after you have made the scheduled payment," singular. 12 C.F.R. § 1026.18(h).

- The Payment Schedule disclosure reflects the single-payment obligation and explicitly states, "Your Payment Schedule will be:  1 payment of **$650.00** due on **2011-08-18**, if You decline* the option of renewing your loan," and also explains that "*To decline the option of renewal, you must select your payment options using the Account Summary link."[27]

The FTC concedes, as it must, that the "TILA cost disclosures, set off from the rest of the text in four prominent boxes, clearly disclose a loan amount of $300, a single finance charge of $90, and an obligation to repay a total of $390."  In other words, the Loan Note's terms reflect a single-payment obligation.  (FTC Opp'n at 19.)

In Part II of its opposition, the FTC argues that the Loan Note was ambiguous as to the obligation it created, and that this ambiguity by itself somehow violated TILA.  (FTC Opp'n at 18-22.)   The FTC's argument is contrary to Ninth Circuit law concerning TILA and contract interpretation.   TILA incorporates the common law of contracts to interpret the legal obligations reflected in disclosures, *see* 12 C.F.R. Pt. 1026, Supp I, Pt. 2, § 1026.17(c)(1)-1, and "[i]t is a well-established maxim of contractual interpretation that a contract is ambiguous if it is capable of more than one reasonable interpretation."   *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) (internal quotation marks and citation omitted); *Local Motion, Inc. v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997) (*per curiam*) ("The existence of an ambiguity in a contract is . . . a matter of law. An ambiguous term is one susceptible to more than one reasonable interpretation." (citations omitted)).

The FTC has put forth only one alternative interpretation of the legal obligation created by the Note—a mandatory obligation to renew for the maximum renewal periods allowed—that cannot reasonably be read into the Note, (*see* Defs.' Mem. ISO SJ at 13–16; Part I.B., *infra*), and therefore cannot show that the Loan Note is ambiguous.  The FTC argues that Defendants' disclosures and loan terms violate TILA because they are ambiguous and misleading in the abstract, relying primarily on *Burton v. Pub. Fin. Corp. of Akron No. 3*, 657 F.2d 842 (6th Cir. 1981).  The FTC's reliance on *Burton* is misplaced, as unlike the TILA disclosure here, the disclosures were extraordinarily garbled and jargon-filled:

---

[27] Ex. I to Defs.' Opp'n.

> A deferment charge may be made for deferred payments equal to the portion of the regular finance charge applicable by the sum-of-the-digits method to the installment period immediately following the due date of the first deferred installment times the number of months of deferment.

*Id.* at 843. The unique facts in *Burton*—a truly incomprehensible disclosure at issue—likely explains why the case has been cited only four times since 1981, and never by the Ninth Circuit.

A more instructive (and binding) case is *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1119 (9th Cir. 2009). There, Chase disclosed a balance transfer rate as having a "low 4.99% Fixed APR" that was conditional "upon the occurrence of certain events" and disclosed in a footnote that the rate applied "only when you make your required minimum payments by the payment due date," and, on the reverse side of the offer, disclosed that it "may change to your Non-Preferred APR if any minimum payment on any loan or account of yours with us or your other creditors was not made by the payment due date." *Id.* The Ninth Circuit emphasized that "TILA is only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction." *Id.* at 1120 (internal quotation marks omitted). The court held that the disclosure complied with TILA and refused to consider in the abstract whether it was ambiguous or misleading: "Instead of determining whether a particular disclosure is 'misleading' in the abstract, our circuit has focused on subsection 226.5(c)'s requirement that disclosures 'reflect the terms of the legal obligation between the parties' and the requirements in other relevant subsections of Regulation Z or TILA." *Id.* at 1121.

The FTC's entire argument in Part II of its opposition (and much of the rest of its brief) runs afoul of *Hauk*: it wrongly presumes that TILA forbids disclosure of an obligation (single payment here, low APR in *Hauk*) that may change based on a post-contract "act, occurrence, or agreement"[28] (renewal here, untimely payments in *Hauk*), and it improperly argues that the Loan Note is ambiguous or misleading in the abstract, as opposed to whether it correctly reflects a single payment obligation (versus an obligation to renew, as the FTC alleges). The FTC's arguments that the Loan Note was ambiguous or misleading also fail for additional independent reasons.

---

[28] 15 U.S.C. § 1634.

***First***, and primarily, the FTC argues that the Loan Note was ambiguous or misleading because the borrower "was automatically going to repay later, [so] he cannot have simultaneously have been obliged to repay sooner" and the Payment Schedule provision "provide[s] that the consumer must take affirmative, post-contract action to stop the 'renewal.'"  (FTC Opp'n at 19, 20.)  But the borrower is not obliged at the outset to renew (*see* Part I.B, *infra*), so there is no contradiction: at the outset, the borrower is obliged to repay in full on the due date, but later may change that obligation by renewing.

***Second***, the FTC wrongly asserts that the Promise to Pay provision is ambiguous because it is "inconspicuous but also conditional."  (FTC Opp'n at 20.)  The Promise to Pay provision is conspicuous—its title tells the borrower exactly what it contains, and it is immediately proximate to the TILA disclosures—but regardless, nothing in TILA requires the underlying loan terms themselves (as opposed to the TILA-mandated disclosures reflecting those terms) to be conspicuous,[29] and contract terms are given their plain meaning irrespective of whether they are inconspicuous.[30]  Similarly, the FTC's argument that the single-payment obligation is conditional (the borrower must pay in full unless he renews) fails because it focuses on the wrong timeframe: TILA requires disclosure of the borrower's legal obligation ***at the outset of the transaction***, whereas renewal cannot be accepted until the near end of the loan term (and thus has no effect on the borrower's obligation at the outset).[31]

***Third***, the FTC makes the facile argument that "the Loan Note is so convoluted that Defendants can only argue that it is clear by discussing its sentences out of order."  (FTC Opp'n at 20.)  Defendants simply followed the logic of TILA and Regulation Z, which require disclosures to "reflect the credit terms to which the parties are legally bound as of the outset of the transaction."

---

[29]   *See* 12 C.F.R. § 1026.17(a).

[30]   *See* 11 *Williston Contracts* § 32:3 (4th ed.)

[31]   The FTC makes the same mistake in arguing that the Loan Note was "non-compliant" (with what, the FTC does not say) because it "informed consumers that Defendants would automatically withdraw '[a]ny payment due' directly from their bank accounts," but did not withdraw payment in full for borrowers who renewed.  (FTC Opp'n at 21.)  The Loan Note could not be clearer that renewal will change the amount due "If renewal is accepted you will pay the finance charge of $[amount] only, on [the due date]."

12 C.F.R. § 1026.17(c), Pt. 1026, Supp I, Pt. 2, § 1026.17(c)(1)-1.   The concept of "reflection" presumes a source, which requires the Court to look first to the Promise to Pay provision to see (as the name indicates) what the borrower promised at the outset to pay, and then to the TILA disclosures to confirm that those disclosures meaningfully reflect that legal obligation.

What is most striking about the FTC's argument is its failure—as the party with the burden of proof, nearly two years into this litigation—to articulate any reasonable interpretation of the Loan Note that would create an obligation to renew or any principled statement of contract law that could support its claim.   The borrower's legal obligation at the outset is to repay the loan with a single finance charge, and that is what the loan documents disclose.   The fact that loans may be subsequently renewed for additional finance charges does not equate to an obligation at the outset to renew.

### B.   The FTC's Obligation-To-Renew Theory Is Unsupported By Facts Or Law.

The FTC contends in Count III that for a $300 loan, "[t]he Finance Charge that should be disclosed [is] $675 . . . .   The Total of Payments that should be disclosed [is] $975,"[32] and that this is the "true schedule and cost of the loan" that "reflects the consumer's obligation."[33]   The FTC's theory would be accurate only if the borrower were obliged at the outset to renew her loan the maximum number of times.   But the FTC fails to cite any contract treatise, case, or other authority for the proposition that acceptance of renewal by inaction—which can occur only at the end of the loan term—creates at the outset an *obligation* to renew.[34]

The FTC's argument in opposition hinges on its characterization of the renewal option as "automatic," and it repeats that word as if it were a talisman.[35]   Substituting the question of whether

---

[32]   Ex. GG to Defs.' Opp'n. at 25.

[33]   *Id.* at 21 ("Defendants should have, but failed to, make the following disclosures regarding the consumers' legal obligations vis-à-vis the loan:  . . . Finance Charge: $675[;] Total of Payments: $975. . . .   The true schedule and cost of the loan in the manner processed by Defendants is described in the answer to Interrogatory No. 8.   That schedule reflects the consumer's obligation to repay with respect to the finance charge, payment schedule, and total of payments.").

[34]   Defs.' Opp'n at 65 & n.280 (citing 1 *Williston on Contracts* § 1:2 (4th ed.); *In Re Vylene Enters., Inc.*, 90 F.3d 1474(9th Cir. 1996), 2 *Williston on Contracts* § 6:54 (4th ed.); *Restatement (Second) of Contracts* § 69 (1981)).

[35]   *See, e.g.*, FTC Opp'n at 7 ("The repayment schedule discussed in SMG ¶¶ 42–46 above was the automatic, or default, schedule."); *id.* at 1, 5, 8, 17 n.46, 18.

renewal occurs passively or "automatically" (which is nowhere in TILA) for the question of whether borrowers are legally obliged at the outset to renew (which is central to TILA), is contrary to Regulation Z and is circular because it skips *the* critical question: does the Loan Note's offer to renew by inaction create an obligation to renew at the outset of the transaction?[36]

The FTC improperly focuses on the term "automatic" as opposed to "obligation" because it has no plausible textual or legal basis to assert that borrowers were obliged at the outset to renew. The Loan Note's "Promise to Pay" provision contains a promise to pay in a single payment, and an offer (but no promise) to accept renewal by inaction:

> You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed.  If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above.  This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed.[37]

Defendants cited the *Restatement (Second) of Contracts, Blacks' Law Dictionary*, *Williston on Contracts*, and Ninth Circuit authority for the proposition that, as a matter of contract law, performance—like renewal—that either party may decline is *not* a legal obligation.[38]  The FTC cites no authority to the contrary, and instead offers only the bizarre argument that this provision "merely" allows the lender to "notify" the borrower the loan will not be renewed, but does not give the lender a right to refuse renewal.  (FTC Opp'n at 11 n.38.)  Plainly the Loan Note would not state that the lender may exercise its right to decline renewal ("unless . . . we tell you that the Note will not be renewed") if it had no right to do so.[39]  Elsewhere in its brief, the FTC more candidly characterizes

---

[36]  *Id.* at 16-18.

[37]  Defs.' Mem. ISO SJ at 14–15.

[38]  *Id.*

[39]  Contracts must be read in accordance with the plain meaning of their terms, *see, e.g., Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013), and readings that would render terms absurd or meaningless must be avoided. *See* 11 *Williston on Contracts* § 32:11 (4th ed.) ("Interpretations which give a contract meaning are preferred to those which render it meaningless."); *In re Villa W. Associates*, 146 F.3d 798, 803 (10th Cir. 1998) ("Reasonable rather than unreasonable interpretations of contracts are favored, and results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided."); *Texas Instruments, Inc. v. Hyundai Electronics Indus. Co., Ltd.*, 42 F. Supp. 2d 660, 675 (E.D. Tex. 1999) (holding that "[t]he law favors an interpretation which is supported by the agreement as a whole and does not render any of its provisions illusory or meaningless" and that "[a] contract must be construed, if possible, to avoid an interpretation that will result in an absurdity").

the Promise to Pay provision as saying the Note will be renewed "absent future action by the consumer *or the lender*."  (FTC Opp'n at 20 (emphasis added).)

The FTC tries to bolster its obligation-to-renew theory by arguing that "some post-contract action by the consumer was always required" to pay in a single payment, and "[i]f the borrower was automatically going to repay later, he cannot have simultaneously have been 'obligated' to repay sooner."[40]  This is wrong both legally and factually.  As a legal matter, an offer to renew that may be accepted (passively or otherwise) subsequent to consummation cannot, as matter of basic contract law, create an obligation at the outset.[41]

And as a textual matter, the Loan Note and other Loan Agreements create at the outset a single payment obligation, with an offer (not an obligation) later to renew.  (Defs.' Mem. ISO SJ at 12–16.)  Reading an obligation to renew into the Loan Note would contradict a number of Loan Note provisions:

- The Prepayment provisions state, "If you prepay your loan in advance, you will not receive a refund of any Finance Charge," and, "The Finance Charge consists solely of a loan fee that is earned in full at the time the loan is funded.  Although you may pay all or part of your loan in advance without penalty, you will not receive a refund or credit of any part or all of the Finance Charge."[42]  If the borrower's obligation on a $300 loan were, as the FTC alleges, a finance charge of $675 and a total of payments of $975,[43] the borrower would be obliged to pay $675 on a $300 loan even if the borrower "prepaid" it on the first due date—an absurd result.[44]

- The Loan Note and other Loan Agreements repeatedly describe the finance charges incurred with renewal as "new" and "additional" fees as opposed to "installments" the borrower is

---

[40]  FTC Opp'n at 16, 19; *see also id.* at 16 ("[I]f the borrower took no affirmative action, the consumer would automatically be assessed multiple finance charges."); *id.* at 17 ("[T]he only way a consumer could actually repay the loan for the disclosed "**Total of Payments**" amount would be to take some affirmative action *after the loan was funded.*" (emphasis in original)); *id.* at 18 ("[I]t is undisputed that some *post*-contract action was required for the consumer to actually repay the loan for the disclosed '**Total of Payments**' amount."  *See* Reply to Response No. 2, *supra.*

[41]  Defs.' Mem. ISO SJ at 13-16 (citing authority).

[42]  Ex. I. to Defs.' Opp'n.

[43]  FAC ¶¶ 39-40; Ex. GG to Defs.' Opp'n at 21 ("[I]n practice the consumer is obligated to repay the loan in ten installments, resulting in a $675 finance charge and a $975 total of payments"); *id.* at 23 ("[T]he FTC states that the following figures should be disclosed to consumers for the [$300] loan . . . Finance Charge: $675").

[44]  The FTC addresses this point in a non-sequitur footnote stating that the prepayment provision "stands only for the uncontroversial and irrelevant proposition that Defendants assessed a finance charge at the moment the loan was funded and would not refund the finance charge if the loan was repaid early." (FTC Opp'n at 21 n.48.)

obliged at the outset to pay.[45]   The FTC offers no reasonable explanation for how its obligation-to-renew theory can be read harmoniously with this language.[46]

- The word "renewal" itself—which means "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract"—wholly contradicts the notion that borrowers were obliged at the outset to renew. (Defs.' Mem. ISO SJ at 13) The FTC offers no contrary meaning but instead simply declares without any authority that the word cannot be given its normal, natural meaning because it "suggests an actual decision by the consumer . . . when in fact precisely the opposite occurred." (FTC Opp'n at 11.)

- Even the FTC's watered-down allegation that renewal was "automatic" (not to say obligatory) contradicts the plain terms of the Loan Note, which give both the borrower and lender a choice about whether to renew.[47]

The TILA disclosures accurately reflect the single-payment obligation to which borrowers were bound at the outset of the transaction. (See Part I.A., supra.)  The FTC thus has failed to prove its claim in Count III, because the Loan Note does not create (and its TILA disclosures need not reflect) any obligation to renew, let alone an obligation to maximally renew and pay $975 on a $300 loan.

## II.   The FTC Cannot Use Extrinsic Evidence To Prove An Initial Renewal Obligation That Would Conflict With The Plain Terms Of The Loan Note.

Extrinsic evidence is inadmissible to "add to, subtract from, vary, or contradict" an unambiguous contract term.   *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1191 (D. Nev. 2006), *aff'd*, 583 F.3d 1232 (9th Cir. 2009).   A contract is ambiguous only "if it is capable of more than one reasonable interpretation," *Miller*, 363 F.3d at 1004 (internal quotation marks and citation omitted); *see also Local Motion*, 105 F.3d at 1280

---

[45]   *See* Defs.' Mem. ISO SJ at 15-16.

[46]   Although the FTC contends that the "consumer is obligated to repay the loan in ten installments" (Ex. GG to Defs.' Opp'n at 21), the word "installment" appears nowhere in the Loan Agreements, whereas the word "renewal" appears twenty-seven times. (Defs. Mem ISO SJ at 13.)  In its opposition brief, the FTC does not attempt to assert a textual basis for its contention that renewals were really obligatory installments.  Instead, the FTC argues "that 'renewals' are not the product of conscious negotiation rather than an automatic attribute of the loan agreement."  (FTC Opp'n at 27.)  But TILA requires disclosures to be based on the legal obligation that exists at the outset of the transaction; it does not regulate whether the obligation is the product of "conscious negotiation" (whatever that means) (*see* Part I.A., *supra*), and the FTC cites no authority for its novel contrary proposition.

[47]   The FTC's repeated contention that "**the only way** a consumer could actually repay the loan for the disclosed 'Total of Payments' amount would be to take some affirmative action *after the loan was funded*," is simply false; it concedes elsewhere in its brief that there *were* "circumstances where Defendants required a consumer to pay in full after the consumer took no action."  (FTC Opp'n at 17; *see also* Reply to Response No. 2, *supra*.)

(*per curiam*) ("The existence of an ambiguity in a contract is . . .  a matter of law.  An ambiguous term is one susceptible to more than one reasonable interpretation.") (citations omitted).

The FTC has not identified any reasonable interpretation of the borrower's obligation under the Loan Note or other Loan Agreements.  The only interpretation it has offered (obligation to renew) contradicts the plain language of numerous provisions and would render others absurd—*see* Part I, *supra*—such that the FTC cannot rely upon (and the Court must not consider) extrinsic evidence to vary the terms of the Loan Note,[48] to prove it does *not* create a single payment obligation,[49] or to otherwise "interpret" its terms.[50]  The parol evidence rule applies with equal force when interpreting contracts in the TILA context.[51]

---

[48]   *Crockett & Myers,* 440 F. Supp. 2d at 1191.

[49]   *See Miller,* 363 F.3d at 1004.  Even if individual sentences or words in the Loan Note could be construed as consistent with an obligation to renew, a single ambiguous provision cannot render an entire contract ambiguous, especially when the ambiguity is clarified by context.  *See Spriggs v. Ray Orr Auto Sales, Inc.*, 508 F. Supp. 116, 118 (E.D. Mo. 1980) (finding that, even though a term in the payment schedule was ambiguous, the payment schedule itself was not unclear because "the remainder of the sentence adequately specified the due dates of payments"), *aff'd,* 676 F.2d 704 (8th Cir. 1981).  Extrinsic evidence may be used to prove a reasonable alternative contractual interpretation is the correct one, but it may not be introduced as evidence of ambiguity.  *Eureka Water Co. v. Nestle Waters N. Am., Inc.*, 690 F.3d 1139, 1149 (10th Cir. 2012) (extrinsic evidence inadmissible to "create an ambiguity in a contract that is unambiguous on its face"); *Operating Engineers Pension Trust v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 566 (9th Cir. 1984) (same).

[50]   The bar on extrinsic evidence is not limited to cases where a party is attempting to rescind or negate a contract or contract provision.  *Crockett & Myers, Ltd.,* 440 F. Supp. 2d at 1191 ("Parol, or extrinsic, evidence is not admissible to **add to, subtract from, vary, or contradict** . . . written instruments which . . . are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake." (internal quotation marks and citation omitted) (emphasis added)); *In re IndyMac Bancorp, Inc.*, No. 2:08-BK-2175, 2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012) ("[M]ere inconsistent interpretations of a contract by two litigants does not mean a contract is ambiguous, but rather likely means that one of the parties is advancing a flawed interpretation.").

[51]   There is no special rule that makes extrinsic evidence "particularly . . . [admissible] when the ambiguity surrounds the manner in which payments will be applied to the consumers' finance charges or principal balances," (Opp'n at 24), and none of the FTC's case law supports such a rule.  In *Monaco v. Bear Stearns Residential Mortgage Corporation*, the court did not, as the FTC claims, hold that "parol evidence would . . . be admissible to resolve the TILA dispute."  554 F. Supp. 2d 1034, 1040-42 & n.10 (C.D. Cal. 2008).  Rather, the court considered parol evidence only in the context of the plaintiffs' breach of contract and breach of warranty claims.  *Fox v. The Montell Corp.*, No. 01 C 299, 2001 WL 293632, at *2 (N.D. Ill. Mar. 19, 2001), did not involve an "ambiguous TILA disclosure"; extrinsic evidence was permitted only to show whether the contract was the type of agreement to which TILA applied.  *McAdams v. Citifinancial Mortgage Co.*, No. Civ. A. 06 27 A, 2007 WL 141128, at *3-4 (M.D. La. Jan. 16, 2007), makes only boilerplate statements about the general admissibility of parol evidence; neither party argued that the contract was ambiguous, so the court did not consider or admit any extrinsic evidence, *id.* at *4 n.18 ("[N]either party asserts that the contract was ambiguous . . . ."), and it does not concern TILA, *id.* at *1 ("[T]his report does not address the plaintiffs' TILA and RESPA claims.").  *In re Streeter*, No. 5:02-BK-15923 E, 2002 WL 32114477, at *3 (Bankr. E.D. Ark. Oct. 28, 2002), does not involve a TILA claim.

The FTC fails in its effort to distinguish *Hicks v. Star Imports,* 5 Fed. Appx. 222 (4th Cir. 2001), and *Dixon v. S&S Loan Servs.*, 754 F. Supp. 1567 (S.D. Ga. 1990), by arguing the disclosures at issue there were allegedly "vastly clearer" than the terms at issue here.  (FTC Opp'n at 25 n.51.)  As the party seeking to offer extrinsic evidence the FTC must first establish ambiguity by articulating an alternative interpretation that is reasonable in light of the contract as a whole; the FTC may not establish that the Loan Note is ambiguous by saying it is less clear than the unambiguous provisions at issue in *Hicks* and *Dixon*.[52]  The same is true of the FTC's efforts to show that the contract is ambiguous because it "failed to inform consumers that Defendants would automatically take multiple finance-charge-only payments."[53]

If the Court were to conclude that the Loan Note is ambiguous, it would be inappropriate to grant summary judgment on Count III for either Defendants or the FTC,[54] but in any event extrinsic evidence overwhelmingly shows consumers were *not* obliged to renew and, thus ultimately the FTC would be unable to prove its claim at trial.  As an initial matter, most of the extrinsic evidence the FTC cites is intended to disprove *the lender's* (not the borrower's) right under the Promise to Pay provision to decline renewal (FTC Opp'n at 27:3-28:10), but disproving the lender's right to decline renewal would not make renewal obligatory: it would only mean borrowers have an option to renew when the loan becomes due that could be accepted by inaction.[55]

---

[52]  *See Miller,* 363 F.3d at 1004; *Local Motion,* 105 F.3d at 1280.

[53]  FTC Opp'n at 26; *In re IndyMac Bancorp, Inc.*, No. 2:08-BK-2175, 2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012) ("[M]ere inconsistent interpretations of a contract by two litigants does not mean a contract is ambiguous, but rather likely means that one of the parties is advancing a flawed interpretation.").

[54]  "In contract cases, summary judgment is appropriate only if the contract or the contract provision in question is unambiguous."  *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).  *See also Smith v. FJM Corp.*, No. 207-CV-1417, 2009 WL 703482, at *2 (D. Nev. Mar. 16, 2009) ("Summary judgment is appropriate for breach of contract claims only if the contract provision or the contract in question is unambiguous." (citing Castaneda)); *Onyx Pharm., Inc. v. Bayer Corp.*, No. C 09-2145, 2011 WL 7905185, at *8 (N.D. Cal. May 10, 2011) ("Given that the Agreement is reasonably susceptible to Onyx's proffered interpretation, and the ultimate interpretation of the contract requires weighing disputed extrinsic evidence, summary judgment on this issue must be denied.").

[55]  An option gives the offeree a choice about whether to be bound by the offered term.  *See* "Option," Black's Law Dictionary (9th ed. 2009) ("The right or power to choose; something that may be chosen …. An offer that is included in a formal or informal contract.").  TILA explicitly provides that options selected after a contract is signed do not affect the validity of the initial disclosures: "If information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part." 15 U.S.C. § 1634.  Nor should lenders include "deferral or extension charge[s]" in the TILA box. *Id*. § 1638(a)(10).  The

While the FTC's extrinsic evidence fails to support the existence of an obligation to renew (at best it is neutral), other extrinsic evidence overwhelmingly shows the opposite—consumers *were* obliged at the outset to pay in full and *were not* obliged to renew:

- The FTC's own consumer witnesses testified that they understood the Loan Note to mean they were obliged to repay the Total of Payments on the first due date, unless they chose to renew the loan and the lender accepted renewal.[56] They also understood the lender was not required to accept renewal, and if the lender declined renewal, the borrower was obliged to repay the disclosed Total of Payments (principal plus finance charge) on the first due date.[57]

- The FTC's own unreliable consumer hearsay evidence (which Defendants maintain is inadmissible) contains numerous statements indicating that consumers understood they were obliged to pay in full on the first due date, unless they decided to renew.[58]

- Hundreds of thousands of borrowers since 2008 chose not to renew, but instead paid in full on their due date. None of these consumers paid more than a single finance charge (*e.g.*, $90 for a $300 loan), despite the FTC's contention they were obliged to pay $675 in finance charges (or more, for larger loans).[59]

- Only a tiny fraction of consumers renew the maximum number of times, such that their payment experience would match the TILA disclosures the FTC says were required.[60]

- Defendants' 30(b)(6) representative, Ms. Dempsey, testified that "[t]he lender always has the

---

FTC's heavy reliance on the Account Summary (Document Request to Pay Out) also is misplaced. (FTC Opp'n at 26.) That document is precisely what it says: (1) a summary of the consumer's account and key loan terms and (2) a written request to pay out the loan in full. (FTC Ex. 9 at AMG_00003684.)  It is not a "new agreement" as the FTC alleges; it memorializes a borrower's choice to decline renewal by paying in full, and reminds the borrower of key loan terms: "You must make one payment of $520 [i.e., $400 principal plus a single $120 finance charge] if you choose to pay off your loan rather than renew." *Id.*  Nor is the FTC correct that "Defendants required consumers to execute" an Account Summary (Document Request to Pay Out) in order to pay in full on their due date: undisputed facts show that consumers could pay in full over the telephone without signing anything. Defs.' Stmt. of Disputed Facts ¶ 51.

[56] *See supra* note 5.

[57] *See supra* note 8.

[58] *See* Defs.' Stmt. of Disputed Facts ¶ 90.

[59] The Prepayment provisions in the Loan Note provide: "If you prepay your loan in advance, you will not receive a refund of any Finance Charge," and "The Finance Charge consists solely of a loan fee that is earned in full at the time the loan is funded.  Although you may pay all or part of your loan in advance without penalty, you will not receive a refund or credit of any part or all of the Finance Charge."  Ex. I to Defs.' Opp'n.  If the Finance Charge obligation were $675 at the outset of the loan, as the FTC alleges, every borrower would have been obliged to pay that sum regardless of whether they repaid in a single pay period or renewed the maximum allowable times.

[60] *Compare* Ex. BB to Defs.' Opp'n, Scheffman Rpt., at 6 (demonstrating that only 17% of borrowers renew the maximum number of times), *with* Ex. GG to Defs.' Opp'n at 21 ("in practice the consumer is obligated to repay the loan in ten installments, resulting in a $675 finance charge and a $975 total of payments"), 23 ("the FTC states that the following figures should be disclosed to consumers for the [$300] loan . . . Finance Charge: $675").

ability to accept or reject that renewal."[61]   And the FTC does not dispute that Defendants have declined to renew loans even where the borrower accepted renewal.[62]

## III.   The FTC Improperly Seeks To Expand TILA And Regulation Z.

Unable to show a legal obligation to renew, the FTC in opposition asserts:  (1) Defendants' TILA disclosures should have reflected the most likely "performance under the Loan Note," (FTC Opp'n at 16-18); (2) the word "renewal" as used in Regulation Z (and the Loan Note) means only extensions that are "the product of conscious negotiation rather than an automatic attribute of the loan agreement," (*id.* at 27); and (3) an offer to renew that may be passively accepted post-consummation must be reflected in TILA disclosures as if it were an obligation at the outset, (*id.* at 16-18, 22-30).  These arguments invite the Court improperly to create and retroactively apply new disclosure requirements different from those in TILA and Regulation Z, which require disclosure to reflect the borrower's legal obligations at the outset, not *ex post* events such as renewals to which the parties may later agree, or the parties' expected, likely, or actual course of performance. 15 U.S.C. § 1634; 12 C.F.R. § 1026.17.

Regulation Z specifically provides it is *not* a TILA violation if a disclosure is accurate at the outset, then rendered inaccurate by a post-contract occurrence (like renewal), and specifically provides that no additional disclosure is required for "renewal of a single-payment obligation."[63] The FTC simply proclaims—without citing any authority—that these principles do not apply to renewals that are passively accepted.  This is arbitrary and is contrary to the Loan Note, TILA, Regulation Z, staff commentary, and hornbook contract law none of which makes the active/passive distinction on which the FTC relies.[64]

---

[61]   FTC Ex. 2, Dempsey Tr. at 280:15-281:22; *see id.* at 285:6-16; 295:18-296:8; 287:16-288:1; 151:14-20.  *Vylene Enters., Inc.*, 90 F.3d at 1476  (when "either party by the terms of [a] promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise").

[62]   *See supra* note 9.

[63]   12 C.F.R. § 1026.20(a)  ("The following shall not be treated as a refinancing [requiring a new disclosure]: (1) A renewal of a single payment obligation with no change in the original terms."); *see also* Official Staff Commentary to 12 C.F.R. § 1026.20(a) at 397; *Bone v. Hibernia Bank*, 493 F.2d 135, 140-41 (9th Cir. 1974) ("[O]nce disclosed, if the annual percentage rate is 'rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures,' it is not a violation of the Act."); *Jackson v. Am. Loan Co., Inc.*, 202 F.3d 911, 913 (7th Cir. 2000) ; *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 163 F.3d 948, 951 (6th Cir. 1998).

[64]   If Congress or the regulators had intended to require disclosures of passively accepted "renewals of a single-payment obligation" they surely could have done so.  They did not.  *See* 15 U.S.C. § 1634; 12 C.F.R. § 1026.17;

18

The Ninth Circuit has explicitly rejected similar efforts to expand TILA's requirements beyond those expressly stated in the statute or regulations:

> As the Supreme Court has emphasized, when neither Congress nor the Federal Reserve Board has elected to require a particular disclosure, such as a disclosure about a creditor's intent, a court should not impose that disclosure requirement:
>
> > [L]egislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence. [. . . .]
>
> We hold that a creditor's undisclosed intent to act inconsistent with its disclosures is irrelevant in determining the sufficiency of those disclosures under sections 226.5, 226.6, and 226.9 of Regulation Z.

*Hauk*, 552 F.3d at 1121 (quoting *Ford Motor Credit Co.*, 444 U.S. 555 (1980)). In *Ford Motor Credit*, the Supreme Court likewise cautioned against judges "stretching provisions [of Regulation Z] beyond their obvious limits to construe them as a mandate for [a particular] disclosure," because regulators, not judges, are best suited to that task.[65]

The CFP Act vested in the CFPB—not the FTC—exclusive authority to promulgate TILA regulations, 12 U.S.C. § 5514, and "Courts must defer to the decisions of the [regulator] with respect to TILA's disclosure requirements and cannot apply '[t]he concept of 'meaningful disclosure' that animates TILA . . . in the abstract.'" *Hauk*, 552 F.3d at 1114 (quoting *Ford Motor Credit Co.*, 444 U.S. 555 (1980)); *see also Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 238 (2004) ("Congress has expressly delegated to the Board the authority to prescribe regulations . . . "necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.'" (quoting 15 U.S.C. § 1604(a)).

---

*Hauk*, 552 F.3d at 1121. The CFPB, the agency now responsible for promulgating TILA regulations, expressly uses the term renewal in the context of passive acceptance: "Some lenders might set up payments assuming you only want to pay a renewal fee on the loan's due date and require you to take action several days before your loan comes due to pay it in full." Ex. P (www.consumerfinance.gov/askcfpb/1599/how-do-i-repay-payday-loan.html).

[65] *Ford Motor Credit*, 444 U.S. at 568-69 ("striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process."). *See also Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437, 443 (3d Cir. 1977) ("Any misgivings about the technical nature of the requirements under the [banking] Act or Regulation should be addressed to Congress and the Federal Reserve Board, not to th[e] Court").

Because rulemaking under TILA is within the exclusive province of the CFPB, the FTC's novel interpretation of TILA and Regulation Z is entitled to no deference.[66]   Moreover, even if the FTC had authority to implement new disclosure requirements for these types of loans, it could not impose them retroactively to create liability for loans Defendants made years ago in compliance with then-existing requirements.[67]   The Court should reject the FTC's invitation to "embellish upon the regulatory scheme" by creating through judicial decision a special disclosure rule for passively accepted renewals that regulators saw fit *not* to impose.

## CONCLUSION

For the foregoing reasons, and those stated in their Motion, Defendants are entitled to summary judgment in their favor as to Count III of the FTC's Amended Complaint.

---

[66]   *See Sec'y of Labor v. Excel Mining, LLC,* 334 F.3d 1, 7 (D.C. Cir. 2003)  ("[W]e do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency."); *Amerada Hess Pipeline Corp., v. Fed. Energy Reg. Comm'n,* 117 F.3d 596, 600 (D.C. Cir. 1997).

[67]   *See SEC v. Chenery Corp.,* 332 U.S. 194, 203 (1947)  (holding retroactivity must be balanced against the mischief of producing a result contrary to statutory design or to legal and equitable principles); *Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 60 n12 (1984)  (holding "an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests").

Dated:  December 20, 2013

/s/ David J. Merrill
DAVID J. MERRILL
DAVID J. MERRILL, P.C.
Nevada Bar No. 6060
10161 Park Run Drive, Suite 150
Las Vegas, NV  89145
Telephone:     (702) 566-1935
Facsimile:      (702) 924-0787
Email:  david@djmerrillpc.com

*Attorney for Defendants*
*AMG Services, Inc. and MNE Services, Inc. (dba*
*Tribal Financial Services, Ameriloan,*
*UnitedCashLoans, USFastCash)*

/s/ Conly Schulte
CONLY SCHULTE
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
Omaha, NE  68116
Telephone:     (303) 673-9600
Facsimile:      (303) 673-9155
Email:  cschulte@ndnlaw.com

*Attorney for Defendants AMG Services, Inc.;*
*Red Cedar Services, Inc. dba 500FastCash; SFS,*
*Inc. dba OneClickCash;MNE Services, Inc., dba*
*Tribal Financial Services, Ameriloan,*
*UnitedCashLoans, USFastCash*

/s/ Bradley Weidenhammer
BRADLEY WEIDENHAMMER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago IL  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:  bradley.weidenhammer@kirkland.com

*Attorney for Defendants AMG Services, Inc.*
*and MNE Services, Inc. (dba Tribal Financial*
*Services, Ameriloan, UnitedCashLoans,*
*USFastCash)*

21

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on the 20th day of December 2013, the foregoing *Defendants' Reply in Support of Motion for Summary Judgment on Count III* was submitted electronically for filing and/or service with the United States District Court of Nevada.  Electronic service of the foregoing document shall be made to all counsel of record.

/s/ *Bradley Weidenhammer*
Bradley Weidenhammer
