**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

FEDERAL TRADE COMMISSION,

                  Plaintiff,

vs.

AMG SERVICES, INC., *et al*.,

                  Defendants.

2:12–cv–00536–GMN–VCF

**REPORT & RECOMMENDATION**

(Plaintiff's motion for summary judgment (#454); Defendants' motion for summary judgment (#461))

       The Federal Trade Commission commenced this civil enforcement action regarding the offer and sale of "high-fee, short-term payday loans." (First Amend. Compl. (#386) at ¶ 1[1]). In pertinent part, the FTC's complaint alleges that Defendants violated the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the Truth in Lending Act, 15 U.S.C. § 1601, by misrepresenting the terms on which credit was extended to short-term borrowers. Before the court are the FTC's and the Lending Defendants' motions for summary judgment. (Pl.'s Mot. Summ. J. #454); (Def.'s Mot. Summ J. #461). Joinders, oppositions, and replies, have been filed.[2] For the reasons stated below, the court grants the FTC's motion for summary judgment on counts one and three, denies the FTC's motion for summary judgment on counts two and four, and denies Defendants' motion for summary judgment in its entirety.

---

[1] Parenthetical citations refer to the court's docket.

[2] The following joinders have been filed: (Def. Brady #461), (Def. LittleAxe #465), (Tucker Defs. #466), (Def. Campbell #470), (Muir Defs. #471). The following oppositions have been filed: (Def.'s Opp'n #493), (Muir Defs. #490), (Pl.'s Opp'n #491). The following replies have been filed: (Pl.'s Reply #514), (Def.'s Reply #512); (Def. LittleAxe's Joinder to Reply #520).

# BACKGROUND[3]

The Federal Trade Commission's ("FTC") action is predicated on thousands of complaints by short-term borrowers and former employees of the short-term lenders. The complaints were submitted to the FTC, the Better Business Bureau, and various state-run consumer protection agencies. (*See* Pl.'s Opp'n (#517) at 15:13–14). The FTC investigated these complaints and filed suit on April 2, 2012 against eighteen Defendants. (*See* Compl. #1). For purposes of the motions before the court, the relevant facts include: (1) the application process borrowers completed to obtain loans; (2) the repayment process Defendants created; and (3) the court's entry of its bifurcation order. Each is discussed below.

## I.      The Application Process

Defendants MNE Services, Inc., Red Cedar Services, Inc., and SFS, Inc. (collectively, "the Lending Defendants") offer short-term payday loans through Defendant AMG Services, Inc. (Def.'s Opp'n (#493) at ¶ 1). AMG Services provides the Lending Defendants with staff, call centers, and the various websites through which the Lending Defendants sell their loans. (*Id.*) Although Defendants' various websites differ in appearance, all provide the same information to borrowers in the same language. (*Id.*) This means that all of Defendants' loan notes and other documents are "identical." (*Id.*)

Borrowers obtain loans by completing an application, which requests the borrower's personal, employment, and financial information. (*Id.* at ¶ 2). Personal information includes the borrower's name, date of birth, contact information, and two personal references. (*Id.* at ¶ 3). Employment information includes the name and contact information of the borrower's employer. (*Id.*) Financial information includes the borrower's bank account number and routing number. (*Id.*) This enabled Defendants to automatically withdraw funds from borrowers' accounts.

---

[3] Because the facts must be viewed in the light most favorable to the nonmoving party, the following facts are taken from Defendants' filings unless otherwise stated.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the application is finished, Defendants determine the maximum amount that can be borrowed and a repayment date. (*Id*.) When this is completed, a new webpage appears that reads: "CONGRATULATIONS! [Defendant] has Pre-Approved you for up to: $300." (*Id*. at ¶ 4). The borrower is, then, prompted to select the amount he or she wants to borrow from a dropdown box on Defendants' website. (*Id*. at ¶ 4). Depending on the individual's creditworthiness, Defendants permit borrowers to select an amount between $150.00 and $800.00. (*Id*. at ¶ 1). To receive loan proceeds, the borrower simply selects the desired amount from the dropdown box, clicks four boxes to accept Defendants' terms and conditions, types his or her name into an electronic signature box, and clicks a button that reads: "I AGREE Send Me My Cash!" (*Id*.)

Defendants do not require borrowers to read their loans' terms and conditions before receiving money. (*See generally id*.) On the contrary, Defendants' webpage facilitates borrowers not reading Defendants' terms and conditions. To read the terms and conditions, the borrowers must click nine separate hyperlinks that are in eight or nine point font:

☑ I have read and accept the terms of the <u>Application</u>, including the terms and provisions of the <u>LIMITED WAIVER OF SOVEREIGN IMMUNITY</u> and the <u>ARBITRATION PROVISION</u> contained therein.

☑ I have read and accept the terms of the <u>Privacy Policy</u> & <u>Electronic Disclosure and Consent Agreement</u>.

☑ I have read and accept the terms of the <u>Authorization Agreement</u>.

☑ I have read and accept the terms of the <u>Loan Note and Disclosure</u>, including the terms and provisions of the <u>LIMITED WAIVER OF SOVEREIGN IMMUNITY</u> and the <u>ARBITRATION PROVISION</u> contained therein.[4]

The most important of the nine links listed in the four rows is the least conspicuous: the <u>Loan Note and Disclosure</u>. The loan note and disclosure link is buried in the fourth paragraph and overshadowed by two redundant links to the <u>LIMITED WAIVER OF SOVEREIGN IMMUNITY</u> and the <u>ARBITRATION PROVISION.</u> (*See id*. at ¶ 4). If a borrower clicks on the <u>Loan Note and Disclosure</u>

---

[4] As depicted in Defendants' filings, underlining signifies hyperlinks. (*See id*. at ¶ 4).

3

link, the following document appears. As depicted below, the <u>Loan Note and Disclosure</u> consists of a

Truth in Lending box (*i.e.*, "TILA box") and 749 words in fine print that contains two obscure footnotes

and is divided by a box:

### LOAN NOTE AND DISCLOSURE
**Borrower's Name:** _____

<u>Parties:</u> In this Loan Note and Disclosure ("Note") you are the person named as Borrower above. "We" Ameriloan are the lender (the "Lender").

All references to "we", "us" or "ourselves" mean the Lender. Unless this Note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide to us shall be provided to Ameriloan at the fax number and address specified in this Note and in your other loan documents.

<u>The Account:</u> You have deposit account, No **********5844 ("Account"), at First Arkansas Bank and Trust ("Bank"). You authorize us to effect a credit entry to deposit the proceeds of the Loan (the Amount Financed indicated below) to your Account at the Bank.

<u>DISCLOSURE OF CREDIT TERMS:</u> The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf | The amount you will have paid after you have made the scheduled payment |
| (e) | | | |
| 684.38% | $90.00 | $300.00 | $390.00 |

Your **Payment Schedule** will be: 1 payment of **$390.00** due on **2010-09-24**, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010-09-24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured.

<u>Prepayment:</u> You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is **9-8-2010**.

<u>Itemization Of Amount Financed of $300.00;</u> **Paid on your account $0**
See below and your other contract documents for any additional information about prepayment, nonpayment and default.

<u>Promise to Pay:</u> You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

(*See* Pl.'s Mot. Summ. J. (#456) at 10:4 –12) (reproducing this exact loan note); (*see also* Def.'s Opp'n

(#493) at ¶ 7) (reproducing a loan note from OneClickCash with the same exact provisions); (*see also*

4

Def.'s Mot. Summ. J. (#461) at 5:11–22) (reproducing a loan note from USFastCash with the same exact provisions).

## II.     The Repayment Process

Provided that borrowers satisfied certain conditions precedent, borrowers who obtained loans from Defendants were only obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (*See*, *e.g.*, Def.'s Reply (#512) at 7:1–15). However, if borrowers did not satisfy the conditions precedent, they were no longer able to satisfy their obligation by repaying the fixed amount in the TILA box. (*Id.*) Instead, they were automatically enrolled in a costly ten pay-period "renewal" plan. (*Id.*) Under the terms of the renewal plan, multiple finances charges are incurred and the borrower's principal balance only decreases by $50.00 a pay period after the fourth payday. (Def.'s Opp'n (#493) at 12–13).

For instance, if a borrower obtained a $300.00 loan from Defendants, and did not act to "decline the option of renewal," his or her "total or payments" would not be $390.00, as disclosed in the TILA box. Rather, the borrowers would be automatically enrolled in the following payment schedule:

| PAYDAY | PAYMENT | FINANCE CHARGE (30% OF REMAINING PRINCIPAL BALANCE) | AMOUNT APPLIED TO PRINCIPAL | REMAINING PRINCIPAL BALANCE | TOTAL PAID TO DATE |
|---|---|---|---|---|---|
| 1 | $90.00 | $90.00 | $0.00 | $300.00 | $90.00 |
| 2 | $90.00 | $90.00 | $0.00 | $300.00 | $180.00 |
| 3 | $90.00 | $90.00 | $0.00 | $300.00 | $270.00 |
| 4 | $90.00 | $90.00 | $0.00 | $300.00 | $360.00 |
| 5 | $140.00 | $90.00 | $50.00 | $250.00 | $500.00 |
| 6 | $125.00 | $75.00 | $50.00 | $200.00 | $625.00 |
| 7 | $110.00 | $60.00 | $50.00 | $150.00 | $735.00 |
| 8 | $95.00 | $45.00 | $50.00 | $100.00 | $830.00 |
| 9 | $80.00 | $30.00 | $50.00 | $50.00 | $910.00 |
| 10 | $65.00 | $15.00 | $50.00 | $0.00 | $975.00 |
| **TOTAL** | **$975.00** | **$675.00** | **$300.00** | – | **$975.00** |

(*See* Def.'s Opp'n (#493) at 13–16) (stipulating to these repayment terms); (*see also* Pl.'s Mot. Summ J.

(#456) at 14:1–14) (reproducing an internal document from Defendants' containing this payment schedule).

Theoretically, borrowers could opt out of the automatic "renewal" plan, but the mechanism for opting out of renewal is ambiguous. One provision of the fine print states that borrowers may decline "renewal" if "you tell us you do not want to renew the Note." Alternatively, another provision states: "[t]o decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due."

In addition to being ambiguous, Defendants—and not the borrowers—maintained control over the mechanism for opting out of renewal. First, Defendants' construed the loan note so that the only way borrowers could decline renewal was through the confusing email-and-hyperlink procedure. (*See* Def.'s Opp'n (#493) at 7:12–14; 14:15–16; 16:16–18) (citing an employee declaration, call script, and the email sent to borrowers from the lenders stating that there is only one procedure for opting out).

Second, Defendants established and controlled a convoluted procedure for opting out. To opt out, borrowers had to complete the following steps: (1) three days after the loan is funded, Defendants send an email to the borrower containing additional loan terms and a link that provides access to a webpage on the lender's website where the opt-out election can be made; (2) the borrower opens the email, reads the new terms,[5] accesses the webpage, and makes the appropriate selection to opt-out; and, (3) the selection is executed three business days before the borrower's "loan is due." (*Id*. at 7:12–14).

This created confusion. Borrowers assumed that Defendants would automatically withdraw a lump sum after one pay period that was equal to one finance charge plus the amount borrowed. Instead,

---

[5] The new terms included in the email state that there are three repayment plans: (1) Renewal, which is depicted in the chart above; (2) Pay down, which involves paying down the principal in increments of $50.00; this option may only be exercised by submitting a request in writing by fax; and, (3) Full pay out, which involves paying a single finance charge plus the amount borrowed before the borrower's next pay day. (*See* Def.'s Opp'n (#493) at 14:2–16) (reproducing a copy of the email describing the three repayment plans).

6

borrowers were automatically enrolled in the costly "renewal" plan, and Defendants automatically withdrew money from borrowers' accounts for ten pay periods.

Defendants received thousands of complaints from disgruntled customers. (*See* Pl.'s Mot. Summ. J. (#456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints). For example, Susan Oxenford estimated that approximately eighty percent of the consumers she spoke with complained that Defendant had withdrawn more from their accounts than the loan cost. (Oxenford Depo. (#455-113) at 170:18–172:10). Joshua Kendall similarly testified that more than half of the consumers with whom he spoke were confused about the loans' repayment terms. (Kendall Depo. (#455-112) at 135:6–16). Finally, Sara Glass testified that more than half of the customer-service calls she received involved consumers not understanding how Defendants' loans worked. (Glass Depo. (#455-75) at 105:7–22; 107:15–108:7; 185:16–186:21).

Internal documents indicate that Defendants' trained employees to deceive borrowers by concealing how the loans work. For instance, an email from Defendants' manager of Training and Development to one of Defendants' sales representatives stated: "When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained." (Email (#456-72) at 1).

### III.   The FTC Files Suit & the Court Enters the Bifurcation Order

The FTC filed suit on April 2, 2012 against eighteen Defendants. (*See* Compl. #1). The FTC's complaint alleges claims for deceptive acts and practices (Count I) and deceptive collection practices (Count II) in violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC's complaint also alleges a claim under the Truth in Lending Act, 15 U.S.C. § 1601 (Count III), a claim under the

7

Electronic Funds Transfer Act, 15 U.S.C. § 1693 (Counts IV), and a claim for disgorgement under the Federal Trade Commission Act, 15 U.S.C. § 53(b) (Count V).

On December 27, 2012, the court entered a stipulated preliminary injunction and bifurcation order. (Bifurcation Order (#296) at 10). The bifurcation order divided the FTC's litigation into two phases: a liability phase and a relief phase. (*Id*. at 9–10). Under the terms of the bifurcation order, no discovery regarding any claims or defenses involving the Muir Defendants would occur until phase two. (*Id*.); (*see also* Muir Def.'s Opp'n (#490) at 2).

On July 18, 2013, the following Defendants (hereinafter "the Settling Defendants") stipulated to settle counts two and four: AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc., MNE Services, Inc., Scott A. Tucker, Blaine A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, LeadFlash Consulting, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LCC, Don E. Brady, Robert D. Campbell, and Troy L. LittleAxe, Jr. (Stip. Mot. (#446) at 1). The settlement was contingent on court approval.

On September 30, 2013, the FTC moved for summary judgment on all counts against all Defendants because the court had not yet approved the Settling Defendants' stipulated settlement. (Pl.'s Mot. Summ. J. (#454) at 1).

On October 8, 2013, the court approved the Settling Defendants' stipulated settlement. (*See* Order (#478) at 1–13).

Consequently, on November 4, 2013, the FTC withdrew its motion for summary judgment on counts two and four against the Settling Defendants, but not the Muir Defendants. (*See* Withdrawal Mot. (#487) at 2).

8

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Rule 56(a) provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Material facts" are facts that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249 (citing 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93–95 (1983)). A dispute regarding material facts is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When determining whether there is a "genuine dispute" regarding "material facts," the court considers the "materials in the record." FED. R. CIV. P. 56(c)(1)(A). The court may also consider "the absence or presence" of disputed facts that are or are not in the record. FED. R. CIV. P. 56(c)(1)(B). The court's role is not to weigh the evidence, make credibility determinations, or determine the truth. *See Anderson*, 477 U.S. at 249, 255. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The purpose of summary judgment is twofold: (1) "to isolate and dispose of factually unsupported claims," and (2) to determine whether a case "is so one-sided that one party must prevail as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Anderson*, 477 U.S. at 252. The court's role is limited to determining whether there is a genuine factual issue for trial. *Id.* at 249.

If the moving party meets its initial burden, the burden shifts to the opposing party to set forth "specific facts showing that there is a genuine issue for trial." *F.T.C. v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009) (citation omitted). "[B]ald assertions of a mere scintilla of evidence" are insufficient. *Id.* at 929 (citation omitted). However, the opposing party must demonstrate the existence of a factual

dispute that "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

The Supreme Court has long held that summary judgment should be granted where the evidence "would require a directed verdict for the moving party." *Id*. at 251 (citing *Sartor v. Arkansas Gas Corp*., 321 U.S. 620, 624 (1944). The only difference between a motion for a directed verdict and a motion for summary judgment is procedural: "summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Id*. (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745, n. 11 (1983).

## DISCUSSION

This case is not about technicalities or whether either party's interpretation of the loan note is, in principle, correct. Rather, the relevant standard under the Federal Trade Commission Act, the Truth in Lending Act, and Regulation Z is one of "reasonableness."[6] This means that arguments about the technicalities of the loan note's provisions, qualifications, and disclaimers are misplaced. Even if an argument regarding the loan note is technically true in the mind of an attorney, the argument is immaterial under Rule 56 if it is not also true in the eyes of a "reasonable" borrower. (*See infra* § II.C.1 n. 14).

---

[6] As discussed in more detail below, representations violate section 5 of the Federal Trade Commission Act if the a common sense "net impression" of the representations are likely to mislead "reasonable" customers. *See, e.g., Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir. 1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003). Similarly, disclosures violate Regulation Z of the Truth in Lending Act if they are not "clear and conspicuous" and "meaningful" or if they are "reasonably susceptible" to more than one interpretation. *See* 12 C.F.R. § 1026.17(a), (c); *Chase Bank USA, NA v. McCoy*, 131 S.Ct. 871, 874–75 (2011); *In re Whitley*, 772 F.2d 815, 815 (11th Cir. 1985) (per curiam).

10

With this distinction in mind, the court turns to the parties' motions for summary judgment. The court's analysis of the parties' motions is divided into three parts: (1) whether the FTC is entitled to summary judgment on count one; (2) whether the FTC or Defendants are entitled to summary judgment on count three; and, (3) whether the court must deny the FTC's motion for summary judgment on counts two and four under Federal Rule of Civil Procedure 56(d). Each is discussed below.

## I.   Count I: The FTC's Motion for Summary Judgment is Granted

The court finds that Defendants violated section 5 of the FTC Act because Defendants misrepresented that borrowers will be obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (*See* First Amend. Compl. (#386) at ¶¶ 47(b), 48(b)). The court's discussion regarding Defendants' violation of the FTC Act proceeds in three parts: (1) a review of section 5 of the FCT Act; (2) a finding that the FTC satisfied its initial burden demonstrating the absence of a genuine issue of material fact; and, (3) a finding that Defendants failed to satisfy their burden because the factual disputes proffered are immaterial and irrelevant.

### A.   *The Federal Trade Commission Act, 15 U.S.C. § 45(a)*

Section 5 of the Federal Trade Commission Act of 1914 prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." 15 § U.S.C. 45(a)(1). "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (citing *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). This inquiry is governed by a standard of reasonableness. *See, e.g.*, *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir. 1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003).

A section 5 violation does **not** require actual deception. *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212, 214 (9th Cir. 1979) (emphasis added). Rather, section 5 "only requires a showing that misrepresentations 'possess a tendency to deceive.'" *F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1073 (C.D. Cal. 2012) (quoting *Trans World Accounts, Inc.*, 594 F.2d at 214); *see also F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 391–92 (1965) ("Nor was it necessary for the Commission to conduct a survey of the viewing public before it could determine that the commercials had a tendency to mislead.") (citation omitted).

This inquiry is governed by a standard of "reasonableness." *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989); *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir. 1976); *F.T.C. v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003). Deception may be found based on the "net impression" created by a representation. *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). This means that the court employs its "common sense," and that a section 5 violation is not determined by fine print, technicalities, and legalese. *Commerce Planet*, 878 F. Supp. 2d at 1063 (citing *Gill*, 265 F.3d at 956)); *see also Cyberspace.Com LLC*, 453 F.3d at 1200 (stating that a representation "may be likely to mislead by virtue of the net impression it creates even though the [representation] also contains truthful disclosures"). "While proof that consumers actually were deceived is not required, such evidence is 'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'" *F.T.C. v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1215 (citation omitted).

For instance, in *Floersheim v. F.T.C.*, the Ninth Circuit held that the appearance and prominent repetition of the words "Washington D.C." on debt-collecting forms from a private collections company created the deceptive impression that the forms were a demand from the government even though the forms contained a small print disclaimer informing recipients that such was not the case. *Floersheim*,

411 F.2d 874, 876-78 (9th Cir. 1969) (cited in *Cyberspace.Com LLC*, 453 F.3d at 1200). Similarly, in *F.T.C. v. Brown & Williamson Tobacco Corp*., the D.C. Circuit affirmed a district court's finding that a representation regarding cigarette tar was deceptive even though fine print in the corner of the advertisement truthfully explained how the tar content was measured. *Brown & Williamson Tobacco Corp*., 778 F.2d 35, 42–43 (D.C. Cir. 1985) (cited in *Cyberspace.Com LLC*, 453 F.3d at 1200). The court reasoned that, under the circumstances, consumers were unlikely to read the fine print in the corner of the ad. *Id*. at 43. Likewise, in *F.T.C. v. Figgie International, Inc*., the Ninth Circuit stated that there is "nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole." *Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993).

### B.   *The FTC Satisfied its Burden of Demonstrating the Absence of a Genuine Issue of Material Fact regarding Count One*

There is no "genuine issue of material fact" regarding count one. *Celotex Corp.*, 477 U.S. at 323. Count one alleges that Defendants violated section 5 of the FTC Act by, *inter alia*, representing that "[a] consumer's total of payments will be equal to the amount financed plus a stated finance charge." (First Amend. Compl. (#386) at ¶ 47(b)). In reality, however, undisputed facts show that "[t]he consumer's total of payments has been greater than the amount financed plus the stated finance charge." (*Id*. at ¶ 48(b)). This misrepresentation satisfies the three elements of a section 5 violation. *See Gill*, 265 F.3d at 950 ("An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"). Each element is discussed below.

#### 1.   "Representations" in Defendants' Loan Documents

With regard to the first element, Defendants' loan note contains two sets of representations: the Truth in Lending (*i.e.*, "TILA") box and the fine print. The TILA box represents that borrowers are obligated to repay a fixed sum equal to the principal plus a single finance charge. (*See* First Amend.

Compl. (#386) at ¶ 35); (Pl.'s Summ. J. Mot. (#456) at ¶ 26) (citing Exs. 19 & 20). For example, when a customer borrowed $300.00 from Defendants, the TILA box in Defendants' Loan Note stated:

**DISCLOSURE OF CREDIT TERMS:** The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate (e) **684.38%** | The dollar amount the credit will cost you **$90.00** | The amount of credit provided to you or on your behalf **$300.00** | The amount you will have paid after you have made the scheduled payment **$390.00** |

(First Amend. Compl. (#386) at ¶ 35) (emphasis original); (Pl.'s Summ. J. Mot. (#456) at ¶ 26).

Fine print, however, immediately follows the TILA box. The fine print explains how the loan actually works. In the case of a $300.00 loan borrowed on approximately September 10, 2010, the fine print read:

Your **Payment Schedule** will be: 1 payment of **$390.00** due on **2010-09-24**, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010-09-24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured.
**Prepayment:** You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is **9-8-2010**.
**Itemization Of Amount Financed of $300.00; Paid on your account $0**
See below and your other contract documents for any additional information about prepayment, nonpayment and default.
**Promise to Pay:** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge show above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

These terms contradict the terms disclosed in the TILA box. In plain English, the fine print means that: (1) the repayment amount is not fixed; (2) the borrower is automatically enrolled in a ten pay-period

loan "renewal" plan; (3) the "renewal" plan imposes multiple finance charges; and (4) the "renewal" plan increases "the dollar amount the credit will cost you" from $90.00 to $675.00.

Additionally, the fine print also means that the borrower can only decline the "renewal" plan if the borrower completes the following three steps: (a) three days after the loan is funded, Defendants send an email to the borrower containing additional loan terms and a link that provides access to a webpage on the lender's website where the opt-out election can be made; (b) the borrower opens the email, reads the new terms,[7] accesses the webpage, and makes the appropriate selection to opt-out; and, (c) the selection is executed and the payment is received before 4:30 p.m., three business days before the borrower's "loan is due."[8] (Def.'s Opp'n (#493) at 7:12–14).

The fine print not only contradicts terms disclosed in the TILA box, the fine print also contains provisions that contradict other provisions in the fine print. For instance, the fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." The fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure. Additionally, the fine print states that "[a]ny payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank," and that if the borrower revokes Defendants' ACH authorization, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if

---

[7] As stated above, the new terms state that there are three repayment plans: (1) Renewal, which is depicted in the chart above; (2) Pay down, which involves paying down the principal in increments of $50.00; this option may only be exercised by submitting a request in writing by fax; and, (3) Full pay out, which involves paying a single finance charge plus the amount borrowed before the borrower's next pay day. (*See* Def.'s Opp'n (#493) at 14:2–16) (reproducing a copy of the email describing the three repayment plans).

[8] The phrase "loan is due," which appears in the seventh line of the fine print, is ambiguous because it is unclear when the loan is due because the fine print automatically enrolls borrowers in a renewal plan.

You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

    2. <u>Defendants' Representations were "Likely to Mislead" Borrowers</u>

  With regard to the second element, Defendants' representations were "likely to mislead" because the loan note's "net impression" is misleading as a matter of law and the loan note is ambiguous as a matter of law. *See Gill*, 265 F.3d at 950 (identifying the second element for a section 5 violation as a representation that is "likely to mislead"). Both reasons are discussed below.

    i. *The loan note's "net impression" is likely to mislead*

  The loan note's "net impression" is likely to mislead reasonable borrowers for six reasons. First, the TILA box presents a set of terms that is materially altered by the fine print. The TILA box implies that borrowers will incur one finance charge, despite the fact that the fine print creates multiple finances charges.[9] Likewise, the TILA box states that borrowers are obligated to repay a fixed sum, despite the fact that the fine print obligates borrowers to repay a scaled sum that is determined by ten finance charges that triple the "total of payments" stated in the TILA box by increasing "the dollar amount the credit will cost you" from $90.00 to $675.00.

  It requires no citation of authority to demonstrate that the "net impression" of a boldfaced representation, which states that the borrower is responsible to repay a fixed sum, is misleading when the fine print indicates that the boldfaced fixed sum is not fixed. *But see* Black's Law Dictionary (9th ed. 2009), misleading ("calculated to be misunderstood"); *Figgie Int'l., Inc.*, 994 F.2d at 604 ("Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole.")

---

[9] Because the FTC Act requires the court to determine what "net impression" the loan note creates, it is irrelevant to the court's section 5 inquiry that Regulation Z does not require lenders to disclose whether multiple finances charges may be incurred. *See* 12 C.F.R. § 1026.17.

16

Second, the loan note's "net impression" is misleading because the loan note hides material terms. Neither the TILA box nor the fine print state that borrowers are automatically enrolled in a costly "renewal" plan. This provision, which is material to the parties' legal obligations, is implied. Defendants' loan note merely states that the borrower may "decline the option of renewing your loan." The word "automatic," which is the legal effect of this clause, never appears.

Third, the loan note's "net impression" is misleading because the provisions regarding declining "renewal" are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Fourth, the loan note's "net impression" is misleading because the provisions regarding payment are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

Fifth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (#493) at 16:16–17) (stating that borrowers could only decline renewal through the email-and-

17

hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who sends the email containing the hyperlink three days after the loan is funded. The contradiction between what the loan note says and what actually occurred is misleading as a matter of law.

Sixth, the court's conclusion that the loan note's "net impression" is misleading is bolstered by (1) the approximately 8,500 consumer complaints submitted by the FTC, which state that Defendants' loan terms were confusing and deceptive; (2) statements from Defendants' own employees, admitting that the loan terms are confusing and should be changed; and (3) Defendants' practice of refusing to "explain how the loans[s] work[]."[10] (*See also* Email to Defendant Sales Representative from Defendants' Training and Development Manager (#456-72) at 1) ("When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained.").

ii.     *The loan note is ambiguous and, therefore, likely to mislead*

Defendants' loan note also violates section 5 of the FTC Act because it is ambiguous as a matter of law. A contract is ambiguous if it is "reasonably susceptible" to more than one interpretation. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012); *see also* 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) (stating the same).

---

[10] (*See* Pl.'s Summ. J. Mot. (#456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints); (*id*. at ¶ 74 (citing Exs. 94–100); (*id*. at ¶ 65) ("Anyone calling in that does not have an existing account – you cannot explain how the loan works.") (citing Ex. 13); (*see also* Jan. 28 Order  at 25:10–11) (denying Defendants' motions to exclude and admitting these exhibits into evidence).

When determining whether a contract is ambiguous, the court must consider (1) "the words of the agreement," (2) "the alternative meanings suggested by the parties, and any extrinsic evidence offered in support of those meanings," (3) "the parties' relative positions and bargaining power," (4) "whether one of the parties prepared the instrument, so that the language should be construed most strongly against it," and (5) "any conduct of the parties which reflects their understanding of the contract's meaning." *See* 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.).

The plain language of the loan note compels a finding of ambiguity for six reasons. First, under the heading, "Disclosure of Credit Terms," Defendants' TILA box states that borrowers are obligated to repay a fixed sum that is equal to one finance charge for one pay period plus the amount borrowed. However, confusing language in the fine print states, *inter alia*, that the borrower's obligation is not limited to a fixed amount, the borrower is automatically enrolled in a costly "renewal" plan, and the "total of payments" identified in the TILA box triples under the terms of the "renewal" plan.

Second, material portions of the loan note are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Third, material portions of the loan note are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

Fourth, material portions of the loan note are hidden. The fine print automatically enrolls borrowers in Defendants' costly "renewal" plan. This provision is hidden from borrowers. Neither the

19

TILA box nor the fine print state that borrowers are automatically enrolled in the "renewal" plan. In fact, the word "automatic" never appears in the loan note. Rather, Defendants imply that enrollment is automatic by stating that the borrower may "decline the option of renewing [his or her] loan." (First Amend. Compl. (#386) at ¶ 36); (Pl.'s Summ. J. Mot. (#456) at ¶ 27). This creates ambiguity.

Fifth, the format of the loan note creates uncertainty. A box randomly divides the fine print, and two footnotes, demarcated with an asterisk and an the letter "(e)" are haphazardly placed within the body of the fine print. This has the effect of visually prioritizing one half of the fine print above the rest, hiding important information—including the provision that makes "renewal" automatic—and, disrupting the reader's understanding of the loan note as a whole.

Sixth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (#493) at 16:16–17) (stating that borrowers could only decline renewal through the email-and-hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who delays sending the email containing the hyperlink until three days after the loan is funded. The contradiction between what the loan note says and what actually occurred creates ambiguity.

20

The "alternative meanings suggested by the parties" also supports a finding of ambiguity. The FTC submitted approximately 8,500 consumer complaints demonstrating that consumers were confused and interpreted Defendants' loan documents as obligating the borrower to repay a fixed sum equal to a finance charge plus the amount borrowed. (*See* Pl.'s Summ. J. Mot. (#456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints). Additionally, the FTC proffered evidence that Defendants were aware of the borrower's confusion and trained their employees to avoid explaining the loans terms. (*See* Email (#456-72) at 1) ("When we are trying to sell [a loan] I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained.").

The parties' "relative positions and bargaining power" also militates in favor of a finding of ambiguity. It requires no citation of authority to recognize that payday loan borrowers are primarily indigent, unsophisticated, and not accustomed to interpreting contracts. Defendants, by contrast, are familiar with the offer and sale of credit, have issued five million loans since 2008, and are represented by Kirkland & Ellis, LLP. (*See* Def.'s Summ J. Opp'n (#493) at 55:18) (stating that Defendants have issued over five million loans since 2008).

Finally, the Defendants conduct "reflects [an] understanding of the contract's meaning," which Defendants sought to conceal from borrowers. (*See, e.g.*, Email (#456-72) at 1). This counsels strongly in favor of finding that the contract is ambiguous.

The court, therefore, concludes that Defendants' loan note is ambiguous as a matter of law. The court may make this determination *sua sponte*. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 571 n.10 (5th Cir. 2010). This determination is appropriate for summary judgment. 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) ("The determination of whether a contract is ambiguous

21

is a question of law for the court.").[11]

Additionally, because "ambiguous" means "open to more than one interpretation," *see* MERRIAM-WEBSTER (10th ed. 2010), the court holds that Defendants' loan documents are "likely to mislead" under section 5 of the FTC Act. *Trans World Accounts, Inc.*, 594 F.2d at 214 (stating that a representation is "misleading" is it "possesses the tendency to deceive").

### 3.    The Representations in the Loan Note are "Material"

The court also finds that Defendants' representations were "material." *See Gill*, 265 F.3d at 950 (identifying the third element for a section 5 violation as a representation that is "likely to mislead consumers"). The number of finance charges, the total amount owed, the existence of an automatic renewal plan, and the procedure for declining the renewal plan are material terms of a loan contract.

### C.    *Defendants Failed to Satisfy their Burden because the Factual Disputes Proffered are "Immaterial"*

Because the court finds that the FTC satisfied its burden of demonstrating the absence of a genuine issue of material fact, Federal Rule of Civil Procedure 56 shifts the burden and requires Defendants to present specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323. The court finds that Defendants failed to satisfy their burden for two reasons: (1) Defendants do not dispute the actual terms of the TILA box and fine print, which—as the court held above—are contradictory and misleading; and (2) the eight factual disputes proffered by Defendants are "immaterial." The court addresses each reason below.

---

[11] Defendants argue in a footnote that if the court determines that the loan note is ambiguous, summary judgment must be denied. (Def.'s Reply (#512) at 16:21 n. 54). This is incorrect. In support, Defendants cite *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981). *Castaneda* was a contract case for declaratory relief. There, the court found the contract to be ambiguous, which required a fact finder to determine the intent of the parties. Here, all that must be determined is whether the loan was "likely to mislead." A finding of ambiguity disposes of counts one and three because ambiguity, by definition, misleads. *See* MERRIAM-WEBSTER (10th ed. 2010), ambiguous (defined as "open to more than one interpretation"). Unlike *Castaneda*, this court is not required to make the additional factual finding that *Castaneda* required: what the parties actually intended.

### 1.   Defendants do not Dispute the Loan Note's Terms

The court concludes that Defendants failed to satisfy their burden of presenting specific facts showing that there is a genuine issue for trial because Defendants do not dispute the actual terms of the TILA box and fine print. (*See, e.g.*, Def.'s Opp'n (#493) at 13–16). The actual terms of the TILA box and fine print provide the basis for the court's holding that Defendants violated section 5 of the FTC Act. (*See supra* § 1.B).

Defendants attempt to create a factual dispute regarding the loan terms by arguing that "the parties genuinely dispute the impression created by Defendants' loan documents." (*See* Def.'s Opp'n (#493) at 43:12–45:15). This argument bolsters the court's holding that the loan documents are misleading. The problem presented by Defendants' loan documents is that their terms are "disputable" because the TILA box and fine print are "misleading" and "ambiguous" as a matter of law.

Presumably, Defendants intended to argue is that summary judgment is inappropriate because there is a material factual dispute regarding the "net impression" the loan documents create. This argument is unpersuasive for two reasons. First, where "net impression" concerns the terms of a contract, "net impression" is a question of law, not fact. *See Native Am. Serv's, Inc.*, 213 F.3d at 642 ("[T]he meaning of a contract is a question of law"); RESTATEMENT (FIRST) OF CONTRACTS § 230 (1932) ("[W]hether or not the language is ambiguous is a question of law for the court, which will analyze whether there is more than one reasonable interpretation which can be gleaned from the contract language"); 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.) ("The determination of whether a contract is ambiguous is a question of law for the court.")

It is only with FTC enforcement actions involving advertisements, which judges are not trained to interpret, that the "net impression" is generally a question of fact. *See Nat'l Bakers Serv's, Inc. v. F.T.C.*, 329 F.2d 365, 367 (7th Cir. 1964) (citing state law) ("The meaning of an advertisement is a

question of fact."); *see also F.T.C. v. Nat'l Urological Group, Inc*., 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) (citing *F.T.C. v. QT, Inc*., 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006) ("The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact").

Second, even in the context of advertisements, summary judgment is appropriate where—as here—the representation is clearly misleading and the defendant relies exclusively on the fine print to correct the misrepresentation. *See F.T.C. v. Gill*, 265 F.3d 944, 957 n. 10 (9th Cir. 2001); (affirming the district court's granting of summary judgment where "at least one of defendants' [advertisement representations] is illegal as a matter of law"); *Cyberspace.Com LLC*, 453 F.3d at 1200 (stating that a representation "may be likely to mislead by virtue of the net impression to makes even though the [representation] also contains truthful disclosures [in the fine print]"); *Figgie Int'l, Inc*., 994 F.2d at 604 (stating that truthful fine print disclosures do not render a representation not deceptive); *Floersheim*, 411 F.2d at 876-78 (stating the same); *Brown & Williamson Tobacco Corp*., 778 F.2d at 42-3 (stating the same); (*see also* Def.'s Opp'n (#493) at 43:23-45:8) (relying exclusively on the fine print to correct Defendants' TILA box representations).

### 2. The Remaining Factual Disputes Proffered by Defendants are "Immaterial"

The remaining eight factual disputes proffered by Defendants are all "immaterial." As stated above, "material facts" are facts that may affect the outcome of the case. *Liberty Lobby, Inc*., 477 U.S. at 248–49. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 249 (citing 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93–95 (1983)).

The first immaterial factual dispute that Defendants proffer is that "the FTC has improperly pursued a series of shifting, conflicting theories for count one." (*See* Def.'s Opp'n (#493) at 38:9–43:6). This argument is "immaterial" for two reasons. First, "shifting legal theories" do not create "factual

disputes." *See Liberty Lobby, Inc*., 477 U.S. at 248–252. Second, this argument only addresses the FTC's allegation that Defendants violated section 5 of the FTC Act because they represented that they would withdraw funds from borrower's accounts on a single day when, in fact, Defendants withdrew funds on multiple days. (*See* Def.'s Opp'n (#493) at 38:9–43:6) (discussing paragraph 47(a) of the FTC's complaint). This allegation is immaterial because the court's holding rests on paragraph 47(b) of the FTC's complaint, which addresses representations in the TILA box and fine print. (*See supra* § 1.B) (basing the court's holding on paragraph 47(b)).

The second immaterial factual dispute Defendants proffer is that "the FTC's consumer witness testimony creates a genuine dispute about the impression created by loan documents." (*See* Def.'s Opp'n (#493) at 45:16–47:4). This argument is immaterial because "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC*, 827 F. Supp. 2d at 1215.

The third immaterial factual dispute Defendants proffer is that "Dr. Scheffman's expert testimony creates a genuine dispute of fact as to consumer confusion and deception." (*See* Def.'s Opp'n (#493) at 47:5–48:2). This argument is immaterial for the same reasons stated above: "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC*, 827 F. Supp. 2d at 1215.

The fourth immaterial factual dispute Defendants proffer is that "the FTC's own consumer hearsay creates a genuine factual dispute about the impression created by Defendants' loan documents." (*See* Def.'s Opp'n (#493) at 48:3–49:21). This argument is immaterial for the same reasons stated above: "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC*, 827 F. Supp. 2d at 1215.

The fifth immaterial factual dispute Defendants proffer is that "Defendants did not intend to mislead consumers." (*See* Def.'s Opp'n (#493) at 49:22–51:8). This argument is immaterial because

"intent" is irrelevant under section 5. *See Gill*, 265 F.3d at 950. ("An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'").

The sixth immaterial factual dispute Defendants proffer is that "TILA compliance is a safe harbor against FTC Act claims based on the same disclosures." (*See* Def.'s Opp'n (#493) at 45: 6–55:7). This argument is immaterial because, as discussed below, Defendants violated TILA. (*See infra* § II).

The seventh immaterial factual dispute Defendants proffer is that "the FTC cannot show a significant minority of consumers likely were misled." (*See* Def.'s Opp'n (#493) at 55:8–56:11). As stated above, this argument is immaterial because "proof that consumers actually were deceived is not required" under section 5 of the FTC Act. *Grant Connect, LLC*, 827 F. Supp. 2d at 1215. Additionally, the FTC has demonstrated that a "significant minority" of consumers were misled. (*See* Pl.'s Summ. J. Mot. (#456) at Exs. 167–68) (compiling approximately 8,500 consumer complaints).

The eighth immaterial factual dispute Defendants proffer is that Defendants' "telephonic representations" do not demonstrate a "pattern or practice" of deception. (*See* Def.'s Opp'n (#493) at 56:12–57:28). This argument is immaterial because it is irrelevant to the court's holding: the plain language of loan note is contradictory and misleading. As a result, this argument cannot "affect the outcome of the case." *Liberty Lobby, Inc*., 477 U.S. at 248–49.

## II.  Count III: the FTC's Motion for Summary Judgment is Granted & Defendants' Motion for Summary Judgment is Denied

Defendants' loan note also violated the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq*. and Regulation Z. Because the loan note is ambiguous as a matter of law, it did not "reflect the credit terms to which the parties are legally bound" at the outset of the transaction. *See* 12 C.F.R. § 1026(a). The court's analysis proceeds in three parts: (1) a review of the Truth in Lending Act and Regulation Z; (2) a finding that the FTC satisfied its initial burden demonstrating the absence of a genuine issue of

26

material fact; and, (3) a finding that Defendants failed to satisfy their burden because the factual disputes proffered are immaterial and irrelevant.

## A.     *The Truth in Lending Act, 15 U.S.C. §§ 1601, et seq.*

Congress enacted the Truth in Lending Act of 1968 ("TILA" or the "Act") to promote "economic stabilization" and consumers' "informed use of credit." *See* 15 U.S.C. § 1601(a) (originally enacted as Title I of the Consumer Credit Protection Act, Pub. L. 90–321, 82 Stat. 146 (1968)). The Act achieves this end by requiring lenders to extend credit on terms that are transparent. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) ("[T]he Act requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights.").

TILA is implemented by Regulation Z, 12 C.F.R. § 1026(a). Where, as here, a creditor offers "closed-end" credit,[12] the creditor's loan note disclosures must comply with Subpart C, 12 C.F.R. § 1026.17. In pertinent part, Subpart C mandates creditors to disclose "clearly and conspicuously" in writing "the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(a), (c). This includes, *inter alia*, the loan's finance charge, annual percentage rate, due date, and period of payments scheduled to repay the total of payments, and a total of payments. 12 C.F.R. § 1026.17(c).

A TILA violation does not require actual harm or deception. *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142, 1145 (11th Cir. 1994) *abrogated on other grounds by Veale v. Citibank*, F.S.B., 85 F.3d 577 (11th Cir. 1996); *Zamarippa v. Cy's Car Sales*, 674 F.2d 877, 879 (11th Cir.1982) ("[I]t is unnecessary to inquire as to the subjective deception or misunderstanding of particular consumers."). This means that

---

[12] Closed-end transactions "include any credit arrangement that does not fall within the definition of open-end credit." Open-end credit plans are those in which "the creditor reasonably contemplates repeated transactions." 15 U.S.C. § 1602(j); 12 C.F.R. § 226.2(a)(20). Credit cards and home equity lines of credit are examples of open-end credit plans. *See Hofstetter v. Chase Home Fin., LLC*, 751 F. Supp.2d 1116, 1124 (N.D. Cal.2010).

an objective standard is used, and that creditors cannot comply with TILA by abusing the fine print. *Id*. The reason for this, as the Supreme Court has stated, is that TILA disclosures must be "meaningful." *Chase Bank USA, NA v. McCoy*, 131 S.Ct. 871, 874–75 (2011) ("Congress passed TILA to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms'"). Likewise, the Ninth Circuit has stated that TILA requires "absolute compliance by creditors." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1199 (9th Cir. 2010) (citations omitted)

The question of whether a creditor's TILA disclosures meaningfully "reflect the credit terms to which the parties are legally bound" is a question of state law. *See* Official Staff Comments, 12 C.F.R. § 226, Supp. I, 226.9(b) cmt. 1 ("*Legal obligation*. The disclosures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures. i. The legal obligation is determined by applicable state or other law.") (emphasis original). Whether a creditor's TILA disclosures are inaccurate, misleading, or confusing ordinarily will be for the fact finder.

However, where, as here, the disclosure is ambiguous as a matter of law, summary judgment is appropriate. *See Bartholomew v. Northampton Nat. Bank of Easton*, 584 F.2d 1288, 1293 (3d Cir. 1978); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978); *Weaver v. General Finance Corp.*, 528 F.2d 589, 590 (5th Cir. 1976); *Allen v. Beneficial Fin. Co.*, 531 F.2d 797 (7th Cir. 1976), *cert. denied*, 429 U.S. 885 (1976).

**B.**   ***The FTC Satisfied its Burden of Demonstrating the Absence of a Genuine Issue of Material Fact regarding Count Three***

The FTC satisfied its burden of demonstrating the "absence of a genuine issue of material fact" regarding count three. *Celotex Corp.*, 477 U.S. at 323. Count three alleges that Defendants violated TILA and Regulation Z by failing to disclose "the terms of the legal obligation between the parties" before extending credit. (First Amend. Compl. (#386) at ¶ 58). As discussed above, the loan note is

ambiguous as a matter of law. (*See supra* § I.B.2.ii). Ambiguous disclosures, by definition, are not clear, conspicuous, or meaningful disclosures. This violates TILA and Regulation Z.[13]  *See Watts v. Key Dodge Sales*, *Inc.*, 707 F.2d 847, 852 (5th Cir. 1983) (imposing liability under TILA and Regulation Z because defendant's disclosure was "ambiguous"); *In re Whitley*, 772 F.2d 815, 815 (11th Cir. 1985) (per curiam) (holding the same).

### C.     *Defendants Failed to Satisfy their Burden because the Factual Disputes Proffered are "Immaterial"*

Because the FTC satisfied its burden, Rule 56 requires Defendants to present "specific facts" showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323. Defendants failed to satisfy this burden because they proffered arguments and not facts. Nonetheless, both of Defendants' arguments fail as a matter of law. First, contrary to Defendants' assertion, the loan note may have legally obligated borrowers to renew their loans. Second, whether the FTC's extrinsic evidence is inadmissible, as Defendants contend, is immaterial. Both arguments are addressed below.

### 1.     <u>Borrowers may have been "Legally Obligated" to Renew Loans</u>

Defendants' opposition and motion for summary judgment contend that count three presents one—and only one—question: "Were the borrowers who took loans from the Lending Defendants obligated to renew their loans? If not, then the Lending Defendants complied with the Truth in Lending Act and are entitled to summary judgment on Count III. If so, then the FTC is correct and the Lending Defendants failed to disclose the borrower' legal obligations at the outset of the loan." (Def.'s Summ. J. Mot. (#461) at 1:2–6); (Def.'s Opp'n (#493) at 61:7–9); (*see also* LittleAxe Joinder (#465) at 2:9). The court disagrees.

---

[13] A corollary of this is that Defendants' motion for summary judgment on count three fails. Defendants cannot demonstrate that they are entitled to judgment as a matter of law under Rule 56(a) because their loan note is ambiguous and violates TILA and Regulation Z as a matter of law.

29

The question under TILA is not a technical question of whether borrowers were "legally obligated" to renew their loans. The question is whether the loan note provided clear, conspicuous, and meaningful disclosures regarding "the terms of the legal obligation between the parties." 12 C.F.R. § 1026.17(a), (c). Because Defendants' loan note is ambiguous as a matter of law (*see supra* § I.B.2.ii), "the terms of the legal obligation between the parties" were not "clearly and conspicuously" disclosed, as TILA requires. *See Watts*, 707 F.2d at 852; *In re Whitley*, 772 F.2d at 815.

For the sake of clarity, the court reiterates the six reasons why the loan note's plain language is ambiguous as a matter of law. First, under the heading, "Disclosure of Credit Terms," Defendants' TILA box states that borrowers are obligated to repay a fixed sum that is equal to one finance charge for one pay period plus the amount borrowed. However, confusing language in the fine print states, *inter alia*, that the borrower's obligation is not limited to a fixed amount, the borrow is automatically enrolled in a costly "renewal" plan, and the "total of payments" identified in the TILA box triples under the terms of the "renewal" plan.

Second, material portions of the loan note are vague and uncertain. The fine print states that the borrower may decline the "renewal" plan if "you tell us you do not want to renew the Note." But, the fine print does not specify whether "telling" must be done in addition to the email-and-hyperlink procedure or may be done instead of the email-and-hyperlink procedure.

Third, material portions of the loan note are circular and contradictory. The fine print states that, under certain circumstances, the borrower "authorize[s] [Defendants] to prepare and submit a check drawn on your Account to repay your loan when it comes due." But, the fine print also provides: "We do not accept personal checks, however, if You send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified."

30

Fourth, material portions of the loan note are hidden. The fine print automatically enrolls borrowers in Defendants' costly "renewal" plan. This provision is hidden from borrowers. Neither the TILA box nor the fine print state that borrowers are automatically enrolled in the "renewal" plan. In fact, the word "automatic" never appears in the loan note. Rather, Defendants imply that enrollment is automatic by stating that the borrower may "decline the option of renewing [his or her] loan." (First Amend. Compl. (#386) at ¶ 36); (Pl.'s Summ. J. Mot. (#456) at ¶ 27). This creates ambiguity.

Fifth, the format of the loan note creates uncertainty. A box randomly divides the fine print, and two footnotes, demarcated with an asterisk and an the letter "(e)" are haphazardly placed within the body of the fine print. This has the effect of visually prioritizing one half of the fine print above the rest, hiding important information—including the provision that makes "renewal" automatic—and, disrupting the reader's understanding of the loan note as a whole.

Sixth, the loan note's plain language contradicts the result the loan note is structured to effect. Once the fine print is understood, it states that borrowers can decline renewal in one of two ways. The borrower may "tell" Defendants that he or she "do[es] not want to renew the note." Alternatively (or in addition to), the borrower may decline renewal through an email-and-hyperlink procedure.

However, Defendants structured the loan note to counteract these representations. First, Defendants construed the loan note to remove the "telling" procedure from the loan note. (*See* Def.'s Opp'n (#493) at 16:16–17) (stating that borrowers could only decline renewal through the email-and-hyperlink procedure). Second, Defendants structured the loan note to: (1) conceal the automatic "renewal" provision; (2) make the process of declining "renewal" difficult by requiring the borrower to access a webpage three days before the loan note is due, which is only available through a hyperlink that is emailed to the borrower; and, (3) give the initial power to decline "renewal" to the lender who delays

31

sending the email containing the hyperlink until three days after the loan is funded.  The contradiction between what the loan note says and what actually does creates ambiguity.

Accordingly, the question of whether borrowers were "legally obligated" to renew their loans is inapposite. The loan note is ambiguous and, therefore, fails to reflect "the terms of the legal obligation between the parties" at the outset of the transaction. This violates TILA and Regulation Z.  *See Watts*, 707 F.2d at 852; *In re Whitley*, 772 F.2d at 815.

It is of no consequence to the court's analysis that some of the ambiguous provisions—like the automatic enrollment provisions and opt-out procedures—are not included in Regulations Z's mandatory disclosures. Congress and the Supreme Court have stated that TILA's purpose is to "'promote the informed use of credit' by requiring 'meaningful disclosure terms.'" *Chase Bank*, 131 S.Ct at 847–75 (citing 15 U.S.C. § 1601(a)). Permitting lenders to funnel borrowers through a deceptive renewal provision that subjects borrowers to unfavorable terms would render TILA and Regulation Z meaningless. As stated—per curiam—by the Ninth Circuit: "If lenders were permitted to include additional information in any form they wish, unsophisticated consumers would be handicapped in making ready comparisons." *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir. 1976) (per curiam); *see also Wright v. Tower Loan of Mississippi, Inc.*, 679 F.2d 436, 445 (5th Cir. 1982) (citing *Williams v. Blazer Fin. Servs.*, 598 F.2d 1371, 1374 (5th Cir. 1979)) ("The entire thrust of contemporary credit legislation is to make credit contract terms comprehensible.").

It is also of no consequence that Defendants can articulate an unambiguous interpretation of the loan note, which—with the guidance and skill of a trained attorney—proves to be the technically correct interpretation. TILA and Regulation Z specify that the parties' "legal obligation[s] are determined by state law." *See* Official Staff Comments, 12 C.F.R. § 226, Supp. I, 226.9(b) cmt. 1 ("*Legal obligation*. The disclosures should reflect the credit terms to which the parties are legally bound at the time of

32

giving the disclosures. i. The legal obligation is determined by applicable state or other law.") (emphasis original). Under the applicable state law, technicalities are irrelevant. A contract is ambiguous if it is reasonably—not technically—susceptible to more than one interpretation. *Skilstaf, Inc.*, 669 F.3d at 1015; 11 WILLISTON ON CONTRACTS § 30:5 (4th ed.). As discussed above, there are at least six reasons why the loan note is "reasonably" susceptible to more than one interpretation. (*See supra* § I.B.2.ii). These six ambiguities violate TILA.[14] *Watts*, 707 F.2d at 852 ("At the very least, the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley*, 772 F.2d at 815 (following *Watts* holding that ambiguous disclosures violate TILA).

### 2.    Whether the FTC's Extrinsic Evidence is Admissible is "Immaterial"

The remaining factual dispute that Defendants proffer to defeat summary judgment on count three is immaterial. The only remaining factual dispute that Defendants proffer is that "the FTC's extrinsic evidence is inadmissible." (*See* Def.'s Opp'n (#493) at 66:6–70:14); (*see also* Def.'s Summ. J. Mot. (#461) at 16:21–19:5). This argument is "immaterial" because (1) the evidence is admissible (*see* Jan. 28 Order at 25:10–11) and (2) the court's holding would not change without the extrinsic evidence. As a result, this argument cannot "affect the outcome of the case." *Liberty Lobby, Inc.*, 477 U.S. at 248–49.

## III.   **Counts II & IV: the FTC's Motion for Summary Judgment is Denied**

The FTC's motion for summary judgment on counts two and four is denied because the FTC's motion, while warranted under the circumstances, overlooks the purpose of the court's bifurcation order, which allowed the Muir Defendants to delay litigation until phase two. As a result, the court must deny

---

[14] Because a TILA violation also constitutes a violation of the FTC Act, *see* 15 U.S.C. § 1607(c), to avoid liability as a matter of law Defendants must show, *inter alia*, that it is **unreasonable** for a borrower to think that he or she can decline renewal by "telling" the lender when the loan note states that a borrower may decline renewal by "telling" the lender. (*See supra* § I.B.2.ii) (discussing the loan note's ambiguities).

the FTC's motion for summary judgment on counts two and four under Federal Rule of Civil Procedure 56(d).

On December 27, 2012, the court entered a stipulated preliminary injunction and bifurcation order. (Bifurcation Order (#296) at 10). Under the bifurcation order, no discovery regarding any claims or defenses involving the Muir Defendants would occur until phase two. (*Id.*); (*see also* Muir Def.'s Opp'n (#490) at 2).

On July 18, 2013, the following Defendants (*i.e.*, "the Settling Defendants") stipulated to settle counts two and four: AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc., MNE Services, Inc., Scott A. Tucker, Blaine A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, LeadFlash Consulting, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LCC, Don E. Brady, Robert D. Campbell, and Troy L. LittleAxe, Jr. (Stip. Mot. (#446) at 1).

This was unexpected. The court's bifurcation order did not envision a partial settlement by less than all Defendants. The bifurcation order divided litigation into two phases: (1) a liability phase, in which the Settling Defendant's would litigate their potential liability; and, (2) a relief phase. When that order was entered, all Defendants were litigating all issues, including whether the Muir Defendants could be held liable for the actions of the Settling Defendants.

Because of the settlement was not yet approved, on September 30, 2013 the FTC moved for summary judgment on all counts against all Defendants. (Pl.'s Mot. Summ. J. (#454) at 1). On October 8, 2013, the court approved the Settling Defendants' stipulated settlement. (*See* Order (#478) at 1–13). This changed the context of the bifurcation order. On November 4, 2013, the FTC withdrew its motion for summary judgment on counts two and four against a number of Defendants because they had settled claims. (*See* Withdrawal Mot. (#487) at 2). However, the FTC did not withdraw its motion for summary judgment against the Muir Defendants. (*See generally id.*)

34

In light of the Settling Defendants' not opposing summary judgment on counts two and four, the court must deny the FTC's motion for summary judgment on counts two and four in order to preserve the substance and spirit of the court's bifurcation order and afford the Muir Defendants an opportunity to conduct discovery and litigate the relevant claims and defenses. *See* FED. R. CIV. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it."); (*see also* Muir Decl. (#490) at Exhibit A) (stating that the Muir Defendants have not yet been afforded the opportunity to conduct discovery). Accordingly, in order to effect the principles and purpose announced by the bifurcation order, the court denies the FTC's motion for summary judgment on counts two and four without prejudice, and defers consideration of courts two and four as to the Muir Defendants until phase two.

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that the FTC's motion for summary judgment (#454) be GRANTED in part and DENIED in part.

IT IS FURTHER RECOMMENDED that the FTC's motion for summary judgment be GRANTED on COUNT I and COUNT III.

IT IS FURTHER RECOMMENDED that the FTC's motion for summary judgment be DENIED WITHOUT PREJUDICE on COUNT II and COUNT IV.

/// /// ///

/// /// ///

/// /// ///

/// /// ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IT IS FURTHER RECOMMENDED that Defendants' motion for summary judgment (#461) be DENIED.

IT IS FURTHER RECOMMENDED that the Bifurcation Order be AMENDED to permit claims two and four to proceed against the Muir Defendants during phase two.

IT IS SO RECOMMENDED.

DATED this 28th day of January, 2014.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

36