1   ANDREW A. KASSOF, P.C.
    BRADLEY H. WEIDENHAMMER
2   RICHARD U.S. HOWELL
    KIRKLAND & ELLIS LLP
3   300 North LaSalle
    Chicago, IL  60654
4   Telephone:      (312) 862-2000
    Facsimile:      (312) 862-2200
5   Email: andrew.kassof@kirkland.com
            bradley.weidenhammer@kirkland.com
6           rhowell@kirkland.com

7   *Attorneys for Defendants AMG Services, Inc. and*
    *MNE Services, Inc. (dba Tribal Financial Services,*
8   *Ameriloan, UnitedCashLoans, USFastCash)*

9

10                      **UNITED STATES DISTRICT COURT**
11                         **DISTRICT OF NEVADA**

12

13

14  FEDERAL TRADE COMMISSION,

15                      Plaintiff,                    Case No. 2:12-CV-536-GMN-(VCF)

16          v.

17  AMG SERVICES, INC., *ET AL.*,              **OBJECTIONS TO THE MAGISTRATE**
                                               **JUDGE'S JANUARY 28, 2014**
18                      Defendants, and        **REPORT AND RECOMMENDATION**

19

20  PARK 269 LLC, *ET AL.*,

21                      Relief Defendants.

22

23

24

25

26

27

28

Defendants AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc. and MNE Services, Inc., pursuant to Federal Rule of Civil Procedure 72(b), object to the Magistrate's Report and Recommendation (ECF No. 539) ("Report") that the Federal Trade Commission's motion for summary judgment (ECF No. 454) should be granted as to Counts I and III, and that the Defendants' motion for summary judgment (ECF No. 461) should be denied.   These Objections are made and based upon the pleadings and papers on file in this action (ECF Nos. 454, 461, 491, 493, 494, 512, 514) as well as the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

The Magistrate Judge's January 28, 2014 Report and Recommendation should be set aside in its entirety because it is applies incorrect legal standards for analyzing claims based on section 5 of the FTC Act and the Truth in Lending Act (TILA), incorrectly treats fact questions as questions of law, and violates the summary judgment standard by resolving genuine disputes of material fact in the FTC's favor.   Specifically, Defendants object to the following errors in the Report's analysis:

- *First*, the Report improperly decides as a matter of law what net impression the Defendants' loan documents create and that the net impression is likely to mislead reasonable consumers.   Net impression and likelihood of misleading are material questions of fact as to which the record shows a genuine dispute.

- *Second*, the Report improperly weighs evidence, selectively cites evidence that supports the FTC while ignoring as "immaterial" Defendants' contrary evidence, draws inferences against Defendants and in favor of the FTC, and generally approaches the facts as if the question were whether the record contains evidence to support the FTC's claims, rather than whether a reasonable fact-finder could find for Defendants.

- *Third*, the Report improperly invents new theories for why the Loan Note could be construed as ambiguous—theories that the FTC never alleged and that are contrary to the record.

- *Fourth*, the Report misconstrues or misunderstands numerous material facts, always in ways favoring the FTC.

- *Fifth*, the Report improperly recommends summary judgment for the FTC on Count III after finding that the Loan Note is ambiguous and therefore violates TILA.   Binding Ninth Circuit precedent forecloses this abstract approach to TILA and instead requires the Court to assess specifically whether the disclosure accurately reflected the borrower's legal obligation at the outset of the transaction.

1

- ***Sixth***, the Report does not apply the correct test for contractual ambiguity and incorrectly finds a TILA violation based on supposed ambiguities unrelated to the borrower's legal obligation at the outset.

- ***Seventh***, the Report acknowledges that Defendants' single-payment-obligation reading of the Loan Note is "unambiguous" and the "technically correct one," whereas the FTC and the Report fail to articulate how the Loan Note can reasonably be read as creating at the outset an obligation to renew.  The Report also correctly determines that Defendants TILA disclosures reflect a single-payment obligation.  The Report therefore errs by failing to grant summary judgment for Defendants on Count III.

## LEGAL STANDARDS

Under Local Rule IB 1-4 and Federal Rule of Civil Procedure 72(b)(3), the district court judge "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1); 28 U.S.C. § 636(b)(1)(C); *Dawson v. Marshall,* 561 F.3d 930, 932-33 (9th Cir. 2009).  "De novo review means the court must consider the matter anew, the same as if it had not been heard before and as if no decision previously has been rendered."  *United States v. Perelman*, 737 F. Supp. 2d 1221, 1223 (D. Nev. 2010) (citing *Ness v. Comm'r*, 954 F.2d 1495, 1497 (9th Cir. 1992)).  In conducting this review, "the Court's obligation is to arrive at its own independent conclusion about those portions of the Magistrate Judge's Report and Recommendation to which objections have been made."  *Id.* (citing *United States v. Remsing*, 874 F.2d 614, 618 (9th Cir. 1989)).  "The district judge must not be a rubber stamp."  12 Charles A. Wright, et al., *Federal Practice & Procedure* § 3070.2, at 375 (2d ed. 1997).

"At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  The evidence of the nonmovant is 'to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 935  (D. Nev. 2011)  (Navarro, J.)  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The summary judgment standard "mirrors the standard for a directed verdict," *Anderson*, 477 U.S. at 250, which "requires the trial court to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect."  *United California Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1356 (9th Cir. 1977).  "At this stage of the litigation, the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge

make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions.  These determinations are within the province of the factfinder at trial."  *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (reversing summary judgment where district court resolved fact disputes by weighing the evidence).

## ARGUMENT

I.  **THE MAGISTRATE'S REPORT IMPROPERLY RECOMMENDS SUMMARY JUDGMENT FOR THE FTC ON COUNT I DESPITE CLEAR DISPUTES AS TO THE MATERIAL FACTS UNDERLYING THE CLAIM.**

To establish a violation of Section 5 of the FTC Act, the FTC must prove three elements: (1) "a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *see also FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1222-23 (D. Nev. 2010) (same).  In recommending summary judgment for the FTC on Count I, the Report vitiates the summary judgment standard by incorrectly treating the first two elements as presenting questions of law, not fact.  (Report at 16-18.)  In addition, the Report improperly steps into the shoes of the fact-finder by weighing the voluminous evidence, drawing all inferences in the FTC's favor, and relying on evidence that supposedly supports the FTC's claim while deeming the Defendants' overwhelming contrary evidence "immaterial."  Accordingly, the Court should reject the Report's recommendation and deny summary judgment as to Count I.

A.  **The Report Incorrectly Decides As A Matter Of Law What Net Impression The Loan Note Creates And That It Is Likely To Mislead Consumers Acting Reasonably Under the Circumstances.**

The Report's recommendation rests on the erroneous proposition that determining what "net impression" Defendants' loan documents create and assessing that net impression are questions of law, rather than of fact:

> [Defendants argue] summary judgment is inappropriate because there is a material factual dispute regarding the "net impression" the loan documents create.  This argument is unpersuasive . . . [because] where "net impression" concerns the terms of a contract, "net impression" is a question of law, not fact.

(Report at 23.)  This ruling is contrary to law.  "The general rule is that when the meaning or effect of words or acts is fairly disputed, the question is for the trier of the fact, to be decided after hearing all material evidence," and even in the context of contracts "interpretation is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn therefrom."  *United States v. J. B. Williams Co., Inc.*, 498 F.2d 414, 431-32 (2d Cir. 1974).[1]  For that reason, the Ninth Circuit and the District of Nevada regularly analyze the "likely to mislead" element of a Section 5 claim as an issue of fact.[2]  Even when these courts grant summary judgment in the FTC's favor, they have done so only after concluding that no genuine issue of material fact exists—not by making  cursory legal determinations as a matter of law.

The authority upon which the Report relies illustrates this error: the Court cannot conclude that the Loan Note is ambiguous and also determine its meaning as a matter of law.  In quoting *Native American Services Inc. v. Givens*, 213 F.3d 642, 2000 WL 328137, at *1-3 (9th Cir. Mar. 23, 2000)—which is not an FTC Act case—the Report omits the crucial caveat: "the meaning of a contract is a question of law that must be determined from words of the contract itself, ***unless the contract is ambiguous***."  (Report at 23 (citing *Native Am. Servs. Inc.*, 2000 WL 328137, at *1) (emphasis added).)  The Report's citation to 11 Williston on Contracts § 30:5 (4th ed.) is equally incomplete, as Williston adds, "When a written contract is ambiguous, its meaning is a question of fact, requiring determination of the intent of parties in entering the contract.  The jury or other trier of fact, rather than the court as a matter of law, must interpret the contract's terms."  11 Williston on Contracts at § 30:7.[3]  Not only does the Report incorrectly rule that the loan documents are

---

[1]   *See also FTC v. Nat'l Urological Grp., Inc.,* 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) ("The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact."), *aff'd*, 356 F. App'x 358, 2009 WL 4810345 (11th Cir. 2009); *Giant Food, Inc. v. FTC*, 322 F.2d 977, 982 (D.C. Cir. 1963) ("The meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive, are questions of fact." (quoting *Kalwajtys v. FTC*, 237 F.2d 654, 656 (7th Cir. 1956))).

[2]   *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009); *FTC v. Cyberspace.com*, 453 F.3d 1196, 1201 (9th Cir. 2006); *FTC v. Gill*, 265 F.3d 944, 955-56 (9th Cir. 2001); *FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1226 (D. Nev. 2010); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1219 (D. Nev. 2011).

[3]   The Report's citation to the *Restatement (First) of Contracts* (Report at 23) appears to be a mistake: the quoted language is not from the Restatement but from the summary of a Missouri appellate decision (*Harris v. Union Elec. Co.*, 622 S.W.2d 239, 247 (1981)), following § 230 (1932) on Westlaw.  That case stands only for the proposition

---

4

ambiguous (*see* Part II, *infra*), but it compounds that error by deciding its meaning as a matter of law in direct contradiction to hornbook contract law.[4]

The Report also errs by focusing its "net impression" analysis narrowly on the Loan Note to the exclusion of the other loan agreements and defendants' other communications with borrowers. (*See* Part I.B.2, *infra* (citing Defs.' Opp'n SOF 7-11).)   The concept of "net impression" requires analysis of the loan agreements and other communications as whole—it cannot be determined from one document in isolation.   *See In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 441 (D.N.J. 1998) ("In determining if deceptive claims pursuant to Section 5 are present, a court is not limited to express claims, but may also look to the overall net impression conveyed by the advertising and promotional statements of a defendant."); *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1104 (D. Kan. 2011) ("In determining whether a claim is deceptive, the Court is not limited to express claims, but may also look to the overall net impression of the promotional statements by the defendant."); *Commerce Planet*, 878 F. Supp. 2d at 1063 (citing *FTC v. Gill*, 265 F.3d 944, 956 (9th Cir. 2001)).

The Report likewise errs in circularly concluding that "summary judgment is appropriate where—as here—the representation is clearly misleading and the defendant relies exclusively on the fine print to correct the misrepresentation."   (Report at 24.)   As the Report acknowledges, Defendants demonstrated a genuine dispute of material fact as to the net impression created by the loan documents.  (Report at 23.)  Calling the Loan Note "clearly misleading" improperly resolves a factual dispute and cannot render that dispute immaterial.  *Giant Food, Inc. v. FTC*, 322 F.2d 977, 982 (D.C. Cir. 1963) ("The meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive, are questions of fact." (citing *Kalwajtys v. FTC*,

---

that courts may determine as a matter of law whether the contract is ambiguous, not that the court may determine the meaning of an ambiguous contract as a matter of law.  *Id.*

[4]   The Loan Note is not ambiguous.  *See* Part II, *infra*; Part I.B.2-5, *infra*.  Nor is contractual ambiguity, as such, evidence of a section 5 violation.  *See FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (listing the elements of a section 5 claim: (1) "a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material.").

237 F.2d 654, 656 (7th Cir. 1956))).  And the cases the Report cites do not stand for the sweeping

proposition that disclaimers are ineffective as a matter of law.[5]

- *FTC v. Gill*, 265 F.3d 944, 956 n. 10 (9th Cir. 2001), has nothing to do with disclaimers or fine print.  The defendant failed to introduce any evidence opposing summary judgment, and the footnote the Report cites refers to the district court's determination (as a matter of fact, not law) that the defendant had falsely told creditors that bankruptcies on his clients' credit reports were erroneous.  *Id.* (citing 71 F. Supp. 2d 1030, 1041-42 (C.D. Cal. 1999)).  *Gill* provides no support for the Report's ruling.

- *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006), stands only for the proposition that a representation *may be* likely to mislead despite a truthful disclaimer; it does not hold that disclaimers are ineffective as a matter of law.  The court considered all of the evidence and concluded that "no reasonable factfinder could conclude that the solicitation was not likely to deceive consumers."  *Id.* at 1201.  That is precisely the analysis the Report fails to perform here.

- *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993), does not hold that "likely to mislead" is a question of law or that fine print disclosures are ineffective or immaterial as a matter of law.  *Figgie* involved a manufacturer's violation of a cease and desist order that had *imposed* a disclaimer to correct a misleading representation, *id.* at 600, and the Commission's findings of fact under Section 5 were assumed true for purposes of the appeal.  *Id.* at 602.

- *Floersheim v. FTC*, 411 F.2d 874, 878 (9th Cir. 1969), is not a summary judgment case; it is a challenge to an FTC cease and desist order for which the standard of review, unlike summary judgment, is sufficiency of the evidence with great deference given to the FTC's ruling.

- *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 (D.C. Cir. 1985), was not a summary judgment case; it was an appeal from a bench trial reviewed under a "clearly erroneous" standard.  It is inapposite to the question of whether, at summary judgment, the court may decide as a matter of law whether a representation is "likely to mislead." *Id.*  Nor does this case hold that disclaimers are ineffective as a matter of law.  *Id.*

In addition to relying on inapposite authority, the Report also mistakenly finds that Defendants opposed summary judgment by "relying exclusively on the fine print to correct Defendants' TILA box representations."  (Report at 24.)  Defendants submitted a mountain of evidence in opposition to summary judgment, including:

---

[5]  Defendants dispute the probity of disclaimer cases here.  (Defs.' Opp'n at 51-54.)  The Payment Schedule disclosure does not disclaim the Total of Payments disclosure; each is a TILA-mandated disclosure that conveys different, complementary information.  (*Id.*)

- The FTC's own consumer witnesses' testimony that they understood the Loan Note as creating a single-payment obligation, requiring affirmative action to decline renewal, and imposing new fees for each renewal;

- Expert analysis by the FTC's former chief economist, Dr. David Scheffman, who studied repayment and default data for over 3.1 million of Defendants' borrowers and concluded their behavior was inconsistent with being misled;

- Loan documents, emails, and payment reminders that repeatedly explained the renewal process and the fact that borrowers would incur new fees if they renewed; testimony from AMG employees; and

- Evidence showing that complaint rates and charge-back rates were extremely low.

(Defs.' Opp'n at 6-35, ECF 493; Defs.' Stmt. of Disputed Facts, ECF 494.)  Such evidence shows that the "net impression" generated by Defendants' loan documents was not misleading.  The Report violates Rule 56 by ignoring this evidence and the resulting disputes of material fact concerning the "net impression" of Defendants' loan agreements and whether they are likely to mislead consumers. Accordingly this Court should reject the Report and Recommendation as to Count I in its entirety.

> **B.  The Report's "Likely To Mislead" Analysis Improperly Ignores Disputes of Fact, Draws Inferences In The FTC's Favor, Weighs Evidence, and Misapprehends Facts.**

Despite asserting that whether the Loan Note's "net impression" is likely to mislead consumers is a question of law, the Report relies upon a range of factual evidence to support its conclusion.  (Report at 13-18.)  The Report's consideration of the evidence is inconsistent with the summary judgment standard because it relies only on evidence that purportedly supports the FTC's claims, draws all factual inferences in favor of the FTC, and ignores all of the evidence favorable to Defendants.  *See Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 935 (D. Nev. 2011) (Navarro, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *United States v. J. B. Williams Co., Inc.*, 498 F.2d 414, 433 (2d Cir. 1974) (noting that at summary judgment the court may not draw inferences against the non-movant unless it is one the jury would be *compelled* to draw).

Defendants amassed a massive body of evidence in opposition to the FTC's motion for summary judgment showing that their loan agreements are not likely to mislead consumers acting reasonably under the circumstances.  (Defs.' Opp'n at 6-35; Defs.' Stmt. of Disputed Facts.)  This

evidence, if credited along with all reasonable inferences that can be drawn from it, would allow a reasonable fact-finder to decide Count I in favor of Defendants at trial.[6]

### 1.   The "TILA Box" And Other Loan Terms Are Consistent.

The Report's conclusion that the Loan Note is misleading because "the TILA box implies that borrowers will incur one finance charge, despite the fact that the fine print creates multiple finance[] charges" (Report at 16) underscores the Report's misapplication of the summary judgment standard. As Defendants set forth in detail in their summary judgment briefing, the Loan Note's TILA disclosures correctly reflect (as required by TILA regulations) the single payment a consumer is obliged to make at the outset of the transaction. *See* 12 C.F.R. § 1026.17(c); 12 C.F.R. Part 1026, Supp. I, Pt. 2 § 1026.17(c)(1)-1.  It is impossible—for a number of reasons—to read the Loan Note (including parts the Report calls "fine print") as creating at the outset an obligation to renew or pay in "installments" as the Report concludes.  (Defs.' Opp'n at 63-64; Defs.' MSJ at 12-16; Defs.' MSJ Reply at 6-14.)   The Report does not (and could not) explain how the Loan Note "obligates borrowers to repay a scaled sum that is determined by ten finance charges that triple the 'total of payments' stated in the TILA box."  (Report at 16.)  Neither the FTC nor the Report articulates a reasonable reading of the Loan Note consistent with an obligation to renew.  And the FTC's own consumer witnesses, whose testimony is "highly probative" of whether the loan agreements are likely to mislead, *Cyberspace.Com LLC*, 453 F.3d at 1201, directly contradict the Report's unsupported assumptions about how consumers read the Loan Note.  (Defs.' Opp'n at 68-70; *see also id.* at 33-35 (summarizing Dr. Scheffman's testimony that millions of borrowers' payment histories indicate they were not misled by the Loan Note).)  The Report impermissibly sweeps aside

---

[6]   That a jury will not hear this case does not alter the summary judgment standard.  Even in cases where the judge conducting the bench trial is the same who decides summary judgment, the Ninth Circuit has emphasized the importance of waiting to resolve issues of fact until trial.  *See, e.g.*, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) ("In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true. The difference in the questions he is asking of the material may lead the judge to read it differently. There is no such thing as . . . findings of fact, on a summary judgment motion.  But in a bench trial on the record, the judge will have to make findings of fact . . . .").

all of Defendants' contrary evidence and improperly purports to rule "as a matter of law" that the Loan Note's "fine print" "creates multiple finance charges" and therefore is misleading.[7]

### 2.   The Loan Note Does Not "Hide Material Terms."

Although the Report concedes that "[n]either the TILA box nor the fine print state that borrowers are automatically enrolled in a costly 'renewal' plan," it finds—without citation to legal authority or factual support—that such a provision "is implied."  (Report at 17.)  Specifically, the Report concludes that "the loan note hides material terms" because "[t]he word automatic, which is the legal effect of this [renewal] clause, never appears" in the loan note.  (*Id.*)  This ignores the fact that the loan documents repeatedly and explicitly advise the consumer that action is required to decline renewal and that borrowers will incur additional fees if they renew:

- "This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew or we tell you the Note will not be renewed."

- "Your **Payment Schedule** will be: 1 payment of **$650.00** due on **2011-08-18**, if you decline* the option of renewing your loan."

- "You will accrue new finance charges with every renewal of your loan."

- "Renewal.  Your loan will be renewed on every* due date unless you notify us of your desire to pay in full or pay down your principal amount borrowed."

- "*To decline the option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due."

- "Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures."

- "**YOU WILL BE CHARGED ADDITIONAL FEES IF YOU RENEW THIS LOAN.**"

---

[7]   The Report's citation to *Black's Law Dictionary* for the definition of "misleading" ("calculated to be misunderstood") further demonstrates a selective consideration of facts: here the Report relies on the FTC's insinuation that Defendants intended ("calculated") the Loan Note to mislead, but elsewhere ignores Defendants' evidence disputing intent on grounds that it is "immaterial because 'intent' is irrelevant under section 5." (Report at 25-26.)

- "If you did not repay the loan at maturity, but instead chose to renew the balance by obtaining a new loan in the same amount and for an additional 14-day period, you would incur an additional Finance Charge."

- "Your loan is always due on your paydays.  By receiving a loan through USFastCash you agree that your loan will be renewed unless you request to pay down an additional amount against your principal, or pay out the balance in full."

(Defs.' Opp'n SOF 7-11.)  It is unclear what the Report means by "automatic."  If it means a borrower must take action to decline renewal, the above-quoted language expressly states as much— it does not "hide" or only "impl[y]" that term.  If it means the "legal effect" of the Loan Note is that borrowers are obliged at the outset to renew, then the above-quoted language clearly refutes the point: there is no obligation to renew for either party; it is entirely voluntary.  (*See* Part II, *infra*.)

Moreover, a reasonable fact-finder unquestionably could read these provisions and decide the loan documents are ***not*** likely to mislead consumers about the cost of their loans or how renewal works.  And such a finding would be bolstered by Defendants' substantial extrinsic evidence—the entirety of the loan documents, consumer testimony, expert testimony, the defendants' 2 out of 10,000 loan complaint rate—showing that consumers are ***not*** likely to be misled.  (Defs.' Opp'n 6-35; Defs.' SDF.)  Simply put, although the Report suggests the Loan Note was likely to mislead because it does not contain the word "automatic," a reasonable fact-finder on this record could disagree, and summary judgment for the FTC is therefore improper.

### 3.   The Renewal Terms Are Not "Vague And Uncertain."

To support a recommendation that summary judgment be granted to the FTC, the Report invents a new theory—one never advanced by the FTC and that lacks any evidentiary support—that "the loan note's 'net impression' is misleading" because the Loan Note is unclear about whether a borrower must "tell" the lender she does not wish to renew in addition to the email-and-hyperlink procedure, or instead of it.[8]  (Report at 17.)  This theory ignores ample record evidence showing that borrowers could decline renewal by any standard means of communication—online, by email, by

---

[8]   Federal Rule of Civil Procedure 56(f) permits granting summary judgment on grounds not raised by the parties only "after giving notice and a reasonable time to respond."  The Magistrate did not do so here.  *See Davis v. Patel*, 506 F. App'x 677, 678 (9th Cir. 2013) (reversing summary judgment where defendants had not moved on the grounds on which the court relied); *Norse v. City of Santa Cruz*, 629 F.3d 966, 972 (9th Cir. 2010) ("Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment.").

fax, or by telephone.[9]  Moreover, neither the FTC nor the Report identifies evidence that the word "tell" ever confused any consumer, and the Report does not explain how such confusion would factor into a consumer's decision to borrow from Defendants (let alone show that a fact-finder would be *compelled* to draw such an inference).

### 4.    The Payment Provisions Are Not "Circular And Contradictory."

The Report also creates another new theory—again, one never alleged or argued by the FTC and unsupported by any evidence—contending that the Loan Note contains "circular and contradictory" provisions about whether the lenders accept personal checks.  (Report at 17.)  This theory has nothing to do with the FTC's claim in Count I, and the notion that uncertainty about whether lenders would accept a personal check influenced anyone's decision to borrow from Defendants is purely speculative (and obviously not an inference a fact-finder would be *compelled* to draw).

Even if this analysis were relevant to Count I, the Report's reliance on it still would be erroneous because there is nothing contradictory about the provisions in question: one authorizes *the lender* to prepare a check for full repayment if the borrower revokes the lender's authorization to withdraw payment by other means; the other states the lender's general policy against accepting personal checks from *the borrower*.  (Defs.' Opp'n SOF 7; *see also* Defs.' SDF Response to SMF 52, n.98 (Defendants' corporate representative testified that "as a customer service courtesy" lenders will sometimes accept personal checks).)  Nothing in the record indicates anyone ever found these two provisions contradictory or that they ever influenced anyone's decision to borrow from Defendants.

---

[9]    *See* Defs.' Opp'n SOF 12 (three days before any due date, the lender sent the borrower an email with a link to the Account Summary where the borrower could elect to pay in full); *id.* at 11 (the Approval Terms email explained to borrowers that they could pay down or pay in full by notifying the lender by fax, by email or by calling the toll-free customer service number).

5.      **The Loan Note Terms Do Not Contradict "The Result The Loan Note Is Structured To Effect."**

The Report also contradicts the record, draws improper inferences, and selectively cites evidence in concluding that Defendants "structured the loan note to counteract" terms allowing borrowers to decline renewal.  (Report at 17-18.)  Each error is addressed below:

- The Report misapprehends the record evidence by concluding borrowers could decline renewal ***only*** by selecting their payment option online, which "remove[d] the 'telling' procedure from the loan note."  (Report at 17.)  Borrowers could decline renewal by any standard means of communication—online, by email, by fax, or by telephone.[10]

- The Report ignores the record evidence by concluding that Defendants "structured the loan note to . . . conceal the automatic 'renewal' provision."  (Report at 18.)  As noted in Part I.B.2 above, the loan documents repeatedly and explicitly explain that action is required to decline renewal, and that borrowers will incur additional fees if they renew. (Defs.' Opp'n SOF 7-11.)

- The Report makes assumptions without evidentiary support and misapplies the record evidence by concluding that Defendants "structured the loan note to . . . make the process of declining renewal difficult by requiring the borrower to access a webpage three days before the loan is due, which is only available through a hyperlink that is emailed to the borrower."  (Report at 18.)  The Report cites no evidence that consumers found it "difficult" to decline renewal, and as noted above, the record shows borrowers could decline renewal online, by email, by fax, or by telephone.  (Defs.' Opp'n SOF 11-12.)

- The Report states that Defendants "structured the loan note to . . . give the initial power to decline 'renewal' to the lender who sends the email containing the hyperlink three days after the loan is funded."  (Report at 18.)  The record is clear on this issue: borrowers could decline renewal online, by email, by fax, or by telephone, and did not need to wait until they received the payment reminder email (Defs.' Opp'n SOF 11-12); there is no evidence that Defendants ever failed to send the payment reminder email or otherwise manipulated the process to hamper a borrower's ability to decline renewal—in fact, Defendants, as a courtesy, allowed borrowers to pay in full and decline renewal even after the deadline had passed.  (Defs.' SDF n.98.)

Moreover, the Report incorrectly states as an undisputed fact that Defendants purposely "structured the loan note" to conceal the renewal terms and make it difficult to renew, despite acknowledging later that there is a genuine dispute of fact as to intent.  (Report at 25-26.)  And most fundamentally, here again the Report fails to ask whether a reasonable fact-finder could find for Defendants based

---

[10]   The word "tell" means "[t]o communicate by speech or writing" and "[t]o make known."  *Webster's II New College Dictionary* (3d ed. 2005).  Using the online customer service portal to decline renewal is as much "telling" the lender as any other form of communication.

12

on the loan documents and other evidence, and instead marshals evidence to support the FTC's claim.

**6.**     **Facts Cited To "Bolster" The Report's Conclusion Are Incorrect And Disputed.**

The Report attempts to "bolster" the conclusion that the loan agreements' "net impression" is misleading as a matter of law with three hotly disputed "facts." ***First***, the Report misapprehends the FTC's evidence as containing "approximately 8,500 consumer complaints . . . which state that Defendants' loan terms were confusing and deceptive." (Report at 18.) The record shows that the real number of complaints related to the loan terms was about 750: in fact, the FTC's summary judgment brief explicitly says that consumers lodged only "hundreds" of complaints (out of more than five million loans issued).[11] ***Second***, the Report ignores sworn consumer testimony, expert testimony, charge-back data, and other evidence disputing the FTC's allegation that the Loan Note is likely to mislead consumers. (Defs.' Opp'n at 6-35, 58-60; Defs.' Stmt. of Disputed Facts.) ***Third***, the Report relies on "statements from Defendants' own employees, admitting that the loan terms are confusing and should be changed" (Report at 18) but again ignores all of the contrary evidence. (Defs.' Opp'n at 6-35; Defs.' SDF ¶ 74.) And ***fourth***, the Report states as undisputed fact that Defendants had a "practice of refusing to 'explain how the loan[s] work[]'" (Report at 7, 18), despite Defendants' substantial evidence showing they never had a practice of refusing to discuss loan terms with customers and that the person who wrote the email where the FTC found this statement had her facts wrong. (*See* ECF 494, Defs.' SDF Response to FTC SMF ¶¶ 23, 65, 66, 67, 68, 70, 74.) The Report adopts the FTC's inferences and negative characterizations ("deceive" and "conceal") instead of asking whether those were inferences a fact-finder would be compelled to draw and whether the record contains contrary evidence that would allow a reasonable fact-finder to reach the opposite conclusion.

---

[11]   The FTC's Exhibit 167 contains 7,100 entries, but the FTC itself identified only 750 of those as allegedly complaining about their loan terms and excerpted those complaints in Exhibit 168. (FTC SMF ¶ 90; Defs.' SDF, Responses to SMF ¶ 90; Defs.' Opp'n at 49 (noting that Exhibit 168 "is a small subset of the larger database produced as Exhibit 167"); FTC MSJ Reply at 38 ("The FTC has submitted hundreds of complaints from consumers who were deceived about the cost of Defendants' loans."); FTC MSJ Mem. at 28, 34 (explaining that Exhibit 168 is a collection of "[a]pproximately 750" complaints about Defendants' loan terms)).

C. **The Report Improperly Ignores Genuine Disputes of Material Fact.**

In addition to the above-noted violations of the summary judgment standard, the Report also improperly dismisses as "immaterial" a number of genuine disputes of material fact.

**FTC Judicial Admissions**.  The Report makes two mistakes in ruling that the FTC's judicial admissions in paragraph 47(a) of the Complaint are immaterial: (1) it concludes that "shifting legal theories" do not create a factual dispute even though judicial admissions are treated as facts that may not be contradicted (Defs.' Opp'n at 39-40) and (2) it treats the subparts of paragraph 47 as distinct (Report at 25) despite the FTC's conjunctive pleading and repeated affirmation that the loan agreements and website together created the net impression alleged in paragraph 47(a) and (b).[12] The FTC's single-payment allegation in paragraph 47 is a judicial admission that precludes it from now attempting to prove that consumers took their loans based on the net impression that they could pay in *multiple* payments while incurring no new fees.  (Defs.' Opp'n at 39-40.)  At a minimum, paragraph 47(a) creates a genuine dispute as to what net impression the loan documents create and whether they are likely to mislead consumers acting reasonably under the circumstances.  (*Id.*)

**Consumer Evidence**.  The Report incorrectly holds that "because 'proof that consumers actually were deceived is not required' under section 5 of the FTC Act," much of Defendants' evidence is "immaterial" and insufficient to defeat summary judgment, including: testimony by all

---

[12]   The FTC in its reply brief implausibly asserted that its allegations in paragraph 47(a) were unrelated to the Loan Note's net impression but were focused solely on Defendants' How It Works webpage.  (FTC Reply at 45 ("Nothing could be further from the truth, and Defendants have cited nothing, because there is nothing, supporting the idea that Paragraph 47(a) was based on representations in Defendants' Loan Note.").)

On the contrary, the complaint itself and the FTC's previous briefing leave no doubt that paragraph 47(a) refers to the representation or "net impression" created by the Loan Note together with the website.  Previously, the FTC clearly stated that Defendants "websites **and** Loan Disclosure" create a single-payment net impression: "rather than withdrawing the consumer's 'scheduled payment' or 'Total of Payments' on a single date as represented on Defendants' websites and Loan Disclosure, Defendants withdraw only an amount equal to the finance charge from the consumer's bank account."  (ECF No. 5 at 15-16 (emphasis added).)  In paragraphs 29 and 30 of its complaint, the FTC likewise alleges that the website and Loan Note together create the net impression that consumers' loans will be automatically repaid in a single payment and the total of payments will include only the principal and a single finance charge.  (ECF No. 386.)  In paragraph 40 of its complaint, the FTC alleges that the Loan Note's "initial representation" is "that there would be a single repayment."  (*Id.*)  In paragraph 35 of its complaint, the FTC alleges that Defendants' Loan Note "told a consumer who borrowed $300 from Defendants on or about September 7, 2010 that her loan would be due on September 24, 2010."  (*Id.*)  The FTC reiterated the point in their preliminary injunction reply brief: "Defendants state on their website and in the Loan Note and Disclosure that they will automatically withdraw the full amount owed on a single date, and that the total payment equals the amount financed plus a one-time finance charge."  (ECF No. 285 at 14.)

four of the FTC's own consumer witnesses stating that they understood the Loan Note and were not misled by it; Dr. Scheffman's expert testimony demonstrating that millions of consumers' repayment history is inconsistent with the allegation they were misled by the Loan Note; and portions of the FTC's own consumer hearsay, which show many borrowers were not confused or misled about the renewal terms.  (Report at 25 (quoting *Grant Connect, LLC*, 827 F. Supp. 2d at 1215).)  Regardless of whether actual deception is an element of a section 5 claim, courts uniformly treat evidence of actual consumers' experience as "highly probative" of whether a representation is likely to mislead a reasonable consumer.  *See, e.g.*, *Cyberspace.Com LLC*, 453 F.3d at 1201; *Grant Connect, LLC*, 827 F. Supp. 2d at 1215.  Here the probity of the consumers' testimony is further enhanced because these are consumers the FTC hand-picked to represent the "hundreds" of consumers who allegedly were misled by the Loan Note.  (Defs.' Opp'n at 17-33; ECF No. 538; Order re 26(a)(1) at 16.)

Moreover, the Report repeatedly cites, relies on, and treats as material the "fact" that "thousands" of borrowers complained to the FTC about their loan terms.  (Report at 1, 7, 18, 21, 26.)  The Report contradicts binding precedent and violates summary judgment standards by ignoring as "immaterial" contrary consumer statements from the same consumer complaint database on which it relies, as well as sworn testimony from the FTC's own consumer witnesses and expert testimony that actual consumers were not misled by Defendants' loan documents.[13]

**Intent**.  The Report similarly disregards as "immaterial" and "irrelevant" Defendants' evidence disproving any intent to mislead, (Report at 25-26 (citing *Gill*, 265 F.3d at 950)),[14] and repeatedly draws impermissible inferences that Defendants intended to mislead consumers.[15]  The

---

[13]  Given that the Report expressly finds that the  FTC violated Rule 26(a)(1) by failing to disclose any of the allegedly complaining consumers, and executed a "bait and switch" by relying on consumer complaints only after Defendants impeached the FTC's four disclosed consumer witnesses, (ECF No. 538 at 12-13), it was doubly improper to credit and rely on such undisclosed and untested consumer complaints to the exclusion of contrary evidence from the witnesses the FTC actually disclosed and  Defendants were permitted to cross-examine.

[14]  *Gill* does not address the issue of intent or hold that it is irrelevant to FTC Act claims. The FTC argued in its motion that intent is relevant to an FTC Act claim (FTC MSJ Mem. at 51 (citing cases)), and introduced evidence to prove intent. Defendants introduced contrary evidence to disprove intent. (*See, e.g.*, Defs.' SDF Response to SMF at 67.)

[15]  Report at 6 ("Defendants established and controlled a convoluted procedure for opting out."); *id.* at 7 ("Defendants[] trained employees to deceive borrowers by concealing how the loans work."); *id.* at 17 ("Defendants structured the loan note to counteract these representations"); *id.* at 18 ("Defendants structured the loan note to: (1) conceal the automatic 'renewal' provision; (2) make the process of declining 'renewal' difficult . . . (3) give the initial power to

summary judgment standard prohibits the Court from selectively relying on evidence and inferences of intent that cut in the FTC's favor while simultaneously disregarding as immaterial Defendants' evidence disproving any intent to mislead.

**TILA Safe Harbor**.  As set forth in detail below, the Report's analysis of Defendants' TILA disclosures is contrary to law and erroneously concludes that Defendants violated TILA.  For those same reasons, the Report's determination that the TILA safe harbor provision is immaterial to the FTC's Section 5 claim is also flawed and must be rejected.  (Defs.' Opp'n at 54-55.)

**Insignificant Minority**.  Despite the fact that it repeatedly cites the "fact" that "thousands" of consumer complaints support the FTC's claims, the Report nonetheless improperly dismisses as immaterial the FTC's own evidence showing that, at most, 0.015% of consumers complained about understanding the Loan Note.[16]  The Report also fails to consider Dr. Scheffman's expert analysis showing that millions of borrowers' behavior was inconsistent with being misled by their loan documents.  (*See* Defs.' Opp'n at 34; Report at 26.)  The Report cites no authority for the proposition that consumer evidence is relevant when cited to support the FTC's claims but immaterial when it contradicts them.  The Report also cites no authority for the proposition that complaints by 0.015% of consumers (2 out of every 10,000) constitutes a significant minority of consumers or somehow supports (rather than soundly rebuts) the contention that the Loan Note is likely to mislead.  Even the FTC previously his argued that "significant minority" means something like "10 percent of consumers."  (ECF No. 285 (citing *In re Telebrands Corp.*, 140 FTC 278, 291 (2005); *Firestone Tire & Rubber Co. v. FTC*, 481 F.2d 246, 249 (6th Cir. 1973)).)

---

decline 'renewal' to the lender."); *id.* at 21 (crediting evidence proffered by the FTC that "Defendants were aware of the borrower's confusion and trained their employees to avoid explaining the loans['] terms"); *id.* ("Defendants['] conduct 'reflects [an] understanding of the contract's meaning,' which Defendants sought to conceal from borrowers."); *id.* at 30-32 (reiterating the same points).

[16]  The Magistrate overstates *by a factor of ten* the number of pertinent complaints the FTC submitted (*see* Part I.B.6, *supra*) and ignores contradictory statements within those same databases, as well as all other contrary consumer evidence.  (*See* Defs.' Opp'n at 6-35.)

**D.      The Report Makes Other Mistakes Of Fact.**

The Report makes several other mistakes of fact and draws inferences unfavorable to Defendants.

- According to the Report, "The loan note and disclosure link is buried in the fourth paragraph and overshadowed by two redundant links." (Report at 3.) To support this point, the Report links an excerpt from the webpage in question. Crucially, it omits the entire top half of the webpage, which shows that the Loan Note is linked prominently at the top of the page in larger font than the other hyperlinks. (*Compare* Defs.' MSJ at 4, *with* Report at 3.)

- According to the Report, "As depicted below, the Loan Note and Disclosure consists of a Truth in Lending box (*i.e.*, 'TILA box') and 749 words in fine print that contains two obscure footnotes and is divided by a box." (Report at 4.) There is nothing "fine" about the print or "obscure" about the footnotes: Both are the exact same font and size as the rest of the disclosures. (*See* Defs.' MSJ at 4.) Moreover, several provisions that the Report characterizes as part of the "749 words in fine print," as distinct from the "TILA box," are themselves TILA disclosures and included within the TILA box. (*See id.* at 4.).

- According to the Report, "To read the terms and conditions, the borrowers must click nine separate hyperlinks that are in eight or nine point font." (Report at 3-4.) But the consumer need only click on one hyperlink to view all of the documents. (Defs.' Opp'n at 10 ("By clicking on the hyperlinks, the applicant could open a pop-up window ***that contained all of the various loan agreements*** (totaling about 5 pages, when printed on 8 1/2 x 11 inch paper). The pop up would open to the page containing the hyperlinked document (*e.g.*, if an applicant clicked on Loan Note, the page would open to the top of that document), but the consumer could scroll up or down to see all the loan documents in a single window, without clicking on each hyperlink." (emphasis added)).)

In addition, Defendants presented voluminous evidence disproving the allegation that their loan documents are likely to mislead reasonable consumers: the expert testimony of the FTC's former chief economist, who analyzed millions of borrowers' repayment and default behavior and found it inconsistent with the FTC's allegation that consumers were misled about their loan terms; evidence showing that customer complaint and chargeback ratios are exceptionally low; and testimony from the FTC's own consumer witnesses who did not find the loan documents confusing (and also cast serious doubt on the reliability and foundation of the FTC's consumer complaint evidence). This evidence presents material questions of fact as to whether Defendants' loan documents created a net impression that was likely to mislead consumers acting reasonably under the circumstances. These material questions of fact preclude summary judgment for the FTC.

At summary judgment, "the district court is prohibited from weighing evidence and deciding issues of contested fact," and "it is not the role of the district court . . . to decide which party has the more compelling argument; rather, it is simply to determine whether a triable issue of fact exists." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1264 (9th Cir. 2001).[17]   To this end, at summary judgment all justifiable inferences must be construed in favor of the non-movant,[18] and in cases where, as here, the issue is "reasonableness," summary judgment is especially improper.  *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 868-72 (9th Cir. 2010); *Wong v. Regents of Univ. of California*, 192 F.3d 807, 826 (9th Cir. 1999); *Chew v. Gates*, 27 F.3d 1432, 1440, 1443 (9th Cir. 1994).

There is no question a reasonable fact-finder could credit Defendants' evidence and find that Defendants' loan documents are not likely to mislead reasonable consumers.  The Report avoids this conclusion only by considering evidence that supports its own conclusion to the exclusion of Defendants' contrary evidence and construing the evidence in favor of the FTC—both of which violate the summary judgment standard.  Instead of neutrally examining the record to determine if Defendants' evidence created genuine disputes of material fact, the Report purports to rule on fact issues "as a matter of law" while simultaneously citing only certain facts and drawing inferences for the FTC that support the predetermined outcome.  Accordingly, this Court should reject the Report and Recommendation and deny the FTC's motion for summary judgment as to Count I.

## II. THE REPORT INCORRECTLY RECOMMENDS GRANTING SUMMARY JUDGMENT FOR THE FTC ON COUNT III AND DENYING SUMMARY JUDGMENT FOR DEFENDANTS.

The Report's analysis of Count III is contrary to binding Ninth Circuit precedent and Regulation Z.  The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, is a technical statute, and the Report admits that Defendants' argument on TILA may be "technically correct."  (Report at

---

[17]   This is equally true for cases that will be tried to the Court rather than a jury.  *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 & n.6 (9th Cir. 2000).

[18]   "A justifiable inference is not necessarily the most likely inference or the most persuasive inference."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (citations and ellipses omitted).  Rather, it only has to be "rational or reasonable."  *Id.*

32.)   Nonetheless, instead of analyzing whether the Defendants' TILA disclosures accurately reflected the legal obligation between the parties at the outset of the transaction, the Report engages in a free-flowing consideration of whether any part of the Loan Note was ambiguous or misleading. The Ninth Circuit has specifically rejected this approach.  Moreover, despite the fact that common law contract principles govern interpretation of the "legal obligation" for TILA purposes, the Report fails to evaluate the Loan Note according to the hornbook test of ambiguity: whether the Loan Note may reasonably be read as creating an obligation to renew as opposed to the single-payment obligation reflected in the TILA disclosures.  Under the proper standard, the Loan Note is not ambiguous as to the borrowers' legal obligation at the outset: it plainly creates a single-payment obligation and cannot reasonably be read as creating an obligation to renew.  Based on that conclusion, and given that the Report finds Defendants' TILA disclosures clearly disclosed a single-payment obligation, it was error to recommend summary judgment for the FTC and to recommend denying Defendants' motion for summary judgment on Count III.

### A. The Report Evaluates TILA Disclosures In The Abstract, Contrary To TILA, Regulation Z, And Ninth Circuit Law.

TILA requires lenders to provide written disclosures to consumers that "reflect the terms of the legal obligation between the parties," 12 C.F.R. § 1026.17(c), meaning "the credit terms to which the parties are legally bound as of the outset of the transaction," 12 C.F.R. Part 1026, Supp. I, Pt. 2 § 1026.17(c)(1)-1.  The Report's entire analysis of Count III improperly eschews the "technical question of whether borrowers were 'legally obligated' to renew their loans" (Report at 30) and therefore never addresses whether the Loan Note's TILA disclosure accurately reflects borrowers' legal obligation at the outset of the transaction.  Instead, the Report concludes that the Loan Note is "ambiguous" in the abstract—without the guiding principle and context of the borrower's legal obligation—and concludes that the Loan Note's "six ambiguities violate TILA."  (Report at 33.)

Courts are not free to ignore the regulator's decision to require disclosures reflecting the legal obligation at the outset of the transaction; nor may courts engage instead in an abstract inquiry into whether any part of the Loan Note is "ambiguous."  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1121 (9th Cir. 2009), which the Report does not address, is directly on point.  There, Chase

issued a balance transfer offer (BTO) to Hauk with a "low 4.99% Fixed APR." In a footnote, the offer disclosed, "This special rate applies only when you make your required minimum payments by the payment due date . . . and your Account is eligible for Preferred Customer Pricing as described in the Terms of Offer." *Id.* at 1119. On the reverse side of the offer, Chase added that it "may change to your Non-Preferred APR if any minimum payment on any loan or account of yours with us or your other creditors was not made by the payment due date." *Id.* Hauk accepted the BTO and transferred a balance to Chase, but he later discovered that Chase was charging him a non-preferred (nearly six times higher) APR because he had made a late payment to another creditor months before receiving the BTO. *Id.* at 1116-17. Hauk argued that Chase's TILA disclosures were ambiguous and that the limiting language on the reverse side of the offer was not "clear and conspicuous," such that "no reasonable consumer receiving the BTO would understand that they could 'accept' the offer and transfer a balance . . . then immediately be assessed a Non-Preferred APR of 28.74% as a result of a prior late payment." Pl.–Appellant's Reply Br. at *5, *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114 (9th Cir. 2009) (No. 06-56846), 2008 WL 656543.

The Ninth Circuit rejected this argument, emphasizing that "TILA is only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction." *Id.* at 1120. The court held that the disclosure complied with TILA and refused to consider in the abstract whether it was ambiguous or misleading: "Instead of determining whether a particular disclosure is 'misleading' in the abstract, our circuit has focused on subsection 226.5(c)'s requirement that disclosures 'reflect the terms of the legal obligation between the parties and the requirements in other relevant subsections of Regulation Z or TILA." *Id.* at 1121. The court explained:

> Courts must defer to the decisions of the Federal Reserve Board and cannot apply "[t]he concept of 'meaningful disclosure' that animates TILA . . . in the abstract." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568 (1980); *see also Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 219 (1981) ("[A]bsent some obvious repugnance to the statute, [Regulation Z] should be accepted by the courts, as should the Board's interpretation of its own regulation.").

*Id.* at 1118.  *Hauk* thus requires the Court to focus on whether the TILA requirement reflects the terms of the legal obligation between the parties, not on abstract notions of ambiguity.

The Report's analysis of Count III runs afoul of this principle by relying on the notion that the Loan Note is ambiguous in the abstract—as opposed to whether the Loan Note creates a single payment obligation that is accurately reflected in its TILA disclosure.  The Report acknowledges that that the ambiguities on which it focuses are unrelated to Regulation Z's mandatory disclosures, but it reasons that it is "of no consequence" because "TILA's purpose is to 'promote the informed use of credit."  (Report at 32 (citation omitted).)  This is precisely the abstract approach rejected in *Hauk*: Congress and the Federal Reserve Board (and now the Consumer Financial Protection Bureau) have already identified—in TILA and Regulation Z—which disclosures are required to promote the informed use of credit and which are not,[19] and courts in the Ninth Circuit must focus their TILA analysis on those specific requirements.  *Hauk*, 552 F.3d at 1118.

To support the contrary position, the Report relies on authority concerning parts of Regulation Z that were eliminated decades ago.[20]  (*See* Report at 32 (citing *Wright v. Tower Loan of Mississippi, Inc.*, 679 F.2d 436, 447 (5th Cir. 1982) (citing 12 C.F.R. § 226.6(c) (1968)); *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir. 1976) (same); *Weaver v. General Finance Corp.*, 528 F.2d 589, 589 (5th Cir. 1976) (same); *Allen v. Beneficial Fin. Co.*, 531 F.2d 797, 802-04 (7th Cir. 1976) (citing 12 C.F.R. § 226.6(a) (1968)).  Other courts have rejected similar efforts to resuscitate these defunct regulations:

> Plaintiffs' final contention is that TILA generally prohibits a lender from making misleading statements in any disclosures to borrowers, including disclosures not required by TILA, and that the statements made in the note they signed were

---

[19]   "Congress has expressly delegated to the Board the authority to prescribe regulations containing 'such classifications, differentiations, or other provisions' as, in the judgment of the Board, 'are necessary or proper to effectuate the purposes of [TILA]."  *Hauk*, 552 F.3d at 1118 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 238 (2004).  *See also DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co., Inc.*, 388 F.3d 886, 893 (D.C. Cir. 2004) (reversing summary judgment because the lower court had "erred in imposing a duty" on a party that neither TILA nor Regulation Z contemplated); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980) ("[W]hile not abdicating their ultimate judicial responsibility to determine the law, judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve . . . ." (internal citation omitted)).

[20]   *See* 12 C.F.R. § 226.6(a) and (c) (1968). The revised Regulation Z, effective in 1981, eliminated these provisions. *See* 46 Fed. Reg. 20848, 20848 (1980).

misleading as to prepayment charges.  No such requirement exists under TILA.  At one time, there was [such] a provision in Regulation Z . . . .   However, when Regulation Z was amended and new rules were issued, this provision was not included.

*Stutman v. Chem. Bank*, No. 94 CIV. 5013, 1996 WL 539845, at *6 (S.D.N.Y. Sept. 24, 1996).  The other cases on which the Report relies—*Bartholomew*, *Watts*, and *In re Whitley*—are from outside the Ninth Circuit and similarly fail to support the proposition that ambiguity generally violates TILA.[21]

**B.    Defendants Complied With TILA And Regulation Z, And Are Entitled To Summary Judgment On Count III.**

Defendants' loan agreements, particularly the Loan Note, clearly and unambiguously oblige borrowers to pay in full the amount financed plus the stated finance charge at the end of a single pay period.  (Defs.' MSJ at 9-13; Defs.' Opp'n at 61-70.)   The TILA disclosures in the Loan Note properly reflect the borrowers' obligation to repay in full at the end of a single pay period.  (*Id.*)  The Loan Note also establishes a process by which borrowers ***may***, three days before their due date (and well after the outset of the transaction), choose to renew their loans for an additional pay period, but that is irrelevant for TILA purposes because nothing in the Loan Note ***obliges*** borrowers to renew.  (*Id.*)

In Count III, the FTC alleges that Defendants' TILA disclosures were inaccurate because they reflected a single-payment obligation, whereas the FTC contends "the consumer is *obligated* to repay the loan in ten installments, resulting in a $675 finance charge and a $975 total of payments." (Ex. C at Interrog. Resp. 5 (emphasis added); *see also id.* at Interrog. Resp. 11; Ex. D ¶¶ 35–41, 53–60.)  But in all of its extensive briefing for and against summary judgment on Count III—and after many months of discovery—the FTC has not articulated any coherent or reasonable reading of the

---

[21]    In *Bartholomew v. Northampton Nat. Bank of Easton*, 584 F.2d 1288 (3d Cir. 1978), the court discussed TILA only as to when a cause of action accrued, the words "ambiguous" and "ambiguity" do not appear in the opinion, and the specific page that the Magistrate cites discusses proper interpretation of the Land Sales Act, not TILA.  (Report at 28 (citing *Bartholomew*, 584 F.2d at 1293)).  *Watts v. Key Dodge Sales, Inc.*, 707 F.2d 847 (5th Cir. 1983), and *In re Whitley*, 772 F.2d 815, 815 (11th Cir. 1985), both address whether a TILA disclosure adequately set forth the method of computing charges for partial delinquency as required by Regulation Z (*i.e.*, where a customer made only a partial payment).  The courts examined the default provisions (not the contracts as a whole) and determined they were ambiguous specifically as to the method of calculating default fees for partial payments.  *Watts*, 707 F.2d at 852.  Here, the Report impermissibly deemed it immaterial whether disclosures reflect the legal obligation at the outset of the transaction, and instead reviewed the Loan Note for ambiguity generally.

Loan Note that would oblige the borrower to renew even once, let alone ten times.  (FTC Mem. in Supp. MSJ 39-42; Defs.' MSJ at 9-13; Defs.' Opp'n at 61-70; Defs.' Reply ISO MSJ at 6-18; FTC Opp'n 16-28; FTC Reply ISO MSJ 8-16.)

The Report acknowledges that "Defendants can articulate an unambiguous interpretation of the loan note, which—with the guidance and skill of a trained attorney—***proves to be the correct one.***"  (Report at 32 (emphasis added).)  But the Report incorrectly deems this fact inconsequential because "[a] contract is ambiguous if it is reasonably—not technically—susceptible to more than one interpretation."  (*Id.* at 33.)  Again, though, the question is not whether any part of the Loan Note is ambiguous, it is whether the TILA disclosures accurately reflect the borrower's legal obligation at the outset.  *Hauk*, 552 F.3d at 1121 ("[O]ur circuit has focused on subsection 226.5(c)'s requirement that disclosures 'reflect the terms of the legal obligation between the parties and the requirements in other relevant subsections of Regulation Z or TILA.").  None of the Report's "six reasons" articulates how the Loan Note could reasonably be read as creating at the outset an obligation to renew.

***First***, the Report acknowledges that the TILA disclosure reflects that "borrowers are obligated to repay a fixed sum" but reads the "fine print" as stating that "the borrower's obligation is not limited to a fixed amount, the borrow[er] is automatically enrolled in a costly 'renewal' plan." (Report at 30.)  TILA is not concerned with whether a borrower's obligation remains "fixed"; it requires disclosure of the ***initial*** obligation, and it is not a violation if subsequent events (like renewal) later alter the obligation.[22]  To the extent the Report means that renewal constitutes an obligation at the outset because it is accepted passively (or "automatically" as the Report has it), such a reading cannot be reconciled with the terms of the Loan Note or hornbook contract law.  (*See*

---

[22]  A creditor need not disclose any "deferral or extension charge[s]," 15 U.S.C. § 1638(a)(10), and a deferral of repayment that occurs after consummation is a "subsequent modification" of the initial contract that need not be disclosed at the outset and does not require new TILA disclosures.  12 C.F.R. § 1026.20(a)(1).  Likewise, "[a] renewal of a single payment obligation with no change in the original terms" is not a "refinancing" that requires "new disclosures to the consumer."  Id.; see also 12 C.F.R. Pt. 1026, Supp. I, Pt. 2, § 1026.20(a) 1 ("Changes in the terms of an existing obligation, such as the deferral of individual installments, will not constitute a refinancing unless accomplished by the cancellation of that obligation and the substitution of a new obligation.").  If the borrower defers repayment after consummating the loan, the original TILA disclosures do not become invalid or inaccurate.  See 15 U.S.C. § 1634.

Defs.' MSJ Reply at 12; Defs.' MSJ at 14-15 (citing the *Restatement (Second) of Contracts*, *Blacks'*
*Law Dictionary*, *Williston on Contracts*, and Ninth Circuit authority for the proposition that, as a
matter of contract law, performance (like renewal) that either party may decline is not a legal
obligation).) To the extent the Report means that TILA requires disclosure if obligations may later
change "automatically" without the borrower taking affirmative action, such a contention lacks any
support in TILA or Regulation Z and is directly contrary to *Hauk*, 552 F.3d at 1118. The Ninth
Circuit there affirmed that the APR was properly disclosed even though it could (and did) change
automatically without the borrower's action or knowledge based on an event that had already
occurred at the time of the disclosure. *Id.*

    ***Second*** and ***Third***, the Report states that the Loan Note is ambiguous as to how a borrower
"tells" the lender she does not want to renew and as to whether the lender accepts personal checks.
(Report at 30.) As noted above, the Report's reading of these provisions is incorrect and does not
demonstrate ambiguity (*see* Parts I.B.3-4, *supra*), but critically for TILA purposes, these provisions
have nothing to do with the borrower's legal obligation at outset or TILA-mandated disclosures.

    ***Fourth***, the Report states that the Loan Note is ambiguous because "neither the TILA box
nor the fine print state that borrowers are automatically enrolled in the 'renewal' plan." (Report at
31.) This is factually incorrect, as noted above in Part I.B.2. The Loan Note, other loan agreements,
and subsequent emails repeatedly and explicitly explain that borrowers must act to decline renewal
(*see* Part I.B.2, *supra*), and elsewhere the Report acknowledges that "[o]nce the fine print is
understood, it states that borrowers can decline renewal in one of two ways." (Report at 31.) To the
extent the Report means to suggest the borrowers were "enrolled in the 'renewal' plan" at the outset
of the transaction—in other words, obliged at the outset to renew—such a reading cannot be
reconciled with the Loan Note's terms or hornbook contract law. (*See* Defs.' MSJ at 13-16; Defs.'
MSJ Reply at 11.)

    ***Fifth***, the Report states that "the format of the loan note creates uncertainty" because a line
"randomly divides the fine print" and two footnotes are "haphazardly placed within the body of the
fine print." (Report at 31.) According to the Report, this "has the effect of visually prioritizing one

half of the fine print above the rest, hiding important information." (*Id.*)  But as the Report notes, contractual provisions are ambiguous when they are reasonably amenable to two competing interpretations, not when some aspects of the contract are "visually prioritiz[ed]." (*See* Report at 33; Defs.' MSJ at 10; Defs.' Opp'n at 26-33.)

*Sixth*, the Report reiterates its statement that "the loan note's plain language contradicts the result the loan note is structured to effect."  This is incorrect for all the reasons explained above in Parts I.B.2 and I.B.5, but it is also immaterial for TILA purposes because it has nothing to do with the borrower's (single-payment) legal obligation at the outset of the transaction or whether the TILA disclosures accurately reflect that obligation.

In the end, neither the FTC nor the Report articulates any way the Loan Note can reasonably be read to create at the outset a legal obligation to renew.  The FTC alleges in Count III that the Loan Note obliged borrowers at the outset to renew their loans ten or more times, an interpretation so unreasonable that the FTC abandoned it in responding to Defendants' summary judgment motion. (FTC Opp'n at 15-28; Defs.' MSJ Reply at 6-18.)  Defendants' interpretation of the Loan Note as creating a single-payment obligation at the outset is "unambiguous" and "the technically correct interpretation."  (Report at 32; *see also* Defs.' MSJ; Defs.' Opp'n at 61-68; Defs.' MSJ Reply.) Defendants' TILA disclosures accurately reflected that single-payment obligation, as the Report correctly finds: "Defendants' TILA box states that borrowers are obligated to repay a fixed sum that is equal to one finance charge for one pay period plus the amount borrowed." (Report at 30.)  For that reason, the Court should reject the Report's recommendation to grant summary judgment for the FTC on Count III and the Report's recommendation to deny Defendants' motion for summary judgment on Count III.[23]  Defendants are entitled to summary judgment on Count III.

---

[23]   Defendants also object to the Report's ruling that Defendants' parol evidence objection to the use of extrinsic evidence to contradict the unambiguous Loan Note is "immaterial." (Report at 33.)  As explained above, the Loan Note is unambiguous, and therefore extrinsic evidence is not permitted to contradict its terms or to create ambiguity. (Defs.' MSJ at 16-17; Defs.' MSJ Reply at 14.)

**CONCLUSION**

Based on the foregoing objections to the Magistrate's Report and Recommendation, Defendants respectfully ask this Court to reject the recommendation and enter an order denying the FTC's motion for summary judgment on Counts I and III and granting Defendants' motion for summary judgment on Count III.

Dated: February 14, 2014

/s/ David J. Merrill
DAVID J. MERRILL
DAVID J. MERRILL, P.C.
Nevada Bar No. 6060
10161 Park Run Drive, Suite 150
Las Vegas, NV  89145
Telephone:     (702) 566-1935
Facsimile:     (702) 924-0787
Email:  david@djmerrillpc.com

*Attorney for Defendants*
*AMG Services, Inc. and MNE Services, Inc. (dba*
*Tribal Financial Services, Ameriloan,*
*UnitedCashLoans, USFastCash)*

/s/ Conly Schulte
CONLY SCHULTE
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
Omaha, NE  68116
Telephone:     (303) 673-9600
Facsimile:     (303) 673-9155
Email:  cschulte@ndnlaw.com

*Attorney for Defendants AMG Services, Inc.;*
*Red Cedar Services, Inc. dba 500FastCash; SFS,*
*Inc. dba OneClickCash;MNE Services, Inc., dba*
*Tribal Financial Services, Ameriloan,*
*UnitedCashLoans, USFastCash*

/s/ Bradley Weidenhammer
BRADLEY WEIDENHAMMER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago IL  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:  bradley.weidenhammer@kirkland.com

*Attorney for Defendants AMG Services, Inc.*
*and MNE Services, Inc. (dba Tribal Financial*
*Services, Ameriloan, UnitedCashLoans,*
*USFastCash)*

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on the 14th day of February 2014, the foregoing *Objections to the Magistrate Judge's January 28, 2014 Report and Recommendation* was submitted electronically for filing and/or service with the United States District Court of Nevada.  Electronic service of the foregoing document shall be made to all counsel of record.

/s/ *Bradley Weidenhammer*
Bradley Weidenhammer