# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:12-cv-00536-GMN-VCF |
| vs. | ) | |
| | ) | **ORDER** |
| AMG SERVICES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court for consideration is the Report and Recommendation (ECF No. 539) of the Honorable Cam Ferenbach, United States Magistrate Judge, entered on January 28, 2014.  On February 14, 2014, the Muir Law Firm, LLC and Timothy J. Muir (collectively the "Muir Defendants") filed their Limited Objection (ECF No. 541) and AMG Services Inc., SFS, Inc., Red Cedar Services, Inc., and MNE Services, Inc. (collectively the "Lending Defendants") filed their Objection. (ECF No. 542.)  The Lending Defendants' Objection was joined by Defendants AMG Capital Management, Level 5 Motorsports, LeadFlash Consulting, Black Creek Capital Corporation, Broadmoor Capital Partners, Scott A. Tucker, Blaine A. Tucker, Don E. Brady, Troy LittleAxe, and Robert D. Campbell. (ECF Nos. 545, 548, 549, 552.)  The Federal Trade Commission (the "FTC") filed its Response to the Muir Defendants' Objection (ECF No. 554) and Response to the Lending Defendants' Objection (ECF No. 556) on March 2, 2014.

For the reasons discussed below, the Court will accept and adopt Magistrate Judge Ferenbach's Report and Recommendation (ECF No. 539) to the extent that it is not inconsistent with this opinion.

# I.    BACKGROUND

The FTC's Complaint (ECF No. 1) alleges that Defendants violated portions of the Federal Trade Commission Act (the "FTC Act"),[1] the Truth in Lending Act ("TILA"),[2] and the Electronic Fund Transfer Act ("EFTA"),[3] in connection with the Defendants' activities in offering and extending "high-fee, short-term 'payday' loans and the collection of those loans." (Complaint 2:23-25, ECF No. 1.)  The relevant facts underlying these claims primarily involve the loan application and loan repayment processes created by Defendants.[4]

### A.  The Loan Application Process

In order to obtain a short-term, payday loan from the Lending Defendants, borrowers must complete online applications available through the Lending Defendants' websites[5] that request personal, employment, and financial information. (Defendants' Opposition 6:8-7:20, ECF No. 493.)  With the information provided in the loan applications, the Lending Defendants determine a maximum amount that can be borrowed, which ranges between $150.00 and $800.00. (*Id.* 7:20-8:3.)  This information also allows the Lending Defendants to make automatic withdrawals from the borrowers' bank accounts. (*Id.*)

In order to receive the loan proceeds, the borrower is required to select the desired loan amount, click four separate boxes accepting the Lending Defendants' terms and conditions, type his or her name in an electronic signature box, and click a button that reads: "I AGREE Send Me My Cash!" (*Id.* 8:4-9:22.)  The borrowers, however, are not actually required to read the terms and conditions of their loans in order to receive the loan proceeds. *See generally* (*Id.*)

---

[1] 15 U.S.C. §§ 41-58.
[2] 15 U.S.C. §§ 1601-1667f.
[3] 15 U.S.C. §§ 1693-1693r.
[4] A more detailed recitation of the underlying facts of the case is set forth in Judge Ferenbach's Report and Recommendation (ECF No. 539).
[5] Though the various websites of the Lending Defendants differ in appearance, all of them provide the same information to borrowers in the same language, so all of the Lending Defendants' loan notes and other documents are essentially "identical." (Defendants' Opposition 6:12-16, ECF No. 493.)

On the contrary, the webpage format discourages the reading of the terms and conditions because it breaks the terms and conditions up into nine separate hyperlinks in eight or nine point font. *See* (*Id.* 8:4-9:22.)  Furthermore, the most important link that takes the borrowers to the document at issue for the present motions—the <u>Loan Note and Disclosure</u> link—is the least conspicuous[6] of the nine links. (*Id.*)  The boxes and disclosure links appear on the websites as follows:

☑  I have read and accept the terms of the <u>Application</u>, including the terms and provisions of the <u>LIMITED WAIVER OF SOVEREIGN IMMUNITY</u> and the <u>ARBITRATION PROVISION</u> contained therein.

☑  I have read and accept the terms of the <u>Privacy Policy</u> & <u>Electronic Disclosure and Consent Agreement</u>.

☑  I have read and accept the terms of the <u>Authorization Agreement</u>.

☑  I have read and accept the terms of the <u>Loan Note and Disclosure</u>, including the terms and provisions of the <u>LIMITED WAIVER OF SOVERIEGN IMMUNITY</u> and the <u>ARBITRATION PROVISION</u> contained therein.[7]

(*Id.* 9:1-22.)  If a borrow does click on the <u>Loan Note and Disclosure</u> link, the following document appears, which consists of a Truth in Lending Box ("TILA Box") and 764 words in densely packed, fine print with some of the fine print curiously contained in a second box:

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[6] As noted by Judge Ferenbach, the <u>Loan Note and Disclosure</u> link is buried in the fourth paragraph and overshadowed by two all caps redundant links to the <u>LIMITED WAIVER OF SOVEREIGN IMMUNITY</u> and the <u>ARBITRATION PROVISION</u>. (Report & Recommendation 3:10-21, ECF No. 539.)
[7] As depicted in Defendants' filings, hyperlinks are signified by underlining. *See* (Defendants' Opposition 8:4-9:22, ECF No. 493.)

**LOAN NOTE AND DISCLOSURE**

**Borrower's Name:** _____

**Parties:** In this Loan Note and Disclosure ("Note") you are the person named as Borrower above. "We" Ameriloan are the lender (the "Lender").

All references to "we", "us" or "ourselves" mean the Lender. Unless this Note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide to us shall be provided to Ameriloan at the fax number and address specified in this Note and in your other loan documents.

**The Account:** You have deposit account, No **********5844 ("Account"), at First Arkansas Bank and Trust ("Bank"). You authorize us to effect a credit entry to deposit the proceeds of the Loan (the Amount Financed indicated below) to your Account at the Bank.

**DISCLOSURE OF CREDIT TERMS:** The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate (e) **684.38%** | The dollar amount the credit will cost you **$90.00** | The amount of credit provided to you or on your behalf **$300.00** | The amount you will have paid after you have made the scheduled payment **$390.00** |

Your **Payment Schedule** will be: 1 payment of **$390.00** due on **2010-09-24**, if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $90.00 only, on 2010-09-24. You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured.

**Prepayment:** You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge. (e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your account, which is 9-8-2010.

**Itemization Of Amount Financed of $300.00; Given to you directly: $300.00; Paid on your account $0**

See below and your other contract documents for any additional information about prepayment, nonpayment and default.

**Promise to Pay:** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge show above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in this Note, the term "Business Day" means a day other than Saturday, Sunday, or legal holiday, that Ameriloan is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on your Account to repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if you send Us a check. You authorize Us to perform an ACH debit on that Account in the amount specified.

*See* (FTC's Memo in Supp. of MSJ 10:4-12, ECF No. 456) (reproducing this exact Loan Note Disclosure); *see also* (Defendants' Opposition 11:1-26, ECF No. 493) (reproducing a loan note from OneClickCash with the same exact provisions); (Lending Defendants' Mot. Summary Judgment 5:11–22, ECF No. 461) (reproducing a loan note from USFastCash with the same exact provisions).

/ / /

/ / /

### B.  The Repayment Process

As indicated by the emphasized terms located in the TILA Box portion of the Loan Note and Disclosure document, borrowers who obtain loans from the Lending Defendants are only obligated to repay a fixed sum equal to one finance charge plus the amount borrowed. (FTC's Memo in Supp. of MSJ 10:4 –12, ECF No. 456) (showing a single repayment of $390.00 for a $300.00 loan); *see* (Defendants' Reply 7:1-15, ECF No. 512.)  However, if borrowers fail to satisfy certain conditions precedent to establish the single payment option, then they are automatically enrolled in a ten pay-period "renewal" plan. (*Id.*)  Under the renewal plan, the terms of which are scattered throughout the dense text below the TILA Box in the Loan Note and Disclosure document, a new finance charge accrues each pay-period and the borrower's principal balance only begins to decrease by $50.00 per pay-period following the fourth payday. (Defendants' Opposition 12:1-15:4, ECF No. 493.)  As a result, if the borrower of a $300.00 loan from the Lending Defendants fails to successfully opt out of the renewal plan, his or her total payments would actually total $975.00 rather than the $390.00 shown in the TILA Box. (*Id.*)  The following table illustrates such a payment schedule under the renewal plan:

| Payday | Payment | Finance Charge (30% of Remaining Principal Balance) | Amount Applied to Principal | Remaining Principal Balance | Total Paid to Date |
|--------|---------|-----------------------------------------------------|-----------------------------|-----------------------------|--------------------|
| 1 | $90.00 | $90.00 | $0.00 | $300.00 | $90.00 |
| 2 | $90.00 | $90.00 | $0.00 | $300.00 | $180.00 |
| 3 | $90.00 | $90.00 | $0.00 | $300.00 | $270.00 |
| 4 | $90.00 | $90.00 | $0.00 | $300.00 | $360.00 |
| 5 | $140.00 | $90.00 | $50.00 | $250.00 | $500.00 |
| 6 | $125.00 | $75.00 | $50.00 | $200.00 | $625.00 |
| 7 | $110.00 | $60.00 | $50.00 | $150.00 | $735.00 |
| 8 | $95.00 | $45.00 | $50.00 | $100.00 | $830.00 |
| 9 | $80.00 | $30.00 | $50.00 | $50.00 | $910.00 |
| 10 | $65.00 | $15.00 | $50.00 | $0.00 | $975.00 |
| **Total** | **$975.00** | **$675.00** | **$300.00** | – | **$975.00** |

1   (*Id.*); *see also* (FTC's Memo in Supp. of MSJ 14:1-14, ECF No. 456) (reproducing an internal

2   document from Defendants' containing this payment schedule).

3         While borrowers technically have the ability to decline enrollment in the automatic

4   renewal plan, the mechanism for declining enrollment is controlled by the Defendants through

5   a convoluted email-and-hyperlink procedure.[8] *See* (Defendants' Opposition 7:12-14; 14:15-16;

6   16:16-18, ECF No. 493.)  For a borrower to decline enrollment in the automatic renewal plan

7   using the email-and-hyperlink procedure, the following steps must be completed: (1) three days

8   after the loan is funded, the Lending Defendants send an email to the borrower containing

9   additional loan terms and a link to a webpage from where the borrower may elect to decline

10  enrollment in the renewal plan; (2) the borrower opens the email, reads the new terms, accesses

11  the webpage, and selects the option to opt out; and (3) the selection is executed three business

12  days before the borrower's "loan is due." (*Id.* 7:12-14.)

13        The discrepancy between the repayment schedule prominently presented in the TILA

14  Box and the renewal plan repayment schedule borrowers are automatically entered into by the

15  Lending Defendants as well as the convoluted procedure for opting out of the renewal plan

16  appear to have created significant confusion for many borrowers about the true cost of their

17  loans. *See* (Exs. 167-168 of FTC's Dec. in Supp. of MSJ, ECF No. 455-167, 455-168)

18  (compiling approximately 8,500 consumer complaints); (Oxenford Depo. 170:18-172:10, Ex.

19  113 of FTC's Dec. in Supp. of MSJ, ECF No. 455-113) (estimating that approximately eighty

---

22  [8] The fine print of Defendants' Loan Note and Disclosure document states that "[t]o decline this option of
23  renewal, you must select your payment option using the Account Summary link sent to your email at least three
    business days before your loan is due."  The document, however, appears to somewhat contradict the first
    statement when it also states that "[t]his Note will be renewed on the Due Date unless at least three Business
24  Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will
    not be renewed." (Defendants' Opposition 11:1-26, ECF No. 493.)  Therefore, it appears ambiguous from the
25  face of the document whether a borrower must use the email-and-hyperlink procedure to opt out of the renewal
    plan or whether simply notifying the Defendants of the desire to opt out would be sufficient to opt out. (Report &
    Recommendation 6:3-13, ECF No. 539.)

percent of the borrowers she spoke with complained that Defendants had withdrawn more from their accounts than the loan cost).  Furthermore, Defendants' own internal records indicate that the Lending Defendants' employees were instructed to conceal how the loan repayment plans worked in order to keep potential borrowers in the dark.  For example, in response to an email from one of the Lending Defendants' sales representatives suggesting they use clearer language when explaining a loan to potential borrowers, the Manager of Training and Development stated:

> I don't think that [this language] encourages a customer to GET a loan. … When we are trying to sell it I think we should leave out terms like renew and pay down. We don't want to complicate things if we are trying to get them to get a loan. I have heard many times customers ask to withdraw the loan after the explanation and I believe that a lot of it has to do with the way it is explained.

(Email, Ex. 72 of FTC's Dec. in Supp. of MSJ, ECF No. 455-72.)

### C. Procedural History of the Case

The FTC filed its Complaint on April 2, 2012, alleging claims for deceptive acts and practices and deceptive collection practices in violation of the FTC Act (Counts I & II), for failing to properly disclose certain loan information in violation of TILA and its implementing Regulation Z[9] (Count III), for conditioning the extension of credit on the preauthorization of recurring loans in violation of EFTA (Count IV), and for disgorgement as provided under section 13(b) of the FTC Act (Count V). (Complaint 15:1-20:8, ECF No. 1.)

On December 27, 2012, the Court signed an Order entering the parties' joint stipulation for preliminary injunction and bifurcation. (ECF No. 296.)  The Bifurcation Order divided the litigation into two phases: a liability phase and a relief phase. (*Id.* 9:1-10:23.)  During Phase I of the proceedings, the Court would adjudicate the merits of the FTC's claims for violations of the FTC Act, TILA, and EFTA. (*Id.* 9:1-24.)  During Phase II of the proceedings, the Court

---

[9] 12 C.F.R. § 1026.

would adjudicate the remaining issues, including whether the various Defendants constitute a common enterprise. (*Id.* 10:1-19.)

On July 18, 2013, the Lending Defendants as well as Defendants AMG Capital Management, Level 5 Motorsports, LeadFlash Consulting, Black Creek Capital Corporation, Broadmoor Capital Partners, Scott A. Tucker, Blaine A. Tucker, Don E. Brady, Troy LittleAxe, and Robert D. Campbell (collectively the "Settling Defendants") stipulated to settle Counts II & IV with the FTC. (Joint Motion for Stipulated Order, ECF No. 446.)  The settlement, however, remained contingent upon Court approval. (*Id.*)  Furthermore, the Muir Defendants, whose liability in this action depends largely upon the FTC's common enterprise theory, were notably absent from the settlement. (*Id.*; Complaint ¶¶ 16, 19, 25, ECF No. 1; Muir Objection 2:1-16, ECF No. 541.)

On September 30, 2013, before the Court had approved the settlement with the Settling Defendants, the FTC moved for summary judgment on Counts I-IV against all Defendants. (FTC's Mot. Summary Judgment p. 1, ECF No. 454.)  That same day, the Lending Defendants filed their own motion seeking summary judgment on Count III, which was joined by the other Defendants. (Lending Defendants' Mot. Summary Judgment, ECF No. 461; Joinders, ECF Nos. 462-63, 465-66, 470-71.)  Then on October 8, 2013, the Court approved the stipulated settlement of Counts II & IV with the Settling Defendants. (Order pp. 1-13, ECF No. 478.)  Subsequently, on November 4, 2013, the FTC withdrew its motion for summary judgment on Counts II & IV against the Settling Defendants, but not the Muir Defendants. (Withdrawal Motion p. 2, ECF No. 487.)

The FTC's Motion for Summary Judgment on Counts I & III against all Defendants, and Counts II & IV against the Muir Defendants (ECF Nos. 454, 487) and the Lending Defendants' Motion for Summary Judgment on Count III (ECF No. 461) were referred to Magistrate Judge Ferenbach pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Nevada Local Rule IB 1-4.  On

January 28, 2014, Judge Ferenbach recommended that this Court enter an order granting the FTC's Motion for Summary Judgment on Counts I & III against all Defendants and denying without prejudice the motion on Counts II & IV against the Muir Defendants as well as denying the Lending Defendants' Motion for Summary Judgment on Count III. (Report & Recommendation, ECF No. 539.)  Judge Ferenbach further recommended that the Bifurcation Order be amended to permit Counts II & IV to proceed against the Muir Defendants during Phase II. (*Id.*)

## II.   <u>LEGAL STANDARD</u>

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2.  Upon the filing of such objections, the Court must make a de novo determination of those portions of the Report to which objections are made. *Id.*  The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b).

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing

competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   **DISCUSSION**

### A.  **Objection of the Lending Defendants**

In their Objection (ECF No. 542), the Lending Defendants—joined by the other Defendants—assert that Judge Ferenbach erred in his Report and Recommendation (ECF No. 539) by applying an incorrect legal standard, by improperly treating fact questions as questions of law, and by violating the summary judgment standard in resolving disputes of material fact in the FTC's favor. (Objection 1:9-14, ECF No. 542.)  Specifically, Defendants assert that Judge Ferenbach erred (1) by treating the net impression of Defendants' loan documents as a question of law instead of fact, (2) by ignoring facts as immaterial that are favorable to Defendants, (3) by "inventing new theories" as to why the loan documents are ambiguous, (4) by misconstruing material facts in favor of the FTC, (5) by evaluating the TILA disclosure in a manner contrary to Ninth Circuit case law, (6) by applying the incorrect test for contractual ambiguity, and (7) by failing to grant summary judgment to Defendants. (*Id.* 1:15-2:6.)  The first four objections relate to Judge Ferenbach's granting of summary judgment to the FTC on Count I while the final three objections relate to Judge Ferenbach's granting of summary judgment to the FTC on Count III.  For the following reasons, each of these objections is without merit.

/ / /

/ / /

### 1.   Treatment of the Net Impression of the Loan Documents

Section 5 of the Federal Trade Commission Act of 1914 prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." 15 § U.S.C. 45(a)(1).  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (citing *F.T.C. v. Pantron I Corp*., 33 F.3d 1088, 1095 (9th Cir. 1994)).  Actual deception is not required for a Section 5 violation. *Trans World Accounts, Inc. v. F.T.C.*, 594 F.2d 212, 214 (9th Cir. 1979).  Rather, Section 5 "only requires a showing that misrepresentations 'possess a tendency to deceive.'" *F.T.C. v. Commerce Planet, Inc*., 878 F. Supp. 2d 1048, 1073 (C.D. Cal. 2012) (quoting *Trans World Accounts, Inc.*, 594 F.2d at 214).  Furthermore, the Court considers "the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading," and a Section 5 violation may still be found even if the fine print and legalese were technically accurate and complete. *Commerce Planet*, 878 F. Supp. 2d at 1063 (citing *Gill*, 265 F.3d at 956)); *see also F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (stating that a representation "may be likely to mislead by virtue of the net impression it creates even though the [representation] also contains truthful disclosures").

Defendants' first objection is that Judge Ferenbach erred by "improperly step[ping] into the shoes of the fact-finder" and treating the net impression of the Loan Note and Disclosure document as a question of fact instead of law. (Objection 3:8-19, ECF No. 542.)  Defendants assert that the Ninth Circuit and District of Nevada cases granting summary judgment to the FTC for Section 5 claims are distinguishable from this case because in those cases the Court found that no genuine issues of material fact existed. (*Id.* 4:1-9) (citing *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009); *Cyberspace.Com LLC*, 453 F.3d at 1201; *Gill*, 265 F.3d at 955-

56; *FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1226 (D. Nev. 2010); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1219 (D. Nev. 2011)).

Defendants' argument, however, is unpersuasive. First, numerous Ninth Circuit cases, including the ones cited by Defendants have found the net impression of a representation to be suitable for summary judgment determination. *See e.g. Cyberspace.Com LLC*, 453 F.3d at 1201 ("[T]he district court properly granted summary judgment to the FTC on the FTCA § 5 violation because no reasonable factfinder could conclude that the solicitation was not likely to mislead consumers acting reasonably under the circumstances in a way that is material."); *F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1035 (E.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ("Where the operative facts are substantially undisputed, and the heart of the controversy is the legal effect of such facts, such a dispute effectively becomes a question of law that can, quite properly, be decided on summary judgment."). Second, as will be addressed in the next section of this opinion, Judge Ferenbach correctly found that there are no genuine issues of material fact regarding the terms Loan Note Disclosure and no reasonable factfinder could conclude that the document was not likely to mislead consumers. *See Infra* § III.A.2. Therefore, Judge Ferenbach did not improperly supplant the role of the jury in determining the net impression of the Loan Note Disclosure. Defendants' objection is without merit.

### 2. Ignoring as "Immaterial" Facts Favorable to Defendants

Defendants' second objection is that in conducting his "likely to mislead" analysis, Judge Ferenbach failed to follow the appropriate summary judgment standard by ignoring all the evidence that was favorable to Defendants and drawing all factual inferences in favor of the FTC. (Objection 7:15-24, ECF No. 542.) In support of this objection, Defendants argue that the facts ignored by Judge Ferenbach, such as Defendants' expert testimony, show the Loan Note Disclosure was not misleading. (*Id.* 8:4-13:24.) Defendants' also reorganize and explain the terms of the document in an attempt to show that the TILA Box and fine print are consistent

and that the terms contained in the fine print of the document are not hidden, vague, uncertain, or contradictory. (*Id.*)

This argument, however, misunderstands the law and Judge Ferenbach's analysis and was directly addressed and refuted in the Report and Recommendation. (Report & Recommendation 22:11-26:18, ECF No. 539.) First, the terms of the Loan Note Disclosure are not disputed by Defendants. *See e.g.* (Defendants' Opposition 11:1-26, ECF No. 493.) Second, Judge Ferenbach noted that the terms of the TILA Box and the fine print of that document provide the basis for his finding that Defendants violated Section 5 of the FTC Act. (Report & Recommendation 23:4-6, ECF No. 539.) Therefore, any facts other than the terms of the Loan Note Disclosure and their presentation in the document are immaterial to a summary judgment determination. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *see also* (Report & Recommendation 24:17-26:18, ECF No. 539) (addressing in detail why each of Defendants' factual disputes are immaterial).

Furthermore, Defendants' presentation and explanation of the fine print terms fail to show that Judge Ferenbach erred in finding that the Loan Note Disclosure was likely to mislead as a matter of law. The Loan Note and Disclosure document's net impression is likely to mislead because of the way the terms are presented to borrowers by the document, not because Defendants' counsel can pull out the important terms and rearrange them in large bullet point lists that allow for a clearer understanding of their effects. *See Feil v. F.T.C.*, 285 F.2d 879, 887 n.18 (9th Cir. 1960) ("The law is not made for experts but to protect the public,— that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impression.") (quoting *Aronberg v. F.T.C.*, 132 F.2d 165, 170 (7th Cir. 1943)); *Cyberspace.Com LLC*, 453 F.3d at 1200 ("A [representation] may be likely to mislead by virtue

of the net impression it creates even though the [representation] also contains truthful disclosures."); (Report & Recommendation 10:14-18, ECF No. 539) ("[A]rguments about the technicalities of the loan note's provisions, qualifications, and disclaimers are misplaced. Even if an argument regarding the loan note is technically true in the mind of an attorney, the argument is immaterial under Rule 56 if it is not also true in the eyes of a 'reasonable' borrower.").  The test for a FTC Act violation is whether the representation "is likely to mislead consumers acting reasonably under the circumstances." *Pantron I Corp.*, 33 F.3d at 1095.

As Judge Ferenbach correctly found, the net impression of the Loan Note Disclosure is likely to mislead borrowers acting reasonably under the circumstances because the large prominent print in the TILA Box implies that borrowers will incur one finance charge while the fine print creates a process under which multiple finance charges will be automatically incurred unless borrowers take affirmative action. (Report & Recommendation 16:17-19, ECF No. 539) ("It requires no citation of authority to demonstrate that the 'net impression' of a boldfaced representation, which states that the borrower is responsible to repay a fixed sum, is misleading when the fine print indicates that the boldfaced fixed sum is not fixed."); *see Commerce Planet, Inc.*, 878 F. Supp. 2d at 1065 ("the information about the continuity plan … is buried with other densely packed information and legalese, which makes it unlikely that the average consumer will wade through the material and understand that she is signing up for a negative option plan.")  This structure gives the impression that a $300.00 loan from the Lending Defendants will only cost borrowers $90.00, when in fact, unless borrowers read the fine print and take the necessary steps to opt out of the renewal plan, such a loan will incur $675.00 in fees.

Furthermore, the material terms in the fine print are arranged in the document in such a way that the existence of the automatic renewal and the process for declining renewal are hidden from borrowers. *See Supra* 4:1-18 (reproducing the Loan Note Disclosure).  These terms, which significantly alter the parties' legal obligations from what is implied by the terms

in the TILA Box, are concealed from borrowers because they are scattered throughout the fine print in the document and because the terms never expressly state that the renewal plan is automatic.[10] (*Id.*)  Instead, the Loan Note Disclosure merely uses phrases implying automatic enrollment, such as that "1 payment [will be due] if you decline the option of renewing your loan."[11] (*Id.*)

Therefore, Defendants' factual disputes are immaterial and no reasonable jury could find that the Loan Note Disclosure was not likely to mislead borrowers acting reasonably under the circumstances.  This objection is without merit.

### 3.  Provision of Additional Reasons why the Loan Documents are Ambiguous

Defendants' third objection is that Judge Ferenbach violated Federal Rule of Civil Procedure 56(f) by granting summary judgment to the FTC after "invent[ing] a new theory" never advanced by the FTC that the Loan Note Disclosure's net impression is misleading because it is unclear under its terms how a borrower may opt out of the renewal plan.[12] (Objection 10:19-23, ECF No. 542.)

/ / /

---

[10] Perhaps the most telling evidence that the important terms in the Loan Note Disclosure are hidden by their scattered presentation in the fine print is provided by Defendants' own counsel.  In the portion of their Opposition arguing that the process for declining renewal is not hidden, Defendants' counsel listed nine bulleted terms that allegedly advise borrowers about the automatic nature of the renewal process. (Defendants' Opposition 9:4-10-5, ECF No. 493.)  As pointed out by the FTC, however, only five of the listed terms are actually contained in the Loan Note Disclosure document and, if numbered as they are listed by Defendants' counsel, those five terms appear in the Loan Note Disclosure in the order 2, 3, 5, 1, 6. (Resp. to Opposition 17:5-18:9, ECF No. 556.)  Furthermore, all of these terms except 1 and 6 are separated from the next relevant term by unrelated fine print. (*Id.*)

[11] Buried in the seventeenth sentence of the Loan Note Disclosure's block of fine print is the statement: "This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed." *See Supra* 4:1-18 (reproducing the Loan Note Disclosure).  This statement is the closest the Loan Note Disclosure comes to clearly expressing the automatic nature of the renewal plan, and notably, it is the first bullet point in Defendants' counsel's list of terms that are "not hid[den]." (Defendants' Opposition 9:3-13, ECF No. 493.)

[12] This ambiguity arises from two statements in the Loan Note Disclosure, which alternatively provide that a borrower may opt out by the email-hyperlink procedure or by "tell[ing]" the Lending Defendants that he or she wishes to opt out. *See supra* note 8.

It is true that a district court may grant a summary judgment motion "on grounds not raised by a party" only "[a]fter giving [the nonmovant] notice and a reasonable time to respond." Fed. R. Civ. P. 56(f).  However, while the FTC may not have specifically argued that this particular ambiguity pointed out by Judge Ferenbach contributed to the misleading net impression of the Loan Note Disclosure, the FTC repeatedly argued in its motion that summary judgment was appropriate because of the "inconspicuous, contradictory, confusing, and vague language" in the document. (FTC's Memo in Supp. of MSJ 1:20-21, ECF No. 456); *see e.g.* (*id.* 19:6-7) ("the loan documents were confusing, particularly on the issue of the repayment terms").  Judge Ferenbach's citing of a particular example of the confusing and contradictory terms argued by the FTC as a basis for their motion does not constitute a ruling on grounds not raised by the moving party under Federal Rule of Civil Procedure 56(f). *See Ervco, Inc. v. Texaco Ref. & Mktg., Inc.*, 422 F. Supp. 2d 1084, 1086 (D. Ariz. 2006) ("Notice is not required if the issue on which the summary judgment was granted is a subset of the larger issue raised by the party.") (citing *Intel Corp. v. Hartford Accident and Indemnity Co.*, 952 F.2d 1551, 1556 (9th Cir. 1991)).  Therefore, this objection is without merit.

### 4.  Interpretation of the Facts

Defendants' fourth objection is that "the Report misconstrues or misunderstands numerous material facts, always in ways favoring the FTC." (Objection 1:23-24, ECF No. 542.) The three examples of "material facts" cited by Defendants that Judge Ferenbach is alleged to have misconstrued are that: (1) The Loan Note Disclosure link is not buried or inconspicuous because it is also displayed at the top of the webpage, (2) the words under the TILA Box are not "fine" because they are the same size as the rest of the disclosures, and (3) borrowers did not need to click the nine separate hyperlinks to read all the loan documents because all the documents were contained on the same webpage and only required scrolling up and down. (*Id.* 17:4-17.)

Defendants' assertions that Judge Ferenbach erred in interpreting these three facts are misleading and irrelevant.  Regarding the first example, Judge Ferenbach noted that the Loan Note Disclosure link appearing next to the mandatory check boxes, which would naturally draw a borrower's attention, was inconspicuous because it was buried in the fourth paragraph and overshadowed by two all caps hyperlinks. (Report & Recommendation 3:10-23, ECF No. 539.) This observation is true and unrefuted by Defendants.  The fact that another link to the Loan Note Disclosure may have been placed at another location on the webpage far away from the check boxes is irrelevant and does not invalidate Judge Ferenbach's observation.  Likewise, Judge Ferenbach's use of the phrase "fine print" to describe the 628 words appearing below the TILA Box is accurate, notwithstanding Defendants' argument that they are the same size as the text in the rest of the document, because the 628 words are grouped in one large block of small print while the TILA Box disclosures are bolded and surrounded by eye-catching white space. *See* BLACK'S LAW DICTIONARY 709 9th ed. 2009) ("fine print. (1951) The part of an agreement or document—usu. in small, light print that is not easily noticeable—referring to disclaimers, restrictions, or limitations.").  Finally, the fact that the nine separate hyperlinks lead to the location of each loan document on one webpage rather than separate webpages with one document on each is irrelevant to Judge Ferenbach's point that the large number of links presented to borrowers as containing the loan documents discourages them from reading the documents. *See* (Report & Recommendation 3:10-23, ECF No. 539) ("Defendants' webpage facilitates borrowers not reading Defendants' terms and conditions.").  Therefore, this objection is without merit.

### 5.  Evaluation of the TILA Disclosures

"[TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998).  These mandated

1    terms must be disclosed "clearly and conspicuously" to borrowers before the credit is extended.

2    12 C.F.R. § 1026.17(a)-(c).  Furthermore, TILA requires "absolute compliance by creditors."

3    *Rubio v. Capital One Bank*, 613 F.3d 1195, 1199 (9th Cir. 2010) (citations omitted).

4    "[B]ecause TILA is liberally construed in favor of the consumer and strictly enforced against

5    the creditor … any misleading ambiguity … should be resolved in favor of the consumer." *Id.*

6    at 1202 (internal quotations omitted).

7        Defendants' fifth objection is that Judge Ferenbach ignored binding Ninth Circuit

8    precedent in determining that the Loan Note Disclosure was ambiguous in the abstract rather

9    than determining the technical question of whether the Loan Note Disclosure complied with

10   TILA. (Objection 19:14-22:7, ECF No. 542.)  Defendants rely entirely on the Ninth Circuit's

11   ruling in *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114 (9th Cir. 2009) for the

12   proposition that courts may not "engage … in an abstract inquiry into whether any part of the

13   Loan Note [Disclosure] is 'ambiguous.'" (*Id.* 19:25-28.)

14       Defendants, however, are the ones who appear to be ignoring binding Ninth Circuit

15   precedent as their argument based on *Hauk* has been explicitly rejected by the Ninth Circuit.  In

16   *Hauk*, the Ninth Circuit denied a plaintiff's claims under TILA based upon ambiguous or

17   misleading language in a provision that was not a disclosure governed by TILA or Regulation

18   Z. *Hauk*, 552 F.3d at 1121-22.  In *Rubio v. Capital One Bank*, the Ninth Circuit clarified that

19   "*Hauk* did not condone misleading disclosures.  It simply rejected the argument that TILA

20   liability could be based on disclosures that were misleading about anything at all—what it

21   called misleading in the abstract." *Rubio*, 613 F.3d at 1200 (internal quotations omitted).  By

22   contrast, the Ninth Circuit found in *Rubio* that disclosures which are required under TILA must

23   be clear and conspicuous, and such a "disclosure that is not 'clear and conspicuous' is *ipso*

24   *facto* misleading." *Id.*

25       The misleading disclosures at issue here—the finance charge, APR, total of payments,

and payment schedule—are the very ones mandated by TILA. 12 C.F.R. § 1026.18(d)-(e), (g)-(h).  Therefore, Judge Ferenbach did not ignore binding Ninth Circuit precedent in finding that the Loan Note Disclosure was ambiguous and in violation of TILA. (Report & Recommendation 30:4-6, ECF No. 539) ("Because Defendants' loan note is ambiguous as a matter of law, 'the terms of the legal obligation between the parties' were not 'clearly and conspicuously' disclosed, as TILA requires.").  Defendants' objection is without merit.

### 6.  Ambiguity in TILA Mandated Terms

Defendants' sixth objection is that Judge Ferenbach failed to use the correct test for contractual ambiguity in finding that the ambiguities in the Loan Note Disclosure violated TILA. (Objection 2:1-2, ECF No. 542.)  In support of this objection, Defendants assert that the proper "hornbook test" for ambiguity in this case is "whether the Loan Note [Disclosure] may reasonably be read as creating an obligation to renew as opposed to the single-payment obligation reflected in the TILA disclosures."[13] (*Id.* 19:6-8.)  Defendants then assert that under this standard the TILA mandated terms in the Loan Note Disclosure were not ambiguous because the "single-payment option" was "clearly disclosed" and borrowers were not legally required to follow the renewal plan. (*Id.* 19:8-14, 22:9-25:22.)

Defendants' argument here is unpersuasive.  A contract is ambiguous if it is "reasonably susceptible" to more than one interpretation. *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012); *see also* 11 WILLISTON ON CONTRACTS § 30:5 (stating the same).  In its analysis of FTC Act violations, this Court has already determined that the terms in the Loan Note Disclosure regarding the automatic renewal plan were likely to mislead because they implied in the prominent TILA Box that only one finance charge would be incurred while

---

[13] Defendants provide no legal citation for this "test," though they do later cite *Williston on Contracts*, for the proposition that, "as a matter of contract law, performance (like renewal) that either party may decline is not a legal obligation." 1 WILLISTON ON CONTRACTS § 1:2 (4th ed. 2010) (The actual quote is: "[A]n understanding that leaves an essential element of a promise open for future negotiation and agreement, constitutes no promise, and creates no legal obligation until the future agreement is actually made.").

the fine print created a process under which multiple finance charges would be automatically incurred unless borrowers take affirmative action. *See supra* § III.A.2.  Those terms are therefore also ambiguous because a reasonable borrower could think the information prominently displayed in the TILA Box accurately reflected his or her legal obligations without needing to undertake any additional action, even if such a reading is not technically accurate. *Rubio*, 613 F.3d at 1202 (citing *Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002)) ("any misleading ambiguity—any disclosure that a reasonable person could read to mean something that is not accurate—'should be resolved in favor of the consumer.'").  Furthermore, an ambiguous disclosure is necessarily not clearly and conspicuously disclosed.[14]  *See id.* ("it is precisely because reasonable consumers can interpret an ambiguous disclosure in more than one way that such a disclosure cannot be clear and conspicuous."); *see also Watts v. Key Dodge Sales, Inc.*, 707 F.2d 847, 852 (5th Cir. 1983) ("the provision is ambiguous, thus violating the TILA or Regulation Z."); *In re Whitley*, 772 F.2d 815, 817 (11th Cir. 1985) ("these divergent readings of the provision render the language ambiguous and therefore violative of TILA and Regulation Z.").  This objection is without merit.

### 7.  Failing to Grant Defendants' Motion for Summary Judgment

Defendants' seventh objection is that Judge Ferenbach erred by failing to grant Defendants' summary judgment on Count III. (Objection 2:3-6, ECF No. 542.)  As the Court has already found that Judge Ferenbach did not err in granting summary judgment for the FTC on Count III, this objection is without merit.

---

[14] The Court also notes that even if the terms were not ambiguous, the disclosures relating to the automatic entry of a loan into the renewal plan were not clear and conspicuous as they were buried in fine print. *See supra* § III.A.2; *see also Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) ("Clear and conspicuous disclosures, therefore, are disclosures that a reasonable cardholder would notice and understand…. [T]he change-in-terms provision … is buried too deeply in the fine print for a reasonable cardholder to [notice].")

**B.  Limited Objection of the Muir Defendants**

In their Limited Objection (ECF No. 541), the Muir Defendants assert that Judge Ferenbach erred in his Report and Recommendation by only denying summary judgment against the Muir Defendants on Counts II & VI while granting the FTC summary judgment against the Muir Defendants on Counts I & III. (Limited Objection 3:23-4:10, ECF No. 541.)

Under the Bifurcation Order, no discovery regarding the Muir Defendants' liability for any of the counts alleged in the Complaint would occur until Phase II of the litigation. (Bifurcation Order p. 10, ECF No. 296); (Report & Recommendation 34:3-6, ECF No. 539.) As a result, discovery during Phase I regarding the alleged violations underlying the claims was effectively left to the Lending Defendants. *See* (Stip. to Withdraw Discovery Requests, ECF No. 278) (where the Muir Defendants and the FTC agree to withdraw pending discovery requests and postpone future discovery against each other until Phase II of the litigation). However, all discovery regarding Counts II & IV ceased when the FTC and the Settling Defendants reached a settlement agreement on those two counts, even though the settlement did not include the Muir Defendants and explicitly did not resolve the FTC's claims against the Muir Defendants on Counts II & IV. (Order Granting Stipulated Motion ¶ 4, ECF No. 478) ("This settlement does not settle and resolve any conduct not alleged in Counts II and IV of the Complaint *or as to any other party*.") (emphasis added).  Therefore, while the Muir Defendants remained potentially liable for Counts II & IV, discovery had not been effectively completed on those counts at the time of the FTC's Motion for Summary Judgment.

In the Report and Recommendation, Judge Ferenbach granted the FTC summary judgment against all Defendants, including the Muir Defendants, on Counts I & III. (Report & Recommendation 35:16-18, ECF No. 539.)  However, because the Bifurcation Order and settlement agreement had effectively prevented the Muir Defendants from conducting discovery at the time the motion for summary judgment was filed, Judge Ferenbach

recommended denying summary judgment on Counts II & IV and amending the Bifurcation Order to permit those claims to proceed during Phase II. (*Id.* 35:1-36:5) (citing Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it.").

The Muir Defendants assert that granting summary judgment on Counts I & III effectively "nullified" the protections afforded under the Federal Rules of Civil Procedure that necessitated denying summary judgment on Counts II & IV. (Limited Objection 3:23-4:10, ECF No. 541.) The Muir Defendants further assert that the Bifurcation Order and Judge Ferenbach's "inconsistent ruling" denied them of their fundamental right to engage in discovery about the claims against them. (*Id.* 4:23-5:8.)

The Muir Defendants assertions, however, are unpersuasive. In contending that they were denied the right to engage in discovery and that Judge Ferenbach's Report and Recommendation is inconsistent in granting summary judgment on Counts I & III while denying it on Counts II & IV, the Muir Defendants appear to ignore two important facts. First, the Muir Defendants voluntarily chose to postpone discovery until after Phase I by stipulation (ECF No. 278) and no doubt benefited from being relieved from the costs involved in conducting that discovery. Second, the situation regarding Counts I & III is fundamentally different from the situation regarding Counts II & IV. Unlike Counts II & IV, which were not fully litigated by the Lending Defendants, full discovery and litigation was conducted by the Lending Defendants on Counts I & III, as was originally contemplated by all parties— including the Muir Defendants—in the Bifurcation Order. *See* (Bifurcation Order, ECF No. 296); (Stip. to Withdraw Discovery Requests, ECF No. 278). With respect to Counts I & III, the Muir Defendants are in the same position as all the other Defendants who allowed the Lending Defendants to take the lead in Phase I. Therefore, the Muir Defendants' rights to

discovery and litigation of the claims in Count I & III were voluntarily given to and adequately protected by the Lending Defendants, while those rights with respect to Counts II & IV were not protected by the Lending Defendants due to their separate settlement.

It was for precisely this reason that Judge Ferenbach denied summary judgment on Counts II & IV while granting it on Counts I & III. (Report & Recommendation 35:1-4, ECF No. 539) ("In light of the Settling Defendants' not opposing summary judgment on counts two and four, the court must deny the FTC's motion for summary judgment on counts two and four in order to … afford the Muir Defendants an opportunity to conduct discovery and litigate the relevant claims and defenses.").  Judge Ferenbach's recommendation to grant summary judgment against the Muir Defendants on Counts I & III while denying it on Count II & IV, would prevent the Muir Defendants from improperly relitigating issues while ensuring their right to engage in discovery and litigation on those claims which were not adequately protected by the Lending Defendants.  Therefore, the Muir Defendants' objection is without merit, and the recommendation of Judge Ferenbach regarding summary judgment against the Muir Defendants and amendment of the Bifurcation Order is adopted by the Court.

## IV.  <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Report and Recommendation (ECF No. 539) is **ACCEPTED and ADOPTED** in full, to the extent it is not inconsistent with this opinion.

**IT IS FURTHER ORDERED** that the FTC's Motion for Summary Judgment (ECF No. 454) is **GRANTED in part and DENIED in part**. The FTC's Motion for Summary Judgment is **GRANTED** on Count I and Count III.  The FTC's Motion for Summary Judgment is **DENIED without prejudice** on Count II and Count IV.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 461) is **DENIED**.

**IT IS FURTHER ORDERED** that the Bifurcation Order is amended to permit Count II

and Count IV to proceed against the Muir Defendants during Phase II of the litigation.

**DATED** this 28th day of May, 2014.

_____
Gloria M. Navarro, Chief Judge
United States District Judge