DANIEL G. BOGDEN
United States Attorney
District of Nevada
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar. No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Phone:  (702) 388-6336
Facsimile:  (702) 388-6787
Email:  Blaine.Welsh@usdoj.gov

JONATHAN E. NUECHTERLEIN
General Counsel
NIKHIL SINGHVI
JASON D. SCHALL
HELEN P. WONG
IOANA RUSU
LaSHAWN M. JOHNSON
COURTNEY A. ESTEP
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mailstop CC-10232
Washington, D.C. 20580
Phone:  (202) 326-3480 (Singhvi)
Facsimile:  (202) 326-3768
Email:  nsinghvi@ftc.gov (Singhvi); jschall@ftc.gov (Schall)
*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>              Plaintiff,<br>     v.<br><br>AMG Services, Inc., et al.,<br><br>              Defendants, and<br><br>Park 269 LLC, et al.,<br><br>              Relief Defendants. | Case No. 2:12-cv-536<br><br>**PLAINTIFF'S MOTION TO COMPEL DISCOVERY FROM  DEFENDANTS** |

**INTRODUCTION**

The Federal Trade Commission ("FTC") hereby moves to compel documents and information from Scott Tucker, Blaine Tucker, their wholly owned companies, and Kim Tucker.  In part, this motion revisits matters first considered by the Court in its January 14, 2015 discovery order (ECF No. 722), which granted in part and denied in part the FTC's earlier motion to compel.  The disputed topics largely concern the FTC's attempt to prove that Scott Tucker principally owned and operated the unlawful lending operation at issue in this case, and that a series of his wholly owned entities operated in a common enterprise with each other and with the Lending Defendants.  Accordingly, the FTC requested documents and information relating to the payments among the Defendants, along with the reasons therefor.  As demonstrated below and in the accompanying declaration of FTC counsel, the FTC has made good faith efforts to narrow and/or compromise on each of the disputed requests, but the parties were unable to reach agreement.

**ARGUMENT**

The legal standard applicable to a motion to compel is familiar to the Court (ECF No. 722 at 3-4) and is briefly summarized as follows.  Rule 26(b)(1) of the Federal Rules of Civil Procedure establishes party-controlled discovery and court-controlled discovery.  (*Id.* at 3.)  Here, the parties have made some progress on the former path, but now seek the Court's intervention regarding what information concerning the Defendants' intertwined financial dealings the Tucker Defendants and Kim Tucker must provide.

Discovery regarding relevant subject matters should be liberally permitted as long as it is not unduly expensive or burdensome.  (*Id.* at 3-4.)  If a good faith attempt to confer is not successful, the moving party must make a threshold showing that the disputed information is relevant and discoverable.  (*Id.* at 4.)  At that point, the resisting party bears a "heavy burden" to avoid disclosure, a burden which cannot be met with unspecific, boilerplate objections.  (*Id.*)

1

**I.     The Tucker Defendants Should Respond To Discovery Concerning Their Financial Dealings With The Lending Defendants.**

The first set of requests at issue in this motion concern requests designed to untangle the web of monetary and in-kind payments (*e.g.*, tuition payments, jet travel, plastic surgery, tax payments, etc.) between the Lending Defendants and Tucker Defendants.  The Tucker Defendants ignore the importance of this evidence for the FTC's common enterprise and individual liability allegations and refuse to provide any accounting of or explanation for their pooling of assets.

As the Court held in its latest order, the pooling of assets between Defendants is a factor supporting the FTC's common enterprise liability claim.  (ECF No. 722 at 6.)  Specifically, a common enterprise "may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."  (*Id.* (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010)).  Where companies were "beneficiaries of and participants in a shared business scheme," the Ninth Circuit has held that "the common revenue generated in the course of that scheme was the proper subject of the court's equitable powers under the FTC Act." *Network Servs.*, 617 F.3d at 1143.

Similarly, Scott Tucker's and Blaine Tucker's control over the Lending Defendants' finances is central to the FTC's allegations against them as individuals.  An individual is liable for an entity's FTC Act violations if he or she participated directly in the wrongful acts or practices, controlled the entities, or had authority to control the entities.  *FTC v. Ivy Capital, Inc.*, No. 2:11–CV–283 JCM (GWF), 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013).  The requisite control or authority to control can be established by such evidence as "active involvement in business affairs and the making of corporate policy," or an individual's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant."  *Id.*

Scott Tucker's and Blaine Tucker's movement of funds between the corporate defendants – and in particular from the Lending Defendants to the Tucker Defendants – is among the most pertinent evidence of their participation, control, and authority to control.  The FTC alleges, and has

2

amassed evidence, that the Tuckers did not just have "authority to sign documents on behalf of the corporate defendant" (*see id*.), but that they signed or authorized the signing of thousands of checks and wire transfers diverting tens or hundreds of millions of dollars from the Lending Defendants to themselves and their wholly owned corporations.  (ECF No. 5 at 9-10 (and evidence cited therein).)

The discovery requests discussed below ask the Tucker Defendants to do three things:  (1) identify the payments that were made between them and the Lending Defendants; (2) identify the reasons for these payments; and (3) produce documents supporting the reasons for the payments.

A.      **Level 5 Should Produce Evidence Relating To The Millions In "Sponsorship" Fees It Received From The Lending Defendants And Other Sponsors.**

Level 5 Motorsports, LLC ("Level 5") is a motorsport racing company wholly owned by Scott Tucker (ECF No. 58 at 1-2), and Tucker is its featured driver.[1]  The FTC alleges Level 5 is part of the common enterprise with other Corporate Defendants, and that payments to Level 5 by the Lending Defendants are simply compensation to Scott Tucker to support his racing pastime.

Scott Tucker wrote more than 1,000 checks, totaling tens of millions of dollars, from the Lending Defendants' bank accounts to Level 5; most of these checks simply recite the word "Sponsorship" on their memo line.  (Singhvi Decl. ¶ 2 & Att. A (Level 5 checks).)  In addition, an accounting firm engaged by AMG Services, Inc. to perform a transaction analysis determined, among other things, that from 2006 through 2011, (i) $59.8 million was transferred by the Lending Defendants to Level 5 (the largest single Tucker-related recipient of the Lending Defendants' funds), (ii) that AMG management "represented" that such payments were for advertising in connection with sponsorship, and (iii), as a general matter, "[t]he AMG accounting department did not have an appropriate level of established policies and accounting procedures, adequate supervision, proper levels of review procedures and/or sufficient technical accounting skills to maintain the books and records of AMG Group entities."  (Singhvi Decl. Att. B (Milner Report) at pp. 13, 6.)  Despite these

---

[1]      *See* http://level5motorsports.com/scott-tucker/.

3

extraordinary payments, Level 5 does not appear to have any written sponsorship agreement with the Lending Defendants executed before commencement of this proceeding, and Level 5's website did not list any of the Lending Defendants among the entity's sponsors.  (*See* ECF No. 5-37 at 6-8 (screen capture from Level 5's website at time of complaint).)

To further test whether these extraordinary expenditures by the Lending Defendants were truly made for sponsorship/advertising, the FTC propounded the following document requests to Level 5:

**ORIGINAL REQUEST NO. 16**
All documents identifying your sponsors.  (Singhvi Decl. Att. C.)

**RESPONSE:**
Level 5 objects to this Request because it seeks information that is not relevant to any party's claim or defense.  The Complaint alleges violations of the FTC Act, TILA, and the EFTA by the Tribal Lending Defendants; it does not allege any facts showing Level 5's involvement, or the involvement of its sponsors, in any of the targeted activity.  Documents identifying Level 5's sponsors have no bearing on the causes of action alleged by the FTC in the Complaint, which focus entirely on the loan documents and collections activities of the Tribal Lending Defendants.  Because the Complaint does not allege any facts showing that Level 5 participates in any of the lending or collections activities targeted by the Complaint, this discovery request strays far beyond the limits imposed by Federal Rule 26(b).   (Singhvi Decl. Att. D.)

**MODIFIED REQUEST NO. 16**
Documents  sufficient to identify your sponsors.  (Singhvi Decl. Att. E at email dated 12/23/14.[2])

**REQUEST NO. 17**
Documents sufficient to identify all Compensation You received from any sponsor, the dates of such Compensation, and the detailed consideration for which such Compensation was received.  (Singhvi Decl. Att. C.)

**RESPONSE:**
Level 5 objects to this Request because it seeks information that is not relevant to any party's claim or defense.  The Complaint alleges violations of the FTC Act, TILA, and the EFTA by the Tribal Lending Defendants; it does not allege any

---

[2]   Level 5 maintained its objection after this modification.  (Singhvi Decl. Att. E at email dated 12/23/14.)

facts showing Level 5's involvement in any of the targeted activity.  Level 5 further objects because this Request is facially overly broad and unduly burdensome because it seeks "Documents sufficient to identify all Compensation You received from any sponsor," without regard to subject matter or timeframe.  Such documents have no bearing on the causes of action alleged by the FTC in the Complaint, which focus entirely on the loan documents and collections activities of the Tribal Lending Defendants.  Because the Complaint does not allege any facts showing that Level 5 participates in any of the lending or collections activities targeted by the Complaint, this discovery request strays far beyond the limits imposed by Federal Rule 26(b).  (Singhvi Decl. Att. D.)

As for the threshold relevance of these requests, their purpose is to test the Tucker Defendants' likely contention that the millions in payments from the Lending Defendants to Level 5 were *bona fide* sponsorship payments.  Likewise, the purpose of seeking the identity of, and amounts paid by, sponsors other than the Lending Defendants is to examine whether the Lending Defendants' "sponsorship" payments were disproportionate to the sponsorship payments made by persons not under Scott Tucker's control.  Such evidence would support the FTC's contention that the millions of dollars in payments from the Lending Defendants to Level 5 constitute transfers of wealth to Scott Tucker at the direction of Scott Tucker, rather than any legitimate business expense.

The Tucker Defendants do not meet their heavy burden of opposing these requests.  Their principal objections – that the FTC's Complaint "does not allege any facts showing Level 5's involvement in any of the targeted activity," or "does not allege any facts showing that Level 5 participates in any of the lending or collections activities targeted by the Complaint" – simply ignore the FTC's common enterprise allegations.  These objections are impertinent because (1) the sufficiency of the FTC's complaint against Level 5 has already been established (ECF No. 226, 297 (denying Level 5's motion to dismiss)) and (2) Level 5 does not have to be "involved in" or "participate in" the lending practices themselves if it had "strongly interdependent economic interests or the pooling of assets and revenues."  *Network Servs. Depot*, 617 F.3d at 1142-43.  By attempting to resist discovery on grounds that Level 5 itself did not lend to consumers, Level 5 ignores the FTC's common enterprise allegations and the indisputable relevance (and importance) of facts surrounding the $60 million that Scott Tucker diverted to Level 5.

5

Level 5 also advances a bald, unsupported objection that Request No. 17 "is facially overly broad and unduly burdensome because it seeks 'Documents sufficient to identify all Compensation You received from any sponsor,' without regard to subject matter or timeframe." But Level 5 does not explain what sort of "subject matter" restriction it seeks or why such unidentified restriction is necessary. In meet and confer discussions, Level 5 provided no further information and merely stated that it believed the requested information is not relevant to this case. All that would be required in response to these two requests are copies of Level 5 sponsorship agreements or, if none exist, a simple list of its sponsors and documents sufficient to identify the consideration exchanged to and from its sponsors. Level 5's boilerplate burden objection is "tantamount to making no objection at all" and does not satisfy its heavy burden to resist discovery. (ECF No. 722 at 4 (citing *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 472-73 (9th Cir. 1992).)

## B. BA Services Should Produce Documents Relating To Millions Diverted To It By Scott Tucker.

BA Services, like Level 5, is a wholly owned Scott Tucker entity that received tens of millions of dollars from Lending Defendants. Like Level 5, it has a pretense for these payments. And, like Level 5, it refuses to allow the FTC to conduct discovery testing the legitimacy of this pretense. In the discovery requests below, the FTC requested (1) documents relevant to the purported reason for scores of millions of dollars of payments from Lending Defendants to BA Services and (2) documents identifying BA Services' employees.

### 1. BA Services Should Produce Documents Relating To Its Contracts With The Lending Defendants.

BA Services was formed in December 2011 and is wholly owned by Scott Tucker. (Singhvi Decl. Att. F.) Since 2012, the Lending Defendants have paid BA Services more than $165 million. (Singhvi Decl. ¶ 8 & Att. G.) At some point in 2012, AMG and BA Services entered into a license agreement, pursuant to which AMG (i) purportedly owed BA Services for past use of the eCash software used to track consumer loans, and (ii) would pay additional amounts for future use of the

software.  (Singhvi Decl. Att. H (BA Services Agreement) §§ 4.1, 4.2.)  Although the agreement is

dated "as of" January 1, 2012, the FTC has reason to believe it was executed *after* the FTC initiated

this proceeding in April 2012.  The FTC contends that the agreement is a pretext and another

example of Scott Tucker asserting his control over the Lending Defendants to make payments from

them to himself.  Accordingly, the FTC seeks drafts of the agreement, communications regarding the

agreement, and documentary evidence that BA Services actually developed or otherwise owned the

software it claimed to license to AMG Services.

**ORIGINAL REQUEST NO. 5**
Documents relating to your ownership, acquisition, purchase, or sale of the rights to the
eCash System used by AMG Services, Inc.  (Singhvi Decl. Att. I.)

**ORIGINAL REQUEST NO. 9**
All documents relating to your role in the development of the eCash System used by
AMG Services, Inc.  (Singhvi Decl. Att. I.)

**RESPONSE TO REQUESTS NOS. 5 & 9**
BA Services objects to these requests because they are overbroad and unduly burdensome
in that they seek all documents relating to BA Services' ownership, acquisition, purchase
or sale of the rights to the eCash System, as well as "all documents relating to your role
in the development of the eCash System."  These requests are facially overbroad.  BA
Services also objects to these requests because they seek information that is not relevant
to any party's claim or defense.  FED. R. CIV. P. 26(b)(1).  There is no explanation or
indication of how or why this information is relevant to the claims or defenses of the
parties and it is not readily apparent to me.  BA Services further objects to these requests
because there is no meaningful temporal limitation included with the request, which
further renders the request overbroad.  BA Services also objects to the request to the
extent that it seeks production of documents that are protected by the attorney-client
privilege, work product doctrine, or any other applicable privilege or protection from
disclosure.  BA Services further objects to these requests because they seek confidential
and proprietary information, including information pertaining to the development of
software.  Therefore, BA Services would require the entry of or joinder to a suitable
protective order before any such production could be made.  (Singhvi Decl. Att. J.)

The FTC later merged and limited requests 5 & 9 into this single request:

**MODIFIED REQUEST NO. 5**
Documents evidencing your development, ownership, acquisition, purchase, or sale of the
rights to the eCash System used by AMG Services, Inc.  (Singhvi Decl. Att. K at 2/5/15
email § 3.e.)

BA Services stood on its objections, other than its objections regarding the confidentiality of the information and the lack of temporal limitation.  (Singhvi Decl. Att. K at 2/5/15 email § 3.f.)[3]

**REQUEST NO. 7**
Communications relating to the agreement(s) referenced in No. 6.[4]  (Singhvi Decl. Att. I.)

**REQUEST NO. 8**
Drafts of the agreement(s) referenced in No. 6.  (Singhvi Decl. Att. I.)

**RESPONSE TO REQUESTS NOS. 7 & 8**
BA Services objects to these requests because they are overbroad and unduly burdensome.  In connection with Request No. 6, BA Services has agreed to produce the agreements themselves, which is more than suffice [sic] under these circumstances.  BA Services also objects to these request because they seek information that is not relevant to any party's claim or defense.  FED. R. CIV. P. 26(b)(1).  There is no explanation or indication of how or why this information is relevant to the claims or defenses of the parties and it is not readily apparent to me.  BA Services further objects to these requests because there is no meaningful temporal limitation included with the request, which further renders the request overbroad.  BA Services also objects to the request to the extent that is seeks the production of documents that are protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or protection from disclosure.  BA Services further objects to these requests because they seek confidential and proprietary information.  Therefore, BA Services would require the entry of or joinder to a suitable protective order before any such production could be made.  (Singhvi Decl. Att. J.)

These requests are intended to uncover the facts surrounding BA Services' agreements with the Lending Defendants.  Request No. 5 seeks proof that BA Services actually developed and owned the "eCash" software, the principal consideration underlying all of the past and future payments made pursuant to the agreement.  The FTC has good reason to demand such proof, given that AMG Services has paid Scott Tucker, via BA Services, at least $165 million pursuant to that agreement,

---

[3]   BA Services withdrew its confidentiality designation because a confidentiality order is in place (ECF No. 308), and withdrew its time frame objection because BA Services only came into existence in December 2011.  (Singhvi Decl. Att. F.)

[4]   Request No. 6, which is not itself at issue in this motion, reads:  "Your January 1, 2012 license agreement with AMG Services, Inc., and any other agreements with any current or former defendant or dba in this action."  (Singhvi Decl. Att. I.)

most of which was paid after the FTC initiated this suit.  (Singhvi Decl. ¶ 8 & Att. G.)  Requests

Nos. 7 and 8 seek drafts of the agreement and the parties' communications regarding the agreement,

given its dubious provenance and further given that the FTC already has in its possession drafts of

the agreement that are materially different than the one produced by BA Services.  (*Compare*

Singhvi Decl. Att. H § 4.1 (referencing a separate agreement for payment for past use), *with* Singhvi

Decl. Att. L § 4.1 (blank space for payment for past use).)

None of BA Services' objections have merit.  BA Services objects that the requests are

"overbroad and unduly burdensome" without any further elaboration or support.  Such objections are

"tantamount to making no objection at all."  (ECF No. 722 at 4.).  BA Services objects that the

request "seeks information that is not relevant to any party's claim or defense," citing Rule 26(b)(1),

but Defendants and BA Services' attempt to paper over the record with post-hoc agreements puts the

veracity of those agreements at issue.  The FTC and the Court are entitled to examine why and how

the Lending Defendants engaged in multi-million dollar transactions with Tucker-owned entities.

### 2.   BA Services Should Produce Documents Identifying Its Employees.

The other disputed document request with BA Services seeks documents identifying its

employees.  Federal Rule of Civil Procedure 26 states, "Parties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense—including . . . the identity and

location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).[5]  Accordingly,

the FTC advanced the following request:

---

[5]   BA Services is a third party.  But especially given that BA Services is a wholly owned Scott
Tucker entity represented by the same counsel, its technical status as a third party is of no
consequence.  *See Schwartz v. New York City Off-Track Betting Corp*, No. 92 Civ. 1166,
1993 WL 42760, at *3 (S.D.N.Y. Feb. 11, 1993) ("[E]ven if a nonparty is still entitled to
some enhanced protection against disclosure of confidential information and from
burdensome discovery requests, Ms. Branch is so closely allied with the defendants and the
information she possesses is so pertinent that it must be disclosed.").

**REQUEST NO. 15**
Documents sufficient to identify each of your employees from January 1, 2011 to the present, including each employee's name, title, last known address, and last known telephone number.  (Singhvi Decl. Att. I.)

**RESPONSE**
BA Services objects to the request because it is overbroad and unduly burdensome. Moreover, BA Services further objects to the request because there is no temporal limitation included with the request further rendering the request overbroad.  Moreover, BA Services objects to the request because it seeks information that is not relevant to any party's claim or defense.  FED. R. CIV. P. 26(b)(1).  BA Services further objects to request to the extent it implies a duty to create documents that would be "sufficient to identify each of your employees from January 1, 2011, to the present, including each employee's name, title, last known address and last known telephone number."  Finally, BA Services further objects to the request because it seeks confidential and proprietary information that, among other things, could subject the company to competitive recruiting efforts if it were disseminated.  Therefore, BA Services would require the entry of or joinder to a suitable protective order before any such production could be made.  (Singhvi Decl. Att. J.)

The FTC's document request complies with Rule 26.  BA Services' current and former employees may have knowledge of what, if anything, BA Services did to justify over $165 million in payments from the Lending Defendants.  *See In re MTI Tech. Corp. Sec. Litig. II*, SACV 00-0745 DOC, 2002 WL 32344347 at *3 (C.D. Cal. June 13, 2002) ("[T]he identity and location of witnesses that may have knowledge of any discoverable matter is not protected….").  As with the foregoing requests, such evidence is relevant to the FTC's claim that Scott Tucker controlled the Lending Defendants, and to the extent of monetary relief for which he should be responsible.

BA Services responded with a scattershot list of objections, most of which it copied and pasted from other responses, and none of which have any merit:

- BA Services objects that the request is "overbroad and unduly burdensome" without any further elaboration or support.  Such an objection is "tantamount to making no objection at all."  (ECF No. 722 at 4.)

- BA Services objects that the request "seeks information that is not relevant to any party's claim or defense," citing Rule 26(b)(1), but the rule itself specifies "the identity and location of persons who know of any discoverable matter" as relevant material.

- BA Services objects to the request "to the extent it implies a duty to create documents," but no such duty is implied or stated.  That objection is not a basis for refusing to produce *existing* documents.

10

**C.    The Tucker Defendants Should Answer Interrogatories Regarding Payments Received From The Lending Defendants And Cannot Reference Wide Ranges Of Third Party Documents That Fail To Provide The Requested Information.**

Via interrogatories, the FTC asked the Tucker Defendants to identify their payments to and from the Lending Defendants, and the reasons for these payments. Below are the FTC's interrogatories and the Corporate Tucker Defendants' responses that improperly invoke Rule 33(d):

**ORIGINAL INTERROGATORY 3**
Identify any payments, including, but not limited to, in-kind payments and purchases of goods and services, made by You or at Your direction to, or for the benefit of, any other Defendant, any Relief Defendant, or any Associated Person, including, for each payment, the amount of payment, date of payment, method of payment, and detailed reason for payment. (Singhvi Decl. Att. M.)

**ORIGINAL INTERROGATORY 4**
Identify any payments, including, but not limited to, in-kind payments and purchases of goods and services, made to You, on Your behalf, or for Your benefit by any other Defendant, Relief Defendant, or Associated Person including for each payment, the amount of payment, date of payment, method of payment, and detailed reason for payment. (Singhvi Decl. Att. M.)

**RESPONSES TO INTERROGATORIES 3 & 4**
Level 5, Broadmoor, and AMG Capital object to this Interrogatory as compound. The Defendants further object to this Interrogatory because it seeks information that is not relevant to any party's claim or defense. Based on the Complaint filed by the FTC, this Interrogatory simply has no meaningful bearing on any of the causes of action alleged in the Complaint for violations of the FTC Act or TILA by the Tribal Lending Defendants. The Complaint focuses almost entirely on pure legal issues of contract interpretation involving lending documents of the Tribal Lending Defendants; no claim asserted by the FTC has any nexus to the information sought by this Interrogatory. The Defendants also object because this Interrogatory seeks information unrelated to the FTC's ability to pursue equitable remedies under Section 13(b) of the FTC Act. The Defendants further object to this Interrogatory, which seeks post-judgment discovery at the inception of the case, as premature.

The Defendants further object because this Interrogatory is overly broad and unduly burdensome because it seeks all "payments" over a 10-year period without limitation to time frame or subject matter. It is especially overly broad and unduly burdensome because it seeks "the date" and "the amount" and "the method of payment" and "detailed reason" for each payment. To this end, the Defendants object because this information is better obtained through documents produced by the other Defendants and through the myriad subpoenas issued by the FTC to the various banks of the Defendants. If the FTC wants to track the flow of monies from the Lending Defendants, it can obtain that

11

information from the Lending Defendants, whose bank accounts would contain all of the relevant information at issue in the case.  Seeking to uncover peripheral financial dealings of the secondary defendants, even if they are part of an alleged common enterprise, is unnecessary and is only done to harass and annoy the Defendants.

Subject to and without waiving the foregoing objections, and in line with how the FTC has chosen to respond to discovery throughout this matter, the Defendants rely on Federal Rule 33(d) to refer the FTC to the following ranges of documents that include bank statements obtained by the FTC using subpoenas.  The Defendants cannot conclusively represent that these document ranges contain responsive documents, and that is precisely the point.  Interrogatory Nos. 3 and 4 presuppose that the Defendants have the ability to track every payment to/from them over a 12-year period, but this would require the Defendants to comb through every line of every bank statement.  The added request for "a detailed reason" for each and every payment over this 12-year period adds an additional layer of impossibility.  In any event, the burden of searching the bank statements is the same for the FTC as it is for the Defendants.  In fact, the following bank statement documents were not in the possession of the Defendants, but rather were obtained by the FTC itself directly from the banks using subpoenas (which is why the Bates labels for these document ranges begin with "FTC").  For all of these reasons, the FTC is equally capable of searching these bank statements:

o   Blue Ridge Bank and Trust (FTC_BlueRidge_0000001 – FTC_BlueRidge_0000001)
o   Brotherhood Bank (FTC_Brotherhood_0000001 – FTC_Brotherhood_0002224)
o   Central States Capital Markets (FTC_CSCM _0000001 – FTC_CSCM_0005804)
o   Country Club Bank (FTC_CountryClub_0000001 – FTC_CountryClub_0000261)
o   First Citizen's Bank (FTC_FirstCitizens_0000001 – FTC_FirstCitizens_0000002)
o   First International Bank & Trust (FTC_Watford_0000001 – FTC_Watford_0001193)
o   First National Bank (FTC_FirstNational_0000001 – FTC_FirstNational_0000001)
o   Midwest Trust Company (FTC_MidwestTrust_0000001 – FTC_MidwestTrust_0000471)
o   PANO Advisors (FTC_PANO_0000001 – FTC_PANO_0000228)
o   Pershing (FTC_Persh_0000001 – FTC_Persh_0001076)
o   Plains Capital Bank (FTC_PlainsCap_0000001 – FTC_PlainsCap_0000005)
o   Security Bank (FTC_SecurityBank_0000001 – FTC_SecurityBank_0000001)
o   TD Ameritrade (FTC_TDBank_0000001 – FTC_TDBank_0006369)
o   The Banker's Bank (FTC_Bankers_0000001 – FTC_Bankers_0000013)
o   Valley View Bank (FTC_ValleyView_0000001 – FTC_ValleyView_0000879)
o   Welch State Bank (FTC_Welch_0000001 – FTC_Welch_0007060)
o   Bay Cities Bank (FTC_BayCities_0000001 - FTC_BayCities_0005308)
o   TD Bank (FTC_TDB_0000001 - FTC_TDB_0000001)
o   US Bank documents received from FTC on 9.24.14 that are not Bates labeled.
o   (The FTC also issued subpoenas to Commerce Bank (in Kansas City, MO); M&I Bank (in Brookfield, WI); First National Bank of Omaha; and Freedom Bank (in Overland Park, KS), but the Defendants are not aware that a production of bank statements from any of these banks was made in this case.  The Defendants reached

out to confirm this with the FTC but did not hear back in time to comply with the FTC's meet/confer deadline.)  (Singhvi Decl. Att. Q at 2/2/15 email (Corporate Tucker Defendants' supplemental response to FTC interrogatories); *see also* Singhvi Decl. Att. N (original responses to FTC interrogatories).)

The FTC propounded similar interrogatories to Scott Tucker and Blaine Tucker.  The original interrogatory to Scott Tucker was:

**ORIGINAL INTERROGATORY 6**

Identify all of Your payments to or from any other Defendant, Relief Defendant, or Associated Person, including in-kind payments and purchases of goods and services, including the amount, date, method of payment, and the reason(s) therefor. Exclude payments to Kim Tucker valued at less than $5,000. (Singhvi Decl. Att. O, Plaintiff's First Set of Interrogatories to Defendant Scott Tucker .)

The original interrogatory to Blaine Tucker was:

**ORIGINAL INTERROGATORY 6**

Identify all of Your payments to or from any other Defendant, Relief Defendant, or Associated Person, including the amount, date, method of payment, and the reason(s) therefor. (Singhvi Decl. Att. O, Plaintiff's First Set of Interrogatories to Defendant Blaine Tucker.)

**RESPONSE TO INTERROGATORY 6**

Mr. Tucker objects to this Interrogatory as compound.  Mr. Tucker further objects to this Interrogatory because it seeks information that is not relevant to any party's claim or defense.  Based on the Complaint filed by the FTC, this Interrogatory simply has no meaningful bearing on any of the causes of action alleged in the Complaint for violations of the FTC Act, TILA, or the EFTA by the Tribal Lending Defendants.  The Complaint focuses almost entirely on pure legal issues of contract interpretation involving lending documents of the Tribal Lending Defendants; no claim asserted by the FTC has any nexus to the information sought by this Interrogatory.  Nor do any of the causes of action alleged in the Complaint require the FTC to be privy to Mr. Tucker's personal financial information over the last ten years.  Mr. Tucker also objects because this Interrogatory seeks information unrelated to the FTC's ability to pursue equitable remedies under Section 13(b) of the FTC Act.  Mr. Tucker further objects to this Interrogatory, which seeks post-judgment discovery at the inception of the case, as premature.

Mr. Tucker further objects because this Interrogatory is facially overly broad and unduly burdensome because it seeks all "payments" over a 10-year period without limitation to time frame or subject matter.  It is especially overly broad and unduly burdensome because it seeks "the date" and "the amount" and "the method of payment" and "the reason[s]" for each payment.  To this end, Mr. Tucker objects because this information is better obtained through documents produced by the other Defendants and through the

myriad subpoenas issued by the FTC to the various banks of the Defendants.  (Singhvi Decl. Att. P.)

Eventually, the FTC narrowed interrogatories 3 and 4 to the Corporate Tucker Defendants, and interrogatory 6 to Scott Tucker and Blaine Tucker, as follows:

**MODIFIED INTERROGATORY 3 (INTERROGATORY 6.A TO INDIVIDUALS)**
Identify any payments, including in-kind payments and purchases of goods and services, made to You, on your behalf, or for Your benefit, by AMG Services, Inc., Red Cedar Services, Inc., MNE Services, Inc., or SFS, Inc., including, for each payment, the amount of payment, date of payment, method of payment, and reason for payment.  If you received more than 10 such payments from any of the four listed payors, you may answer on an annualized basis, stating, for the applicable payor(s), the year, the amount received during the year, the number (or approximate number) of payments in the year, the method(s) of payment, and reason(s) for the payments.  (Singhvi Decl. Att. K at 2/5/15 email § 2.)

**MODIFIED INTERROGATORY 4 (INTERROGATORY 6.B TO INDIVIDUALS)**
Identify any payments, including in-kind payments and purchases of goods and services, made by You to, or for the benefit of, AMG Services, Inc., Red Cedar Services, Inc., MNE Services, Inc., or SFS, Inc., including, for each payment, the amount of payment, date of payment, method of payment, and reason for payment.  If you made more than 10 such payments to any of the four listed payees, you may answer on an annualized basis, stating, for the applicable payee(s), the year, the amount received during the year, the number (or approximate number) of payments in the year, the method(s) of payment, and reason(s) for the payments.  (Singhvi Decl. Att. K at 2/5/15 email § 2.)

The FTC proposed that the revised interrogatories 3 and 4 apply to all Tucker Defendants (corporate and individual), and all of the Tucker Defendants stood on their objections.  (Singhvi Decl. Att. K at 2/11/15 and 2/16/15 emails.)

> **1.      The Relevance Of The Requests And The Tucker Defendants' Objections**

The threshold relevance of these interrogatories is self-evident and the same as with the earlier Level 5 and BA Services discussions:  they are designed to identify and explore the reasons for many transfers of value from the Lending Defendants to the Tucker Defendants, thereby supporting the common enterprise claims, individual liability for Scott Tucker and Blaine Tucker, and, potentially, to aid in calculating monetary relief.  (*See supra* p. 2.)

The Tucker Defendants object to these interrogatories on three grounds, none of which has merit. *First*, they contend that the interrogatories are "compound." However, "interrogatory subparts are to be counted as part of but one interrogatory . . . if they are logically or factually subsumed within and necessarily related to the primary question." *See Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 686 (D. Nev. 1997) (holding that an interrogatory does not have distinct subparts where "subsequent questions in each interrogatory are necessary to complete the details required in the identification."). The FTC's interrogatories are not compound because their subparts are "factually subsumed and necessarily related to the primary question" pertaining to identification of payments. *See id.* at 685. Questions regarding the dates, amounts, methods, and reasons for those payments do not "stand alone" and Defendants could not "fully and completely" identify such payments without answering these secondary questions. *See id.* at 686 (holding that two questions constitute separate interrogatories if the "first question can be answered fully and completely without answering the second question"). Even if these interrogatories were compound, which they are not, a party cannot refuse to answer an interrogatory on the basis that it is supposedly compound unless the permitted number of interrogatories has been exceeded. *See id.* at 687 (ordering party to respond to interrogatories that contained several subparts as long as total number of permitted interrogatories was not exceeded).

*Second*, the Tucker Defendants object that the interrogatories "seek[] information that is not relevant to any party's claim or defense" because "[t]he Complaint focuses almost entirely on pure legal issues of contract interpretation involving lending documents of the Tribal Lending Defendants." This objection wholly ignores the distinction between Phase I and Phase II in this case. The legality of the conduct at issue was resolved in Phase I. (ECF No. 584.) In Phase II, these Defendants' participation in a common enterprise and the roles of Scott Tucker and Blaine Tucker are squarely at issue.

*Third*, the Tucker Defendants object that the interrogatories are "overly broad and unduly burdensome because [they seek] all 'payments' over a 10-year period without limitation to time

frame or subject matter" and "this information is better obtained through documents produced by the other Defendants and through the myriad subpoenas issued by the FTC to the various banks of the Defendants." (Singhvi Decl. Att. Q at 2/2/15 email.)  The Tucker Defendants complain generally about the duration of the interrogatories, but they do not provide any information about their supposed burden including whether any responsive payments were made by each of them – or any of them – for the requested period.  Moreover, as demonstrated below, many of the corporate Tucker Defendants did not come into existence until later in the requested time frame, mitigating or eliminating this supposed burden:

- AMG Capital was formed in 2007 and has never conducted business.  (Singhvi Decl. Att. N. (AMG Capital Resp. to Interrog. 1).)  The Tucker Defendants do not explain why a company that never did business would have an overly burdensome quantity of payments to account for, and how the duration of the request could pose a burden.

- Level 5 was formed in 2007 and thus has existed for less than eight years, not 12 years as claimed.  (Singhvi Decl. Att. N. (Level 5 Resp. to Interrog. 1).)  The Tucker Defendants have not explained why this racing company is unable to tally and explain the payments it received at the very direction of its founder.

- LeadFlash was formed in 2010 (Singhvi Decl. Att. N. (LeadFlash Resp. to Interrog. 1)), and therefore cannot credibly claim any burden posed by the duration of the request.

The Tucker Defendants also complain that there is no "subject matter" limitation to the interrogatory.  This objection is nonsensical because the FTC seeks to learn about all payments from the Lending Defendants to the Tucker Defendants regardless of their subject matter.  In fact, payments made by the Lending Defendants for the Tucker Defendants' personal expenditures (*e.g.*, Scott Tucker's vacation mansion, Scott Tucker's and Blaine Tucker's luxury automobiles, etc.), may be *more* probative of Scott Tucker's and Blaine Tucker's individual control over the enterprise.  In any event, recognizing that the number of payments to the Tucker Defendants is likely voluminous, the FTC modified the interrogatories to alleviate any burden associated with identifying the transactions individually by allowing Defendants to identify payments on an annualized basis.  In spite of this modification, the Tucker Defendants still improperly refuse to identify any in-kind

payments or purchases of goods or services on their behalf and still improperly refuse to identify the reason for Lending Defendants' vast transfers of wealth to them.

In short, the Tucker Defendants fail to meet their "heavy burden" in opposing this request because they fail to provide any support for their contention that they are unable to provide the requested information, even on an annualized basis. Their objections are further without merit because they are stated collectively, without regard to the fact that the supposed burden posed by the interrogatories obviously varies among the different Tucker Defendants.

### 2.      Rule 33(d) Requirements

Beyond their meritless objections, the Tucker Defendants attempted to respond to these interrogatories by reference to documents pursuant to Rule 33(d).

Rule 33(d) allows a party to "answer an interrogatory by specifying records from which the answers may be obtained and by making the records available for inspection," *Rainbow Pioneer No. 44–18–04A v. Hawaii–Nevada Inv. Corp.*, 711 F.2d 902, 906 (9th Cir. 1983), "if the burden of deriving or ascertaining the answer will be substantially the same for either party . . . ." Fed. R. Civ. P. 33(d). But this allowance is not unlimited. The rule "was amended in 1980 to prevent abuse of the business records option," whereby responding parties direct propounding parties to a "mass of business records." *Id.*; Rule 33(c) 1980 Advisory Committee's Notes.[6] Courts have agreed on several well-established limitations to a party's entitlement to employ a Rule 33(d) answer rather than a traditional answer.

*First*, the party answering the interrogatory "must affirm that the information sought by the interrogatory in fact is available in the specified records." Charles Allen Wright, Arthur R. Miller, *et al.*, 8B *Federal Practice & Procedure* § 2178 (3d ed. 2010) ("Wright & Miller")*; see also Chudacoff v. Univ. Med. Ctr.*, No. 2:08–cv–00863–RCJ–GWF, 2013 WL 1737201, at *2 (D. Nev. Apr. 22,

---

[6]    Rule 33(d) was enumerated as Rule 33(c) before the 1993 amendments to Rule 33.

17

2013) ("A party who seeks to rely upon the Rule [33(d)] must … certify that the answer may be found in the records referenced by it…")  A party may not invoke Rule 33(d) if "the answer 'might' be found in the records."  *Sabel v. Mead Johnson and Co.*, 110 F.R.D. 553, 555 (D. Mass. 1986).[7]

 *Second*, "the information [must] be obtainable from the records of the responding party, not those of somebody else."  Wright & Miller § 2178.[8]

 *Third*, a party may only provide a Rule 33(d) answer in "situations in which answering the interrogatory would impose a significant burden on the responding party."  Wright & Miller § 2178.  The Advisory Committee noted that the purpose of Rule 33(d) is to alleviate the burden of "interrogatories which require a party to engage in burdensome or expensive research into his own business records in order to give an answer."  Rule 33(c), 1970 Advisory Committee's Notes.  Rule 33(d) can only be invoked when answering the interrogatory would present a "significant burden."  Wright & Miller § 2178; *see also O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272, 277 (C.D. Cal. 1999) ("One 'prerequisite for invoking the Rule 33[(d)] option is that there be a burden on the

---

[7]  *See also Chudacoff,* 2013 WL 1737201, at *2 (party's 33(d) responses were inadequate where party only stated it "believe[d]" the records would contain the information requested, but did not certify that fact); *In re G–I Holdings, Inc.,* 218 F.R.D. 428, 438 (D.N.J. 2003) ("The option afforded by Rule 33(d) is not a procedural device for avoiding the duty to give information.... Rather, the responding party has a 'duty to specify, by category and location' the records from which he *knows* the answers to the interrogatories can be found." (emphasis added)); *Minter v. Wells Fargo Bank, N.A.*, 286 F.R.D. 273, 278 (D. Md. 2012) ("First, the responding party must affirm that the information sought is available in the specified records.").

[8]  *See also Davis v. Fendler*, 650 F.2d 1154, 1158 n. 3 (9th Cir. 1981) ("It is apparent that the records of the first four of these places [the state offices] do not qualify as appellant's 'business records.'"); *Georgia-Pacific LLC v. OfficeMax Inc.*, No. C 12–02797 LB, 2014 WL 843498, at *2 (N.D. Cal. Feb. 28, 2014) ("Many of the documents that Georgia–Pacific is producing are not its own documents, and so it cannot avail itself of Rule 33(d) for those documents."); *Vaught v. Clark*, No. 2:09–cv–3422 MCE CKD P, 2012 WL 5381518, at *3 (E.D. Cal. Oct. 31, 2012) (rejecting Rule 33(d) response referring to plaintiff's medical records because they were not "business records of the party upon whom the interrogatory has been served" (internal quotation omitted).)

1    interrogated party if it were required to answer the interrogatories in the traditional manner.'"

2    (*quoting Sable*, 110 F.R.D. at 556).); *Minter*, 286 F.R.D. at 278  ("[T]he producing party must

3    demonstrate that answering the interrogatory in the more traditional manner . . . would impose a

4    burden.").

5        *Fourth*, "the burden of deriving or ascertaining the answer [from the business records must] be

6    substantially the same for either party."  Fed. R. Civ. P. 33(d).  A party's familiarity with its own

7    records can be crucial for determining whether the burden of deriving the answer is the same for

8    each party.  *See*, *e.g.*, *Donell v. Fidelity Nat'l Title Agency of Nevada*, No. 2:07–cv–00001–KJD–

9    PAL, 2012 WL 1118944, at *7 (D. Nev. Apr. 2, 2012) ("A party is generally charged with

10   knowledge of the contents of records available to it."); *O'Connor*, 185 F.R.D. at 278 ("Without

11   detailed specification by category and location of responsive documents, the burden of deriving the

12   answers to the interrogatories is not the same for the parties; rather, it would be easier for persons

13   employed by the defendants to locate responsive documents.").[9]  The effort that the answering party

14   already dedicated towards analyzing the designated documents and the effort the answering party

15   will, in the future, dedicate towards analyzing the designated documents also affect the calculus of

16   the parties' relative burdens.  *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. at 366 (citing

17   "familiarity of defense counsel" with documents as part of burden calculus); Wright & Miller § 2178

18   ("[W]hen the responding party has already culled the requested information from its records, as part

19   of its trial preparation or for other reasons, that may indicate that it would be substantially more

20   burdensome for the inquiring party to compile the information.").

21

22   [9]   *See also In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 366 (N.D. Ill. 2005) ("[T]he
        effort involved is not as great for the producing parties as it is for the plaintiffs, since the
23      former are more familiar with the documents than the plaintiffs.  Added to that familiarity is
        the familiarity of defense counsel, who have already undertaken at least one review of the
24      documents."); *T.N. Taube Corp. v. Marine Midland Mortg. Corp.*, 136 F.R.D. 449, 454
        (W.D.N.C. 1991) ("An important-often key-factor in weighing the respective burdens on the
25      parties is the interrogated party's familiarity with its own documents.").

26

*Fifth*, the answering party must "specify[] the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could," and produce the documents or make them available for inspection to the propounding party. Fed. R. Civ. P. 33(d).  The purpose of the 1980 amendment to Rule 33 was to emphasize that it is "an abuse of the option" for an answering party to "direct[] the interrogating party to a mass of business records or . . . offer[] to make all of their records available . . . ."  Rule 33(c) 1980 Advisory Committee's Notes.  The Advisory Committee has specified that "a responding party has the duty to specify, by category and location, the records from which answers to interrogatories can be derived." Rule 33(c) 1980 Advisory Committee's Notes; *see also Chudacoff,* 2013 WL 1737201, at *2 ("The responding party may not avoid answers by imposing on the interrogating party a mass of business records from which answers cannot be ascertained by a person unfamiliar with them. . . .  A party that attempts to rely upon Rule 33(d) with a mere general reference to a mass of documents or records has not adequately responded.") (internal citations and quotations omitted).

### 3.       The Tucker Defendants' Responses Do Not Comply With Rule 33(d)

When an interrogatory response citing Rule 33(d) is challenged, the party filing the motion to compel must "make a prima facie showing that the use of Rule 33(d) is somehow inadequate . . ." *RSI Corp. v. Int'l Bus. Machines Corp.*, 2012 WL 3095396, at *1 (N.D. Cal. July 30, 2012) (*quoting* Moore's Federal Practice–Civil § 33.105) (internal quotations omitted). .  Once that showing is made, "[t]he burden then shifts to the producing party to show that:  (1) a review of the documents will actually reveal answers to the interrogatories; and (2) the burden of deriving the answer is substantially the same for the party serving the interrogatory as for the party served."  *Id.*

The Tucker Defendants' responses are rife with deficiencies.  *First*, they fail the most basic requirement of Rule 33(d) – affirming that the records actually answer the question.  They write, "**The Defendants cannot conclusively represent that these document ranges contain responsive documents, and that is precisely the point.**"  (Singhvi Decl. Att. Q at 2/2/15 email (emphasis

added).)  By their own admission, the Tucker Defendants' response fails to satisfy Rule 33(d).  *See* note 7, *supra*, and accompanying text.  Not only do the Tucker Defendants affirmatively admit that the records might not answer the questions posed, they simply regurgitate a list of document ranges associated with financial institutions' productions.  Those documents do not contain all the information requested by the FTC.  First, one cannot identify from those records payments made via other channels, including in-kind or indirect payments.  Second, in many cases, one cannot identify from those records the *reasons* for any payments, even if some details for those payments are apparent.

*Second*, the Tucker Defendants' improperly referenced documents belong to other persons and are not the Tucker Defendants' own "business records."  This is not compliant with Rule 33(d).  *See* note 8, *supra*, and accompanying text.

*Third*, the Tucker Defendants did not establish that "answering the interrogator[ies] would impose a significant burden on the responding party."  Wright & Miller § 2178.  None of the Tucker Defendants provided a basis for their burden objection other than to refer to the maximum time period any of the Tucker Defendants were in business.  As demonstrated above (*supra* p. 16), the Tucker Defendants' burden and timeframe arguments are overblown.  In addition, the FTC modified its interrogatories to allow for answers on an annualized basis (and with general descriptions for reasons for the payments) to the extent that the number of payments was voluminous.

*Fourth*, the burden on the FTC to derive responsive information from the records is not "substantially the same for either party."  Fed. R. Civ. P. 33(d).  As noted above, the FTC cannot ascertain the existence of payments through methods other than bank transfers, in-kind payments, or the reason for payments from the documents identified.

*Fifth*, the Tucker Defendants each indiscriminately identified every bank document produced in this case, regardless of whether the documents included payments to or from that defendant or any Tucker Defendant.  This violates this Court's holding that "[a] party that attempts to rely upon Rule 33(d) with a mere general reference to a mass of documents or records has not adequately

21

responded." *Chudacoff*, 2013 WL 1737201, at *2; *see also*, *Rainbow Pioneer*, 711 F. 2d at 906 (affirming sanctions where responding party stated "that the answers could be found 'in partnership books of accounts, banking accounts, records, computer printouts, ledgers and other documents. . .'" because the response "did not specify where in the records the answers could be found."); *Donell*, 2012 WL 1118944, at *10 (where plaintiff's interrogatory response "essentially consist[ed] of a response to read the documents and figure it out for yourself," this Court granted the defendant's motion to compel and precluded the plaintiff from giving evidence regarding the subject of the interrogatory).

The Tucker Defendants' purported Rule 33(d) answers failed to satisfy each requirement of Rule 33(d). If these Defendants are incapable of providing a compliant Rule 33(d) answer with reference to documents, they should be compelled to answer the interrogatory in the ordinary manner. *See L.H. v. Schwarzenegger*, 2007 WL 2781132, at *3 (E.D. Cal. Sept. 1, 2007) ("If the party can not identify which specific documents contain the answer to the interrogatories, they must completely answer the interrogatories without referring to the documents.").

## II.   The Tucker Defendants Should Produce Select Documents From Within Their Grand Jury Productions, And Kim Tucker Should Produce Her Tax Returns

Although the parties have resolved some of the open matters discussed in the Court's latest discovery order (ECF No. 722), two disputes remain:  the Tucker Defendants' production of documents previously produced to grand juries, and Kim Tucker's production of tax returns.

### A.   The Tucker Defendants Should Produce Documents Pursuant To The FTC's Modified Request, Which Narrowly Seeks Documents Related To Four Subtopics

In response to the Court's order, and considering in particular the limits of party-controlled discovery and the Ninth Circuit's decision in *United States v. Dynavac, Inc.*, 6 F.3d 1407 (9th Cir. 1993) (ECF No. 722 at 19), the FTC now proposes a narrowed request tied to four subtopics.

The FTC's original request was posed as follows:

> For the period January 1, 2010 to present, all documents produced by You in connection with any grand jury proceeding (excluding documents produced by You in this case). (Singhvi Decl. Att. R (FTC's 2nd Document Requests to Scott Tucker, No. 3).)

The Tucker Defendants' response to the original request was as follows:

> Mr. Tucker objects to this request because, even if a grand jury has convened, this request would invade the province of that grand jury and would contravene the applicable Rules of Criminal Procedure. The numerous policy reasons supporting the secrecy of grand juries and the limitations on the use of information obtained through a grand jury subpoena would be subverted if the FTC, or other civil plaintiffs, could simply issue a document request for materials provided to the grand jury. Moreover, in any event, the FTC attorneys would not be authorized recipients of any such records. Finally, Mr. Tucker objects to this request as overly broad because this request fails to limit the "grand jury proceedings" to those related to any issue in this suit. As a result, this request would encompass any grand jury proceeding regardless of its subject matter. (Singhvi Decl. Att. S (Scott Tucker's Response to FTC's 2nd Document Requests, No. 3).[10])

The parties could not resolve their differences on this request, and the FTC moved to compel. The Court denied the motion to compel, first holding that it exceeded the limits of party-controlled discovery because, framed as a request for any grand jury production, it was not sufficiently tailored to "any party's claim or defense." (ECF No. 722 at 11.) Second, the Court addressed whether the documents were prohibited entirely from disclosure by the Federal Rules of Criminal Procedure and the Ninth Circuit's decision in *Dynavac*. (*Id.*) The Court held that the Tucker Defendants were not precluded under the rules from disclosing grand jury materials. (*Id.*[11]) But the Court ruled that, under *Dynavac*, production of documents previously produced to a grand jury must be limited to documents "sought for their own sake" and not to "learn what happened before the grand jury." (*Id.* at 12.) In this respect, too, the Court found the FTC's request problematic, not because it referenced

---

[10] The FTC posed identical requests (and received identical responses) from the other Tucker Defendants.

[11] *Accord Oracle Corp. v. SAP AG*, 566 F. Supp. 2d 1010, 1011 (N.D. Cal. 2008) ("Witnesses are not under the obligation of secrecy."); *In re Graphics Processing Units Antitrust Litigation*, No. C 06-07417 WHA, 2007 WL 2127577, at *2 (N.D. Cal. Jul. 24, 2007) (defendants "are *not* in the Rule 6(e) list. They are free to reveal the subpoena itself as well as all documents produced in response to it.") (emphasis in original).

a "grand jury" specifically, but because it was posed in a way to suggest that the FTC sought the documents because they were submitted to a grand jury.  (*Id.* at 13 & n.9.)

In light of the Court's ruling, the FTC has proposed to limit its request, as follows (modifying language emphasized):

> For the period January 1, 2010 to present, documents produced by You in connection with any grand jury proceeding (excluding documents produced by You in this case) *concerning (i) the receipt and use of funds generated from defendants' lending operations, (ii) transfers of funds between or among defendants, (iii) Scott Tucker's role with, or control of, any Defendant, (iv) or Blaine Tucker's role with, or control of, any Defendant.*  (Singhvi Decl. Att. K, 2/5/15 email exchange among counsel at 1.c).)

The Tucker Defendants rejected this proposal.  (*Id.* at 1.d.)

The FTC respectfully submits that its modified request complies with the Court's instruction to consider the limits of party-controlled discovery and *Dynavac*.

First, as to the limits of party-controlled discovery, the FTC's modified request complies because it restricts the request to four narrow subtopics that are directly relevant to the most pertinent issues in phase two (excepting calculation of consumer injury):  the commingling of funds among the defendants and the role and involvement of the two remaining individual defendants.  The request is now tailored – in accord with familiar standards of FTC Act liability previously acknowledged by the Court – to specifically seek documents pertaining to Scott Tucker and Blaine Tucker's role with the corporate defendants, along with details regarding the disposition of earnings and revenues from the unlawful lending operations and other transfers among the defendants.  These subtopics are designed to address the FTC's claims that Scott Tucker and Blaine Tucker are individually responsible for the conduct deemed unlawful by the Court via their personal participation in the acts and their control of the entities.  *See FTC v. Ivy Capital, Inc.*, No. 2:11–CV–283 JCM (GWF), 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013) (discussing standard for individual liability under the FTC Act)  They also relate to the FTC's claims that the corporate defendants operated as a common enterprise by, among other things, operating through a maze of

24

interrelated entities, commingling funds with one another, and maintaining no real distinction among them.  (ECF No. 722 at 6 (listing common enterprise factors, citing *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011), *aff'd in part, vacated on other grounds by* 763 F.3d 1094 (9th Cir. 2014).)  Notably, *these same four subtopics* appear to have resolved the parties' differences regarding the disputed communications request previously addressed by the Court.  (Singhvi Decl. Att. K, 2/5/15 email exchange among counsel at 1.b.).)  Yet the Tucker Defendants balk at applying the same compromise to the grand jury production request.  (*Id.* at 1.d.)

Second, in accord with *Dynavac*, the FTC seeks to compel production from within the Tucker Defendants' grand jury productions, not because the FTC desires to learn about the grand jury's deliberations, but because the documents sought are relevant to the claims and issues (individual liability and common enterprise) discussed above.  *Dynavac*, 6 F.3d at 1411 ("[I]t is not the purpose of the Rule to foreclose from all future revelation to proper authorities the same information or documents which were presented to the grand jury.").  The FTC does not seek any grand jury transcripts, or any documents specifically created for, or by, any grand jury; instead, the FTC seeks ordinary course documents existing prior to any such subpoena.  *Id.* at 1412 ("The fear of compromising future grand jury proceedings is further reduced when the request is for business records created for purposes independent of grand jury investigations, which have legitimate uses unrelated to the substance of the grand jury proceedings.").  The Tucker Defendants have consistently complained that the FTC's requests for documents regarding the roles of the individual defendants and the thousands of transactions among the corporate defendants will require exhaustive "keyword" searches through hundreds of thousands of documents.  Because the FTC's request is limited to existing document productions, the Tucker Defendants can readily examine a previously-arranged, finite production of non-privileged documents to determine which documents among those

are relevant to the identified subtopics.[12]  The FTC's request does not aim to uncover what happened before the grand jury; it aims to limit the universe of documents that must be searched.

### B.   The FTC Has A Compelling Need For Production Of Kim Tucker's Tax Returns Because Mrs. Tucker Will Not Confirm Whether Her Substantial Payments From The Corporate Defendants Were Earned Or Unearned

The FTC moved to compel tax returns from relief defendant Kim Tucker because she is the recipient of millions of dollars from the alleged common enterprise, and her tax returns would, among other things, address whether she earned any of the substantial payments made to her.  It would be unfair for Mrs. Tucker to resist disgorgement by claiming that any payments by the corporate defendants to her were earned, but simultaneously block access by the FTC to her tax returns to evaluate that defense.

The FTC's request was as follows:

> All Your Financial Statements[13] and tax returns.  (Singhvi Decl. Att. T, FTC Document Requests to Kim Tucker, No. 11).)

Kim Tucker responded as follows:

> Relief Defendant objects to this Request on the basis that it is overly broad in time and scope, is vague and ambiguous as to the term "sufficient" documents, it seeks information not relevant to any claim against Relief Defendant and not reasonably calculated to lead to the discovery of admissible evidence, and seeks information unrelated to and outside the scope of equitable relief that Plaintiff may pursue under Section 13(b) of the FTC Act. This Request is also an attempt to obtain post-judgment discovery and is premature. In addition, tax returns are generally discoverable only if the information is relevant and "not otherwise available." See e.g. Hackett v. Feeney, No. 2:09-cv-02075- RLH- LRL, 2011 WL 4433663 (D. Nev. Sept. 22, 2011); KeyBank Nat'l Ass'n v. Nielson, No. 2:10-cv-00352-PMP-

---

[12]   *See Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 59 (E.D. Pa. 1980) (ordering production of documents previously produced to a grand jury and noting that "[s]ince the documents in question have already been identified and sorted, compliance with this request should impose only a minimal burden upon the defendants").

[13]   The Court previously denied the FTC's motion to compel financial statements as moot, accepting Kim Tucker's representation that she has none.  (ECF No. 722 at 16 & n.11.)

LRL, 2011 WL 2036975, at *3 (D. Nev. May 24, 2011); Taser Int'l, Inc. v. Stinger Systems, Inc., No. 2:09-cv-00289-KJD-PAL, 2010 WL 5070929, at *4 (D. Nev. 2010).  (Singhvi Decl. Att. U, Kim Tucker Responses to FTC Document Requests, No. 11).)

The Court held that tax returns are not privileged and therefore discoverable, but protected from disclosure for public policy reasons.  (ECF No. 722 at 16-17.)  Specifically, the Court followed *Aliotti v. Vessel Senora*, 217 F.R.D. 496, 497 (N.D. Cal. 2003) and held that tax returns may be ordered for production if they are relevant, and upon a showing of compelling need and that the information is not otherwise available.  (ECF No. 722 at 17.)  The Court then denied the FTC's motion to compel tax returns, finding under the second and third *Aliotti* requirements that the FTC failed to demonstrate a compelling need for the documents and that the information was otherwise unavailable.  (*Id.*)

The Court granted leave to the FTC to file a renewed motion on this issue.  (*Id.*)  The Court did not specifically order the FTC to confer with Kim Tucker before refiling (*id.*), but the FTC nevertheless conferred with Mrs. Tucker and offered to withdraw the request if she would identify any corporate entities owned by her and identify any payments she received from the corporate defendants that were earned (except to the extent reflected in the W2 tax forms she previously produced).  (Singhvi Decl. Att. V, 2/20/15 email exchange among counsel.)  Mrs. Tucker confirmed that she only owns one business, but refused to confirm whether her payments were earned.  (*Id.*)

As outlined above, the Court under *Aliotti* should uphold the FTC's request if the documents are relevant, if the FTC has a compelling need, and if the information is not otherwise available.

The Court previously held that the FTC's request for Mrs. Tucker's tax returns seeks relevant information, as the documents would tend to demonstrate commingling of funds among the Lending Defendants, Tucker Defendants, and Relief Defendants.  (ECF No. 722 at 14.)  And the FTC's need for Mrs. Tucker's tax returns is even more urgent now that Mrs. Tucker is refusing to specify whether she earned any of the substantial payments made to her by the other corporate defendants. (Singhvi Decl. Att. V, 2/20/15 email exchange among counsel.)

The FTC has a compelling need for Mrs. Tucker's tax returns, and has exhausted efforts to obtain the information sought from other sources, for the following reasons.

Mrs. Tucker, a relief defendant, is liable in this action to the extent that (i) she received ill-gotten gains and (ii) does not have a legitimate claim to those assets (her knowledge of or participation in the wrongdoing is not required for recovery). *See Ivy Capital*, 2011 WL 2118626, at *4. Specifically, the FTC contends that Mrs. Tucker's husband, Scott Tucker, has caused the Lending Defendants and the Tucker Defendants to make substantial unearned payments derived from their unlawful lending activities directly to Kim Tucker, to others on her behalf, and to entities owned by her.

To support this claim, the FTC has sought to examine the financial dealings of the Defendants. As previously demonstrated, Mrs. Tucker has received millions in payments from the corporate defendants, either in outright payments, for the payment of her income taxes, or toward the purchase, furnishing, property tax, and maintenance of her Aspen, CO mansion. (Exs. 27-29 to FTC's 10/24/14 Mot. to Compel (ECF No. 691) (filed under seal).) Moreover, the FTC has learned that Defendants, principally at Scott Tucker's direction, have opened and closed at least 265 different accounts at least 18 different financial institutions. (ECF No. 691-1 ¶ 3 (Decl. of FTC Investigator).)

To aid in its review of the volumes of transaction data from those counts, the FTC earlier in this proceeding posed to all defendants and relief defendants interrogatories calling upon them to identify their payments to one another, including the reasons for such payments. All defendants and relief defendants claimed that the burden posed by those interrogatories was too daunting, and the FTC has attempted, with some success, to accept various compromises (*e.g.*, production of documents and revised interrogatory responses) to obtain the same information. But the principal *beneficiaries* of those payments, the Tucker Defendants and Mrs. Tucker, have most zealously attempted to avoid full disclosure of those payments.

The FTC's attempt to obtain this information from other sources extends beyond the interrogatories as well. Most recently, the FTC offered to withdraw its tax return request if Mrs.

28

1   Tucker would provide salient information available in those returns:  the identification of businesses

2   wholly owned by her, and, more importantly, the extent to which payments she received were

3   *earned*.  (Singhvi Decl. Att. V.)   Mrs. Tucker answered the former query, but would not confirm

4   that the only earned payments she received from the corporate Defendants are reflected in her

5   produced W2s.  (*Id*.)  This means that Mrs. Tucker is likely harboring a defense that some of the

6   payments she received from the corporate defenses were earned – *i.e.,* that she has a purported

7   "legitimate claim" to them under the relief defendant standard of liability – even as she prevents the

8   FTC from examining her tax returns which would tend to corroborate or refute any such contention.

9        In sum, the FTC respectfully submits that it has a compelling need to access Mrs. Tucker's tax

10   returns to assess Mrs. Tucker's anticipated defense that some of the substantial payments made to

11   her by the corporate defendants were earned, and to aid the FTC in analyzing the vast amounts of

12   transactional data present in the productions from Defendants' financial institutions.  The FTC also

13   submits that it has a made a reasonable, but unsuccessful attempt to obtain this information by other

14   means.

15                                   **CONCLUSION**

16        For the foregoing reasons, the Court should compel production of the documents and

17   information addressed in this motion.

                                            Respectfully submitted,
18
19   Dated:  February 24, 2015                */s/ Nikhil Singhvi*
                                            Nikhil Singhvi
20                                          Jason D. Schall
                                            Helen P. Wong
21                                          Ioana Rusu
                                            LaShawn M. Johnson
22                                          Courtney A. Estep

23
                                            ***Attorneys for Plaintiff***
24                                          ***Federal Trade Commission***

25

26

                                            29

### CERTIFICATE OF SERVICE

I, Nikhil Singhvi, certify that, as indicated below, all parties were served with the **FTC'S MOTION TO COMPEL** filed with the Court, as indicated below.  Under seal exhibits were served by email to the parties (except the intervenor).

Dated:  February 24, 2015

*/s/ Nikhil Singhvi*
Nikhil Singhvi

**Via Electronic Case Filing**:

Joshua M. Dickey (jdickey@baileykennedy.com)
*Attorney for Red Cedar Services, Inc. dba 500FastCash; SFS, Inc. dba OneClickCash*

Conly J. Schulte (cschulte@ndnlaw.com)
Francis J. Nyhan (jnyhan@ndnlaw.com)
Nicole Ducheneaux (nducheneaux@ndnlaw.com)
*Attorneys for Defendants Red Cedar Services, Inc. dba 500FastCash; SFS, Inc. dba OneClickCash*

Von S. Heinz (vheinz@lrrlaw.com)
Darren J. Lemieux (dlemieux@lrrlaw.com)
E. Leif Reid (lreid@lrrlaw.com)
Jeffrey D. Morris (jmorris@berkowitzoliver.com)
Ryan C. Hudson (rhudson@berkowitzoliver.com)
Nick J. Kurt (nkurt@berkowitzoliver.com)
*Attorneys for Defendants AMG Capital Management, LLC; Level 5 Motorsports, LLC; LeadFlash Consulting, LLC; Black Creek Capital Corporation; Broadmoor Capital Partners, LLC; Scott A. Tucker; Nereyda M. Tucker, as Executor of the Estate of Blaine A. Tucker*

Jay Young (jay@h2law.com)
*Attorney for Defendant for Robert D. Campbell*

Paul C. Ray (paulcraylaw@aol.com)
Alyssa D. Campbell (acampbell@laic-law.com)
*Attorneys for Defendant Troy L. LittleAxe*

Patrick J. Reilly (preilly@hollandhart.com)
Linda C. McFee  (lmcfee@mcdowellrice.com)
Robert Peter Smith (petesmith@mcdowellrice.com)
*Attorneys for Relief Defendants Kim C. Tucker and Park 269 LLC*

1

Nathan F. Garrett (ngarrett@gravesgarrett.com)
Whitney P. Strack (pstrack@gravesgarrett.com)
Kelly H. Dove (kdove@swlaw.com)
*Attorneys for Defendant Don E. Brady*

2

3

4

Sarah E. Belton (sbelton@publicjustice.net)
Craig B. Friedberg (cbfreidberg@justice.com)
*Attorneys for Intervenor Americans for Financial Reform*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

31