DANIEL G. BOGDEN
United States Attorney
District of Nevada
BLAINE T. WELSH
Assistant United States Attorney
Nevada Bar. No. 4790
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
Phone:  (702) 388-6336
Facsimile:  (702) 388-6787
Email:  Blaine.Welsh@usdoj.gov

DAVID C. SHONKA
Acting General Counsel
NIKHIL SINGHVI
JASON D. SCHALL
HELEN P. WONG
IOANA RUSU
COURTNEY A. ESTEP
THOMAS E. KANE
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mailstop CC-10232
Washington, D.C. 20580
Phone:  (202) 326-3480 (Singhvi)
Facsimile:  (202) 326-3768
Email:  nsinghvi@ftc.gov (Singhvi); jschall@ftc.gov (Schall)
*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AMG Services, Inc., et al.,<br><br>Defendants, and<br><br>Park 269, LLC, et al.,<br><br>Relief Defendants. | Case No. 2:12-cv-536<br><br>**OPPOSITION TO MOTION TO SET ASIDE ORDER ENFORCING ASSET FREEZE ORDER** |

**INTRODUCTION**

On March 31, 2016, the Court entered a preliminary injunction freezing all assets of Defendant Level 5 Motorsports, LLC ("Level 5"), requiring third parties with notice of the injunction to restrain those assets. (ECF No. 960, the "Asset Freeze Order".) On August 8, 2016, the FTC served the Asset Freeze Order on El Dorado,[1] requesting that it restrain a vehicle in El Dorado's possession purchased by Level 5. (Ex. 1.) El Dorado refused, ignoring the Asset Freeze Order and threatening to sell the vehicle by September 6, 2016. (Ex. 2.) To prevent El Dorado's unilateral action, the FTC sought, and the Court granted, an order enforcing the Asset Freeze Order as to the trailer. (ECF No. 1036, the "Order".)

Now, El Dorado seeks to set aside the Order, claiming that another preliminary injunction order is required by the Court to enforce the preliminary injunction order the Court already entered. El Dorado also seeks what amounts to a summary factual determination that it is the sole owner of the trailer, conveniently ignoring that Level 5 already paid for it. Indeed, the paperwork submitted by El Dorado in support of its ownership claim raises more questions than it answers.

In light of the factual and legal uncertainty surrounding the trailer, El Dorado's hurried attempt to set aside the Order fails to answer the principal questions currently before the Court: if there is no dispute that Level 5 paid for the trailer, why should El Dorado be permitted to declare itself the owner and sell the trailer, before the Court can fully consider the facts?

The Order merely restrains the trailer until the Court can have an opportunity to properly consider all the relevant evidence. Thus, the Court should deny El Dorado's motion to set aside the Order. Instead, the Court should enter the FTC's proposed discovery plan – filed concurrently herewith (ECF No. 1045) – for an orderly and expedited determination regarding the trailer's ownership.

**FACTS**

El Dorado boldly proclaims that the facts regarding ownership of the trailer are "straightforward and not subject to reasonable dispute." (ECF No. 1038 at 3.) That is not so. The only straightforward facts are that Level 5 ordered and paid for the Trailer. The rest of the facts – even as submitted by El

---

[1] "El Dorado" refers collectively to interested third parties El Dorado Trailer Sales, LLC and E.T.S. Ventures, LLC, which share the same principal owner, Dale Becker.

Dorado itself – are incomplete and internally inconsistent.  With the exception of the check images obtained by the FTC from Level 5 (Ex. 3), every fact discussed below comes directly from El Dorado.

In August 2014, Level 5 contracted with Bruce High Performance Transporters, LLC ("Bruce Transporters") to purchase an automobile transporter trailer (the "Trailer").  (ECF No. 1040-1 at 15-21.) The sales agreement specifies a purchase price of $589,680 (including tax) to be paid in a down payment and two installments.  (*Id.* at 15.)  Check images confirm that Level 5 made the payments (Ex. 3), and El Dorado – which now claims ownership of the Trailer – admitted that Level 5 paid for it.  (Ex. 4 ¶ 6 ("Level 5 had previously paid Bruce High Performance Trailers the purchase price for this trailer.").)

On December 31, 2015 – more than a year after Level 5 paid for the Trailer in full – Bruce Transporters sold certain of its assets to E.T.S. Ventures, LLC.  (*Id.* at ¶ 2.)

El Dorado insists that the Trailer was included among the assets sold (ECF No. 1040 at ¶ 14) and that, as a result, ownership of the Trailer passed to El Dorado, regardless of Level 5's earlier payment. But that claim runs counter to the actual text of the asset purchase agreement, which *does not include the Trailer in the sale*.  (ECF No. 1040-1 at 5-14.)  The asset purchase agreement references a specific "Exhibit 'A' Asset List" specifying which assets would be changing hands.  (ECF No. 1040-1 at 5, 11.) Importantly, El Dorado has never filed with the Court the "Exhibit 'A' Asset List" to the asset purchase agreement to corroborate its claim.  (ECF No. 1040-1 at 11.)  Only after inquiry from the FTC (Ex. 5) did El Dorado supply the asset list.  (Ex. 6.)  Upon inspection of the "Exhibit 'A' Asset List," *the FTC could find no mention of the Trailer among the assets purchased by El Dorado from Bruce Transporters.*  (*Id.*) Likewise, the Trailer is absent from the Exhibit B asset list of items retained by Bruce Transporters, presumably because Bruce Transporters had already sold the Trailer to Level 5.  (Ex. 7.)

To overcome this deficiency, El Dorado has now concocted a theory that that the Trailer was included in the sale as a "Work in Progress."  (ECF No. 1040 at ¶ 13, referencing ECF No. 1040-1 at 6.) But that term is undefined in the asset purchase agreement and appears only in Section 3 of the document, pertaining to the allocation of the purchase price, not in Section 1 (or the attached Exhibit A), which sets out the specific list of  "Purchased Assets" covered by the agreement.

El Dorado claims that Level 5's Trailer was incomplete and that Bruce Transporters likely used the funds from Level 5 payments to work on other projects.  (ECF No. 1040 at ¶¶ 7, 14.)  El Dorado further

claims that it incurred $281,000 in labor and materials to complete the Trailer. (*Id.* at ¶¶ 15-16.) But there is no allegation, much less proof, that Level 5 requested or authorized any work by El Dorado. Nor could there be, since El Dorado disclaims having had any contact with Level 5. (*Id.* ¶¶ 8-10.)[2]  In addition, the itemization of El Dorado's purported work on the Trailer bears a "Level 5" header. (ECF No. 1040-1 at 22-69 ("detail history report" lists "Level 5" at the top of each page and identifies customer on page 22 as "Level 5 Motorsports, LLC").) This reveals El Dorado's knowledge that the Trailer upon which the work was supposedly being performed belonged to Level 5, and not part of El Dorado's general inventory as a result of the asset purchase agreement.

Most charitably framed, El Dorado's position appears to be that Bruce Transporters sold the same Trailer twice, first to Level 5 pursuant to the sales agreement, and then to El Dorado pursuant to the asset purchase agreement. This is a dubious proposition, and certainly not one that El Dorado has proved conclusively enough at this stage to warrant El Dorado's unilateral sale of the Trailer.

The circumstances surrounding the origin, registration, and titling documents for the Trailer are also suspect, warranting further inquiry. Solely within El Dorado's *own* submission, several discrepancies are present. The VIN on the certificate of origin supplied by El Dorado (ECF No. 1040-1 at 70) is 4B9S53**S**14GP004030 (17 characters, emphasis added), but the VIN on the certificate of registration and title supplied by El Dorado (*id.* at 71) and excerpted in the body of its motion (ECF No. 1038 at 12) is 4B9S5314GP004030 (16 characters).[3]  Also, without explanation, El Dorado supplied at Dale Becker's Exhibit H a second certificate of registration and a second certificate of title for the trailer (ECF No. 1040-1 at 72), and the VINs on the two certificates of registration and title (*id.* at 71-72) do not match. Moreover, E.T.S. Ventures, LLC claims to have purchased the Trailer (ECF No. 1040 at ¶ 14), but without explanation (other than that the companies share ownership), a separate company, El Dorado Trailer Sales, LLC, attempted to title and register it. (Becker Aff. Exs. G and H.)

---

[2]   Likewise, Level 5 was not a party to the asset purchase or involved in any way in that agreement. (ECF No. 1041-1 at 5-10 (Level 5 not a party to, and not mentioned in, the asset purchase agreement); *see also* ECF No. 1040 at ¶¶ 9-10 (Becker stating that El Dorado has never contracted or interacted with Level 5.)

[3]   According to National Highway Traffic Safety Administration regulations, a vehicle identification number (VIN) must have 17 characters. 49 C.F.R. § 565.13(b).

Throughout its motion, El Dorado assails the FTC for its presentation of the facts in the FTC's emergency motion, going so far as to claim that the FTC "misdirect[ed] the Court" and obtained the Order under false pretenses.  (ECF No. 1038 at 12-13.)  The premise of that incendiary claim is that the FTC relied in part on representations made by Level 5 and El Dorado's counterparty, Bruce Hanusosky.  But the presence of those factual disputes supports, rather than undermines, the FTC's limited request to restrain the Trailer and commence an expedited factual discovery period (*see* ECF No. 1045) to properly resolve the matter.  More importantly, the foregoing analysis reveals that, *even under El Dorado's version of the facts*, its claim to ownership has glaring deficiencies.  The only undisputed and relevant fact before the Court is that Level 5 paid the full purchase price of the Trailer.  Notwithstanding that undisputed payment, the absence of the Trailer on the list of El Dorado's purchased assets, and the dubious origin/titling/registration documents, El Dorado would have the Court summarily award it permission to sell the Trailer by setting aside the Order.

## I.    The Court Properly Entered The Order Pursuant To The All Writs Act Because The Court Is Not Required To Issue A Second Preliminary Injunction To Enforce Its Earlier Preliminary Injunction

The Court's Order is authorized by the All Writs Act as well as the Court's inherent authority to fashion relief in cases in equity.

The Court's order enforcing its existing asset freeze order is a quintessential application of the All Writs Act.  28 U.S.C. § 1651(a).  The All Writs Act permits courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).  The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."  *U.S. v. N.Y. Telephone Co.*, 434 U.S. 159, 172 (1977).  Likewise, the Ninth Circuit has held "that a district court's 'powers under § 1651 should be broadly construed,'" *SEC v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 (9th Cir. 1981) (quoting *Hamilton v. Nakai*, 453 F.2d 152, 157 (9th Cir. 1972)), and echoing *N.Y. Telephone Co.*, that "[o]ne of the recognized applications of the All Writs Act is the issuance of orders necessary to ensure the integrity of orders previously issued."  *Nat'l Org. For The Reform Of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987).  This includes, of course, a previously issued

1   preliminary injunction order. *Id.* at 544 ("The appointment of a master to monitor compliance with the

2   preliminary injunction in the instant case validly applies the All Writs Act.").

3       In accord with that authority, the Order challenged here effectuates and prevents the frustration of

4   the Court's earlier Asset Freeze Order.  The Court issued a preliminary injunction freezing Level 5's (and

5   other Defendants') assets on March 31, 2016 to preserve the possibility of equitable monetary relief.  (ECF

6   No. 960.)  El Dorado is in possession of Level 5's asset and threatens to sell it.  The Court's Order (ECF

7   No. 1036) was therefore necessary to preserve the availability of the asset for equitable relief and prevent

8   the frustration of the Asset Freeze Order.

9       El Dorado's argument that the All Writs Act does not apply contradicts its other arguments as well

10  as controlling law.  *First*, El Dorado contends that the Court could not issue an injunction pursuant to the

11  All Writs Act "because other, adequate remedies at law exist, namely Fed. R. Civ. P. 65," (ECF No. 1038

12  at 6:17-18), but a few pages later argues that "**UNDER F.R.C.P. 65, THIS COURT LACKS**

13  **JURISDICTION**" to enjoin it (*id.* at 8:1-2) and "[t]he Court cannot find the 'active concert or

14  participation' requirement necessary to exercise jurisdiction over the Interested Parties."  (*Id.* at 9:1-2.)  El

15  Dorado cannot, to avoid application of the All Writs Act, simultaneously contend that an injunction

16  pursuant to Rule 65 is both available and unavailable.[4]

17      *Second*, El Dorado contends that an order that "preserve[s] the status quo and prevent[s] allegedly

18  irreparable injury" cannot be issued under the All Writs Act (ECF No. 1038 at 6:21-22 (quoting *Schiavo ex*

19  *rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005)), but the Supreme Court and Ninth Circuit

20  have held otherwise.  *See FTC v. Dean Foods Co.*, 384 U.S. 597, 604-05 (1966) (FTC could obtain an

21  injunction pursuant to the All Writs Act to "maintain the status quo"); *U.S. v. BNS, Inc.*, 858 F.2d 456,

---

[4]    El Dorado's argument that the Order was really a temporary restraining order under Rule 65(b) is
equally perplexing.  (ECF No. 1038 at 7.)  Rule 65(b) only applies to orders issued "without written
or oral notice to the adverse party," Fed. R. Civ. P. 65(b), but El Dorado had notice of the FTC's
motion.  (*See* ECF No. 1031 at 8:16-21.)  El Dorado delves further afield by arguing that the FTC's
motion for an emergency order was really a temporary restraining order pursuant to § 13(b) of the
FTC Act.  (ECF No. 1038 at 7:7-13; ECF No. 1031-2 ¶ 6.)  The proviso upon which El Dorado
relies pertains only to preliminary relief against first-party violators of acts enforced by the FTC
pending a cease and desist order or an action under § 19(b) of the FTC Act, not to the ancillary
relief sought here pursuant to the Court's inherent authority to enforce orders in a case under the
second proviso of § 13(b).  Hence, El Dorado cites no case supporting its interpretation.

461-62 (9th Cir. 1988) ("[T]he issuance of a preliminary injunction pursuant to the All Writs Act is appropriate in certain instances to preserve the court's . . . jurisdiction.").  And federal courts specifically employ the All Writs Act to freeze assets.[5]  El Dorado's suggested rule that the All Writs Act cannot be used to preserve the status quo appears nowhere in the All Writs Act or controlling case law and is directly contrary to the law's purpose of enabling courts to ensure compliance with existing orders.[6]

El Dorado also argues that the Court cannot bind third parties pursuant to the All Writs Act, but does not cite a single case in support of such an interpretation.  No such case exists because the Supreme Court established decades ago that "[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, *though not parties to the original action or engaged in wrongdoing*, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *New York Telephone*, 434 U.S. at 174 (emphasis added) (internal citations omitted).[7]  Since El Dorado is in a position

---

[5]     *See*, *e.g.*, *U.S. v. Yielding*, 657 F.3d 722, 727 (8th Cir. 2011) ("A number of . . . decisions upheld, as necessary and appropriate in aid of this jurisdiction, orders issued under the All Writs Act restraining a restitution debtor from diverting or concealing assets to avoid paying restitution."); *U.S. v. Catoggio*, 698 F.3d 64, 66-68 (2d Cir. 2012) (holding that the All Writs Act may be used to restrain the defendant's funds); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1259-60 (7th Cir. 1980) (All Writs Act empowered district court to freeze assets); *FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1994 WL 730144, *12 (N.D. Ohio Oct. 24, 1994) ("This Court has authority to grant a preliminary injunction with an asset freeze, and other appropriate relief pursuant to Sections 13(b) of the FTC Act, 15 U.S.C. § 53(b), the All Writs Act, 28 U.S.C. § 1651(a) and Rule 65 of the Federal Rules of Civil Procedure.").

[6]     El Dorado's argument is based solely on inapplicable dicta in *Schiavo*.  There, the parents of a woman taken off life support sought an injunction pursuant to Rule 65 and the All Writs Act ordering the woman's husband to transfer her to a hospital for further medical care.  403 F.3d at 1225.  The district court denied preliminary relief on the merits, and the Eleventh Circuit affirmed.  In dicta, the court noted that under Eleventh Circuit law, a party cannot obtain relief under the All Writs Act when relief under Rule 65 is available.  Dicta from an Eleventh Circuit case is not controlling here, and in any event El Dorado conceded that relief is not available here under Rule 65.  (ECF No. 1038 at 8-9.)

[7]     El Dorado asks the Court to ignore this clear Supreme Court mandate on incorrect and irrelevant grounds.  El Dorado contends that *New York Telephone* "dealt with a criminal wiretap under the Omnibus Crime Control and Safe Streets Act" (ECF No. 1038 at 9), but the Supreme Court explicitly upheld the injunction on the basis of the court's criminal procedure authority and rejected reference to the Omnibus Crime Control and Safe Streets Act.  434 U.S. at 166-69.  Neither the Supreme Court nor lower courts limited *New York Telephone*'s discussion of the All Writs Act to pen registers; to the contrary, the New York Telephone analysis was based in part on prior Supreme Court precedent applying the All Writs Act to injunctions issued at the behest of the FTC.  *See id.* at

1    to frustrate the implementation of the Court's asset freeze against Level 5 (ECF No. 960), it does not

2    matter whether it is a party or has engaged in any wrongdoing.  Similarly, because the Court's power to

3    enforce the Asset Freeze Order is not limited to Rule 65, El Dorado's lengthy argument that it is not "in

4    active concert or participation" with Level 5 (ECF No. 1038 at 8-11) is entirely irrelevant.[8]

5            The Ninth Circuit and other courts established decades ago that courts also have the inherent

6    authority to issue orders against third parties for purposes of preserving assets for equitable monetary

7    relief.  In *SEC v. Wencke*, the Ninth Circuit affirmed an injunction binding a third party who was outside of

8    the court's Rule 65 jurisdiction.  622 F.2d 1363, 1369 (9th Cir. 1980 (Kennedy, J.) ("The power of a

9    district court to impose a receivership or grant other forms of ancillary relief . . . derives from the inherent

10   power of a court of equity to fashion effective relief.").  In *FTC v. H.N. Singer, Inc.*, the Ninth Circuit ruled

11   that in FTC Act cases, like in other cases in equity, the district court is empowered to "issue a preliminary

12   injunction to preserve the status quo in order to protect the possibility of" rescission and the district court

13   has "authority to grant *any ancillary relief necessary* to accomplish complete justice."  668 F.2d 1107,

14   1112-13 (1982) (emphasis added); *see also FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir.

15   1982) ("In the exercise of this inherent equitable jurisdiction the district court may order temporary,

16   ancillary relief preventing dissipation of assets or funds that may constitute part of the relief eventually

17   ordered in the case.").  On the basis of these principles, Courts have issued a variety of orders against third

18   parties – regardless of whether they are covered by Rule 65(d)(2) – to ensure that assets remain available

19   for potential equitable relief.[9]

---

20   173-74 (citing *Dean Foods*); *see also FTC v. 4 Star Resolution, LLC*, No. 15-CV-112S, 2016 WL

21   4138229, at *4 (W.D.N.Y. Aug. 4, 2016) (quoting *New York Tel. Co.*).

22   [8]   Likewise, El Dorado's suggestion that the Asset Freeze Order restrains only non-parties in active
     concert or participation with a named Defendant (ECF No. 1038 at 8:15-16) is false.  The order

23   contains no such limitation for an asset holder like El Dorado.  (ECF No. 960 at 16 § II.A.)

24   [9]   *See*, e.g., *SEC v. Alternate Energy Holdings, Inc.*, No. 1:10–CV–00621–EJL–REB, 2014 WL
     2515710, *14-15 (D. Idaho May 13, 2014) (freezing disputed assets held by unaffiliated third party

25   pursuant to court's inherent equitable authority and holding the court "does have the authority to
     fashion an appropriate equitable remedy, as necessary, to ensure the enforcement of federal

26   securities laws and this Court's orders."); *FTC v. Productive Mktg., Inc.*, 136 F.Supp.2d 1096,
     1104-06 (C.D. Cal. 2001) (third-party was not covered by Rule 65(d)(2), but was subject to the

27   court's "inherent authority to fashion equitable relief" and was, therefore, held in contempt for
     violating asset freeze) (citing *Wencke*); *FTC v. Vocational Guides, Inc.*, No. 3:01–0170, 2009 WL

28   943486, at *20 (M.D. Tenn. Apr. 6, 2009) (ordering third parties to turn over automobiles owned by

## II.     El Dorado Cannot Disregard Level 5's Admitted Payment For The Trailer, Claim Ownership To An Asset It Did Not Purchase, And Make Level 5 Bear The Loss Stemming From El Dorado's Asset Purchase Agreement

Level 5 ordered and paid for the Trailer.  The business, or portions of the business, responsible for delivering the Trailer to Level 5 thereafter changed hands.  It defies all notions of law and equity that the new owner would claim, as El Dorado does now, that because of a dispute between those two business owners, the customer, a bystander to their transaction, cannot receive delivery of the product it ordered and paid for.

### A.     The Trailer Was Not Listed Among The Specific Assets Purchased By El Dorado

El Dorado's attempt to use the asset purchase agreement as a magic wand to make Level 5's contract and payment disappear fails for several reasons.  *First*, Level 5's contract and payment in August-November 2014 (Ex. 3) preceded the asset purchase in December 2015 (ECF No. 1040-1 at 5).  Thus, Bruce Transporters was not in a position to sell to El Dorado a Trailer that was already sold to Level 5.

*Second*, Bruce Transporters did not sell the Trailer to El Dorado in the first place.  By its plain terms, the asset purchase agreement did not include the Trailer.  Pursuant to the asset purchase agreement, El Dorado purchased from Bruce Transporters certain assets listed in a 14-page Exhibit A to the agreement.  (ECF No. 1040-1 at 5 § 1 (defining "Purchased Assets" and referencing an Exhibit "A").)  The 14-page Exhibit "A" Asset List – which, it must be noted, El Dorado did not include in its submission to the Court – does not include the Trailer.  (*See generally* Ex. 6.)  Given the detail and length of the Asset List – which includes precise details for 335 items, including clocks and lamps (*id.*) – it is inconceivable that the parties would have omitted the 53 foot transporter Trailer if it were truly meant to be included in the sale.  Likewise, the Trailer is not included in the Exhibit "B" list of assets retained by Bruce Transporters (Ex. 7), because it no longer belonged to Bruce Transporters either.

El Dorado's claim is that the Trailer was conveyed from Bruce Transporters to E.T.S. Ventures as a "Work in Progress," a term not defined in the agreement but found in Section 3.1.  (ECF No. 1040-1 at 6 §

---

defendant pursuant to the court's "authority to use its inherent powers, including orders to non-parties, to fashion effective relief.") (citing *Productive Mktg.*); *FTC v. Para-Link Int'l, Inc.*, No. 8:00–CV–214T17TBM, 2001 WL 34107045, at *5 (M.D. Fla. May 30, 2001) (expanding asset freeze order to include control over defendant's property owned in part by third-party mortgage holders and authorizing sale of property pursuant to FTC motion).

3.1.)  Section 3, however, merely defines the purchase price and allocates the purchase price between the tangible and intangible items being sold.  (*Id.*)  Section 3 references the "Purchased Assets" but does not supplement the list of Purchased Assets.  Equally noteworthy is that "works in progress" is not found in the Section 1 definition of "Purchased Assets" or the controlling Exhibit "A" Asset List.  (ECF No. 1040-1 at 5 § 1; Ex. 6.)   Under those circumstances, El Dorado cannot, by use of Black's Law Dictionary (ECF No. 1038 at 15) or otherwise, use an undefined term in a separate portion of the agreement to contradict the more specific itemization of assets being sold in Section 1 and the Exhibit "A" Asset List.  *Garofoli v. Whiskey Island Partners, Ltd.*, 25 N.E.3d 400, 406 (Ohio Ct. App. 2014) ("It is well established that where a general provision in a contract conflicts with a specific provision, the specific provision controls.") (quotations and citations omitted); *O'Bannon Meadows Homeowners Ass'n, Inc. v. O'Bannon Props., L.L.C.*, No. CA2012-10-073, 2013 WL 2635531, at *6 ("[W]hen it is not possible to harmonize all provisions of the contract, the specific clause prevails over the general clause.") (Ohio Ct. App. June 10, 2013).

*Third*, El Dorado misstates the law regarding corporate successor liability.  Citing *Pilkington North America, Inc. v. Travelers Casualty and Surety Co.*, 861 N.E.2d 121 (Ohio 2006), El Dorado claims that, as a purchaser corporation, it is not liable for the debts and obligations of the seller.  (ECF No. 1038 at 17.) As is relevant here, *Pilkington* merely states that the purchaser of a corporation's assets is not liable for its debts and obligations, unless one of the following four exceptions are met:  the buyer expressly or impliedly agrees to assume liability, the transaction amounts to a *de facto* consolidation or merger, the buyer corporation is merely a continuation of the seller corporation, or the transaction is entered into fraudulently for the purpose of escaping liability.  861 N.E.2d at 130.  But this statement of law does not help answer the question before the Court, which is whether El Dorado actually purchased the Trailer from Bruce Transporters in the first place.

Moreover, El Dorado simply breezes past the four exceptions stated in *Pilkington*, summarily claiming that they do not apply.  (ECF No. 1038 at 17-18.)  El Dorado cannot have it both ways.  Either El Dorado purchased only certain assets of Bruce Transporters, in which case it did not purchase the Trailer (which was not included in the asset purchase agreement); or El Dorado somehow purchased *all* the assets of Bruce Transporters, including the non-listed ones, in which case it effected a *de facto* merger or

continuation and assumed Bruce Transporters' liabilities (including the duty to complete and deliver the paid-for Trailer to Level 5). Indeed, the additional facts that El Dorado continued the Bruce Transporters business, used the Bruce Transporters name, and hired Bruce Transporter's principal, and that that Bruce Transporters itself ceased operations at the time of the transaction (ECF No. 1040 ¶¶ 4, 12; ECF No. 1040-1 at 70 (El Dorado using Bruce Transporters name)), strengthen the case for a *de facto* merger finding. *Permasteelisa CS Corp. v. The Airolite Co.*, No. 2:06-CV-569, 2007 WL 4615779, at *10-11 (S.D. Ohio Dec. 31, 2007) (applying Ohio law). At least for present purposes, El Dorado is not entitled to a summary disposition on this issue. *See Davis v. Loopco Indus., Inc.*, 609 N.E.2d 144, 145 (Ohio 1993); *Permasteelisa*, 2007 WL 4615779, at *11.

### B. Ohio Law Does Not Vest Ownership In El Dorado Because Its Origin, Title, And Registration Documents Are Dubious, And Because El Dorado Was In A Superior Position To Avoid Any Fraud Committed By Bruce Transporters

El Dorado contends that Ohio Rev. Code Ann. § 4505.04 is dispositive here, and that under no circumstance could Level 5 be deemed the owner of the Trailer because Level 5 did not receive a title or certificate of origin in its name. (ECF No. 1038 at 14-15.) But "Section 4505.04 is not as inflexible as" El Dorado "suggests." *In re Akron-Cleveland Auto Rental, Inc.*, 921 F.2d 659, 662–63 (6th Cir. 1990). In fact, the Ohio Supreme Court "has explicitly recognized that section 4505.04 is not to be construed literally and that 'narrowly drawn case-law exceptions' involving 'equitable ownership' do exist, including where fraud has occurred." *Id.* (quoting *State v. Shimits,* 10 Ohio St.3d 83, 85, 461 N.E.2d 1278 (1984).)

One such "recognized exception[] to the seemingly absolute language of section 4505.04" is the proposition that "[w]hen one of two *innocent* persons must suffer from the fraud of a third, the one who made it possible for the fraud to be perpetrated must bear the loss." *Id.* at 663 (quoting *In re Easy Living, Inc.*, 407 F.2d 142, 145 (6th Cir. 1969) and *Hardware Mut. Cas. Co. v. Gall*, 15 Ohio St. 2d 261, 267, 240 N.E.2d 502, 506 (1968)). This exception makes perfect sense: it could not be the case that a manufacturer and a dealer, with superior knowledge of the titling and registration procedures, could extinguish a customer's claim to ownership of a vehicle by unilaterally deciding to title and register a paid-for vehicle to themselves. El Dorado's attempt to do so here is even more suspect, given the multiple conflicting origin/title/registration documents it submitted to the Court.

In *Easy Living*, a bankruptcy trustee seized possession of two mobile homes sold by the debtor-dealer, claiming they belonged to the estate because the debtor-dealer had issued the certificates of title in its name and had never transferred them to the purchasers.  407 F.2d at 143-44.  The district judge disagreed, holding that the two buyers were innocent purchasers for value and ordering the Trustee to cause certificates of title to be issued in their names.  *Id.*  The Sixth Circuit affirmed, finding, among other things, that the dealer had violated Ohio Rev. Code Ann. § 4505.06 by not obtaining certificates of title in the names of the purchasers.  *Id.* at 144-45 (emphasis added).  Noting the Ohio Supreme Court's holding in *Gall*, the Sixth Circuit further determined that "[s]ince equity regards as done that which in good conscience should have been done, the District Court was correct in ordering the Trustee to comply with the Ohio statute by causing certificates of title to be issued to the *innocent* purchasers who were defrauded by the bankrupt."  *Id.* at 145.  The Sixth Circuit revisited the *Easy Living* decision in *Akron-Cleveland*, re-affirming the "equitable principle of allocating loss between two innocent parties" and clarifying that the equitable principle must involve parties "who were truly innocent."  *Akron-Cleveland,* 921 F.2d at 664.[10]

Here, El Dorado is not a "truly innocent" party to the transaction.  *Akron-Cleveland,* 921 F.2d at 664.  El Dorado both failed to include the Trailer in its asset purchase and thereafter knew that the Trailer belonged to Level 5.  At the time of the asset sale between Bruce Transporters and El Dorado, the parties listed in minute detail all tangible items included in the asset sale, including wrenches and other small tools, but conspicuously omitted any mention of a 53-foot trailer worth nearly $600,000.  (Ex. 6.)  Moreover, El Dorado's documents supporting its claim for work to complete the Trailer bear indications confirming that the Trailer belonged to Level 5, not El Dorado.  (ECF No. 1040-1 at 22 (identifying "Level 5 Motorsports, LLC" as the customer for the work).)  This further undermines El Dorado's current position that the Trailer is somehow part of El Dorado's general inventory, such that El Dorado may sell it whenever and to whomever it pleases.[11]

---

[10] The *Akron-Cleveland* court ultimately distinguished *Easy Living* and *Gall* on the facts because it was unclear whether the dealer-purchaser involved in the *Akron-Cleveland* transaction could be considered a "truly innocent" party.  921 F.2d at 665.  Here, the FTC submits that the facts are lear that, as between El Dorado and Level 5, Level 5 is the innocent party.

[11] El Dorado's observation that Level 5 apparently failed to file a UCC "financing statement" for the Trailer pursuant to UCC § 9-310 (ECF No. 1038 at 16 n.3) is a complete red herring; Level 5 is the purchaser and end user of the Trailer, not a lender seeking secured creditor status.

Conversely, Level 5 is a "truly innocent" party – it contracted and paid for the Trailer, but, for reasons outside of its control, did not receive a certificate of title in exchange.  Put differently, Level 5 cannot be held responsible for El Dorado's dissatisfaction with the asset purchase agreement, to which it was a total stranger.

Even if this court were to determine that El Dorado was also an "innocent" party, under the equity principle outlined in *Gall* and *Easy Living*, "[w]hen one of two innocent persons must suffer from the fraud of a third, the one who made it possible for the fraud to be perpetrated must bear the loss." *Easy Living*, 407 F.2d at 145.  Here, El Dorado made it possible for the fraud to be perpetrated by taking possession of (and creating title documents for) a Trailer that did not belong to El Dorado or Bruce Transporters.  If El Dorado's claim to incurring $281,000 in costs to complete the Trailer is to be credited, that claim must be resolved separately against Bruce Transporters.  El Dorado, not Level 5, is responsible for El Dorado's decision to purchase Bruce Transporters assets and El Dorado's decision to complete the Level 5 Trailer – knowing that it was a Level 5 Trailer – at its own expense.

### III.    The Equities Favor Injured Consumers And El Dorado Will Not Be Irreparably Harmed By An Expedited Resolution Of The Ownership Dispute

As noted in Part I, a balancing of the equities and consideration of harm is not necessary because the FTC does not seek a preliminary injunction but rather enforcement of an existing preliminary injunction.

But to the extent those factors are relevant, they favor the injured customers over El Dorado.  Citing three Ninth Circuit decisions, the Court has previously held that "[i]n balancing the equities, public equities receive *far greater weight* than private equities."  (ECF No. 960 at 8 (emphasis added).)  That principal applies with greater force here, given that the only relief sought by the FTC at the moment is a pause to permit development of the facts necessary to resolve the competing claims.  The public's interest in maximizing potential recovery to deceived borrowers – merely by preventing a unilateral sale by El Dorado at this time – is greater than that of private actor El Dorado, which is hurriedly attempting to dispose of a valuable asset on its own terms and for its own benefit.  Indeed, El Dorado comes before the Court with an incomplete and inconsistent claim to ownership, and, it seems, having failed to conduct proper due diligence prior to its asset purchase agreement.

1   As to harm, El Dorado claims it will suffer irreparable harm if it is not permitted to sell the

2   Trailer, because the Trailer will deteriorate in value.  (ECF No. 1040 at ¶ 22.)  But that claim, supported

3   only by Dale Becker's testimony, is speculative and conclusory.  *See Sophia & Chloe, Inc. v. Brighton*

4   *Collectibles, Inc.*, No. 12-CV-2472-AJB-KSC, 2016 WL 3211800, at *10 (S.D. Cal. Mar. 21, 2016)

5   (contention regarding irreparable monetary harm not supported by party's affidavit), reconsideration

6   denied, No. 12-CV-2472-AJB-KSC, 2016 WL 4077403 (S.D. Cal. Aug. 1, 2016).  In any event, the

7   FTC has offered to permit El Dorado to sell the Trailer on terms acceptable to the FTC, Level 5, and El

8   Dorado, with the proceeds of any such sale deposited into this Court or held in escrow.  Such an

9   outcome would ensure that the parties can preserve the monetary value of the Trailer (if it is indeed

10  deteriorating) and reserve for later the issue of who gets the benefit of that monetary value.

## CONCLUSION

12  The Court should deny El Dorado's motion to set aside the Order.

13  Dated:  September 13, 2016                    Respectfully submitted,

14                                               */s/ Nikhil Singhvi*
                                                 Nikhil Singhvi
15                                               Jason D. Schall
                                                 Helen P. Wong
16                                               Ioana Rusu
                                                 Courtney A. Estep
17                                               Thomas E. Kane

18                                               ***Attorneys for Plaintiff***
                                                 ***Federal Trade Commission***

**CERTIFICATE OF SERVICE**

I, Nikhil Singhvi, certify that, as indicated below, all parties were served by ECF with the FTC's **OPPOSITION TO MOTION TO SET ASIDE ORDER ENFORCING ASSET FREEZE ORDER** filed with the Court.

Von S. Heinz (vheinz@lrrc.com)
Darren J. Lemieux (dlemieux@lrrc.com)
E. Leif Reid (lreid@lrrc.com)
Jeffrey D. Morris (jmorris@berkowitzoliver.com)
Nick J. Kurt (nkurt@berkowitzoliver.com)
Justin C. Griffin (justingriffin@quinnemanuel.com)
Sanford I. Weisburst (sandyweisburst@quinnemanuel.com)
Kathleen Sullivan (kathleensullivan@quinnemanuel.com)
*Attorneys for Defendants AMG Capital Management, LLC; Level 5 Motorsports, LLC; LeadFlash Consulting, LLC; Black Creek Capital Corporation; Broadmoor Capital Partners, LLC; Scott A. Tucker; Nereyda M. Tucker, as Executor of the Estate of Blaine A. Tucker*

Patrick J. Reilly (preilly@hollandhart.com)
Linda C. McFee (lmcfee@mcdowellrice.com)
Robert Peter Smith (petesmith@mcdowellrice.com)
*Attorneys for Relief Defendants Kim C. Tucker and Park 269 LLC*

Victoria W. Ni (vni@publicjustice.net)
Craig B. Friedberg (attcbf@cox.net)
*Attorneys for Intervenor Americans for Financial Reform*

Jeffrey Vanderloop (jvanderloop@madvanlaw.com)
Martin Welsh (mwelsh@lvlaw.com)
*Attorneys for Interested Third Parties El Dorado Trailer Sales, LLC and ETS Ventures, LLC*

September 13, 2016
*/s Nikhil Singhvi*
Nikhil Singhvi