# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:12-cv-00536-GMN-VCF |
| vs. | ) | |
| | ) | **ORDER** |
| AMG SERVICES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is a Motion for Summary Judgment, (ECF No. 900), filed by Defendants AMG Capital Management, LLC ("AMG Capital"); Level 5 Motorsports, LLC ("Level 5"); Black Creek Capital Corporation ("Black Creek"); Broadmoor Capital Partners ("Broadmoor"); and Scott A. Tucker ("Scott Tucker") (collectively "Tucker Defendants").[1] Plaintiff Federal Trade Commission ("FTC") filed a Response, (ECF No. 938), and the Tucker Defendants filed a Reply, (ECF No. 949).

Also pending before the Court is a Motion for Summary Judgment, (ECF No. 907), filed by the FTC. Defendants Park 269, LLC ("Park 269") and Kim C. Tucker ("Kim Tucker") (collectively "Relief Defendants") filed a Response, (ECF No. 935), as did the Tucker Defendants, (ECF No. 941). The FTC filed a Reply, (ECF No. 952).

Also pending before the Court is a Motion for Summary Judgment, (ECF No. 913), filed by the Tucker Defendants. The FTC filed a Response, (ECF No. 940), and the Tucker Defendants filed a Reply, (ECF No. 950).

---

[1] As per the Court's Order of September 20, 2016, the instant Order does not implicate Defendants Nereyda Tucker, as Executor of the Estate of Blaine Tucker, or LeadFlash Consulting, LLC. (*See* Order, ECF No. 1054).

1   Because the Court **GRANTS** FTC's Motion, the Court **DENIES as moot** the motions

2   filed by the Tucker Defendants and the Relief Defendants (collectively "Defendants").[2]

3   I.   **BACKGROUND**

4   This action was brought by the FTC, asserting that the "high-fee, short-term payday

5   loans" offered by former Defendants AMG Services, Inc. ("AMG"), SFS, Inc. ("SFS"), Red

6   Cedar Services, Inc. ("Red Cedar"), and MNE Services, Inc. ("MNE") (collectively "Lending

7   Defendants") violated section 5 of the Federal Trade Commission Act of 1914, 15 § U.S.C.

8   45(a)(1), the Truth in Lending Act of 1968, 15 U.S.C. § 1601(a), and Regulation Z, 12 C.F.R. §

9   1026(a). (Am. Compl. 15:1–20:6, ECF No. 386).

10   The FTC has filed its Motion for Summary Judgment against the only remaining parties

11   that did not settle the claims against them.  The remaining defendants are AMG Capital, Level

12   5, Black Creek, and Broadmoor (collectively "Corporate Lending Defendants") as well as Scott

13   _____

14   [2] Also pending before the Court are three Motions to Reconsider filed by the Tucker Defendants. (*See* ECF Nos.
15   850, 963, 975).  Two of these motions relate to orders entered by Magistrate Judge Cam Ferenbach.  "A district
     judge may reconsider any pretrial matter referred to a magistrate judge in a civil . . . case . . . where it has been
16   shown that the magistrate judge's ruling is clearly erroneous or contrary to law." LR IB 3–1.  A magistrate
     judge's pretrial order issued under 28 U.S.C. § 636(b)(1)(A) is not subject to *de novo* review, and the reviewing
17   court "may not simply substitute its judgment for that of the deciding court." *Grimes v. City and County of San
     Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).  The Court may overturn the magistrate judge's decision if, upon
18   review, the Court is left with a definite and firm conviction that a mistake has been made. *See David H. Tedder
     & Assocs. v. United States*, 77 F.3d 1166, 1169–70 (9th Cir. 1996).

19   The most recently filed Motion, (ECF No. 975), asks the Court to reconsider its Asset Freeze Order, (ECF No.
20   960).  Because the Court grants the FTC's request for equitable monetary relief, *infra*, the Court DENIES this
     Motion as moot.  Similarly, Defendants' first Motion to Reconsider, (ECF No. 850), is DENIED as moot in light
21   of the instant Order.  In this Motion, Defendants raise a multitude of objections to Magistrate Judge Ferenbach's
     Order, (ECF No. 849), regarding discovery issues.  Even if the Court were to grant this Motion, the result of the
22   instant Order would remain unchanged given the wealth of evidence establishing Defendants' liability.

23   Finally, Regarding Defendants' remaining Motion to Reconsider, (ECF No. 963), the Court does not agree with
     Defendants that Judge Ferenbach exceeded his authority.  First, Judge Ferenbach's Order, (ECF No. 956),
24   denying Defendants' request for discovery sanctions did not constitute a dispositive order. *See* 28 U.S.C. §
     636(b)(1)(A) (listing dispositive motions).  Second, the Court does not endorse Defendants' interpretation of
25   Judge Ferenbach's Order as indicative of double standard.  The well-reasoned decision does not reflect
     Defendants' absolutist reading.  In light of the acrimonious discovery process in this case, Judge Ferenbach's
     Order is a clear attempt to move the discovery process forward.  Accordingly, the Court DENIES this Motion.

Tucker.  The FTC seeks injunctive relief against Scott Tucker and equitable monetary relief from the Corporate Lending Defendants and Scott Tucker.  The FTC also seeks disgorgement from the Relief Defendants.

### A.   Factual History[3]

Scott Tucker controlled, founded, or was president of a host of short-term payday loan marketing and servicing companies, including, *inter alia*, National Money Service, Inc. ("NMS"), CLK Management LLC ("CLK"), and Universal Management Services, Inc. ("UMS") (collectively "Scott Tucker Loan Servicing Companies"). (Exs. 1–2, 4–5, 14 to Singhvi Decl., ECF Nos. 908-1–2, 4–5, 14).  Between 2003 and 2008, the Scott Tucker Loan Servicing Companies entered into agreements with the Santee Sioux Tribe of Nebraska, the Miami Tribe of Oklahoma, and the Modoc Tribe of Oklahoma to allow the tribes to become "authorized lenders" for CLK. (*See* Exs. 14–15, 18 to Singhvi Decl., ECF Nos. 908-14–15, 18). The tribes subsequently formed SFS, Red Cedar, and MNE. (Exs. 17, 19–20 to Singhvi Decl., ECF Nos. 908-17, 19–20).  In 2006, CLK transferred its trademarks for 500 FastCash, OneClickCash, Ameriloan, USFastCash, and UnitedCashLoans ("Loan Portfolios") to the new tribal entities. (Ex. 6 to Singhvi Decl., ECF No. 908-6).  Following these transfers, SFS, Red Cedar, and MNE became the lenders for the Loan Portfolios. (Dempsey Dep. at 15–19, ECF No. 908-7).  In 2008, CLK was acquired by AMG Services, Inc., a tribal corporation created by the Miami Tribe. (Ex. 46 to Singvhi Decl., ECF No. 908-46).

### B.   Procedural History

On December 27, 2012, the Court signed an Order, (ECF No. 296), entering the parties' joint stipulation for preliminary injunction and bifurcation.  The Bifurcation Order divided the litigation into two phases: Phase I, a liability phase, and Phase II, a relief phase. (*Id.* 9:1–

---

[3] Given the lengthy history of this case, the Court provides a brief factual overview and discusses the remaining facts in further detail, *infra*, as they pertain to specific issues.

10:23).  During Phase I of the proceedings, the Court would adjudicate the merits of the FTC's claims for violations of the FTC Act, TILA, and EFTA. (*Id.* 9:1–24).  During Phase II of the proceedings, the Court would adjudicate the remaining issues, including the individual liability of the various Defendants. (*Id.* 10:119).  On January 28, 2014, Magistrate Judge Cam Ferenbach entered a Report and Recommendation ("R&R"), (ECF No. 539), granting summary judgment in favor of the FTC on two of its four causes of action.  In his R&R, Magistrate Judge Ferenbach reviewed the websites through which the Lending Defendants sold their loans as well as the Loan Note Disclosures contained therein. (*See, e.g.*, R&R 2:12–16).

On May 28, 2014, this Court entered an Order, (ECF No. 584), adopting the R&R. Specifically, the Court agreed that "the net impression of the Loan Note Disclosure is likely to mislead borrowers acting reasonably under the circumstances because the large prominent print in the TILA Box implies that borrowers will incur one finance charge while the fine print creates a process under which multiple finance charges will be automatically incurred unless borrowers take affirmative action." (Order 15:8–12, ECF No. 584).  Subsequently, the Lending Defendants stipulated to settle all of the FTC's claims against them resulting in monetary judgments in the aggregate amount of $25,496,677. (*See generally* Orders, ECF Nos. 727, 760–762, 888–889).

In the instant Motion, the FTC seeks summary judgment on the Defendants' remaining affirmative defenses as well as the issues of individual liability, common enterprise liability, liability of the Relief Defendants, and remedies. (Pls.' MSJ 14:22–23, ECF No. 907).  The Court addresses each of these issues in turn, after first addressing several of Defendants' evidentiary objections.

## II.  <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

       In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

1        If the moving party satisfies its initial burden, the burden then shifts to the opposing

2  party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

3  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

4  the opposing party need not establish a material issue of fact conclusively in its favor. It is

5  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

6  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

7  *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid

8  summary judgment by relying solely on conclusory allegations that are unsupported by factual

9  data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go

10  beyond the assertions and allegations of the pleadings and set forth specific facts by producing

11  competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

12        At summary judgment, a court's function is not to weigh the evidence and determine the

13  truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

14  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

15  in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is

16  not significantly probative, summary judgment may be granted. *See id.* at 249–50.

17  **III.**    **<u>DISCUSSION</u>**

18      **A.**    **Evidentiary Objections**

19        The Tucker Defendants object to nearly all of the evidence relied upon by the FTC in its

20  Motion for Summary Judgment. (*See* Obj., ECF No. 943). While the Court addresses some of

21  those objections that pertain to the Court's Order below, the Tucker Defendants' remaining

22  objections do not merit further discussion.

23           *1.*    *The Squar Milner Report*

24        The Squar Milner Report was prepared at AMG's request "to assist management in

25  calculating any outstanding balances to, from, and among AMG, CLK Management, the

1   various portfolios . . . on the one hand, and Scott Tucker and related entities, on the other

2   hand." (Squar Milner Report at 8, ECF No. 908-260).  It reflects statements and interviews with

3   unknown individuals, (*see id.* at 11), and the FTC seeks to offer evidence from the Squar

4   Milner Report to prove the truth of the matter asserted: "the presence of *thousands* of

5   transactions solely for Scott Tucker's benefit, that AMG's books and records were not

6   maintained in an orderly fashion, and that the Defendants' complete lack of accounting controls

7   were susceptible to manipulation," (FTC's MSJ 47:24–27, ECF No. 907).

8        The FTC argues this Report falls within the exception under Federal Rule of Evidence

9   803(6) for a business record. (*See* Resp. to Obj. 13:3–14:9, ECF No. 953).  However, the Court

10   finds that this Report does not meet the requirements in order to constitute a business record

11   pursuant to this Rule.  The case relied upon by Defendants, *Paddack v. Dave Christensen, Inc.*,

12   745 F.2d 1254 (9th Cir. 1984), is instructive.  In *Paddack,* the subject documents were special

13   audit reports prepared in anticipation of litigation, not restated quarterly and annual reports or

14   corresponding auditor's work product prepared in the ordinary course of business. *Paddack*,

15   745 F.2d at 1257–58.  Similarly, the Squar Milner Report is not simply a regular audit report.

16   Instead, it was "a special investigation" in which "a financial audit report under GAAP" was

17   not issued and, moreover, was likely made in anticipation of and preparation for this litigation.

18   (Obj., 4:9–15, ECF No. 943).  Therefore, the Court finds that the Squar Milner Report was not

19   made in the normal, regular course of business, as required by Federal Rule of Evidence

20   803(6), and is therefore inadmissible.

21             *2.   Emails*

22        The Tucker Defendants argue that the emails relied upon by the FTC "must be excluded

23   as unauthenticated and inadmissible hearsay." (Obj. 11:25–26).  However, all but one of the

24   emails are presumptively authentic because they were produced by a party opponent. *Haack v.*

25   *City of Carson City*, No. 3:11-CV-00353-RAM, 2012 WL 3638767, at *7 (D. Nev. Aug. 22,

2012) (noting that exhibits produced by a party opponent are "deemed authentic").  In addition, all of the emails are authentic per Federal Rule of Evidence 901(b)(4) because of their distinctive characteristics. *See, e.g.*, *Brown v. Wireless Networks, Inc.*, No. C 07-4301 EDL, 2008 WL 4937827, at *4 (N.D. Cal. Nov. 17, 2008).

Regarding the hearsay issue, many of the emails are admissible non-hearsay as they were sent by Scott Tucker or an employee of the Corporate Lending Defendants. *See* Fed. R. Evid. 801(d)(2)(D).  Further, other emails are admissible pursuant to Federal Rule of Evidence 801(c)(2) because they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2).  The FTC relies on one such email, for example, to show Scott Tucker was "*aware* that the loan repayment model was problematic and confusing to consumers," (Resp. to Obj. 18:13–15) (emphasis added), not that "90% of the issues [the Tucker Defendants] have with customers stems from them not understanding [the Tucker Defendants'] process of renewal and paydowns," (Ex. 75 to Singhvi Decl., ECF No. 908-75).  The Court therefore overrules the Tucker Defendants' objections regarding emails.

### 3. *Checks and Other Bank Records*

The Tucker Defendants seek to exclude certain checks and bank records as unauthenticated and inadmissible hearsay. (*See* Tucker Defs.' Resp. to FTC's MSJ 16:26–18:11, ECF No. 941).  With regard to the authentication objection, "[a]s a negotiable instrument, a check is a species of commercial paper, and therefore self-authenticating." *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004); *see also* Fed. R. Evid. 902(9).  As to the bank records, the Tucker Defendants have not set forth any reasons for questioning the authenticity of the bank records submitted by the FTC.  Federal Rule of Evidence 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).  The appearance of the bank records and

content persuade the Court that the documents are what they purport to be. *See* Fed. R. Evid. 902(9) ("Commercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law" are self-authenticating); Fed. R. Evid. 901(b)(4) (documents can be authenticated by their "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances").

Next, neither the checks nor the bank records constitute hearsay. The bank records fall under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6); (*see, e.g.*, Custodian of Bus. R. Aff., Ex. 257 to Singhvi Decl., ECF No. 908-257) (laying foundation testimony establishing that bank statements are bank's business records). Further, to the extent the bank statements and checks are signed by Scott Tucker, they are non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(A). Accordingly, the Court overrules the Tucker Defendants' objections regarding the checks and bank records relied upon by the FTC.

### B.    Defenses

The remaining affirmative defenses argued by Defendants' are without merit. *See F.T.C. v. Am. Microtel, Inc.*, No. CV-S-92-178-LDG(RJJ), 1992 WL 184252, at *1 (D. Nev. June 10, 1992) ("[T]he law is well established that principles of laches and equitable estoppel are not available as defenses in a suit brought by the government to enforce a public right or a public interest.") (citing *United States v. Ruby Co.*, 588 F.2d 697, 705 n. 10 (9th Cir.)); *F.T.C. v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM GWF, 2011 WL 2470584, at *2 (D. Nev. June 20, 2011) ("Section 13(b) of the Federal Trade Commission Act specifies no statute of limitations period."); *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016) (holding that "joint and several liability is permissible" in actions brought under § 13(b) and affirming monetary award); *F.T.C. v. Evans Prod. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985) (rejecting defendant's attempt to "limit § 13(b) to cases involving 'routine fraud'" and agreeing that "a

'proper case' for which § 13(b) injunctive relief may be sought includes . . . any case involving a law enforced by the FTC").

Likewise, the Court rejects the Tucker Defendants' argument that the FTC abused its discretion under the FTC Act by proceeding through adjudication rather than rulemaking. (*See* Tucker Defs.' Resp. to FTC's MSJ 96:15–16). "[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 203 (1947). The Ninth Circuit has clarified that where "adjudication change[d] existing law, and ha[d] widespread application," the FTC "exceeded its authority by proceeding to create new law by adjudication rather than by rulemaking." *Ford Motor Co. v. F.T.C.*, 673 F.2d 1008, 1010 (9th Cir. 1981). Subsequent cases have clarified that an agency may announce new principals during adjudication so long as "its action [does not] 1) constitute an abuse of discretion or 2) circumvent the [Administrative Procedure Act's] requirements." *Union Flights, Inc. v. FAA*, 957 F.2d 685, 688 (9th Cir. 1992).

Here, adjudication by the FTC is proper. First, this litigation will not result in any changes to existing law. It merely applies the established principles of the FTC Act to the Tucker Defendants' particular unfair business practices. Moreover, this action is against a single set of defendants and involves one discrete fraudulent practice. The Court's instant Order does not have "widespread application." Further, the FTC has not abused its discretion nor attempted to circumvent the APA. The FTC is not using this "adjudication to amend a recently amended rule, or to bypass a pending rulemaking proceeding." *Union Flights*, 957 F.2d at 688. Similarly, the Tucker Defendants cannot claim that they relied on a former FTC policy, or any other recognized situation constituting an abuse of discretion. *See id.* Without these showings, the Tucker Defendants have not demonstrated an abuse of discretion or an attempt to circumvent the APA.

**C.    Individual Liability**

An individual may be held liable for corporate violations of the FTC Act if the individual: "(1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth." *Commerce Planet*, 815 F.3d at 600; *see also F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)

If the FTC proves direct participation in or authority to control the wrongful act, then the individual may be permanently enjoined from engaging in acts that violate the FTC Act. *F.T.C. v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004).  To hold an individual liable for monetary redress, the FTC must additionally establish knowledge. *FTC v. Affordable Media*, 179 F.3d 1228, 1234 (9th Cir. 1999); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  Proof that the defendant intended to deceive consumers or acted in bad faith is unnecessary to establish a § 5(a) violation. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations."); *Feil v. F.T.C.*, 285 F.2d 879, 896 (9th Cir. 1960) ("Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive.").

### 1.    Participation and Authority to Control

Authority to control may be evidenced by "active involvement in business affairs and making of corporate policy, including assuming the duties of a corporate officer." *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  An individual's position as a corporate officer or authority to sign documents on behalf of the corporate defendant is sufficient to show requisite control. *See Publ'g Clearing House*, 104 F.3d at 1170 (holding that individual's "assumption of the role of president of [the corporation] and her authority to sign

documents on behalf of the corporation demonstrate that she had the requisite control over the corporation" for purposes of finding individual liability under § 5(a)).

The FTC has satisfied the first prong for individual liability.  The evidence abundantly establishes that Scott Tucker participated in and had authority to control the Lending Defendants.  As president of NMS and CLK, Scott Tucker directed the creation and organization of the Lending Defendants, which operated merely as a veneer for Scott Tucker's lending entities.  Specifically, Scott Tucker presented the Santee Sioux Tribe of Nebraska, the Miami Tribe of Oklahoma, and the Modoc Tribe of Oklahoma with business proposals that would allow the tribes to become "authorized lenders" for NMS. (Exs. 2, 12–13 to Singhvi Decl., ECF Nos. 908-2, 12–13).  These proposals required the Scott Tucker Loan Servicing Companies to provide "the capital to fund all loan transactions" and "the personnel, equipment and knowledge to make the business an immediate success," while the tribes were not required to invest any capital in the business.  (*See, e.g.*, Ex. 2 to Singhvi Decl. at 3, 7, ECF No. 908-2) ("The Tribe and the proposed Tribal entity will not be required to provide any investment, cash or cash equivalent and will not be responsible for any losses.").  Instead, the tribes were merely required to designate one employee and to do "all things reasonably necessary to carry on the Pay Day Loan business as a lender with the full support of [a Scott Tucker Loan Servicing Company]." (*Id.*).  In exchange, the tribes would receive a guaranteed monthly fee. (*Id.*).  Scott Tucker arranged for the drafting of the tribal lending ordinances that the tribes ultimately enacted without any significant changes. (Exs. 18, 27–29 to Singhvi Decl., ECF Nos. 908-18, 27–29).

Scott Tucker structured the Lending Defendants to be completely dependent on the Scott Tucker Loan Servicing Companies.  The service agreements signed by Scott Tucker between UMS and the tribes required UMS to "furnish . . . all support staff, equipment and business arrangements required to conduct an efficient payday loan business." (Miami Tribe Serv.

1   Agreement ¶ 3, ECF No. 908-14).  Further, UMS agreed to provide all capital for the payday

2   loan operation "to be administered wholly and only by UMS." (*Id.* ¶ 2); (*see also* SFS Serv.

3   Agreement ¶ 1, ECF No. 908-15).  Moreover, the Lending Defendants' 30(b)(6) representative,

4   Natalie Dempsey, testified that "all the consumer loans ever offered by [the Lending

5   Defendants have] been serviced by AMG, CLK or NM Services." (Dempsey Dep. at 21, ECF

6   No. 908-7).

7          With regard to the Lending Defendants' lending activities, SFS's Rule 30(b)(6)

8   representative, Lee Ickes ("Ickes"), testified that AMG drafted SFS's loan applications. (Ickes

9   Dep. at 9, ECF No. 908-13).  Similarly, MNES stated during discovery that AMG performs

10  "the drafting, modification and review of [MNES's] loan notes, disclosures and websites."

11  (MNE Resp. to FTC Interrog. No. 9, ECF No. 908-144); (*see also* Red Cedar Resp. to Interrog.

12  No. 9, ECF No. 908-146) (stating same).  Moreover, Dempsey testified that only AMG staff

13  were involved in the drafting and modification of loan disclosures and websites. (Dempsey

14  Dep. at 90).  Ickes testified that AMG set the payment schedule for consumer loans for SFS and

15  underwrites consumers' loan applications. (Ickes Dep. at 14, 16).  Moreover, Ickes testified that

16  SFS does not have access to the criteria for loan approval, and SFS has never rejected a loan

17  that AMG determined met the criteria for approval. (*Id.* at 15–16).

18         Scott Tucker's role did not materially change following the merger of CLK into AMG in

19  2008.  Indeed, AMG Meeting Minutes describe CLK's merger with AMG as "just a name

20  change." (Ex. 48 to Singhvi Decl., ECF No. 908-48).  In addition, an email to CLK employees

21  announcing the AMG merger clarifies that "[y]our job description, responsibilities and pay will

22  not change at all . . . just the name of the company you work for." (Ex. 49 to Singhvi Decl.,

23  ECF No. 908-49).  Even after the merger, Scott Tucker retained the authority to implement

24  policies as AMG's President. (*See* Grote Dep. at 44, Ex. 908-67); (Ex. 54 to Singhvi Decl. at 7,

25  ECF No. 908-54) (referencing Scott Tucker as AMG President).  Although Scott Tucker

1    attempted to obfuscate his official title with AMG over time, Defendants admit that, at the very

2    least, Scott Tucker was an executive with operational control of AMG. (AMG Am. Resp. to

3    Expedited Interrog. No. 3, ECF No. 908-58).

4           Consistent with this authority, Scott Tucker continued to participate in control of the

5    Lending Defendants.  Scott Tucker had authority to control the Lending Defendants' accounts

6    used to fund consumer loans. (*See* Ickes Dep. at 21) ("AMG Services oversees or manages [the

7    day-to-day operational funds] for the Santee Sioux Nation, SFS, Inc.").  Specifically, the Miami

8    Tribe passed a corporate resolution granting Scott Tucker power of attorney over its accounts.

9    (Ex. 80 to Singhvi Decl., ECF No. 908-80)  Scott Tucker is also an authorized signatory on the

10   SFS portfolio account and seven other accounts belonging to the Lending Defendants. (Ickes

11   Dep. at 29); (AMG Am. Resp. to Interrog. No. 1, ECF No. 908-81).  The FTC has produced a

12   voluminous record of checks signed by Scott Tucker from the Lending Defendants' accounts to

13   the Corporate Lending Defendants wholly owned by Scott Tucker. (*See, e.g.*, Ex. 83 to Singhvi

14   Decl., ECF No. 908-83).

15          Further, Scott Tucker reviewed and approved loan disclosures and websites for the

16   Lending Defendants. (*See, e.g.*, AMG Am. Resp. to Expedited Interrog. No. 9, ECF No. 908-

17   62); (Dempsey Dep. at 90.  Indeed, the FTC has produced numerous examples of Scott Tucker

18   involved in such activities. (*See, e.g.*, Ex. 63 to Singhvi Decl., ECF No. 908-63) (email in

19   which Scott Tucker opines on whether or not certain language should be included in lending

20   application).  Scott Tucker also had the power to hire and fire and exercised that authority with

21   respect to the expansion of loan processing employees in the Miami office. (Williams Decl. at

22   7, ECF No. 908-155).

23          *2.    Knowledge*

24          The knowledge requirement is satisfied by establishing that "the individual had actual

25   knowledge of the material misrepresentation, was recklessly indifferent to the truth or falsity of

1  a misrepresentation, or had an awareness of a high probability of fraud along with an

2  intentional avoidance of truth." *Garvey*, 383 F.3d at 900 (citing *Publ'g Clearing House*, 104

3  F.3d at 1171).  "The degree of participation in business affairs is probative of knowledge." *FTC*

4  *v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994); *see also Affordable*

5  *Media*, 179 F.3d at 1235 ("The extent of an individual's involvement in a fraudulent scheme

6  alone is sufficient to establish the requisite knowledge for personal restitutionary liability.").

7       The evidence demonstrates that, at the very least, Scott Tucker was recklessly indifferent

8  to the misleading representations of the Lending Defendants.  As discussed above, Scott Tucker

9  reviewed the loan disclosures and websites.  Dempsey testified that Tucker "conducted

10  reviews" of loan documents and websites. (Dempsey Dep. at 90).  In many instances, Scott

11  Tucker proposed specific language for loan disclosures. (*See, e.g.*, Ex. 65 to Singhvi Decl.,

12  ECF No. 908-65).  Further, Scott Tucker stated in discovery exchanges that he "comments on

13  and recommends proposed changes to webpages." (Scott Tucker Resp. to Interrog. No. 2, ECF

14  No. 908-68).

15       With regard to consumer complaints, Scott Tucker had ample notice of internal AMG

16  complaint tracking reports as well as complaints received by the tribes and third party services.

17  Dempsey testified that Scott Tucker had "seen [AMG] reports on customer complaints."

18  (Dempsey Dep. at 90).  Red Cedar Services' president, Troy LittleAxe, stated that he "would

19  forward the written [consumer] complaints to AMG Services, Inc., specifically Scott Tucker."

20  (LittleAxe Resp. to Pl.'s Interrog. No. 4, ECF No. 908-69).  Moreover, "[e]verytime

21  [LittleAxe] had contact with an individual consumer or a state agency, [he] would notify . . .

22  AMG Services, Inc., specifically Scott Tucker." (*Id.*).  In emails between Scott Tucker and

23  Blaine Tucker discussing the escalating consumer complaints, Scott Tucker suggested

24  development of a compliance department. (*See* Ex. 72 to Singhvi Decl., ECF No. 908-72).

25

Finally, Scott Tucker was specifically aware that customers often did not understand Defendants' process of renewals and paydowns.  Scott Tucker received an email from Tim Buckley, an AMG manager, proposing a new repayment model that would address the fact that "90% of the issues we have with customers stem from them not understanding our process of renewals and paydowns." (Ex. 75 to Singhvi Decl.).  When asked about the e-mail during his deposition, Scott Tucker invoked his Fifth Amendment privilege against self-incrimination.[4] (Scott Tucker Dep. 41:25–44:9, , ECF No. 908-76).  Scott Tucker's pervasive role and authority at AMG, which extended to almost every facet of the company's business and operations, also creates a strong inference that Scott Tucker had the requisite knowledge that the Lending Defendants' webpages were misleading. *Am. Standard Credit Sys.*, 874 F. Supp. at 1089; *Amy Travel*, 875 F.2d at 574; *Affordable Media*, 179 F.3d at 1235.  Accordingly, the evidence, coupled with Scott Tucker's assertions of the Fifth Amendment, demonstrate that Scott Tucker had the requisite knowledge to be held individually liable for the deceptive website marketing of the Lending Defendants.

### D.   Common Enterprise Liability

Under the theory of common enterprise, each entity in a group of interrelated companies can be held jointly and severally liable for the actions of other entities in that group. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010).  "Entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *Id.*  "To determine whether a common enterprise exists, the Court considers factors such as: common control; the sharing of office space and officers;

---

[4] In this instance, the Court draws an adverse inference against Scott Tucker for his repeated invocation of his Fifth Amendment privilege during his deposition. *See SEC v. Jasper*, 678 F.3d 1116, 1126–27 (9th Cir. 2012) (affirming district court's adverse inference in similar circumstances).

whether business is transacted through a maze of interrelated companies; the commingling of

corporate funds and failure to maintain separation of companies; unified advertising; and

evidence that reveals that no real distinction exists between the corporate defendants." *FTC v.*

*Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) *aff'd in part, vacated in part*,

763 F.3d 1094 (9th Cir. 2014).

      The evidence demonstrates that no real distinction exists between the Corporate Lending

Defendants.  The Tucker Defendants admit that AMG Capital, Level 5, and Broadmore all used

the same Nevada address for incorporation. (Tucker Defs.' Am. Ans. ¶¶ 10–12, 15, ECF No.

397).  Further, bank statements, checks, and invoices all demonstrate that the Corporate

Lending Defendants all operated from the same Kansas address, which the Tucker Defendants

do not dispute. (*See* Ex. 168 to Singhvi Dep., ECF No. 908-168).  Nor do the Tucker

Defendants dispute that the Corporate Lending Defendants are wholly-owned by Scott Tucker.

(*See* Corp. Disclosure Statement, ECF No. 58).  Finally, as discussed *supra*, Scott Tucker

dominated the Lending Defendants' bank accounts and funneled thousands of payments to the

Corporate Lending Defendants.  Indeed, beyond their unfounded evidentiary objections, the

Tucker Defendants do not dispute the commingling of funds between AMG Capital, Level 5,

Broadmore, Black Creek, and other entities owned by Scott Tucker. (*See* Tucker Defs.' Resp.

to FTC's MSJ 67:15–27, 68:18–24).

      The Tucker Defendants argue that a common enterprise did not exist because "the FTC

has not shown that the Tucker entities participated in the lending." (Resp. 66:5–7).  The Tucker

Defendants oversimplify the standard to show common enterprise liability.  The Ninth Circuit

panel in *Network Services* did not find the existence of a common venture dispositive. *Network*

*Servs.*, 617 F.3d at 1143.  Instead, the panel also considered the existence of pooled resources,

staff, and funds as well as common ownership in its determination that a common enterprise

existed under the facts in that case. *Id.*  Likewise, other courts analyze these factors collectively

without emphasis on any one factor. *See, e.g.*, *Fed. Trade Comm'n v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF (AGRx), 2015 WL 11257575, at *6 (C.D. Cal. July 1, 2015) ("It is not necessary that the FTC prove any particular number of entity connections in order to establish a common enterprise, and, similarly, no one connection is dispositive."). Accordingly, in light of the overwhelming evidence that the Tucker Defendants operated as a common enterprise, each is jointly and severally liable for one another's wrongful conduct.

### E.  Relief Defendants

District courts are given broad authority under the FTC Act to fashion equitable remedies to the extent necessary to ensure effective relief. *Network Servs.*, 617 F.3d at 1141–42. "[T]he broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998). "The creditor plaintiff must show that the [relief] defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds." *Id.* at 677.  Upon such a showing, the remedy is an equitable monetary judgment in the amount of the funds that the relief defendant received. *See id.*; *see also S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset.").

The evidence establishes that Scott Tucker diverted millions of dollars from himself and the Corporate Lending Defendants to the Relief Defendants.  Beginning with Scott Tucker's wife, Kim Tucker, numerous bank statements show payments amounting to $19,072,774 in favor of Kim Tucker from the Tucker Defendants. (*See* Ex. 227 to Singhvi Decl., ECF No. 908-227).  These payments include a check for over $4.1 million from Black Creek. (Ex. 228 to Singhvi Decl., ECF No. 908-228).  In addition, on several occasions Scott Tucker directed loan portfolios to make payments to a Corporate Lending Defendant, then simultaneously caused the

Corporate Lending Defendant to pay the aggregate amount to Kim Tucker. (*See, e.g.*, Ex. 231 to Singhvi Decl., ECF No. 908-231).  Moreover, Kim Tucker admits that she "intermittently received monies from or on behalf of her spouse, Scott Tucker, through AMG Services, Inc. and Black Creek Capital Corporation . . . for the purposes of personal and household uses." (Kim Tucker Supp. Ans. to Interrog. 6(c), ECF No. 908-226).

Turning to Park 269, Kim Tucker's wholly owned entity and nominal owner of an $8 million home located at 269 Park Avenue, Aspen, Colorado, the evidence demonstrates that AMG financed the purchase, mortgage, furnishing, maintenance, housekeeping, landscaping, and property taxes for the property. (*See* Ex. 87 to Singhvi Decl., ECF No. 908-87); (Ex. 238 to Singhvi Decl., ECF No. 908-238).  Park 269 does not dispute these payments. (*See generally* House Dep., ECF No. 908-237).  Further, a summary created by Blaine Tucker of Scott Tucker's investments shows that AMG is the holding company and funding company for Park 269. (Ex. 202 to Singhvi Decl. at 4, ECF No. 908-202).

Neither Kim Tucker nor Park 269 have a legitimate claim to these funds. *See Colello*, 139 F.3d at 676.  Kim Tucker admits she had no role or ownership interest in any Corporate Lending Defendant. (Kim Tucker Supp. Resp. to Interrog. No. 1, ECF No. 908-226).  Nor did Kim Tucker provide any consideration for the money transfers to her. (*See* Kim Tucker Supp. Ans. to Interrog. 6(c)).  Further, Park 269 disclaims having offered any services or other value to the Tucker Defendants. (Park 269 Resp. to Interrog. No. 6, ECF No. 908-235).  The Court therefore finds disgorgement of $19,072,774 from Kim Tucker's accounts and $8 million from Park 269 is appropriate.

## F.   Remedies

The FTC requests both a permanent injunction against the Tucker Defendants and monetary equitable relief, in the form of restitution or, in the alternative, disgorgement. (First Am. Compl. 20:7–19, ECF No. 386).  Under § 13(b) of the FTC Act, the FTC "may seek, and

after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also Evans Prods.*, 775 F.2d at 1086.  "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), including "any ancillary relief necessary to accomplish complete justice," *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

### 1.   *Permanent Injunction*

A permanent injunction is justified if there exists "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or "some reasonable likelihood of future violations," *CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982).  The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct. *Co Petro Mktg. Grp.*, 502 F. Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89–3818, 1991 WL 90895, at *15–16 (C.D. Cal. Mar. 28, 1991).  "[I]t must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 953 (9th Cir. 1981) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

The Court finds that a permanent injunction against Scott Tucker is appropriate under the circumstances to enjoin him from engaging in similar misleading and deceptive lending activities.  Here, Scott Tucker did not participate in an isolated, discrete incident of deceptive lending, but engaged in sustained and continuous conduct that perpetuated the deceptive

1  lending since at least 2008.  Scott Tucker initiated the Corporate Lending Defendants'

2  relationship with the tribes and oversaw the organization of the Lending Defendants.  Scott

3  Tucker served as a key leader and executive of the Corporate Lending Defendants.  Scott

4  Tucker reviewed the various iterations of the loan documents and webpages and, at the very

5  least, was recklessly indifferent to the fact that they were misleading, given the ample notice of

6  consumer confusion.  In addition, Scott Tucker was previously convicted on federal charges

7  related to another fraudulent lending scheme. *See United States v. Tucker*, Case No. CR-90-

8  00163-01 (W.D. Mo. Aug. 13, 1990); *United States v. Tucker*, Case No. 4:81-CR-00001 (W.D.

9  Mo. Jan. 4, 1991).  Further, as with every question asked during his deposition, Scott Tucker

10  invoked the Fifth Amendment as to his current business ventures and whether or not he is

11  currently engaged in consumer lending. (*See* Scott Tucker Dep. 111:21–114:12); *Colello*, 139

12  F.3d at 677 (affirming district court's adverse inference against defendant who "consistently

13  invoked his Fifth Amendment privilege not to testify").  All of these factors weigh in favor of

14  imposing a permanent injunction against Scott Tucker.

### 2.    Monetary Equitable Relief

16    Section 13(b) permits a panoply of equitable remedies, including monetary equitable

17  relief in the form of restitution and disgorgement, as well as miscellaneous reliefs such as asset

18  freezing, accounting, and discovery to aid in providing redress to injured consumers. *Pantron I*

19  *Corp.*, 33 F.3d at 1103 n. 34 (9th Cir. 1994); *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–08

20  (9th Cir. 1993); *H.N. Singer*, 668 F.2d at 1113.

### i.    Restitution and Disgorgement

22    The FTC Act is designed to protect consumers from economic injuries. *Stefanchik*, 559

23  F.3d at 931.  To effect that purpose, courts may award restitution to redress consumer injury.

24  *F.T.C. v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("We have held that restitution is a form of

25  ancillary relief available to the court in these circumstances to effect complete justice.").

1    Restitution may be measured by the "the full amount lost by consumers rather than limiting

2    damages to a defendant's profits." *Stefanchik*, 559 F.3d at 931 (affirming restitution of over $17

3    million for the full amount of consumer loss); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th

4    Cir. 1997) (affirming restitution for more than $16 million against company and officer as

5    consumer loss under section 13(b)).  Consumer loss is calculated by "the amount of money paid

6    by the consumers, less any refunds made." *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d

7    202, 213–14 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010); *see also Stefanchik*, 559 F.3d at

8    931; *Figgie*, 994 F.2d at 606; *Gill*, 265 F.3d at 958.

9           As an alternative to restitution, "[s]ection 13(b) permits a district court to order a

10   defendant to disgorge illegally obtained funds." *Febre*, 128 F.3d at 537.  Disgorgement is

11   measured by the amount of profits causally connected to the violation. *SEC v. Happ*, 392 F.3d

12   12, 31 (1st Cir. 2004).  The purpose of disgorgement is not to redress consumer injuries but to

13   deprive wrongdoers of ill-gotten gains. *Febre*, 128 F.3d at 537.

14          Irrespective of the measure used to calculate monetary equitable relief, courts apply a

15   burden-shifting framework to determine the specific amount to award. *Direct Mktg. Concepts*,

16   624 F.3d at 15.  First, the FTC bears the initial burden of providing the Court with a reasonable

17   approximation of the monetary relief to award. *Commerce Planet*, 815 F.3d at 603.  A

18   reasonable estimate, rather than an exact amount, is proper because that may be the only

19   information available, as when defendants do not maintain data necessary to calculate the

20   precise amount. *FTC v. QT, Inc.,* 512 F.3d 858, 864 (7th Cir.2008) ("A court is entitled to

21   proceed with the best available information[.]"); *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 69 (2d

22   Cir.2006) ("Of course, the reasonableness of an approximation varies with the degree of

23   precision possible."), *cert. denied,* 549 U.S. 1278, 127 S.Ct. 1868, 167 L.Ed.2d 317 (2007).

24          Second, once the FTC satisfies this burden, "the burden then shifts to the defendant to

25   show that the FTC's figures overstate the amount of the defendant's unjust gains." *Commerce*

*Planet*, 815 F.3d at 604.  "Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy." *Direct Mktg. Concepts*, 624 F.3d at 15; *see also Commerce Planet*, 815 F.3d at 604 ("Any risk of uncertainty at this second step 'fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'") (quoting *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011)).

ii.    *Calculation of Consumer Loss*

The FTC requests an amount of $1,317,753,577 in consumer loss between 2008 and 2012. (FTC's MSJ 73:20–21).  The FTC relies on calculations performed by Elizabeth Miles, a data analyst employed by the FTC. (*See* Miles Decl. ¶ 1, ECF No. 908-244).  Miles used loan data from eCash, the Tucker Defendants' loan management software, produced by AMG and MNES. (*See Id.* ¶ 2); (Resp. to Obj. 22:13–15).  To implement the calculations, Miles used Stata, software designed to sort and aggregate large databases. (Miles Decl. ¶ 4).  Miles created "scripts," or commands, to identify where a consumer paid more than the disclosed total of payments, the principal and one finance charge. (*Id.* ¶¶ 4–11).  Miles excluded loan records without matching consumer information as well as loans to individual consumers who borrowed from any specific portfolio more than once. (*Id.* ¶¶ 8–9).  For that subset of loans, the FTC instructed Miles multiply the amount borrowed by the disclosed total of payments, or 1.3, reflecting the standard 30% finance charge imposed by the Lending Defendants. (*Id.* ¶ 11); (*see* Resp. to Obj. 25:2–4).  Then, Miles directed the software to subtract that amount from the total amount consumers paid. (*Id.* ¶ 12).  The resulting amount of consumer harm is the total amount paid in excess of the amount borrowed accounting for disclosed finance charges, or $1,317,753,577. (*Id.* ¶ 13).

The Tucker Defendants' objections to the FTC's consumer harm calculation largely center on the admissibility of the Miles Declaration. (*See* Obj. 21:13–22:20); (Tucker Defs.' Resp. to FTC's MSJ 72:20–80:2).  On this point, the Tucker Defendants argue, *inter alia*, that

the FTC's calculations do not include "over 3.3 million consumer records and over 3,000 loan records" that failed to merge into a single new data set. (Tucker Defs.' Resp. to FTC's MSJ 79:13). However, the absence of these records likely benefits the Tucker Defendants; if these records had successfully merged, the amount of consumer harm would conceivably be greater than the instant calculation. Further, the Court has already found the Miles Declaration admissible. (Order 9:20 n.5, ECF No. 960).

Next, the Tucker Defendants object that the FTC's calculation "erroneously assumes that every single borrower forever relied upon the loan disclosures and that every dollar paid in excess of the principal plus one finance charge was directly attributable to a Section 5 violation." (Tucker Defs.' Resp. to FTC's MSJ 80:9–11). The Court agrees with the FTC that, as a matter of law, the FTC need not show that all consumers were deceived or that all consumers relied upon the misrepresentations. Under § 13(b) of the FTC Act, proof of injury by every individual consumer is not required to justify a restitution award. *Stefanchik*, 559 F.3d at 929 n. 12; *Figgie*, 994 F.2d at 605 ("It is well established with regard to Section 13 of the FTC Act . . . that proof of individual reliance by each purchasing customer is not needed."). This is because, unlike a private suit for fraud, "[s]ection 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers," and "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *Figgie Int'l*, 994 F.2d at 605. Rather, "[a] presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Id.*; *see also FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) ("[I]t is sufficient for the FTC to prove that misrepresentations were widely disseminated (or impacted an overwhelming number of consumers) and caused actual consumer injury."), *aff'd*, 475 Fed. Appx. 106 (9th Cir. 2012).

1    In addition, the Tucker Defendants argue that repeat borrowers within the same loan

2  portfolio as well as repeat borrowers across the different loan portfolios should be excluded

3  from the calculation. (Tucker Defs.' Resp. to FTC's MSJ 81:21–84:19).  The Tucker

4  Defendants assert that the repeat nature of these loans indicates that these borrowers were

5  "satisfied" and "unconfused." (*Id.* 82:27, 83:2).  In support, the Tucker Defendants rely on a

6  report prepared by their economics expert, Dr. David Scheffman ("Dr. Scheffman"). (*Id.*

7  81:22–25).  Dr. Scheffman states in his report that "[repeat borrowers] . . . plainly understood

8  the loan terms," without further explanation and merely as a premise to his ultimate

9  conclusions. (Scheffman Report ¶ 20, ECF No. 942-16).  This single conclusory statement

10  alone is insufficient to create a genuine dispute of material fact that repeat customers were not

11  misled.  Further, the Tucker Defendants provide no evidence that repeat borrowers across loan

12  portfolios knew they were dealing with the same enterprise.

13    Finally, the Tucker Defendants also argue that they should only be liable for one finance

14  charge per borrower because "the only amount with a causal nexus to the Court's finding of a

15  Section 5 violation is one finance charge for each first-time borrower." (Tucker Defs.' Resp. to

16  FTC's MSJ 86:5–6).  This argument is legally and factually incorrect.  The instant § 13

17  damages calculation asks whether consumers who purchased loans "did so in reliance on the

18  misrepresentations." *Commerce Planet*, 815 F.3d at 604.  On this point, the Court determined,

19  *supra*, that the FTC was entitled to a presumption in the affirmative.  Consumers began paying

20  back their loans only after the "fraud in the selling" was complete and could not thereafter

21  escape the loan repayment scheme. *Figgie*, 994 F.2d at 606.  Accordingly, the calculation

22  appropriately includes subsequent finance charges.

23    Where, as here, consumers suffer economic injury resulting from a defendant's

24  violations of the FTC Act, equity requires monetary relief in the full amount lost by consumers.

25  *See Stefanchik*, 559 F.3d at 931.  Accordingly, the Court finds that the Tucker Defendants are

jointly and severally liable for restitution in the amount of $1,266,084,156, plus prejudgment interest.  This amount reflects the $1,317,753,577 in total harm minus the $24,596,677 collected from former defendants and the $27,072,744 owing from the Relief Defendants, discussed *supra*. (*See* FTC's MSJ 100:3–6).

## IV.   <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Relief Defendants' Motion for Summary Judgment (ECF No. 900) is **DENIED**.

**IT IS FURTHER ORDERED** that the Tucker Defendants' Motion for Summary Judgment (ECF No. 913) is **DENIED**.

**IT IS FURTHER ORDERED** that the Tucker Defendants' Motions to Reconsider, (ECF Nos. 850, 963, 975), are **DENIED**.

**IT IS FURTHER ORDERED** that the FTC's Motion for Summary Judgment (ECF No. 907) is **GRANTED** pursuant to the following terms:

## I.   DEFINITIONS

For the purpose of this Order, the following definitions apply:

1.   "Collection of Debts" means any activity the principal purpose of which is to collect or attempt to collect, directly or indirectly, Debts owed or due or asserted to be owed or due.

2.   "Consumer credit" means credit offered or extended to a natural person primarily for personal, family, or household purposes.

3.   "Corporate Defendants" means AMG Capital Management, LLC; Black Creek Capital Corporation; Level 5 Motorsports, LLC; LeadFlash Consulting, LLC; and Broadmoor Capital Partners, LLC, and their successors and assigns, individually, collectively, or in any combination.

4.      "Debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, or services that are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

5.      "Defendants" means the Corporate Defendants and Scott Tucker and Nereyda Tucker, as executor of the estate of Blaine Tucker.

6.      "Material" means likely to affect a person's choice of, or conduct regarding, goods or services.

7.      "Person" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

8.      "Relief Defendants" means Kim Tucker and Park 269, LLC.

## II.      BAN ON CONSUMER LENDING

**IT IS ORDERED** that Scott Tucker and the Corporate Defendants, whether directly or through an intermediary, are permanently restrained and enjoined from, or assisting others engaged in:

A.      Providing, arranging for, or assisting any consumer in receiving or applying for any loan or other extension of Consumer Credit; and

B.      Advertising, marketing, promoting, or offering any loan or other extension of Consumer Credit.

## III.      PROHIBITION AGAINST MISREPRESENTATIONS

**IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants, and the Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, Whether acting directly or indirectly, in connection with promoting or offering for sale any

good or service, are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication, any fact Material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## IV.   PROHIBITION AGAINST DECEPTIVE COLLECTION PRACTICES

**IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the Collection of Debts, are hereby permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, expressly or by implication:

A.   That consumers can be arrested, prosecuted, or imprisoned for failing to pay the Defendant;

B.   That the Defendant will or can take formal legal action against consumers who do not pay the Defendant, including but not limited to, filing suit; and

C.   Any other Material fact.

## V.   INJUNCTION CONCERNING ELECTRONIC FUND TRANSFER PRACTICES

**IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby permanently restrained and enjoined from conditioning the extension of credit on preauthorized electronic fund transfers.

## VI.   MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.     Judgment in the amount of $1,301,897,652 is entered in favor of the Commission against the Defendants as equitable monetary relief. In addition, judgment in the amount of $19,072,774 is entered in favor of the Commission against Relief Defendant Kim Tucker, and judgment in the amount of $8,000,000 is entered in favor of the Commission against Relief Defendant Park 269, LLC.

B.     The Defendants are ordered to pay to the Commission $1,266,084,156, plus prejudgment interest. Such payment must be made within 14 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

C.     Kim Tucker is ordered to pay to the Commission $19,072,774. Such payment must be made within 14 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

D.     Park 269, LLC is ordered to pay to the Commission $8,000,000. Such payment must be made within 14 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

E.     The Defendants and Relief Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

F.     The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

G.     The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

H.      The Defendants and Relief Defendants must submit their Taxpayer Identification Numbers to the Commission, and acknowledge that their Taxpayer Identification Numbers may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

I.      All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to the Defendants' practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. The Defendants and Relief Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VII.   CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants, the Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are hereby permanently restrained and enjoined from directly or indirectly:

A.      Failing to provide sufficient customer information, to the extent it is in the Defendants' possession, custody or control, to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, the Defendants must provide it, in the form prescribed by the Commission, within 14 days.

B.      Disclosing or transferring to any other person customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that the Defendants obtained prior to entry of this Order in connection with the offering and collection of high-fee, short-term payday loans.

C.      Failing to destroy such customer information in all forms in its possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission. *Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## VIII.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that the Defendants and Relief Defendants obtain acknowledgments of receipt of this Order:

A.      The Defendants and Relief Defendants, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, Scott Tucker, for any business that Scott Tucker, individually or collectively with any other defendant in this action, is the majority owner or controls directly or indirectly, and each Corporate Defendant must deliver a copy of this Order to (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in the Collection of Debts; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

1    C.    From each individual or entity to which Scott Tucker and the Corporate

2 Defendants delivered a copy of this Order, these Defendants must obtain, within 30 days, a

3 signed and dated acknowledgment of receipt of this Order.

4              **IX.    COMPLIANCE REPORTING**

5       **IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants make

6 timely submissions to the Commission:

7    A.    One year after entry of this Order, Scott Tucker and the Corporate Defendants

8 must submit compliance reports, sworn under penalty of perjury:

9         1.    Scott Tucker and each Corporate Defendant must:

10             a.    Identify the primary physical, postal, and email address and

11                   telephone number, as designated points of contact, which

12                   representatives of the Commission may use to communicate with

13                   Scott Tucker and the Corporate Defendants;

14             b.    Identify all of Scott Tucker's or the Corporate Defendant's

15                   businesses by all of their names, telephone numbers, and physical,

16                   postal, email, and Internet addresses;

17             c.    Describe the activities of each business and the involvement of any

18                   other defendant in this proceeding;

19             d.    Describe in detail whether and how Scott Tucker and the Corporate

20                   Defendants are in compliance with each Section of this Order; and

21             e.    Provide a copy of each Order Acknowledgment obtained pursuant

22                   to this Order, unless previously submitted to the Commission.

23         2.    Additionally, Scott Tucker must:

24             a.    Identify all telephone numbers and all physical, postal, email and

25                   Internet addresses, including all residences;

b.   Identify all business activities, including any business for which Scott Tucker performs services whether as an employee or otherwise and any entity in which Scott Tucker has any ownership interest; and

c.   Describe in detail Scott Tucker's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.   For 20 years after entry of this Order, Scott Tucker and the Corporate Defendants must submit compliance notices, sworn under penalty of perjury, within 14 days of any change in the following:

1.   Scott Tucker and each Corporate Defendant must report any change in:

a.   Any designated point of contact; or

b.   The structure of any Corporate Defendant or any entity that Scott Tucker or any Corporate Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.   Additionally, Scott Tucker must report any change in:

a.   Name, including aliases or fictitious names, or residence address; or

b.   Title or role in any business activity, including any business for which Scott Tucker performs services whether as an employee or otherwise and any entity in which Scott Tucker has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.      Scott Tucker and the Corporate Defendants must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Scott Tucker or the Corporate Defendants within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. AMG Services, Inc., No. X120026.

## X.      RECORDKEEPING

**IT IS FURTHER ORDERED** that Scott Tucker and the Corporate Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendants and Scott Tucker for any business that Scott Tucker, individually or collectively with any other defendants in this action, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.      Accounting records showing the revenues from all goods or services sold;

B.      Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E. A copy of each unique advertisement or other marketing material.

## XI.   COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Scott Tucker and the Corporate Defendants' compliance with this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, Scott Tucker and the Corporate Defendants must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69, provided that Scott Tucker or the Corporate Defendants, after attempting to resolve a dispute without court action and for good cause shown, may file a motion with this Court seeking an order for one or more of the protections set forth in Rule 26(c).

B. For matters concerning this Order, the Commission is authorized to communicate directly with the Defendants. The Defendants must permit representatives of the Commission to interview any employee or other person affiliated with the Defendants who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to the Defendants or any individual or entity affiliated with the Defendants, without the necessity of identification or

prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

### XII.   PRESERVATION OF RECORDS AND TANGIBLE THINGS

**IT IS FURTHER ORDERED** that the Defendants and officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order are hereby enjoined from: destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any documents or records that relate to the business practices, or business or personal finances, of the defendants in this proceeding or any other entity directly or indirectly under the control of any defendant in this proceeding. In the event of the dissolution of any Corporate Defendant, that Defendant shall ensure continued preservation of all such documents and records through the conclusion of the proceeding (and any appeals therefrom).  *Provided that*, nothing in this Article shall prohibit destruction of consumer information as may be directed by the Commission pursuant to Article VI.C.

### XIII.   DISSOLUTION OF STIPULATED ORDERS FOR PRELIMINARY AND PERMANENT INJUNCTIONS AND JUDGMENT

**IT IS FURTHER ORDERED** that, upon entry of this Order, the Court's Order Entering Stipulated Preliminary Injunction and Bifurcation dated December 27, 2012 (ECF No. 296) is **VACATED**; and

**IT IS FURTHER ORDERED** that, upon entry of this Order, the Court's Stipulated Order for Permanent Injunction and Judgment dated October 8, 2013 (ECF No. 478) is **VACATED**.

/ / /

/ / /

/ / /

## XIV.   RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

The Clerk of the Court shall enter judgment accordingly and close the case.

**DATED** this __30__ day of September, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge