**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>AMG CAPITAL MANAGEMENT, LLC;<br>BLACK CREEK CAPITAL<br>CORPORATION; BROADMOOR<br>CAPITAL PARTNERS, LLC; LEVEL 5<br>MOTORSPORTS, LLC; SCOTT A.<br>TUCKER; PARK 269 LLC; KIM C.<br>TUCKER,<br>*Defendants-Appellants.* | No. 16-17197<br><br>D.C. No.<br>2:12-cv-00536-<br>GMN-VCF<br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, Chief Judge, Presiding

Argued and Submitted August 15, 2018
San Francisco, California

Filed December 3, 2018

2          FTC v. AMG Capital Mgmt.

Before:  Diarmuid F. O'Scannlain and Carlos T. Bea,
Circuit Judges, and Richard G. Stearns,[*] District Judge.

Opinion by Judge O'Scannlain;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Bea

**SUMMARY**[**]

**Federal Trade Commission**

The panel affirmed the district court's summary judgment, and relief order, in favor of the Federal Trade Commission ("FTC") in the FTC's action alleging that Scott Tucker's business practices violated § 5 of the FTC Act's prohibition against "unfair or deceptive acts or practices in or affecting commerce."

Tucker's businesses offered high-interest, short-term payday loans through various websites that directed approved borrowers to hyperlinked documents that included the "Loan Note" and the essential terms of the loan as mandated by the Truth in Lending Act ("TILA").  The FTC alleged that Tucker violated § 5 of the FTC Act because the Loan Note was likely to mislead borrowers about the terms of the loan.

---

[*] The Honorable Richard G. Stearns, United States District Judge for the District of Massachusetts, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the Loan Note was deceptive because it did not accurately disclose the loan's terms. Specifically, the panel held that the TILA box's "total of payments" value was deceptive, and the fine print's oblique description of the loan's terms did not cure the misleading "net impression" created by the TILA box. The panel concluded that the Loan Note was likely to deceive a consumer acting reasonably under the circumstances.

The panel held that the district court had the power to order equitable monetary relief under § 13(b) of the FTC Act. The panel held that the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), and this court's decision in *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (holding that § 13 empowers district court's to grant any ancillary relief necessary), were not clearly irreconcilable; and *Commerce Planet* remained good law.

The panel held that the district court did not abuse its discretion in calculating the $1.27 billion award. The panel applied the burden-shifting framework of *Commerce Planet*, and concluded that the district court did not abuse its discretion when calculating the amount it ordered Tucker to pay.

The panel held that the district court did not err in permanently enjoining Tucker from engaging in consumer lending.

Judge O'Scannlain, specially concurring, joined by Judge Bea, wrote separately to suggest that the court rehear the case en banc to reconsider *Commerce Planet* and its predecessors, and the court's interpretation of § 13(b) of the FTC Act to empower district courts to compel defendants to

pay monetary judgments styled as "restitution." He would hold that this interpretation wrongly authorized a power that the statute did not permit.

Judge Bea concurred in the opinion because precedent compelled him to do so, but he wrote separately because he believed that this court's precedent was wrong in that it allowed the panel to decide that the Loan Note was deceptive as a matter of law. *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). Judge Bea would hold that courts should reserve questions such as whether the Loan Note was "likely to deceive" for the trier of fact.

---

## COUNSEL

Paul C. Ray (argued), Paul C. Ray Chtd., North Las Vegas, Nevada, for Defendants-Appellants.

Imad Dean Abyad (argued) and Theodore P. Metzler, Attorneys; Joel Marcus, Deputy General Counsel; David C. Shonka, Acting General Counsel; Federal Trade Commission, Washington, D.C.; for Plaintiff-Appellee.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Federal Trade Commission Act can support an order compelling a defendant to pay $1.27 billion in equitable monetary relief.

### I

### A

Scott Tucker controlled a series of companies that offered high-interest, short-term loans to cash-strapped customers. He structured his businesses to offer these payday loans exclusively through a number of proprietary websites with names like "500FastCash," "OneClickCash," and "Ameriloan." Although these sites operated under different names, each disclosed the same loan information in an identical set of loan documents. Between 2008 and 2012, Tucker's businesses originated more than 5 million payday loans, each generally disbursing between $150 and $800 at a triple-digit interest rate.

The application process was simple. Potential borrowers would navigate to one of Tucker's websites and enter some personal, employment, and financial information. Such information included the applicant's bank account and routing numbers so that the lender could deposit the funds and—when the bill came due—make automatic withdrawals. Approved borrowers were directed to a web page that disclosed the loan's terms and conditions by hyperlinking to seven documents. The most important of these documents was the Loan Note and Disclosure ("Loan

Note"),[1] which provided the essential terms of the loan as mandated by the Truth in Lending Act ("TILA"). *See* 15 U.S.C. § 1601 *et seq.* Borrowers could open the Loan Note and read through its terms if they chose, but they could also simply ignore the document, electronically sign their names, and click a big green button that said: "I AGREE Send Me My Cash!"

### B

In April 2012, the Federal Trade Commission ("Commission") filed suit against Tucker and his businesses in the District of Nevada.[2] The Commission's amended complaint alleged that Tucker's business practices violated § 5 of the Federal Trade Commission Act's ("FTC Act") prohibition against "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).[3] In particular, the Commission alleged that Tucker violated § 5 because the terms disclosed in the Loan Note did not reflect the terms

---

[1] An example of the Loan Note is reproduced in the Appendix.

[2] As is relevant on appeal, Tucker's businesses include defendants-appellants AMG Capital Management, LLC; Black Creek Capital Corporation; Broadmoor Capital Partners, LLC; and Level 5 Motorsports, LLC. Tucker is the sole owner of these corporations, and we refer to them collectively as "Tucker." The Commission's complaint also alleged that defendants-appellants Kim Tucker (Scott Tucker's wife) and Park 269 (a limited liability corporation that Kim Tucker owns) "received funds" that could be "traced directly to [Tucker's] unlawful acts or practices."

[3] The Commission also claimed that such practices violated TILA's "Regulation Z," which requires disclosures to be made "clearly and conspicuously." 12 C.F.R. § 1026.17(a)(1). These formally independent legal theories are largely duplicative, however, because TILA states that a violation of its provisions "shall be deemed" a violation of the FTC Act. 15 U.S.C. § 1607(c).

that Tucker actually enforced. Thus, the Commission asked the court permanently to enjoin Tucker from engaging in consumer lending and to order him to disgorge "ill-gotten-monies."

In December 2012, the parties agreed to bifurcate the proceedings in the district court into a "liability phase" and a "relief phase." During the liability phase, the Commission moved for summary judgment on the FTC Act claim, which the district court granted. In the relief phase, the court enjoined Tucker from assisting "any consumer in receiving or applying for any loan or other extension of Consumer Credit," and ordered Tucker to pay approximately $1.27 billion in equitable monetary relief to the Commission. The district court instructed the Commission to direct as much money as practicable to "direct redress to consumers," then to "other equitable relief . . . reasonably related to the Defendants' practices alleged in the complaint," and then to "the U.S. Treasury as disgorgement." Tucker timely appeals and challenges both the entry of summary judgment and the relief order.

## II

Tucker first argues that the district court wrongly granted the Commission's motion for summary judgment finding Tucker liable for violating § 5 of the FTC Act.

## A

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). To prevail, the Commission must show that a representation, omission, or practice is "likely to mislead consumers acting reasonably under the circumstances." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (internal quotation marks

8                FTC v. AMG Capital Mgmt.

omitted). This consumer-friendly standard does not require
the Commission to provide "[p]roof of actual deception."
*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th
Cir. 1979). Instead, it must show only that the "net
impression" of the representation would be likely to
mislead—even if such impression "also contains truthful
disclosures." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196,
1200 (9th Cir. 2006).

1

In this case, the Commission argues that Tucker violated
§ 5 because the Loan Note was likely to mislead borrowers
about the terms of the loan. The top third of such Loan Note
contained the so-called TILA box, which disclosed the
"amount financed," the "finance charge," the "total of
payments," and the "annual percentage rate." The "amount
financed" portion of the box was the amount borrowed, and
the "finance charge" was equal to 30 percent of the borrowed
amount. The final two figures were calculated by summing
the principal and the finance charge ("total of payments")
and then determining the "annual percentage rate." By way
of illustration, suppose that a customer wanted to borrow
$300. The Loan Note's TILA box would state that the
"amount financed" was $300, that the "finance charge" was
$90, and that the "total of payments" was $390. The "annual
percentage rate" would vary based on the date the first
payment was due.

But the fine print *below* the TILA box was essential to
understanding the loan's terms. This densely packed text set
out two alternative payment scenarios: (1) the "decline-to-
renew" option and (2) the "renewal" option. Beneath the
TILA box, the Loan Note stated: "Your Payment Schedule
will be: 1 payment of [the 'total of payments' number] . . . if
you decline* the option of renewing your loan." The asterisk

directed the reader to text five lines further down the page, which read: "To decline this option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due." Tucker would send this "Account Summary link" three days after the funds were disbursed. With this email, borrowers hoping to exercise the decline-to-renew option had to navigate through an online customer-service portal, affirmatively choose to "change the Scheduled" payment, and agree to "Pay Total Balance." All of this had to be done "at least three business days" before the next scheduled payment. Thus, the borrower had to take *affirmative action* within a specified time frame if he hoped to pay only the amount listed in the TILA box as the "total of payments."

By contrast, the "renewal" option would end up costing a borrower significantly more. Importantly, renewing the loan did not require the borrower to take any affirmative action at all; it was the default payment schedule. On the third line below the TILA box, the Loan Note read: "If renewal is accepted you will pay the finance charge . . . only." And with each "renewal," the borrower would "accrue new finance charges"—that is, an additional 30-percent premium. After the fourth renewal, Tucker would begin to withdraw the "finance charge plus $50," and he would withdraw another such payment each subsequent period until the loan was paid in full.

To illustrate, consider again the example of the customer who wanted to borrow $300. The Loan Note's TILA box would indicate that his "total of payments" would be $390, equaling $300 in principal plus a $90 finance charge. But he would be required to pay much more than that, unless he took the affirmative steps to "decline" to renew the loan.

Once again, these steps required him to wait three days after getting the cash, follow a link in a separate email, and agree at least three days before the due date to pay the full balance. If he failed to perform this routine, then he would owe yet another finance change (equaling another 30 percent of the borrower's remaining balance) at the next due date. And if he simply let Tucker automatically withdraw the payments for the course of the loan, he would owe the $300 principal, plus *ten* separate finance charges, each equaling 30 percent of the borrower's remaining balance. Altogether, a borrower following the default plan would pay $975 instead of $390.

2

We agree with the Commission that the Loan Note was deceptive because it did not accurately disclose the loan's terms. Most prominently, the TILA box suggested that the value reported as the "total of payments"—described further as the "amount you will have paid after you have made the scheduled payment"—would equal the full cost of the loan. In reliance on this information, a reasonable consumer might expect to pay only that amount. But as we have described, under the default terms of the loan, a consumer would be required to pay much more. Indeed, under the terms that Tucker actually enforced, borrowers had to perform a series of affirmative actions in order to decline to renew the loan and thus pay only the amount reported in the TILA box.

The Loan Note's fine print does not reasonably clarify these terms because it is riddled with still more misleading statements. First, the explanation of the process of declining to renew the loan is buried several lines below where the option to decline is first introduced. Second, nothing in the fine print explicitly states that the loan's "renewal" would be the *automatic* consequence of inaction. Instead, it misleadingly says that such renewal must be "accepted,"

which seems to require the borrower to perform some affirmative action. Third, between the sentence that introduces the decline-to-renew option and the sentences that explain the costly consequences of renewal, there is a long and irrelevant sentence about what happens if a pay date falls on a weekend or holiday. Thus, the fine print's oblique description of the loan's terms fails to cure the misleading "net impression" created by the TILA box.

3

Tucker suggests, however, that the Loan Note is not deceptive because it is "technically correct." But the FTC Act's consumer-friendly standard does not require only technical accuracy. In *Cyberspace*, we held that a solicitation was deceptive even though "the fine print notices . . . on the reverse side of the" solicitation contained "truthful disclosures." 453 F.3d at 1200. Indeed, *Cyberspace* held that it was irrelevant that "most consumers [could] understand the fine print on the back of the solicitation when that language [was] specifically brought to their attention." *Id.* at 1201. Just as in *Cyberspace*, consumers acting reasonably under the circumstances—here, by looking to the terms of the Loan Note to understand their obligations—likely could be deceived by the representations made there. Therefore, we agree with the Commission that the Loan Note was deceptive.

B

Tucker further contends that the district court erred because its narrow focus on the Loan Note fails to capture the "net impression" on consumers. The district court found that "any facts other than the terms of the Loan Note . . . and their presentation in the document are immaterial to a summary judgment determination." But according to

Tucker, the court should have considered all of his loan disclosures and all of his communications regarding those disclosures.

Tucker's argument wrongly assumes that non-deceptive business practices can somehow cure the deceptive nature of the Loan Note. The Act prohibits deceptive "acts *or* practices," 15 U.S.C. § 45(a)(1) (emphasis added), so it gives the Commission flexibility to bring suit either for particular misleading representations, or for generally deceptive business practices. *Cf. FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 243 (1972) ("Congress [did not intend] to confine the forbidden methods to fixed and unyielding categories." (citation omitted)). In this case, the Commission must show only that a specific "representation" was "likely to mislead." *Stefanchik*, 559 F.3d at 928; *see also Cyberspace*, 453 F.3d at 1200–01 (basing liability on deceptive solicitations without resorting to defendant's other practices); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads."). Under this standard, the district court's focus on the Loan Note—that is, on this particular deceptive "representation"—was perfectly permissible.

## C

Tucker next argues that summary judgment was also inappropriate because he demonstrated a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor. Tucker cites a host of evidence in support of this point, but only two of his arguments merit our attention.

First, Tucker claims that the Commission introduced evidence that "contradicted" its theory of deception because four deposed consumers "had not read the loan disclosures" and "understood the disclosures upon reading them at their depositions." Thus, Tucker argues that there is some evidence that consumers may not have regularly *read* the supposedly deceptive Loan Note. And if customers were not likely to read the Loan Note in the first place, the argument goes, then it cannot be likely to deceive them.

But Tucker once again misunderstands the consumer-friendly standards of § 5 of the FTC Act. We have held that "[p]roof of actual deception is unnecessary to establish a violation," and thus Tucker can be liable if the Loan Note itself "possess[es] a tendency to deceive." *Trans World Accounts, Inc.*, 594 F.2d at 214. Thus, we held in *Cyberspace* that the terms of a solicitation alone were deceptive such that "no reasonable factfinder could conclude that the solicitation was not likely to deceive consumers acting reasonably under the circumstances." 453 F.3d at 1201. True enough, we also stated in *Cyberspace* that proof of actual deception is "highly probative," but we did so only to "bolster[]" our conclusion that the solicitation itself "created [a] deceptive impression." *Id.* at 1200–01. In this case, however, Tucker points to no evidence that consumers who *did* read the Loan Note understood its terms. Tucker therefore fails to show that a genuine issue of material fact exists.

Second, Tucker claims that the expert testimony offered by Dr. David Scheffman demonstrated an "absence of confusion or deception." Tucker's counsel retained Dr. Scheffman, who earned his doctorate in economics at the Massachusetts Institute of Technology, to "opine on whether the economic evidence regarding borrower behavior" was consistent with the Commission's theory of liability. He

designed his analysis "to test for any material difference in the behavior of inexperienced consumers that would indicate their understanding of the loan terms was different from highly experienced consumers." In other words, he wanted to determine whether first-time borrowers behaved like those who took out multiple loans. If first-time borrowers behaved just like the repeat borrowers, Dr. Scheffman reasoned, then the first-time borrowers could not have been misled about the loan terms. Because there was a "near-perfect . . . correlation between payoff behavior" among borrowers, Dr. Scheffman concluded that the data were "inconsistent with the allegation that borrowers were misled."

But Dr. Scheffman's reasoning begs the question. Consistent payoff patterns among classes of consumers show, at best, that the consumers were similarly aware of their obligations. While Dr. Scheffman concludes that first-time borrowers were just as well informed as the repeat ones, it is equally plausible that the repeat borrowers were just as confused as those taking out their first loans. As the district court noted, the expert's analysis simply assumed that repeat borrowers "plainly understood the loan terms." He did not, however, offer any evidence "that repeat borrowers across loan portfolios knew they were dealing with the same enterprise." To survive summary judgment, Tucker must identify some specific factual disagreement that could lead a fact-finder to conclude that the Loan Note was not likely to deceive. *See Stefanchik*, 559 F.3d at 929. Dr. Scheffman's testimony offers only speculative analysis that could cut either way. *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) ("Arguments based on conjuncture or speculation are insufficient . . . ." (internal

quotation marks omitted)). Therefore, Dr. Scheffman's testimony does not raise a genuine issue of material fact.[4]

### D

We conclude that the Loan Note was likely to deceive a consumer acting reasonably under the circumstances. We are therefore satisfied that the district court did not err in entering summary judgment against Tucker as to the liability phase.

### III

Tucker next challenges the relief phase determination that he must pay the Commission $1.27 billion. He urges that the district court did not have the power to order equitable monetary relief under § 13(b) of the FTC Act. Alternatively, he argues that the order to pay $1.27 billion overstates his unjust gains.

### A

Tucker contends that the Commission "improperly use[d] Section 13(b) to pursue penal monetary relief under the guise of equitable authority." After all, he points out, § 13(b) provides only that district courts may enter

---

[4] We need not address Tucker's objections that the admission of the Commission's consumer complaint database violated Federal Rule of Evidence 807 and Federal Rule of Civil Procedure 37. Such evidence was irrelevant to the district court's determination that the Loan Note itself was deceptive. Even if Tucker were correct, any error is harmless. *See Dowdy v. Metro. Life Ins. Co.*, 890 F.3d 802, 807 (9th Cir. 2018). Likewise, we need not address the Commission's alternative theory that Tucker is liable because he "independently violated the Truth in Lending Act." The finding of liability under § 5 of the FTC Act is independently sufficient to affirm the judgment against Tucker.

"injunction[s]." 15 U.S.C. § 53(b). According to Tucker, an order to pay "equitable monetary relief" is not an injunction, so he concludes that the statute does not authorize the court's order.

Tucker's argument has some force, but it is foreclosed by our precedent. We have repeatedly held that § 13 "empowers district courts to grant any ancillary relief necessary to accomplish complete justice, including restitution." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (internal quotation marks omitted); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) ("[T]he authority granted by section 13(b) . . . includes the power to order restitution."). Our precedent thus squarely forecloses Tucker's argument.

Tucker responds that we should revisit *Commerce Planet* in light of the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). In *Kokesh*, the Court determined that a claim for "disgorgement imposed as a sanction for violating a federal securities law" was a "penalty" within the meaning of the federal catch-all statute of limitations. 137 S. Ct. at 1639. Much like the equitable monetary relief at issue in this case, disgorgement in the securities-enforcement context is "a form of restitution measured by the defendant's wrongful gain." *Id.* at 1640 (citing Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. A, at 204 (2010)); *see also Commerce Planet*, 815 F.3d at 599 (describing restitution under § 13(b) as the power to "deprive defendants of their unjust gains"). The Court held that disgorgement orders are penalties because they "go beyond compensation, are intended to punish, and label defendants wrongdoers as a consequence of violating public laws." *Id.* at 1645 (internal quotation marks omitted).

Tucker suggests that *Kokesh* severs the line of reasoning that links "injunctions" to "equitable monetary relief." We said in *Commerce Planet*, for instance, that by "authorizing the issuance of injunctive relief," the statute "invoked the court's equity jurisdiction." 815 F.3d at 598 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)). Therefore, we concluded, § 13(b) "carries with it the inherent power to deprive defendants of their unjust gains from past violations, unless the Act restricts that authority." *Id.* at 599. Tucker contends, however, that *Kokesh*'s reasoning compels the conclusion that restitution under § 13(b) is in effect a penalty—not a form of equitable relief.

A three-judge panel may not overturn prior circuit authority unless it is "clearly irreconcilable with the reasoning or theory of intervening higher authority," *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), and such threshold is not met here. First, *Kokesh* itself expressly limits the implications of the decision: "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings." *Kokesh*, 137 S. Ct. at 1642 n.3. Second, *Commerce Planet* expressly rejected the argument that § 13(b) limits district courts to traditional forms of equitable relief, holding instead that the statute allows courts "to award complete relief even though the decree includes that which might be conferred by a court of law." *Commerce Planet*, 815 F.3d at 602 (internal quotation marks omitted). Because *Kokesh* and *Commerce Planet* are not clearly irreconcilable, we remain bound by our prior interpretation of § 13(b).

## B

Tucker next argues that the district court abused its discretion in calculating the amount of the award. Under our

case law, we apply a burden-shifting framework. *See Commerce Planet*, 815 F.3d at 603–04. The Commission "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gain," which is measured by "the defendant's net revenues . . . , not by the defendant's net profits." *Id.* at 603. If the Commission makes such showing, the defendant must show that the Commission's approximation "overstate[s] the amount of the defendant's unjust gains." *Id.* at 604. Any "risk of uncertainty at this second step falls on the wrongdoer." *Id.* (internal quotation marks omitted).

Tucker argues that the $1.27 billion judgment overstates his unjust gains. The court arrived at such figure based on the calculations of one of the Commission's analysts. The analyst relied on data from Tucker's loan management software to determine how much money Tucker received from consumers in excess of the principal disbursed plus the initial 30-percent finance charge. This surplus represented the amount of money that Tucker had received over-and-above the amount disclosed in the TILA box, which the Commission argued represented Tucker's ill-gotten gains. The district court agreed, so the final sum it ordered Tucker to pay was calculated as follows: the sum of each consumer's payments to Tucker, minus the sum of each consumer's "total of payments" as disclosed in the TILA box, and minus certain other payments already made or to be made by other defendants.

Tucker responds that the district court erred because it ignored evidence of non-deception that should have reduced the award. Once again, Tucker reiterates the argument that repeat customers could not have been misled by the loan's terms. Therefore, he concludes, these customers should have been excluded from the calculation. As we said above,

however, Tucker has not pointed to specific evidence that indicates one way or another whether repeat customers were actually deceived. *See supra* Part II.C. Further, Tucker has not offered "a reliable method of quantifying what portion of the consumers who purchased [the product] did so free from deception." *Commerce Planet*, 815 F.3d at 604. Therefore, the district court did not abuse its discretion when calculating the amount it ordered Tucker to pay.[5]

## IV

Finally, Tucker challenges the district court's decision to enjoin him from engaging in consumer lending. The text of § 13(b) limits injunctive relief to "proper cases," 15 U.S.C. § 53(b), and Tucker argues that the "proper case" language confines district courts to cases of "routine fraud." But we rejected this very argument in *FTC v. Evans Products Co.*, 775 F.2d 1084, 1086–87 (9th Cir. 1985). We thus cannot find fault with the district court's decision to enter a permanent injunction.

---

[5] The district court's relief order also required Kim Tucker and Park 269 to disgorge more than $27 million because Tucker had "diverted millions of dollars" from himself to them. Kim Tucker and Park 269 challenge this order. We have held that the FTC Act gives district courts the power to reach fraudulently obtained property "in the hands of any subsequent holder," unless "the transferee purchases ill-gotten assets for value, in good faith, and without actual or constructive notice of the wrongdoing." *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141–42 (9th Cir. 2010) (internal quotation marks omitted). Here, the district court found that Kim Tucker and Park 269 did not provide any consideration for their money transfers from Tucker. They do not dispute this core finding, and therefore we hold that the district court did not err when it ordered Kim Tucker and Park 269 to disgorge ill-gotten gains.

20          FTC v. AMG Capital Mgmt.

V

The judgment of the district court is **AFFIRMED**.

# APPENDIX

The following is an example of the Loan Note:

**LOAN NOTE AND DISCLOSURE**

Borrower's Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Date: 08/03/2011 ID#: OneClickCash-1953793314

**Parties:** In this Loan Note and Disclosure ("Note") you are the person named as Borrower above. "We" OneClickCash are the lender (the "Lender").

All references to "we", "us" or "ourselves" mean the Lender. Unless this Note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide to us shall be provided to OneClickCash at the fax number and address specified in this Note and in your other loan documents.

**The Account:** You have deposit account, No. ▮▮▮▮▮▮▮▮ ("Account"), at ▮▮▮▮▮▮▮▮▮▮▮▮ ("Bank") You authorize us to effect a credit entry to deposit the proceeds of the Loan (the Amount Financed indicated below) to your Account at the Bank

**DISCLOSURE OF CREDIT TERMS:** The information in the following box is part of this Note.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate (e) 782.14% | FINANCE CHARGE The dollar amount the credit will cost you. $150.00 | Amount Financed The amount of credit provided to you or on your behalf. $500.00 | Total of Payments The amount you will have paid after you have made the scheduled payment. $650.00 |
|---|---|---|---|

Your **Payment Schedule** will be: 1 payment of **$650.00** due on **2011-08-18** , if you decline* the option of renewing your loan. If your pay date falls on a weekend or holiday and you have direct deposit, your account will be debited on the business day prior to your normal pay date. If renewal is accepted you will pay the finance charge of $150.00 only, on 2011-08-18 You will accrue new finance charges with every renewal of your loan. On the due date resulting from a fourth renewal and every renewal due date thereafter, your loan must be paid down by $50.00. This means your Account will be debited the finance charge plus $50.00 on the due date. This will continue until your loan is paid in full. *To decline the option of renewal, you must select your payment options using the Account Summary link sent to your email at least three business days before your loan is due. **Security:** The loan is unsecured

**Prepayment:** You may prepay your loan only in increments of $50.00. If you prepay your loan in advance, you will not receive a refund of any Finance Charge.(e) The Annual Percentage Rate is estimated based on the anticipated date the proceeds will be deposited to or paid on your Account, which is 8-4-2011.

**Itemization Of Amount Financed of $500.00: Given to you directly: $500.00; Paid on your account $0**

See below and your other contract documents for any additional information about prepayment, nonpayment and default.

**Promise To Pay:** You promise to pay to us or to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this Note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above. This Note will be renewed on the Due Date unless at least three Business Days Before the Due Date either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the new due date, finance charge and all other disclosures. As used in the Note, the term "Business Day" means a day other than Saturday, Sunday or legal holiday, that OneClickCash is open for business. This Note may be renewed four times without having to make any principal payments on the Note. If this Note is renewed more than four times, then on the due date resulting from your fourth renewal, and on the due date resulting from each and every subsequent renewal, you must pay the finance charge required to be paid on that due date and make a principal payment of $50.00. Any payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to three Business Days prior to the date any payment becomes due on this Note. However, if you timely revoke this authorization, you authorize us to prepare and submit a check drawn on Your Account to 'repay your loan when it comes due. If there are insufficient funds on deposit in Your Account to effect the ACH debit entry or to pay the check or otherwise cover the Loan payment on the due date, you promise to pay Us all sums You owe by another form of payment other than personal check. We do not accept personal checks, however, if You send Us a check, You authorize Us to perform an ACH debit on that Account in the amount specified.

O'SCANNLAIN, Circuit Judge, specially concurring, joined by BEA, Circuit Judge:

I write separately to call attention to our circuit's unfortunate interpretation of the Federal Trade Commission Act. We have construed § 13(b)'s authorization of "injunction[s]" to empower district courts to compel defendants to pay monetary judgments styled as "restitution." *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

I respectfully suggest that such interpretation is no longer tenable.

Because the text and structure of the statute unambiguously foreclose such monetary relief, our invention of this power wrests from Congress its authority to create rights and remedies. And the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), undermines a premise in our reasoning: that restitution under § 13(b) is an "equitable" remedy at all. Because our interpretation wrongly authorizes a power that the statute does not permit, we should rehear this case en banc to relinquish what Congress withheld.

I

A

I would begin (and end) with the statute's text. Section 13(b) states that "the Commission may seek, and after proper proof, the court may issue, a permanent *injunction*." 15 U.S.C. § 53(b) (emphasis added). An injunction is "a judicial process whereby a party is required to do a particular

thing, or to refrain from doing a particular thing." 2 J. Story, *Commentaries on Equity Jurisprudence* § 1181, at 549 (14th rev. ed. 1918); *see also* 1 D. Dobbs, *Law of Remedies* § 1.1, at 7 (2d ed. 1993) (similar). Injunctions might either "prevent violation of rights," or compel the defendant to "restore the plaintiff to rights that have already been violated." 1 Dobbs, § 2.9(2), at 227. But an order to pay money "as reparation for injury resulting from breach of legal duty" is essentially a *damages* remedy—not a form of "specific relief" like an injunction. *Bowen v. Massachusetts*, 487 U.S. 879, 913–14 (1988) (Scalia, J., dissenting). Indeed, any other interpretation would be absurd: if "injunction" included court orders to pay monetary judgments, then "a statutory limitation to injunctive relief would be meaningless, since any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002).

If such text were not plain enough, the rest of § 13(b) reaffirms that "injunction" means only "injunction." The statute states, for example, that the Commission must believe that a person "is violating" or "is about to violate" the Act in order to request injunctive relief. 15 U.S.C. § 53(b)(1). Thus, § 13(b) anticipates that a court may award relief to prevent an *ongoing* or *imminent* harm—but not to deprive a defendant of "unjust gains from *past* violations." *Commerce Planet*, 815 F.3d at 599 (emphasis added). Indeed, § 13(b) expressly instructs courts to consider the traditional prerequisites for preliminary injunctive relief. The court must "weigh[] the equities," consider the Commission's "likelihood of ultimate success," and determine whether the preliminary injunction is "in the public interest." 15 U.S.C. § 53(b); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (listing these requirements along with

"irreparable harm"). Further, the statute expressly dispenses with the normal rule that a plaintiff must post a bond as security before the district court will grant preliminary relief. *Compare* 15 U.S.C. § 53(b) ("[A] preliminary injunction may be granted without bond . . . ."), *with* Fed. R. Civ. P. 65(c) (requiring plaintiffs seeking preliminary injunctions to give "security"). Section 13(b) thus not only provides for injunctions, but it also references the constellation of legal rules that make sense only with reference to such relief.

Further, "injunction" cannot reasonably be interpreted to authorize *other* forms of equitable relief, because Congress would have said so if it did. For example, the Employee Retirement Income Security Act (ERISA) authorizes litigants to seek *both* "to enjoin any act or practice" *and* "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). Indeed, in the Dodd-Frank Act, Congress felt compelled to amend the Commodity Exchange Act to allow courts to impose "equitable remedies including . . . restitution . . . [and] disgorgement of gains"—even though the statute *already* allowed it to impose "a permanent or temporary injunction." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 744, 124 Stat. 1376, 1735 (2010) (codified at 7 U.S.C. § 13a-1). Similar examples abound, as a brief glance through the Statutes at Large shows. *See* Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22, § 201, 123 Stat. 1632, 1639 (codified at 15 U.S.C. § 1639a) (stating that certain persons "shall not be subject to any injunction, stay, or other equitable relief"); Veterans' Benefits Improvement Act of 2008, Pub. L. No. 110-389, § 315, 122 Stat. 4145, 4167 (codified at 38 U.S.C. § 4323(e)) ("The court shall use . . . its full equity powers, including temporary or permanent injunctions, temporary restraining orders, and contempt orders"); Class Action Fairness Act of 2005, Pub. L. No.

109-2, § 3(a), 119 Stat. 4, 6 (codified at 28 U.S.C. § 1712) ("equitable relief, including injunctive relief").

If Congress could have used a broader phrase but "chose instead to enact more restrictive language," then "we are bound by that restriction." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99 (1991). Interpreting § 13(b)'s authorization of "injunctions" to empower courts to award so-called equitable monetary relief is, to say the least, strained.

## B

### 1

Such sensible interpretation—that "injunction" means only "injunction"—makes good sense in the context of the "overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2490 (2015) (internal quotation marks omitted). While § 13(b) empowers the Commission to stop *imminent* or *ongoing* violations, an entirely different provision of the FTC Act allows the Commission to collect monetary judgments for *past* misconduct. In particular, § 19 authorizes the Commission to seek "such relief as the court finds necessary to redress injury to consumers," which "may include, but shall not be limited to, rescission or reformation of contracts, the *refund of money or return of property*, the payment of *damages*, and public notification respecting . . . [such] unfair or deceptive act or practice." 15 U.S.C. § 57b(b) (emphasis added).

Read together, §§ 13(b) and 19 give the Commission two complementary tools—one forward-looking and preventive, the other backward-looking and remedial—to satisfy its statutory mandate. Injunctive relief in § 13(b) therefore functions as a simple stop-gap measure that allows the

Commission to act quickly to prevent harm. Indeed, the congressional findings regarding § 13(b) state that the "purpose of th[e] Act" is to "[e]nsure prompt enforcement of [the FTC Act] by granting statutory authority . . . to seek preliminary injunctive relief." Trans-Alaska Pipeline Authorization Act, § 408(b), Pub. L. No. 93-153, 87 Stat. 576, 591 (1973). Buttressing § 13(b)'s preventive relief, § 19 allows the Commission later to seek retrospective relief to punish or to remediate *past* violations. 15 U.S.C. § 57b; *see FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 603 (1993) ("The redress remedy [in § 19] relates to past conduct . . . ."). Our misguided interpretation of § 13(b), therefore, fundamentally misunderstands § 13(b)'s function within the FTC Act's "overall statutory scheme." *Burwell*, 135 S. Ct. at 2490.

Worse still, awarding monetary relief under § 13(b) circumvents § 19's procedural protections. Before the Commission can collect ill-gotten gains under § 19, it must surmount one of two procedural hurdles. First, it may prove to the district court that the defendant "violate[d] any rule" promulgated through the Commission's rulemaking procedures. 15 U.S.C. § 57b(a)(1); *see also id.* § 57a (granting the Commission's rulemaking authority). If the Commission has not promulgated such a rule, however, it must first pursue an administrative adjudication, issue a "final cease and desist order," and then prove to the district court that the defendant's conduct was such that a "reasonable man" would know it was "dishonest or fraudulent." *Id.* § 57b(a)(2); *see also id.* § 45 (granting the Commission authority to issue cease and desist orders). Thus, before the Commission can make someone pay, it must have already resorted to the FTC Act's administrative processes.

Doubtless, Congress included § 19's procedural rules with good reason. "No statute yet known pursues its stated purpose at all costs," *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (alterations and internal quotation marks omitted), and § 19 prevents the Commission from imposing significant monetary burdens simply by bringing a lawsuit in federal court. Instead, § 19 requires the Commission either to promulgate rules that define unlawful practices *ex ante*, or first to prosecute a wrongdoer in an administrative adjudication that culminates in a cease and desist order. Indeed, the very same statute that included § 19 significantly expanded both the Commission's rulemaking authority and its authority to seek civil penalties through § 5's cease-and-desist procedures. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, tit. II, §§ 202, 205, Pub. L. No. 93-637, 88 Stat. 2183, 2193, 2200 (1975) (codified as amended 15 U.S.C. §§ 45, 57a). Our circuit's flawed interpretation of § 13(b) in *Commerce Planet* therefore wrongly allows the Commission to avoid the administrative processes that Congress directed it to follow.

## 2

*Commerce Planet*'s attempt to reconcile its interpretation of § 13(b) with § 19 is entirely unpersuasive. The decision suggests that § 19 "precludes a court from awarding *damages*" under § 13(b), but "does not eliminate the court's inherent equitable power to order payment of *restitution*." 815 F.3d at 599 (emphasis added). But *Commerce Planet*'s interpretation of § 13(b) fails to give unique effect to the series of remedies *besides* damages that § 19 authorizes. Specifically, § 19 expressly allows federal courts to impose certain equitable remedies like "refund of money or return of property" and the "rescission or

reformation of contracts." 15 U.S.C. § 57b(b); *see* 1 D. Dobbs, § 4.3(1), at 587 (characterizing "rescission in equity" and "reformation of instruments" as "important equitable remedies"); Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 555–58 (2016) (same). According to *Commerce Planet*, however, these very same remedies were *already available* under § 13(b) when Congress subsequently enacted § 19.[1] Because *Commerce Planet*'s interpretation renders § 19 almost entirely redundant, it violates the "cardinal rule that, if possible, effect shall be given to every clause and part [of] a statute." *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932).

## II

I would end the inquiry here, for "[w]hen the words of a statute are unambiguous," the "judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (internal quotation marks omitted). But even assuming *arguendo* that the word "injunction" authorizes "equitable relief," that still does not answer the question.

The Supreme Court has held that statutes authorizing equitable relief limit federal courts only "to those categories

---

[1] Congress passed § 13(b) in 1973 and § 19 in 1975. *See* Trans-Alaska Pipeline Authorization Act, § 408(F), Pub. L. No. 93-153, 87 Stat. 576, 592 (1973) (codified as amended 15 U.S.C. § 53(b)); Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, tit. II, § 206, Pub. L. No. 93-637, 88 Stat. 2183, 2193 (1975) (codified as amended 15 U.S.C. § 57b); *see also* Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act: Good Intentions or Congressional Intentions*, 41 Am. U. L. Rev. 1139 (1992) (reviewing the legislative history of §§ 13(b) and 19).

of relief that were *typically* available in equity during the days of the divided bench." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657 (2016) (internal quotation marks omitted).[2] And as the Supreme Court has noted, "not all relief falling under the rubric of restitution is available in equity." *Great-West*, 534 U.S. at 212; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4, cmt. a (2011) ("The most widespread error is the assertion that a claim in restitution or unjust enrichment is by its nature equitable rather than legal."). In this case, because restitution under § 13(b) is not a form of equitable relief, I would conclude that we lack the authority to impose it.

## A

Under the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), restitution under § 13(b) would appear to be a penalty—not a form of equitable relief. In *Kokesh*, the Court held that SEC disgorgement, which it described as "a form of restitution measured by the defendant's wrongful gain," is a *penalty*. *Id.* at 1640 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a, at 204 (2011)). The Court described three characteristics that render disgorgement a penalty. First, it "is imposed by the courts as a consequence for violating . . .

---

[2] These cases have arisen because the Court must interpret ERISA's authorization of "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). *See generally* Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1014–23 (2015) (discussing the Court's use of history to demarcate equitable and legal remedies). But "statutes addressing the same subject matter" should be construed *in pari materia*, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315 (2006), so the Court's analysis in these ERISA cases should apply whenever we must determine which equitable remedies a statute authorizes.

public laws." *Id.* at 1643. Second, disgorgement is "punitive" rather than "remedial." *Id.* at 1644. With respect to this second characteristic, the Court elaborated that it is "ordered without consideration of a defendant's expenses that reduced the amount of illegal profit," so it "does not simply restore the status quo [but] leaves the defendant worse off." *Id.* at 1644–45. Third, disgorgement is "not compensatory" because some "funds are dispersed [sic] to the United States Treasury." *Id.* at 1644.

Restitution under § 13(b) shares each of these three characteristics with SEC disgorgement. First, in *Commerce Planet*, we noted that the Commission sought "to enforce a regulatory statute like § 13(b)," rather than to resolve a "private controversy." 815 F.3d at 602 (internal quotation marks omitted). And like suits for disgorgement in *Kokesh*, suits under § 13(b) "may proceed even if victims do not support or are not parties to the prosecution." *Kokesh*, 137 S. Ct. at 1643. Second, restitution under § 13(b) is "punitive" rather than "remedial." *Id.* at 1643–44. *Commerce Planet* holds that the wrongdoer's unjust gains must be measured by "net revenues" rather than "net profits." 815 F.3d at 603. Thus, restitution under § 13(b)—just like SEC disgorgement—"does not simply restore the status quo [but] leaves the defendant worse off." *Kokesh*, 137 S. Ct. at 1645. Third, it is not compensatory. Funds can be paid to victims, but they need not be. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 n.34 (1994). In this case, for instance, the Commission was instructed to give refunds to consumers, then to use any remaining money in a way "reasonably related to the Defendants' practices alleged in the complaint," then to deposit the balance in "the U.S. Treasury as disgorgement."

Restitution under § 13(b) therefore "bears all the hallmarks of a penalty." *Kokesh*, 137 S. Ct. at 1644. As the Supreme Court has already stated, "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Tull v. United States*, 481 U.S. 412, 422 (1987). Because penalties were not "available in equity during the days of the divided bench," *Montanile*, 136 S. Ct. at 657 (internal quotation marks omitted), we should not be able to impose such penalty here—even if we (wrongly) assume that § 13(b)'s use of "injunction" authorizes "equitable relief."

## B

Nor does restitution under § 13(b) have much resemblance to equitable forms of restitution. Historically, courts sitting in equity could impose a series of distinct restitutionary remedies, including the "constructive trust," the "equitable lien," "subrogation," "accounting for profits," "rescission in equity," and "reformation of instruments." 1 Dobbs, § 4.3(1), at 587; *see also* Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553–57 (2016) (similar). The general thread connecting these remedies was that they did not "impose *personal liability* on the defendant, but . . . restore[d] to the plaintiff *particular* funds or property in the defendant's possession." *Great-West*, 534 U.S. at 214 (emphasis added). The constructive trust, for instance, is "only used when the defendant has a legally recognized right in a particular asset"—e.g., a "trademark" or a "fund of money like a bank account." 1 Dobbs, § 4.3(2), at 591. But if such property is "dissipated," then a plaintiff may not "enforce a constructive trust of or an equitable lien upon other property of the defendant." *Great-West*, 534 U.S. 213–14 (quoting Restatement of Restitution § 215, cmt. a, at 867 (1937)) (brackets omitted).

*Commerce Planet*, however, refused to limit restitution under § 13(b) to the recovery of "identifiable assets in the defendant's possession." 815 F.3d at 601. But without such a tracing requirement, the remedy authorized by *Commerce Planet* loses its resemblance to the traditional forms of equitable restitution. In this case, for instance, the Commission's complaint makes no effort to identify a specific fund that the defendant wrongfully obtained. Therefore, the requested relief is indistinguishable from a request "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money"— essentially an "action[] at law." *Great-West*, 534 U.S. at 213 (quoting Restatement of Restitution § 160, cmt. a, at 641–42 (1937)).

The only traditional equitable remedy to which restitution under § 13(b) is plausibly analogous is the "accounting for profits." Such remedy "order[s] an inquiry into the defendant's handling of money or property, usually to ascertain the defendant's gains so they may be paid to . . . the plaintiff." Bray, *The System of Equitable Remedies*, *supra*, at 553; *see also Great-West*, 534 U.S. at 214 n.2 (discussing accounting for profits). An accounting for profits also dispenses with the requirement that the plaintiff "seek a particular *res* or fund of money." 1 Dobbs, § 4.3(1), at 588. Nevertheless, restitution under § 13(b) is still inapposite. Generally, a suit for an accounting was proper only if (1) "the legal remedy was inadequate because of the complexity of the accounts" or (2) "there was a pre-existing equitable duty to account" because of some fiduciary relationship. 1 Dobbs, § 4.3(5), at 609; *see also* 4 S. Symons, *Pomeroy's Equity Jurisprudence* § 1421, at 1077–78 (5th ed. 1941). Neither is true here: the borrowers defrauded by Tucker could establish precisely how much they lost simply by producing bank statements, and the defendant was not in

a "fiduciary relationship" with such borrowers. More fundamentally, however, the Commission cannot possibly claim that it seeks to recover "monies owed by the fiduciary or other wrongdoer . . . which in equity and good conscience belong[] to the *plaintiff*"—here, the Commission. 1 Dobbs, § 4.3(b), at 608 (emphasis added). In sum, restitution under § 13(b) bears little resemblance to historically available forms of equitable relief, and therefore we should lack the authority to impose it.

## C

*Commerce Planet* wholly avoided the historical analysis required by cases like *Great-West* and *Montanile*. Relying on the Supreme Court's decision in *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946), we reasoned that § 13(b)'s use of the word "injunction" invoked the "the court's equity jurisdiction." 815 F.3d at 598. Such equity jurisdiction, we continued, brought with it "all the inherent equitable powers of the District Court" to afford "complete rather than truncated justice." *Id.* at 598–99 (internal quotation marks omitted). According to *Commerce Planet*, then, § 13(b) granted a broader set of powers than what is authorized in statutes (like ERISA) that use the phrase "other appropriate equitable relief." *Id.* at 602. Thus, we concluded that the "interpretive constraints" that guided the Supreme Court in cases like *Great-West* and *Montanile* did not control our construction of § 13(b). *Id.*

But such reasoning conflicts with the Supreme Court's repeated admonitions that the equitable powers of federal courts must be hemmed in by tradition. For instance, in *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, the Court interpreted the scope of the equitable jurisdiction of the federal courts under the Judiciary Act of 1789. 527 U.S. 308 (1999). There, the Supreme Court squarely

rejected the dissenting Justices' argument that the "grand aims of equity" allowed "federal courts [to] rely on their flexible jurisdiction in equity to protect all rights and do justice to all concerned." *Id.* at 342 (Ginsburg, J., dissenting) (internal quotation marks omitted). In "the federal system," the majority reasoned, "that flexibility is confined within the broad boundaries of traditional equitable relief." *Id.* at 322. Indeed, the Court has reiterated similar concerns in more recent cases. *E.g.*, *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) ("Relief in redistricting cases is fashioned in the light of well-known principles of equity." (internal quotation marks omitted)); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) ("[Equitable] discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."). Such cases show that we may not simply incant "equity" and thereby conjure the boundless power to afford "complete rather than truncated justice."

## III

I acknowledge that several other federal courts have agreed with our circuit's interpretation of § 13(b), but their numbers do not persuade me that they are correct on the law, especially in light of *Kokesh*. The only decisions that engage with the issue at any length rely on the same faulty reasoning as *Commerce Planet*. *See FTC v. Ross*, 743 F.3d 886, 890–92 (4th Cir. 2014); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468–70 (11th Cir. 1996); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314–15 (8th Cir. 1991); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571–72 (7th Cir. 1989).[3] But none of these decisions cogently explains how

---

[3] The remaining decisions uncritically adopt the analysis of the other federal courts. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365

restitution under § 13(b) fits with § 19. None undertakes the historical analysis that *Montanile* and *Great-West* seem to require. And in any event, the Court's decision in *Kokesh*—which casts serious doubt on restitution's equitable pedigree—postdates every single one of them. These past errors, even if common, do not justify our continued disregard of the statute's text and the Supreme Court's related precedent.

## IV

Just last year, Justice Kennedy explained in *Ziglar v. Abbasi* that the Supreme Court once "followed a different approach to recognizing implied causes of action than it follows now." 137 S. Ct. 1843, 1855 (2017). Under this "*ancien regime*," the Court described, it was assumed "to be a proper judicial function to provide such remedies as [were] necessary to make effective a statute's purpose." *Id.* (internal quotation marks omitted). Since those days, however, the Court has "adopted a far more cautious course before finding implied causes of action." *Id.* at 1855. Under *Ziglar*, if "a party seeks to assert an implied cause of action under the Constitution itself" or "under a federal statute, separation-of-powers principles are or should be central to the analysis."

---

(2d Cir. 2011); *FTC v. Magazine Sols., LLC*, 432 F. App'x 155, 158 n.2 (3d Cir. 2011) (unpublished); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005). And though the Fifth Circuit reasoned that § 13(b) invoked the district court's "inherent equitable jurisdiction," the actual remedy in the case was an order to place assets into an escrow account "to preserve the status quo" and "assure the possibility of complete relief following administrative adjudication." *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 716–21 (5th Cir. 1982). Such an order is quite unlike the order to pay a sum of money as restitution, so it says little about the question here.

*Id.* at 1857. So too here, the principle that must guide our analysis is that Congress—not the courts—should dictate rights and remedies in our federal system. *See id.* ("The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? The answer most often will be Congress." (internal quotation marks and citation omitted)); *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create . . . a private remedy.").

Heedless of such instruction, we have implausibly construed the word "injunction" in § 13(b) to authorize the extensive power to order defendants to repay ill-gotten gains—never mind that such interpretation makes nonsense out of § 19, and never mind that it ignores the Court's statements that our equitable powers must be hemmed in by tradition. I submit that our interpretation of § 13(b) is thus an impermissible exercise of judicial creativity, and it contravenes the basic separation-of-powers principle that leaves to Congress the power to authorize (or to withhold) rights and remedies. Our decision in *Commerce Planet* is therefore a relic of that *ancien regime* that the Court over the last few decades has expressly and repeatedly repudiated.

We should rehear this case en banc to revisit *Commerce Planet* and its predecessors.

BEA, Circuit Judge, specially concurring:

I concur in the opinion because our precedent[1] compels me to, but I write separately to acknowledge that the question whether something is "likely to deceive" is inherently factual and should not be decided at the summary judgment stage.

Summary judgment is proper only when there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute of a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In other words, in this case, to affirm the district court's grant of summary judgment, we must conclude from the proofs presented that no reasonable juror could find other than that a reasonable consumer would likely be deceived by the Loan Note. This is difficult to do when the whole of the Loan Note is read. It is undisputed that a careful reading of the Loan Note and its fine print reveals the automatic renewal feature, whereby borrowers' loans would be automatically renewed unless they navigated to a link sent to their email and chose to pay their total balance. Because the Loan Note includes truthful disclosures, we can say it is "likely to deceive" as a matter of law only by positing two scenarios: (1) it is unreasonable as a matter of law to expect the average consumer to read all the words of the Loan Note, including the fine print, or (2) as a matter of law, it is unreasonable to expect the average consumer to understand all the words of the Loan Note in the manner in which they are displayed.

---

[1] *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

As to the first point, I know of no authority that says consumers need not read the fine print of their contracts; such a holding would certainly imperil the validity of many insurance contracts.  And as to the second point, to say it is unreasonable to expect the average consumer to understand the words of the Loan Note in the manner in which they are displayed, we would have to recognize either that the three judges of this panel are better text readers than is the average consumer or that judges are not average consumers. I don't know of any authority for recognizing either assertion.

Indeed, we, a panel of three judges, have read and understood the terms of the Loan Note.  We have not been deceived.  Yet, we hold that the Loan Note is likely to deceive the average consumer *as a matter of law*.

Under this court's precedent, I accept that we may decide that the Loan Note is deceptive as a matter of law under § 5 of the FTC Act.  *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).  What is determinative under *Cyberspace* is whether the "net impression" of the questioned text is likely to deceive.  *Id.*  This rule seems to require a judge consciously to blur his eyes as to the actual print to gain an "impression," or perhaps to see the print as French impressionist masters of the late Nineteenth Century saw objects.  But whether we are guided by impressions from words or words themselves, *Cyberspace* defies logic when the words are actually understood by the judge to state something other than the "net impression" that is claimed "likely to deceive."

If something is "likely to deceive," it means it will more probably than not deceive.  To predict what is "likely" to happen is to predict an event.  An event is a fact, yet to occur. It did not occur when we read the Loan Note.  I am at a loss to understand how we can find it would ineluctably occur in

the case of an average reasonable consumer. It seems the event may occur or may not occur. If so, whether it occurs in every case can be disputed. Disputed factual questions are reserved for juries, not for district judges acting alone nor for a panel of appellate judges. Thus, while our precedent obliges me to concur in this case, I think our precedent is wrong. Courts should reserve questions such as whether the Loan Note is "likely to deceive" for the trier of fact.