UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | Case No.: 2:12-cv-00536-GMN-VCF |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| AMG SERVICES, INC., *et al.*, | ) | |
| Defendants. | ) | |

Pending before the Court is the Motion for Discharge of Monitor, (ECF No. 1365), filed by court-appointed monitor Thomas W. McNamara ("the Monitor"). Monitor Entities[1] AMG Capital Management, LLC; Level 5 Motorsports, LLC; Black Creek Capital Corporation; Broadmoor Capital Partners, LLC; Scott A. Tucker; and Park 296, LLC (collectively "Monitor Entities") and Relief Defendant Kim Tucker[2] filed Responses, (ECF Nos. 1371, 1373, and 1382). The Monitor filed a Reply, (ECF No. 1377).

---

[1] The Monitor Order defines "Monitor Entities" as: (a) the corporate defendants and corporate relief defendant: AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LLC, Park 269, LLC; and their successors, assigns, affiliates, and subsidiaries; (b) BA Services LLC, C5 Capital LLC, DF Services Corp., DFTW Consolidated [UC] LLC, Impact BP LLC, Level 5 Apparel LLC, Level 5 Capital Partners LLC, Level 5 Eyewear LLC, Level 5 Scientific LLC, NM Service Corp. (f/k/a/ National Money Service), PSB Services LLC, Real Estate Capital LLC (f/k/a/ Rehab Capital I, LLC), Sentient Technologies, ST Capital LLC, Westfund LLC, Eclipse Renewables Holdings LLC, Scott Tucker Declaration of Trust, dated February 20, 2015, West Race Cars, LLC, and Level 5 Management LLC, and their successors, assigns, affiliates, and subsidiaries; and (c) any other entity identified by the Monitor that, upon motion granted by the Court, is found to be a proper Monitor Entity because, for example, such entity holds Assets of a Defendant or existing Monitor Entity, or is owned or controlled by a Defendant or Monitor Entity. (Monitor Order 3:17–4:6, ECF No. 1099).

[2] Kim Tucker is Defendant Scott Tucker's ex-wife.

Also pending before the Court are the Monitor's Motions for Attorney Fees, (ECF Nos. 1366 and 1378). The Monitor Entities and Kim Tucker filed Responses, (ECF Nos. 1371, 1373, and 1382), and the Monitor filed a Reply, (ECF No. 1377).

Also pending before the Court is Paul C. Ray's Motion to Enforce Attorney's Lien, (ECF No. 1386). The Monitor, the Federal Trade Commission ("FTC"), the United States, and Kim Tucker filed Responses, (ECF Nos. 1387, 1388, 1389, and 1391). Paul C. Ray filed a Reply, (ECF No. 1393).

Also pending before the Court is the Motion to Vacate Judgment, (ECF No. 1341), filed by David Feingold, Dylan, Jagger Investment Co., Inc., Homeowners Realty, LLC, UMR Building, LLC, and United Material Recovery, LLC (collectively, "Feingold Parties"). Kim Tucker filed a Response, (ECF No. 1359).

For the reasons discussed below, the Court **GRANTS** the Monitor's Motion for Discharge of Monitor, **GRANTS** the Monitor's Motions for Attorney Fees, **DENIES** Paul C. Ray's Motion to Enforce Attorney Lien, and **DENIES** the Feingold Parties' Motion to Vacate Judgment.

I.  **BACKGROUND**

This action was brought by the FTC, asserting that the "high-fee, short-term payday loans" offered by former Defendants AMG Services, Inc., SFS, Inc., Red Cedar Services, Inc., and MNE Services, Inc. violated section 5 of the Federal Trade Commission Act of 1914, 15 § U.S.C. 45(a)(1), the Truth in Lending Act of 1968, 15 U.S.C. § 1601(a), and Regulation Z, 12 C.F.R. § 1026(a). (Am. Compl. 15:1–20:6, ECF No. 386). Defendant Scott Tucker controlled, founded, or was president of a host of short-term payday loan marketing and servicing companies, including, inter alia, National Money Service, Inc., CLK Management LLC, and Universal Management Services, Inc. (Exs. 1–2, 4–5, 14 to Singhvi Decl., ECF Nos. 908-1–2, 4–5, 14).

On September 20, 2019, the Court granted summary judgement in favor of the FTC, awarding both injunctive and monetary equitable relief based on the long-held Ninth Circuit precedent that Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), permits a panoply of equitable remedies, including monetary equitable relief in the form of restitution and disgorgement. *See Pantron I Corp.*, 33 F.3d at 1103 n.34; *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–08 (9th Cir. 1993); *H.N. Singer*, 668 F.2d at 1113; (Order 19:22–26:4, ECF No. 1057).  Defendants appealed the FTC's monetary equitable relief award. (Notice of Appeal, ECF No. 1097).

The Ninth Circuit originally affirmed this Court's Order, but the Supreme Court reversed, holding that "[section] 13(b) as currently written does not grant the [FTC] authority to obtain equitable monetary relief." *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341, 1352 (2021); *FTC v. AMG Captial Management, LLC*, 910 F.3d 417, 426–27 (9th Cir. 2018); *FTC v. AMG Services, Inc.*, No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416, at *11–13 (D. Nev. Sept. 30, 2016); (Order, ECF No. 1057).  The Ninth Circuit subsequently vacated its affirmation of the FTC's monetary award, reversing this Court's Order and remanding for further proceedings consistent with the Supreme Court's opinion. *See FTC v. AMG Capital Management, LLC*, 998 F.3d 897, 897–98 (9th Cir. 2021).  On remand, the Court amended its original Order to deny the FTC's request for equitable monetary relief. (Second Am. Order 22:18–20, ECF No. 1338).

During the pendency of Defendants' appeal the parties jointly moved to (1) stay the FTC's collection of the monetary relief award; (2) freeze Defendants' assets; and (3) appoint the Monitor to "oversee the asset freeze and the orderly sale of certain assets the Tucker Defendants[3] have agreed to liquidate while the appeal is pending." (*See* Order Appointing

---

[3] The Monitor Order defines "Tucker Defendants" as: Scott A. Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, Broadmoor Capital Partners, LLC, and their successors,

Monitor ("Monitor Order") 1:14–15, ECF No. 1099). The Monitor's purpose was to "preserve the status quo during the pendency of the appeal, and to facilitate the liquidation of assets that absent such liquidation would waste in value during the pendency of the appeal." (*Id.* 2:6–8). Additionally, the Monitor initiated numerous lawsuits and settlement negotiations to recover debts owed to Scott Tucker and the Monitor Entities and clawback fraudulent transfers or ill-gotten gains. (Monitor's Final Report 9:9–13, ECF No. 1364). As a result of the Monitor's efforts, the Monitorship Estate currently holds $14,452,645.57 in net cash. (*See* Final Status Report 20:10–12, ECF No. 1364).

The parties agree that the Monitor's authority to act on behalf of the Monitorship Estate ended with the conclusion of the appeal. Accordingly, the Court's Second Amended Order, (ECF No. 1338), provided instructions for the orderly wind-down of the Monitorship Estate. Most of the assets in the Monitorship Estate, including the net cash, are subject to a Preliminary Order of Forfeiture ("POOF") in the District Court for the Southern District of New York ("SDNY") in relation to Scott Tucker's criminal money judgment of $3.5 billion. The POOF states: "Upon the entry of this Preliminary Order of Forfeiture of Substitute Assets, to the extent the Substitute Assets are ordered released in the FTC Action or the FTC Monitor is terminated prior to entry of the Final Order of Forfeiture, the United States (or a designee) is hereby authorized to take possession of the Substitute Assets and to keep them in its secure, custody and control." (*See* POOF, Ex. A to Resp., ECF No. 1371-1). The Final Order of Forfeiture for this POOF has not yet been entered.

//
//
//

---

entities, assigns, affiliates, and subsidiaries. (Order Appointing Monitor ("Monitor Order") 4:20–22, ECF No.1099).

## II. DISCUSSION

### A. Monitor's Motion for Discharge of Monitor

In the Second Amended Order, the Court began the wind-down of the Monitorship Estate by ordering the Monitor to file his final report and accounting, consistent with the Monitor Order, (ECF No. 1099). (Sec. Am. Order 23:11–13, 35:3–5, ECF No. 1338). To dispose of the non-forfeited Monitorship assets not covered by SDNY's POOF, the Court also ordered the Monitor to assign his interest in any outstanding judgments "to the entity on whose behalf the Monitor was acting when he pursued each judgment." (Order, 9:6–9, ECF No. 1379).

On November 23, 2021, the Monitor filed his final status report and accounting, along with his Motion for Discharge of Monitor. (*See* Final Status Report, ECF No. 1364); (Motion for Discharge of Monitor, ECF No. 1365). On January 14, 2022, the Monitor also confirmed that he effectuated all of the appropriate assignments for the remaining outstanding judgments. (Notice, ECF No. 1392). After a review of the Monitor's final report and accounting, the Court finds that discharging the Monitor is appropriate.

Kim Tucker opposes the discharge of the Monitor, arguing that the Monitor's application for discharge is "premature" and should be postponed until a Final Order of Forfeiture has been entered in the SDNY case. (Resp. 1:19–23, ECF No. 1371). However, the Court finds Ms. Tucker's argument to be without merit because the POOF itself expressly anticipates the termination of the Monitorship prior to entry of the Final Order of Forfeiture (*See* POOF, Ex. A to Resp., ECF No. 1371-1) ("Upon the entry of this Preliminary Order of Forfeiture of Substitute Assets, to the extent the Substitute Assets are ordered released in the FTC Action or the FTC Monitor is terminated prior to entry of the Final Order of Forfeiture, the United States (or a designee) is hereby authorized to take possession of the Substitute Assets and to keep them in its secure, custody and control."). Therefore, the Court finds no

1  reason why the ongoing litigation in the SDNY case should further delay the discharge of the
2  Monitor.
3      Ms. Tucker also claims that the Monitor's Final Report "raises serious questions about
4  the collection and disposition of the assets." (Resp. 4:20–22).  Ms. Tucker's main argument is
5  that the amounts reported in the Monitor's final accounting differ from the amounts reported in
6  SDNY's POOF. (*Id.* 4:23–7:16).  For example, the Monitor reports that the Monitorship
7  account currently holds $14,452,645.57 in net cash, but SDNY's POOF orders the forfeiture of
8  at least $17,339,322.13 coming from the Monitorship Estate. (*Id.* 4:23–5:6).  However, the
9  Monitor did not author SDNY's POOF or produce SDNY's accounting of the Monitorship
10 Estate, and thus any discrepancies between the POOF and the Monitor's own final accounting
11 should be disputed in the SDNY case. (Reply 4:24–5:17, ECF No. 1377).  Further, the POOF's
12 calculation appears to only account for the total amount *collected* by the Monitor, and neglects
13 to account for the authorized *disbursements* made by the Monitor for Monitorship expenses,
14 such operational costs and voided settlements. (*See id.*).  The Monitor points out that, as of
15 November 15, 2021, the total amount collected was $17,347,144.93, but after authorized
16 disbursements, only $14,452,645.57 remained. (*Id.* 5:3–12).  The POOF's reported amount of
17 $17,339,322.13, entered on June 9, 2021, presents only a $7,822.80 discrepancy from the
18 Monitor's collection calculation, and that discrepancy can be explained by the extra interest
19 earned by the Monitorship Estate in the months between June 2021 and November 2021. (*Id.*
20 5:3–10).
21     Accordingly, the Monitor's Final Report and Accounting is accepted and approved.
22 Since the Monitor has successfully completed all of the duties required by the Monitor Order,
23 his Motion for Discharge of Monitor is granted.
24 //
25 //

### B. Monitor's Motions for Attorney Fees

The Monitor Order authorizes the Monitor, and all personnel hired by the Monitor, to request payment for "reasonable compensation for the performance of duties pursuant to [the Monitor Order], and for the cost of actual out-of-pocket expenses incurred by them, for the Assets now held by or in the possession or control of, or which may be received by, the Defendants or Monitorship Entities." (Monitor Order § XV, ECF No. 1099). The Monitor has requested and received reasonable compensation on eight prior occasions throughout his management of the Monitorship Estate.

The Monitor now submits his final requests for reasonable compensation totaling $164,301.39, which covers the timeframe between September 1, 2020, and November 15, 2021. (McNamara Decl. ¶¶ 6–17, ECF No. 1365-1). The Monitor also filed a supplemental request for fees totaling $13,433.00 to cover the costs incurred by the Monitor in defending his Motions for Discharge of Monitor and Attorney Fees. (Suppl. Mot. Attorney Fees 1:21–24, 2:18–22, ECF No. 1378).

Ms. Tucker objects to the Monitor's final fee application by claiming that the Court should not authorize payment of any fees coming out of the Monitorship Estate because all of the Monitorship assets are currently subject to SDNY's POOF. (Resp. 2:20–4:16, ECF No. 1371). Ms. Tucker argues that the Court should defer ruling on the Monitor's final fee application until the SDNY case determines how the assets in the Monitorship Estate should be distributed. (*Id.* 4:13–16). However, SDNY's POOF authorizes the United States to take control of the Monitorship Assets only "to the extent . . . ordered released" by this Court. (*See* POOF, Ex. A to Resp., ECF No. 1371-1). Granting the Monitor's final fee application does not create a conflict with SDNY's POOF, because the Monitorship is still subject to this Court's authority until its assets are released. This is especially true when considering that the Monitor Order expressly permits the Monitor to be paid his fees directly from the Monitorship Estate.

The Monitor may collect his fees, accept his discharge, and release the remaining Monitorship assets to the United States in accordance with SDNY's POOF.

Accordingly, the Court has reviewed the Monitor's declarations and supporting documents with respect to the final fee application and supplemental fee application and approves the following payments as reasonable compensation: $46,702.50 fees and $972.21 expenses of the Monitor and staff to be paid to TWM Receiverships Inc. dba Regulatory Resolutions; $111,331.50 fees and $1,434.33 expenses of the Monitor's counsel, McNamara Smith LLP; $1,323.85 fees and $600.00 expenses of the Monitor's local counsel in Nevada, Ballard Spahr LLP; and $15,370.00 fees of the Monitor's counsel in Overland Park, Kansas, Geiger Prell, LLC.

### C. Paul C. Ray's Motion to Enforce Attorney Lien

Paul C. Ray represented the Tucker Defendants during the appeals process and helped to secure the Supreme Court's reversal of the Ninth Circuit's long-standing precedent allowing the FTC to collect civil restitution judgments. (Ray Decl. ¶¶ 2–7 ECF No. 1386-1). The Tucker Defendants retained Mr. Ray on a contingent fee basis, promising him payment upon recovery of their assets. (*Id.* ¶ 5). On August 23, 2021, Mr. Ray filed a petition in the SDNY case asserting his $1,300,000 interest in the Monitorship Estate. (*See USA v. Tucker, et al.*, Case No. 1:16-cr-00091-PKC (S.D.N.Y. Aug. 2021), ECF No. 476). Four months later, on December 30, 2021, Mr. Ray filed his Motion to Enforce Attorney's Lien in this case, which asks the Court to award him $1,300,000 in attorney's fees (plus costs) out of the assets held in the Monitorship Estate and other assets worth $10,700,000 purportedly controlled by the FTC itself. (Mot. Enforce Attorney's Lien 1:25–2:5, 10:2–8 ECF No. 1386).

The proper venue to establish Mr. Ray's interest in the Monitorship Estate is the court in the SDNY case. SDNY's POOF covers the assets in the Monitorship Estate, and therefore, the SDNY court is the appropriate court to determine the interests and priorities in the

Monitorships Estate, aside from the Monitor's own interest, which is governed by the Monitor Order under the authority of this Court. Further, Mr. Ray originally filed his $1,300,000 contingency fee claim in the SDNY case; this Court declines to simultaneously attempt to adjudicate the same claim. Accordingly, Mr. Ray's Motion is denied, but without prejudice and with leave to refile with regards to any of the remaining assets allegedly held by the FTC, after the SDNY case has decided his claim.

### D. Feingold Parties' Motion to Vacate Judgment

On March 3, 2018, the Feingold Parties entered into a settlement agreement with the Monitor as a result of the Monitor's efforts to liquidate and preserve the Tucker Defendant's assets during the pendency of the appeal. (Mot. Vacate J. ¶ 3, ECF No. 1341). Under the terms of the settlement agreement, the Feingold Parties were to pay the Monitor $3,100,000 immediately and $2,600,000 over time. (Settlement Agreement ¶ 4t, Ex. 1 to Joint Mot. Approve Settlement, ECF No. 1188-1). The settlement agreement expressly conditioned its validity on the Supreme Court's affirmance of the FTC's monetary award. (*Id.* ¶ 3). The settlement agreement provides:

> The validity, enforceability and effectiveness of this Settlement Agreement, all monetary transfers to the Monitor and/or Monitorship Estate, and all assignments of membership interests and security agreements granted to the Monitor and/or Monitorship estate, are conditioned on the Judgment becoming final for all material purposes following the completion of appellate proceedings. In other words, although the Agreement will be binding and enforceable upon execution, it will become voidable by the Feingold Parties if the Judgment is reversed in a material way on appeal, as defined below.

(*Id.*). Nonetheless, the settlement agreement also required the Feingold Parties to continue making payments during the pendency of the appeal, which they ultimately refused to do. (*Id.*). As result, the Court entered an order enforcing the settlement agreement as a Judgment, stating "the Court accordingly enters Judgment in favor of the Monitor and against the Feingold

Parties, jointly and severally, in the amount of $2,416,666.36," (Order 3:5–18, ECF No. 1290); (J., ECF No. 1291).

In the wake of the Supreme Court's decision, the Feingold Parties now seek to vacate the Judgment under the terms of the settlement agreement. (Mot. Vacate J. ¶ 12, ECF No. 1341). In response, Ms. Tucker argues that, although the settlement agreement is voidable based on the Supreme Court's reversal, the money currently owed by the Feingold Parties is governed by the Judgment, which is independent from the settlement agreement. (Resp. 5:13–6:27, ECF No. 1359). The Court agrees. The Court entered Judgment against the Feingold Parties in the amount of $2,416,666.36, and that Judgment was not expressly conditioned on the terms of the settlement agreement or the Supreme Court's decision. Further, the Court entered Judgment based on the Feingold Parties' own breach of their settlement agreement, and therefore, any potential vacatur is unrelated to the Supreme Court's decision regarding the FTC's judgment. Had the Feingold Parties complied with the settlement agreement, their remaining obligations to pay would have likely been extinguished by the Monitor along with the other settlement agreements expressly conditioned on the outcome of the Supreme Court case. (*See* Status Report 4:15–22 ECF No. 1333) (acknowledging that the Supreme Court's decision rendered a settlement void). However, because the Feingold Parties breached the settlement agreement and had an independent Judgment entered against them, they can no longer rely on the settlement agreement's terms for relief. As such, the Feingold Parties' Motion is denied.

## III. CONCLUSION

**IT IS HEREBY ORDERED** that the Monitor's Motion for Discharge of Monitor, (ECF No. 1365) is **GRANTED** to the extent consistent with the following:

1. The Monitor's Final Report and Accounting, dated November 23, 2021, is hereby accepted and approved, and all acts, transactions, and actions taken by or on behalf

of the Monitor as disclosed in the pleadings filed with the Court in this matter are confirmed and approved as being in the best interest of the Monitorship Estate.

2. The Monitor is authorized to hold back a reserve of $10,000.00 for final administrative costs, e.g., preparation of the final QSF tax return and other Estate-closing expenses, which may be expended without further order of the Court, and after 120 days any unexpended funds from that reserve shall be disbursed to the United States of America or its designee.

3. Promptly following entry of this order, the Monitor shall transfer all remaining funds, after deductions for the fees and expenses approved in this Order the reserve approved above, to the United States of America or its designee pursuant to the Preliminary Order of Forfeiture as to Substitute Assets (SDNY Case No. 1:16-cr-00091-PKC (ECF No. 447)).

4. All assets not distributed or otherwise administered by the Monitor as of the closing of the Monitorship Estate are deemed abandoned. Abandoned assets may be destroyed or discarded, without regard to title or value, in the sole and absolute discretion of the Monitor.

5. Thomas W. McNamara is hereby discharged as Monitor.

6. Thomas W. McNamara is released and exonerated from all further duties, liabilities, and responsibilities as Monitor. Mr. McNamara and the professionals retained by him as Monitor shall have no personal liability to any person or entity for any action taken in good faith in connection with carrying out the Monitor's administration of this Monitorship Estate, and the exercise of any powers, duties, and responsibilities in connection therewith.[4]

---

[4] Ms. Tucker claims that the language of this discharge order is "broader than authorized by the applicable law." (Resp. 8:7–8, ECF No. 1371). The Court disagrees. The language to relieve the Monitor of liability, approve his conduct, and exonerate his bond is routinely used in receivership cases to secure the discharge of the receiver.

7. This Court shall retain jurisdiction over any and all matters relating to the Monitor, the Monitorship, and the Monitorship Estate, including any matters relating to the distribution of funds received by the Monitor in connection with his obligations as Monitor or otherwise received after the Monitorship is closed. To the extent any dispute arises concerning the Monitor's administration of the Monitorship Estate or to the extent any person or entity seeks to pursue or assert any claim or action against the Monitor or any agent, employee, member, officer, independent contractor, attorney, or representative of the Monitor, arising out of or related to this Monitorship, the Court shall retain jurisdiction to hear and resolve any such dispute or claim.

8. The Monitor's bond is exonerated.

9. The Monitorship is terminated.

**IT IS FURTHER ORDERED** that Monitor's Motions for Attorney Fees, (ECF Nos. 1366 and 1378) are **GRANTED** to the extent consistent with this Order.

**IT IS FURTHER ORDERED** that Paul C. Ray's Motion to Enforce Attorney's Lien, (ECF No. 1386), is **DENIED without prejudice**.

**IT IS FURTHER ORDERED** that the Feingold Parties' Motion to Vacate Judgment, (ECF No. 1341), is **DENIED**.

**DATED** this __24__ day of August, 2022.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT

---

(*See, e.g.*, *Federal Trade Commission v. Infusion Media, Inc., et al.*, Case No. 2:09-cv-01112-GMN-VCF (D. Nev.), ECF No. 131). (*See also* Reply 7:18–9:15, ECF No. 1377) (compiling cases).